Brian M. Holm (California State Bar No. 255691)
HOLM LAW GROUP, PC
171 Saxony Road, Suite 203
Encinitas, California 92024
p. 858.433.2001   f. 888.483.3323
brian@holmlawgroup.com

John J. O'Brien (California State Bar No. 253392)
THE O'BRIEN LAW FIRM, APLC
1804 Garnet Ave., Suite 408
San Diego, California 92109
p. 619.535.5151
john@theobrienlawfirm.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE NOS. 1 through 40, inclusive, individuals;<br><br>        Plaintiffs,<br><br>v.<br><br>MG FREESITES, LTD., dba "PORNHUB," a foreign entity; MINDGEEK S.A.R.L. a foreign entity; and MINDGEEK USA INCORPORATED, a Delaware corporation;<br><br>        Defendants. | Case No.: **'20 CV 2440 W    RBB**<br><br>**COMPLAINT FOR DAMAGES PURSUANT TO 18 U.S.C. § 1595**<br><br>DEMAND FOR JURY TRIAL |

Jane Doe Nos. 1 through 40 **(collectively "Plaintiffs")** hereby allege as follows:

### I.

### THE PARTIES

**a.    PLAINTIFFS**

        1.      Plaintiff Jane Doe No. 1 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

1
COMPLAINT

2.     Plaintiff Jane Doe No. 2 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

3.     Plaintiff Jane Doe No. 3 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

4.     Plaintiff Jane Doe No. 4 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

5.     Plaintiff Jane Doe No. 5 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

6.     Plaintiff Jane Doe No. 6 is a United States citizen who resided within this judicial district at all relevant times alleged herein.

7.     Plaintiff Jane Doe No. 7 is a United States citizen who resided within this judicial district when the actions occurred giving rise to her claims herein and now resides outside this judicial district.

8.     Plaintiff Jane Doe No. 8 is a United States citizen who resided within this judicial district when the actions occurred giving rise to her claims herein and now resides outside this judicial district.

9.     Plaintiff Jane Doe No. 9 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

10.    Plaintiff Jane Doe No. 10 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

11.    Plaintiff Jane Doe No. 11 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

12.    Plaintiff Jane Doe No. 12 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

13.    Plaintiff Jane Doe No. 13 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

14.    Plaintiff Jane Doe No. 14 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

15.     Plaintiff Jane Doe No. 15 is a United States citizen who resided within this judicial district when the actions occurred giving rise to her claims herein and now resides outside this judicial district.

16.     Plaintiff Jane Doe No. 16 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

17.     Plaintiff Jane Doe No. 17 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

18.     Plaintiff Jane Doe No. 18 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

19.     Plaintiff Jane Doe No. 19 is a citizen of Canada and resided outside of this judicial district at all relevant times alleged herein.

20.     Plaintiff Jane Doe No. 20 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

21.     Plaintiff Jane Doe No. 21 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

22.     Plaintiff Jane Doe No. 22 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

23.     Plaintiff Jane Doe No. 23 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

24.     Plaintiff Jane Doe No. 24 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

25.     Plaintiff Jane Doe No. 25 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

26.     Plaintiff Jane Doe No. 26 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

27.     Plaintiff Jane Doe No. 27 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

///

28.     Plaintiff Jane Doe No. 28 is a citizen of Canada and resided outside of this judicial district at all relevant times alleged herein.

29.     Plaintiff Jane Doe No. 29 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

30.     Plaintiff Jane Doe No. 30 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

31.     Plaintiff Jane Doe No. 31 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

32.     Plaintiff Jane Doe No. 32 is a United States citizen who resided within this judicial district at all relevant times alleged herein.

33.     Plaintiff Jane Doe No. 33 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

34.     Plaintiff Jane Doe No. 34 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

35.     Plaintiff Jane Doe No. 35 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

36.     Plaintiff Jane Doe No. 36 is a citizen of Canada and resided outside of this judicial district at all relevant times alleged herein.

37.     Plaintiff Jane Doe No. 37 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

38.     Plaintiff Jane Doe No. 38 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

39.     Plaintiff Jane Doe No. 39 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

40.     Plaintiff Jane Doe No. 40 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

///

///

b.    **DEFENDANTS**

41.    At all relevant times alleged herein, defendant MindGeek S.a.r.l. is a foreign entity (a Société à responsabilité limitée) conducting business throughout the United States, including within the Southern District of California.  MindGeek S.a.r.l., formerly known as ManWin, is the convergence of two large pornography companies, Mansef and InterTube.  Over the last decade, MindGeek S.a.r.l. went on an acquisition spree buying up its competition and now owns and operates over 100 pornographic websites, production companies, and brands.  MindGeek S.a.r.l. has, for all intents and purposes, monopolized the pornography industry, and is believed to own and/or control the majority of the pornography on the Internet, much of which it distributes for free, to any person with a web connection, regardless of age.  Although incorporated in Luxembourg, MindGeek S.a.r.l.'s principal place of business is Montreal, Canada, with satellite offices in, among other places, San Diego, Los Angeles, San Francisco, London, Bucharest (Romania), and Nicosia (Cyprus).

42.    At all relevant times alleged herein, defendant MG Freesites, Ltd. is a foreign entity incorporated in the Republic of Cyprus conducting business throughout the United States and California, including within the Southern District of California.  Upon information and belief, MG Freesites, Ltd. is a wholly owned subsidiary of MindGeek S.a.r.l, either directly or through intermediary companies that are also under the control of MindGeek S.a.r.l.  Upon information and belief, MG Freesites, Ltd. is predominantly under the control of and operated by directors, officers and employees working in MindGeek's offices in the United States and Canada, with little business operations being conducted within the Republic of Cyprus where MG Freesites, Ltd. is incorporated.

43.    Defendant MindGeek USA Incorporated is a corporation incorporated in the State of Delaware, with its principal place of business in Los Angeles, California.  Upon information and belief, MindGeek USA Incorporated is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also under the control of MindGeek S.a.r.l.

44.     MindGeek S.a.r.l., MG Freesites, Ltd. and MindGeek USA Incorporated, as well as all of these entities' subsidiary and sister companies, are collectively referred to as **"MindGeek"** or the **"Defendants"** herein.

45.     Upon information and belief, MindGeek has incorporated dozens of subsidiaries and sister companies around the world for the purpose of avoiding liabilities and to hide the identity of the entities and individuals behind its corporate actions.  Upon information and belief, MindGeek S.a.r.l and all other MindGeek entities operate as a single business enterprise solely dedicated to producing, distributing, and monetizing pornography on the Internet.  In doing all acts alleged herein, and as a business generally, MindGeek USA Incorporated, MindGeek S.a.r.l., MG Freesites, Ltd. and all of their subsidiary and sister companies were and are alter egos of one another.

46.     Upon information and belief, and in particular, the Defendants: (a) commingled their funds and other assets, failed to segregate funds between them, and have without authorization diverted corporate funds and assets for noncorporate uses; (b) treated each other's assets as their own; (c) issued shares of one other to themselves and third parties haphazardly and without authority; (d) held themselves out as being personally liable for the debts of each other; (e) failed to maintain minutes and corporate records, and confused the records of the separate entities; (f) used the same business locations and employed the same employees; (g) failed to adequately capitalize the entities; (h) used each other as a conduit for a single venture of themselves; (i) failed to maintain arm's length relationships among themselves; and (j) diverted assets without consideration from/to one another to the detriment of creditors, including Plaintiffs. Recognition of the privilege of separate existences between the Defendants would promote injustice, unfairness, and fraud.  Any separateness is to be disregarded.  As such, these defendants are jointly and severally liable in this action as alter egos.

47.     In doing all things alleged herein, Defendants were agents, servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees of each other in the acts and/or omissions herein alleged.  The Defendants

were acting within the course and scope of their authority as such agents, servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees and with the permission, authorization, consent, and ratification of each other.

## II.

## JURISDICTION AND VENUE

**a.  SUBJECT MATTER JURISDICTION**

48.    This Court has original subject matter jurisdiction over the private right of action for victims of sex trafficking under 18 U.S.C. § 1595(a).  See, *Id*. ("An individual may bring a civil action…in an appropriate district court of the United States…")

**b.  PERSONAL JURISDICTION**

49.    This Court has personal jurisdiction over all defendants.  As for MindGeek USA Incorporated, its domicile and principal place of business are in California.  Each of the three defendants has minimum contacts with California such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.  Defendants have purposefully availed themselves of California jurisdiction, there is a substantial nexus between Plaintiffs' claims and Defendants' California-based activities, and jurisdiction is fair.

50.    More specifically, and as set forth below in the description of "MindGeek's Tubesites," *infra*, by operating interactive commercial websites and transacting various forms of business related thereto in California (e.g., contracting with California residents and knowingly and repeatedly transmitting currency and computer files over the Internet), all of the Defendants purposefully availed themselves of doing business in California.  Among other things, the Defendants purposefully: (a) directed their activities at California residents; (b) derived benefit from their activities in California; (c) created a substantial connection with California; (d) engaged in significant activities within California; (e) created continuing obligations between themselves and residents of California; and (f) caused liability-producing acts and foreseeable consequences in California.

51.     Further, there exists personal jurisdiction as MindGeek S.a.r.l. and MG Freesites, Ltd. were and are agents, partners, alter egos, ratified the conduct, and have substantial control of and over forum-based MindGeek USA Incorporated.

52.     Finally, Defendants contracted and partnered with the forum-based perpetrators of the subject sex trafficking to split revenues that Defendants generated by marketing, selling and exploiting videos featuring victims of the GirlsDoPorn sex trafficking venture, *infra*.  Particularly, pursuant to its partnership with GirlsDoPorn as part of its "Viewshare Program" (*see, infra*), defendant MG Freesites, Ltd. made monthly payments to the forum-based sex traffickers representing GirlsDoPorn's share of revenues MG Freesites Ltd. received by marketing, selling and exploiting the victims' videos on MG Freesites, Ltd.'s websites through Mindgeek's Viewshare Program, discussed *infra*.

c.     **VENUE**

53.     Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (d) in that a substantial part of the events or omissions giving rise to the claims occurred in this district and the corporate defendants are subject to personal jurisdiction in this district. Particularly, the subject sex trafficking actions occurred in San Diego, California.  The perpetrators are currently in custody and being prosecuted for sex trafficking in this judicial district.  Further, MindGeek contracted and maintained a business partnership with the perpetrators of the subject sex trafficking within this judicial district and made payments to financial institutions within this judicial district as part of that relationship. MindGeek maintains an office situated in and conducts substantial business within this judicial district.  Finally, several plaintiffs reside within this judicial district.

### III.

### SUMMARY OF CLAIMS

54.     From 2007 until October 2019, Michael Pratt (**"Pratt"**), Matthew Wolfe (**"Wolfe"**), Douglas Wiederhold (**"Wiederhold"**), and Andre Garcia (**"Garcia"**) ran a

sex trafficking venture out of San Diego, California known as "GirlsDoPorn."[1]  For over a decade, GirlsDoPorn sex-trafficked hundreds of high school and college-aged women using fraud, coercion, and intimidation to get the young women to film pornographic videos under the false pretense that the videos would remain private, off the Internet, and never be seen in North America.  In reality, GirlsDoPorn intended to publish the videos on its subscription website, as well as to dozens of other heavily trafficked websites available to anyone with an Internet connection, as it had done with hundreds of its prior videos.  GirlsDoPorn (and MindGeek) knew the unconsented publication of victim's sex video would upend the victim's life.  Once published, GirlsDoPorn's victims were brutally harassed by peers and strangers, effectively turning them into pariahs in their own communities.  The victims were ostracized by friends and family, many lost their jobs, and some were expelled from college.  The relentless harassment caused all victims to become suicidal and some even attempted such.

55.    In June 2016, four victims filed an action in the Superior Court of California, County of San Diego **("San Diego Superior Court")** against GirlsDoPorn for, among other things, intentional misrepresentation, concealment, and misappropriation of likeness **("State Court Action")**.[2]  By November 2017, an additional eighteen victims had joined the State Court Action, for a total of twenty-two plaintiffs.  After nearly three years of extensive litigation, on August 19, 2019, the State Court Action proceeded to a bench trial before the Honorable Kevin A. Enright.  The victims' testimony was covered heavily by the media.

56.    On October 9, 2019—as victim testimony accumulated—the United States Attorney for the Southern District of California charged GirlsDoPorn's three principals (Pratt, Wolfe, Garcia) and three others with federal sex trafficking and conspiracy to

---

[1] The individuals, websites and the offshore and domestic entities used to operate this sex trafficking venture are collectively referred to herein as **"GirlsDoPorn."**

[2] The complaints from the State Court Action (San Diego Superior Court Case Nos. 37-2016-00019027-CU-FR-CTL, 37-2017-00033321-CU-FR-CTL and 37-2017-00043712-CU-FR-CTL) are hereby incorporated by reference as though set forth fully herein.

commit sex trafficking under 18 U.S.C. § 1591 **("Section 1591")**.  A grand jury indictment unsealed about a month later formally charged them with these crimes.[3]  The grand jury also indicted Pratt for Production of Child Pornography in violation of 18 U.S.C. §2251, subs. (a) and (e).  Wolfe and Garcia were arrested on or about October 9, 2019.  Pratt escaped to Mexico and is currently a fugitive of justice on the Federal Bureau of Investigation's Most Wanted List.

57.     The civil trial in the State Court Action concluded on November 26, 2019, about six weeks after the arrests.  On January 2, 2020, the Honorable Kevin A. Enright issued a nearly two-hundred-page Statement of Decision[4] detailing the "fraud, intimidation and coercion" GirlsDoPorn used to coax its victims into filming adult videos.  The decision collectively awarded the twenty-two plaintiffs nearly $13 million in compensatory and punitive damages, voided all contracts as part and parcel of the fraudulent and coercive scheme, and enjoined GirlsDoPorn from using their fraudulent and coercive practices in any future business dealings.

58.     Garcia pled guilty to sex trafficking under Section 1591 and conspiracy to commit sex trafficking for his role in the GirlsDoPorn sex trafficking venture.[5]  Garcia is set to be sentenced by the Honorable Janis L. Sammartino in the coming months.  Wolfe remains in federal custody in San Diego awaiting trial.  Pratt is still at large.

59.     Over the last two decades, United States Congress has taken significant measures to fight sex trafficking as criminals began utilizing the Internet to perpetrate and monetize their crimes.  Part of Congress' fight includes making it more difficult for traffickers to carry out and profit from their crimes by deterring otherwise law-abiding businesses from providing services to suspected traffickers.  Pursuant to 18 U.S.C. §

[3] The November 7, 2019 Indictment from *USA v. Pratt, et al.,* , Case No. 19:CR-4488-JLS (S.D. Cal.) , is hereby incorporated by reference as though set forth fully herein.

[4] The Final Statement of Decision entered on April 27, 2020 is hereby incorporated by reference as though set forth fully herein.

[5] See, Docket Entry 138 in *USA v. Pratt, et al.*, Case No. 19:CR-4488-JLS (S.D. Cal.)

1595 **("Section 1595")**, any business that "knew or should have known" it was profiting from its participation in a sex trafficking venture is civilly liable to the victims for damages and attorney fees. Section 1595 presents businesses frequented by sex traffickers (*e.g.,* hotels, websites, social media platforms, and online dating applications) with a choice: (a) deny services to suspected sex traffickers; or (b) provide services to the suspected traffickers, accept the profits from the transaction, but risk civil liability to the sex trafficking victims.

60. MindGeek operates some of the most popular pornographic websites in the world, including the 8th most popular website in the United States, www.PornHub.com. In 2011, MindGeek contracted with GirlsDoPorn and began selling, marketing, and exploiting videos featuring GirlsDoPorn's sex trafficking victims on its websites.

61. As early as 2009, and definitely by fall 2016, MindGeek knew GirlsDoPorn was trafficking its victims by using fraud, coercion, and intimidation as part of its customary business practices to get the women to film the videos. Despite this knowledge, MindGeek continued to partner with GirlsDoPorn, never bothering to investigate or question its business partner regarding the mounting evidence of sex trafficking that MindGeek received. MindGeek continued its partnership with GirlsDoPorn until October 2019 when the Department of Justice shut down GirlsDoPorn by arresting and indicting its principals. At this point, there was no longer a company left for MindGeek to partner with.

62. If MindGeek did not know GirlsDoPorn was a sex trafficking venture before October 2019, it should have known for a great number of reasons, the most notable of which is that GirlsDoPorn's victims sent MindGeek complaints detailing the fraud and coercion they were subjected to by GirlsDoPorn. Because of this knowledge, MindGeek is, at minimum, civilly liable to Plaintiffs under Section 1595 for damages and attorney fees. And if MindGeek truly did not know that its GirlsDoPorn was using fraud, intimidation, and coercion are part of its regular business practices until the criminal ///

charges were filed in October 2019, MindGeek's ignorance of the sex trafficking is a direct result of its own negligence, which still triggers Section 1595 liability.[6]

63.     Even after severing its partnership with GirlsDoPorn, MindGeek continues to profit from Plaintiffs' videos to this day.  As of December 12, 2020, MindGeek still hosts victims' videos on its websites, including Plaintiffs.  The URLs for the victims' videos contain affiliate tails and are surrounded by hyperlink advertisements that, if clicked, redirect the visitors to various paysites.  Most of the hyperlink advertisements on these victim's videos redirect the visitor to MindGeek's paysite, www.Brazzers.com. Others redirect the visitor to third party paysites, such as JerkMate.com.

64.     MindGeek knew it was partnering with and profiting from a sex trafficking venture for years.  MindGeek also knew of the significant harassment and trauma GirlsDoPorn's victims were enduring by its continued publication of the victims' videos. MindGeek simply did not care and continued to partner with GirlsDoPorn until it was no longer profitable because of the indictments and arrests.  MindGeek's actions were malicious, oppressive and taken in reckless disregard of the Plaintiffs' rights.  Plaintiffs are therefore entitled to punitive damages against MindGeek to punish MindGeek for its reprehensible actions and to deter others from acting similarly in the future.

## IV.

## FACTUAL BACKGROUND

### a.   THE AFFILIATE MARKETING RELATIONSHIP BETWEEN PAYSITES AND FREESITES

65.     The online pornography industry consists of two types of websites: "paysites" and "freesites."  As the name suggests, "freesites" allow the public to view videos for free, without the requirement of any membership, payment, age verification, or personal information.  Not surprisingly, MindGeek operates its freesites, including,

---

[6] "The phrase 'knew or should have known' echoes common language used in describing an objective standard of negligence." *A.B. v. Marriott Int'l, Inc.*, No. 19-5770, 2020 WL 1939678, at *7 (E.D. PA, Apr. 22, 2020), quoting *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 19-849, 2019 WL 4929297 (S.D. Ohio, Oct. 7, 2019)).

PornHub.com, YouPorn.com, RedTube.com, and Tube8.com, *infra*,[7] through its subsidiary, MG Freesites, Ltd.  Freesites are also referred to as "tubesites" because most freesites mimic the business model of YouTube.com.  The names of MindGeek's freesites, YouPorn, RedTube, and Tube8, are ostensibly derived from the name YouTube.

66.   The videos on freesites are typically five to ten-minute clips of longer pornographic videos or short compilations of many longer pornographic videos.  The short clips on freesites are the equivalent of a movie trailer giving the public the gist of the entire production.

67.   "Paysites" are websites where, as the name suggests, the customer must pay to view the pornographic content.  The videos on paysites are commonly said to be behind a "paywall."  Paysites are owned and operated by pornography production companies and feature full-length pornographic videos approximately 30 to 60 minutes long.  GirlsDoPorn operated two paysites where it sold videos featuring its sex trafficking victims, GirlsDoPorn.com and GirlsDoToys.com, which offered access to a library of its victims' videos for $30 to $60 per month, *infra*.

68.   Freesites attract significant web traffic with the allure of free pornography—albeit only short trailer versions cut from longer full-length videos.  These heavily trafficked websites present a golden marketing opportunity to convert a freesite visitor to a paysite subscriber.  Once on the freesite, a potential customer is targeted with hyperlinked advertisements that, if clicked, take the potential customer to a

[7] See, MG Freesites, Ltd.'s Complaint in *MG Freesites, Ltd. v. ScorpCast, LLC dba "HaulStars,"* Case No. 1:20-cv-01012-CFC (D. DE, July 28, 2020) at ¶ 2 ["the Pornhub website (www.pornhub.com), which is operated by MG Freesites Ltd…"].  Further, of www.pornhubpremium, *infra,* is copyrighted by "MG Cyprus Limited," its customer service and billing pages represent the following ownership and/or operation: "MG Billing US Corp, 2300 Empire Avenue, 7th Floor, Burbank, CA 91504 USA and "MG Billing Limited, 195-197 Old Nicosia-Limassol Road, Dali Industrial Zone 2540, Block 1, Cyprus," its terms of service state it is "operated by MG Freesites Ltd, Block 1, 195-197 Old Nicosia-Limassol Road, Dali Industrial zone, Cyprus 2540."

corresponding paysite with the hope that, once on the paysite, the potential customer purchases a subscription.

69.     Freesites earn money by partnering with paysites through "affiliate programs" operated by the payment processing companies who process subscribers' credit card, cryptocurrency, and Paypal payments on the paysites.  When a paysite opts into a payment processor's affiliate program—something that nearly all paysites do—freesites are able to register with the payment processor as an "affiliate" of the paysite. As part of the registration, freesites provide the payment processor with its bank account information.  Once registered, the freesite begins marketing free trailer versions of the paysites' full-length videos surrounded by advertisements redirecting the customer to the paysite if clicked.  If a hyperlinked advertisement on a freesite directs a potential customer to a paysite, the payment processor is able to track which freesite (now registered as an affiliate) directed the potential customer to the paysite through the use of an affiliate URL and/or software referred to as a "cookie" that tracks the internet user's history.  If the potential customer subscribes to the paysite after being directed there by a registered affiliate, the payment processor splits the subscriber's monthly payments between the freesite and the paysite, often in perpetuity, and often 50%/50%.  The money earned by the freesite through this relationship is called an "affiliate fee."

**b.     MindGeek Owns and Operates Dozens of Websites, Including the 8th Most Popular Website in the World, www.PornHub.com**

70.     MindGeek's four most popular websites are www.PornHub.com **("PornHub.com")**, www.Redtube.com **("RedTube.com")**, www.YouPorn.com **("YouPorn.com")**, and www.Tube8.com **("Tube8.com")**, each of which is similar in format to YouTube.com **(collectively "MindGeek's Tubesites ")**.  PornHub is MindGeek's flagship website.  In 2019, PornHub.com had roughly 42 billion visits (an average of 115 million per day), making it the 8th most popular website in the United States behind Google.com (1st), YouTube.com (2nd), Facebook.com (3rd), Amazon.com

///

(4th), Yahoo.com (5th), Twitter.com (6th), and Instagram.com (7th).[8]  In 2019, PornHub.com had more visitors than Wikipedia.org, Reddit.com, NetFlix.com, Craigslist.org, and Bing.com.  Further, according to analytics MindGeek posted on PornHub.com, the United States is the top country by volume of PornHub.com usage and, as for top cites, Los Angeles, California is ranked the 4th highest in the world.

71.    MindGeek's Tubesites are interactive, robust, and multifaceted e-commerce websites designed to attract and sell various sex related products and services—primarily pornographic videos—to a high volume of sex industry customers, production companies, and performers.  MindGeek's Tubesites do extensive business over the Internet, whereby MindGeek knowingly and repeatedly receives and transfers funds for various purchases and services, transfers computer files and other information, and enters into contracts with residents of all countries and states, including those of California.

72.    Just the homepage of PornHub.com includes, without limitation, the following links to the various products MindGeek is marketing and/or selling:

- **A "Premium" link** directs the customer to: www.pornhubpremium.com ("PornHub Premium").  MindGeek describes the content on PornHub Premium as a "carefully curated selection" of pornography,[9] for which customers purchase "premium" content for $9.99 per month.

- **A "Shop" link** directs the customer to: www.pornhubapparel.com ("PornHub Apparel").  There, customers across the globe, including in California, can buy various PornHub-branded merchandise, from Christmas tree ornaments to underwear.  PornHub Apparel is powered by Shopify, a publicly-traded company on the New York Stock Exchange.  The governing law in PornHub Apparel's terms of service is California.

---

[8] See, https://www.similarweb.com/top-websites/united-states

[9] MindGeek curates this content from various production companies, including, without limitation: (a) Screw My Wife Productions (based in Northridge, California); (b) Smash Pictures (Chatsworth, California); (c) Suze Randall (Calabasas, California); and (d) Wildlife Productions (Northridge, California).

- **A "Toys" link** directs the customer to: www.pornhubtoys.com/ ("PornHub Toys").  There, customers across the globe, including in California, can purchase various sex toys and other paraphernalia, which appear to ship from the United States (and there is no shipping charge when ordered from California).  In addition to other features and advertisements, PornHub Toys offers the following solicitation: "We Make Money Selling Sex Toys! So Can You! Porn[H]ubToys is looking for sex-positive affiliates.  We need enthusiastic site-owners, performers, and online promoters to refer sex toy consumers to our site.  Every successful sale earns you royalty commissions."  PornHub Toys represents it "is managed …in association with Pornhub.com."

- **A "Fuck Now" link** directs the customer to: www.adultfriendfinder.com ("Adult Friend Finder").  This website is ostensibly thinly veiled dating website where prostitutes and/or their handlers can solicit johns.  The banner on the site reads: "The nude snaps you're about to see were posted by horny women looking for fuck buddies, not boyfriends.  If you wish to proceed, you'll have to answer a few questions first."  Adult Friend Finder is headquartered in Campbell, CA.

- **A "Live Cams" link** directs the customers to: www.pornhub.com/live.  Here, performers can sign up to make money from live pornographic performances, which customers pay to view live and can also compensate performers via a "tip" function.

- **An "Advertising" link** invites parties to advertise products and services on PornHub.com through MG Freesites Ltd.-owned website, www.trafficjunky.com.

- **A "Model Program" link** invites pornographic models to "make ad revenue, sell your videos and build your fan base on the largest adult platform in the world."

- **A "Jobs" link** solicits various employment opportunities with MindGeek, including, as of this complaint, for product managers, search engine optimization specialists, and model recruiters.

///

True and correct screenshots of PornHub.com on December 7, 2020 are attached hereto as Exhibit 1.  The screenshots are redacted for nudity.

73.     The most popular feature on MindGeek's Tubesites is a searchable video library.  PornHub.com currently has about 14,000,000 pornographic videos in its free video library.  Most videos are between five and twenty minutes long.  If each of these 14,000,000 videos were just four minutes long, it would take over 106 years for one person to watch all of the footage.

74.     The videos in the public libraries on MindGeek's Tubesites come from several different sources, including members of the public,[10] third party pornographic production companies, and also MindGeek itself, which publishes trailer verisons of videos produced by its very own pornography production companies and brands, such as Reality Kings, Brazzers, and Digital Playground.

75.     As part of the interactive experience offered on the MindGeek's Tubesites, customers and viewers can create accounts, post comments regarding content, and communicate with one another.  Further, customers and viewers can subscribe to follow certain performers and send performers compensation through the websites.  Finally, MindGeek's Tubesites also allow its users to download videos from the public library for free, thereby turning it into a free sharing platform for its users.

76.     Beyond the commercial and entertainment services offered to consumers, MindGeek's Tubesites offer business-to-business services.  MindGeek offers pornography production companies the opportunity to partner with MindGeek through several programs that allow MindGeek to market, sell and exploit the partners' videos in exchange for splitting the profits therefrom.  These programs include the "Content Partner Program" and "Premium Viewshare Program."

///

---

[10] Any member of the public may upload a video to the general library on MindGeek's Tubesites.  There is no age verification process and MindGeek does not require any personal information that would allow MindGeek or the authorities to locate or identify the person who uploaded a specific video.

77.     MindGeek describes its Content Partner Program as follows:

> The Content Partner Program is designed for studios with a pay-site to expose their content to millions of visitors.   Once partnered, you receive a personalized channel that includes free ad space both on your channel and on your videos.  Through the use of video features on our homepage, your content is promoted to our users which will direct traffic back to your pay-site, with the intention of converting them into paying members.  In turn, we would receive a share of this revenue through your affiliate program.   There is no compensation based on views in this program.[11]

78.     MindGeek claims its Content Partner Program provides "100+ milion [sic] visits per day, Dedicated account reps, Most ad space in the industry, Exposure across the Pornhub network (PornHub.com, YouPorn.com, RedTube.com and Tube8.com)."[12]

79.     Pornography production companies must apply to join MindGeek's Content Partner Program.  If accepted, MindGeek creates a "channel" on MindGeek's Tubesites centralizing the content partner's videos in a single location where MindGeek's potential customers are able to search the channel for particular videos, organize them by ratings and recentness, and, by subscribing to the channel, receive notifications, *e.g.,* when a content partner posts a new video.  MindGeek's dedicated account representatives create hyperlinked advertisements on the channel.  MindGeek designs its channels to keep its prospective customers interested in the content partner's niche of pornography.  The longer MindGeek can keep the potential customer engaged on the content partner's channel, the longer MindGeek is able to target the potential customer with hyperlinked advertisements in hopes of redirecting the potential customer to the content partner's paysite where MindGeek may then generate affiliate fees if the potential customer purchases a subscription.

---

[11] See, https://help.pornhub.com/hc/en-us/articles/360048496113-What-is-the-Content-Partner-Program-

[12] See, https://www.pornhub.com/partners/cpp

80.     While MindGeek's Tubesites are predominantly freesites designed to earn MindGeek affiliate fees, portions of MindGeek's Tubesites also act as paysites through MindGeek's Premium Viewshare Program.  PornHub describes this program as follows:

> The Viewshare program, also known as Pornhub Premium, is designed to earn you revenue based on the number of views your content receives.  In this program you will upload full-length, HD videos which are locked behind our paywall, and you are compensated every time a Premium user watches your video. While Premium is an ad-free environment, partners receive a prominent "Join" button on their channel and below their videos to drive traffic back to their pay-site.
>
> Are you a studio or producer without a pay-site?  No problem! The only requirement to be eligible for the Viewshare program is that you are producing HD, adult video content.[13]

81.     By contracting with MindGeek in its Viewshare Program, pornography companies license their videos to MindGeek, which MindGeek then sells to the public through the premium portion of MindGeek's Tubesites.  If MindGeek partners with a company through its Content Partner Program and its Viewshare Program, MindGeek also includes advertisements and hyperlinks on the content partner's channel soliciting potential customers to view the content partner's full-length videos behind the paywall on the premium portion of MindGeek's Tubesites.

c.     **GIRLSDOPORN SEX-TRAFFICKED YOUNG WOMEN FROM 2007 UNTIL 2019**

82.     GirlsDoPorn started in 2006 when Pratt bought the domain GirlsDoPorn.com and set out to create a paysite featuring 18 to 22-year-old women, who had never appeared in a pornographic video before and did not plan to do so again. GirlsDoPorn's channels on MindGeek's Tubesites later advertised GirlsDoPorn's videos as: "Real amateur girls having sex on video for the very first time… You will not find these girls on any other website – all girls are 100% exclusive – this is the only [sic] and

---

[13] https://help.pornhub.com/hc/en-us/articles/360047765034-What-is-the-Viewshare-program-

only time they do porn."

83.    From 2007 until 2009, Pratt and Wiederhold traveled the United States filming pornographic videos in hotel rooms, with Pratt as videographer and Wiederhold as the male actor.  In July 2009, Pratt launched the GirlsDoPorn.com website after he and Wiederhold had amassed enough videos.  The two continued to film victims together for the next two years.  In 2011, Pratt's childhood friend from New Zealand, Wolfe, joined Pratt and Wiederhold.  Around this same time, Garcia replaced Wiederhold as the male actor and Wiederhold began focusing on a similar website featuring older female victims, MomPOV.com, that, like GirlsDoPorn, used fraud and coercion as part of its regular business practices.

   i.    **GirlsDoPorn's Fraudulent Recruiting Practices**

84.    GirlsDoPorn niche was to film 18 to 22-year old "girls next door" having sex who will never appear in another pornographic video.  Consequently, GirlsDoPorn's success turned on its ability to induce a high volume of everyday high school and college women with zero interest in filming Internet pornography to fly to San Diego and shoot a pornographic video.

85.    To overcome its victims' obvious reservations, GirlsDoPorn created a scheme that relied heavily on fraud, coercion and intimidation, and which it used to locate and recruit all of its victims.  The scheme, which GirlsDoPorn honed over the years, included: (a) drawing women in through bait-and-switch advertisements for clothed modeling; (b) offering (although most times never paying in full) enough money to overcome the woman's general compunction against the idea of participating in pornography; (c) lying about the utmost concern the victims have—where and how the video will be distributed and who will be able to see it, by claiming it would be sold on DVD's in foreign countries or given to a private collector; (d) paying and coaching fake reference models to earn the victim's trust and to reassure the victim that, like their own videos that they claimed to have filmed, the victim's video will never be online or available to anyone in the United States, and that the victims will remain anonymous; (e)

20
COMPLAINT

concealing the websites and their own identities at every stage of the recruiting and filming process; (f) curtailing the women's ability to investigate or discover the truth; and (g) using legal threats to stifle the victims' ability to seek redress through the courts.

### ii.   The False and Misleading Craigslist Advertisements

86.   GirlsDoPorn predominantly posted advertisements on Craigslist.com purporting to seek young women for clothed modeling work.  The facially benign advertisements offered 18 to 22-year-old women with little to no modeling experience a relatively large sum of money to apply for modeling jobs.  The advertisements directed prospective models to sham modeling websites, such as BeginModeling.com, ModelingGigs.com, and ModelingWorks.com, all owned by GirlsDoPorn, and which also appear to be for clothed modeling work.  Neither the Craigslist.com advertisements nor the sham modeling websites contained any indication that pornography was involved, let alone nudity.  The websites contained an application form directing the prospective victims to upload pictures and provide contact information (email, phone number, address).

87.   In 2010, GirlsDoPorn admitted to using deceptive modeling advertisements to lure victims to hotel rooms.  The caption for a victim's video published on the public portion of GirlsDoPorn's website read:

> This smokin hot 18 y/o teen named jessica was trying too find some money so that she could get a boob job done.  **She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha** :)  (sics in original, emphasis added.)

88.   GirlsDoPorn continued to use bogus clothed modeling advertisements to attract victims, including Plaintiffs, until it was shut down in October 2019.

### iii.   The Deceptive Emails to get Victims to Answer Their Calls

89.   If the photographs submitted to the sham modeling websites and age of the victim met GirlsDoPorn's criteria (attractive and under 22 years old), GirlsDoPorn would respond with an email.  GirlsDoPorn used stock emails to reach out to the victims.  Since

the emails were in writing, GirlsDoPorn used deft wording, fake names for the employees, and danced around the true nature of the job, never using the word pornography, never mentioning its websites, and never disclosing where it would distribute the final product.  Instead, the emails stated: "[t]his is a legitimate adult gig for an established Southern California company" and "[a]ll the girls that I shoot are first times.  I shoot cheerleaders, sorority girls, preppy college girls, IG [Instagram] models with 70k followers and models of that caliber."

90.    If the prospective victim did not respond to this initial email, GirlsDoPorn sent a follow-up email increasing the amount of pay and offering "$300 if you want to do clothed modeling" even though clothed modeling was never on the table.  The entire purpose of the vague emails was to get the victim to answer the phone so GirlsDoPorn could begin its campaign of lies without the fear of a paper trial or to get the victim to travel to a hotel where GirlsDoPorn would meet the victim, get her alone in a hotel, and then coerce her into filming pornography.

### iv.    **The Lies on the Phone**

91.    Once on the phone, GirlsDoPorn told the victim the job was for an "adult video," but immediately and falsely reassured the victim the video would never be published online or seen by anyone in North America since the videos would only be distributed on DVD in a foreign country, typically Australia and New Zealand.  Pratt and Wolfe have New Zealand accents, which helped sell this lie.  GirlsDoPorn played with different lies to see which were more successful.  For a period of time, GirlsDoPorn told its victims the videos were for a wealthy individual in Australia who commissioned the video.  While the details of GirlsDoPorn's representations varied slightly, the part of the message that mattered most to the prospective models remained the same— "the video is not going online and no one in the United States will find out."

### v.    **GirlsDoPorn Coached and Paid "Reference Models" to Lie to Victims**

92.    Prospective victims were naturally skeptical of GirlsDoPorn's promises of anonymity made over the phone.  However, as proof of its ability to keep the footage off

the Internet and out of North America, GirlsDoPorn paid other young women (referred to as "reference models") to reach out to the victim and assure her that her privacy and anonymity would remain intact.  The reference model—in text messages, phone calls and/or over Facetime—would tell the prospective victim she had already filmed videos for the company, the footage was never leaked online, and had never been discovered by anyone in their lives.  The reference models shared their social media accounts and other personal details with the victims to earn their trust and as proof that they were who they said they were.  However, unbeknownst to the victim, GirlsDoPorn paid and coached the references to lie about distribution and to conceal GirlsDoPorn's true identity, as a simple Google search of the term "GirlsDoPorn" leads to GirlsDoPorn's website, hundreds of videos branded with GirlsDoPorn's logo published on MindGeek's Tubesites freely accessible to anyone in the United States, and several firsthand horror stories from GirlsDoPorn's previous victims on Reddit, Facebook and elsewhere.

93.    Kailyn Wright acted a reference for dozens of victims even though she knew the truth about GirlsDoPorn.  In the State Court Action, Wright testified that GirlsDoPorn instructed her "to tell them [prospective victims] it would not be going online and that it was going overseas to wealthier countries."  When asked why she told women that their videos would not be released online when she knew that this was not true, Wright testified, "Because that's what they told me to say.  That's what they were paying me to say."

94.    Amberlyn Clark, a girlfriend of Garcia's, had never filmed a video for GirlsDoPorn.  She testified in the State Court Action that Garcia helped her create a fake backstory about how she was from a small town, filmed several videos for the company, and none were released online or in the United States.  Garcia instructed Ms. Clark to tell prospective models that the videos "wouldn't be put online and that they would go to private collectors" located "[o]utside of the U.S."  Garcia also advised her to assure models that "no one would find out."  Finally, Garcia instructed her to never mention the name GirlsDoPorn or use his real name.

### vi.     The False Promises of Pay

95.     In addition to lying about distribution, GirlsDoPorn's business practice was to continue to increase the offer to the victim in order to get her to fly to San Diego for a shoot, but with no intention of actually paying in full.  GirlsDoPorn's assistant, Valorie Moser, who was also indicted for her actions in the sex trafficking venture, testified in the State Court Action that Pratt asked her to recruit several "super hot" women that had submitted applications to the fake modeling websites, but whom he and Garcia could not convince to fly to San Diego.  Pratt instructed Ms. Moser that, once on the phone with these prospective victims, she should "[m]ake an offer of a price that was high enough to get the model on a plane."  However, even before the victim arrived in San Diego, Pratt had graded the victim as an "A, B, or C model" based on her attractiveness and youth, and already knew GirlsDoPorn would not pay the inflated price.  Once the victim was alone in a hotel room in San Diego, GirlsDoPorn (usually Garcia) routinely fabricated an excuse to pay the victim less, such as by claiming the victim had cellulite, bruises, scars or uneven breasts.  If a victim complained, GirlsDoPorn blamed the victim for submitting misleading pictures and would tell the victim she would be required to pay for the cost of the hotel and flight if she did not accept less.  Having flown to San Diego and alone in a hotel room with two agitated males, this left the victim with little choice but to accept the lesser amount and proceed with GirlsDoPorn's demands or risk the unknown.

### vii.    Further Coercion and Deceit in San Diego

96.     GirlsDoPorn also coached its makeup artists, drivers, and cameramen how to answer victims' general questions about who they are or if the video will ever leak online.  If asked, the employees were initially instructed to confirm the video will not be online.  Like the fake reference models, the employees were also coached to never mention GirlsDoPorn and to reassure models that everything will be fine.  GirlsDoPorn's long-time and San Diego, California-based corporate attorney, Aaron Sadock, who is also Pratt's long-time personal attorney, forced all employees and contractors to sign Non-Disclosure Agreements and advised them the agreements prevented them from telling

victims they interacted with the true nature of the business.  After GirlsDoPorn was sued in 2016, Sadock coached the employees how to give deceptive answers to questions about distribution and the company's identity.  Consequently, after June 2016, when victims asked GirlsDoPorn's drivers, cameramen and makeup artists about distribution or the name of the company once they arrived in San Diego, the victims received the same false assurances about anonymity promised over the phone and by reference models and deft, misleading responses crafted by an attorney that evaded providing any material information that would alert the victim as to who the Defendants were or the true nature of Defendants' intentions.

97.     GirlsDoPorn took the models to their hotel rooms where GirlsDoPorn offered alcohol and/or marijuana to the victim, regardless of her age, before the shoot and encouraged her to drink or smoke in order to "loosen up."  A makeup artist that GirlsDoPorn coached to conceal the true nature of the shoot did the victim's makeup.

98.     Just minutes before filming, GirlsDoPorn presented the victims with, at least, one document to sign.  They did not permit the women to thoroughly read or review the document(s) before signing them, often times telling the victims the document(s) merely confirmed the agreement they had already reached over the phone.  In some other instances, GirlsDoPorn told the victim the documents were "just to prove that [she is] 18," to show they were "not forcing [her] to do this," or "this is just about the basic agreements, everything we spoke about," or "just kind of a formality."  By this time, the victims had been in the hotel room for over an hour and had typically consumed alcohol and/or marijuana.  GirlsDoPorn also intentionally waited until the last minute to present the document(s) to the victim to create a false sense of urgency, telling many victims that they were "behind schedule" and that the victim needed to hurry up and sign the document(s).  Garcia, Wolfe, and/or Pratt also got irritable and aggressive when victims asked questions about the document(s) or requested time to read.  GirlsDoPorn often videotaped the victims as they signed the document(s).  The videos, which are published on MindGeek's Tubesites, show GirlsDoPorn's cameramen peppering the victims with

questions as the victims attempted to read the contract.

99.    The document(s) do not directly contradict the express promises about distribution; they do not clearly indicate that the videos *will* be published online on GirlsDoPorn.com (which is never identified), as well as dozens of free tube sites, and marketed broadly on affiliate websites.  Instead, the document(s) contain broad, vague release language couched in disorganized, complicated legalese and only mentions the innocuously named shell entities GirlsDoPorn maintained (*e.g.,* Bubblegum Films Inc. or Oh Well Media Limited) as the contracting party.  Thus, Google searches done in hotel rooms by several victims would lead to innocuous websites set up by GirlsDoPorn for these shell entities rather than GirlsDoPorn.com or GirlsDoPorn's videos on MindGeek's websites.

100.    While filming the sexual portions of the video, some victims asked to stop, but the actor and videographer would not permit it.  They told women they could not leave until they had the footage they wanted, often falsely saying the victim was contractually obligated to finish and that she would be forced to repay them for the costs of production if she did not proceed.  If a victim was grimacing or showing signs of distress during a scene, GirlsDoPorn would force the victim refilm the segment, hide any pain she was experiencing and act as if she were enjoying it.  This often caused filming to last for four or five hours. At times, Garcia or Pratt became aggressive and agitated if a woman hesitated to perform an act or asked to leave.  Once in the hotel room, the victims lacked any feasible means of egress until GirlsDoPorn released them.

   **viii.    GirlsDoPorn's Distribution, Doxing, and its Immense Profits**

101.    GirlsDoPorn published the full-length videos in the "members area" of its paysites, GirlsDoPorn.com and GirlsDoToys.com.  Once published to its paysites, GirlsDoPorn used an aggressive marketing strategy to encourage as many people as possible to view the videos.  These efforts included partnering with MindGeek via its Content Partner and Viewshare Programs.

///

102.   Further, aware that the victim's classmates, friends, and coworkers would be keen on paying to view the full-length video, GirlsDoPorn intentionally sent (or recklessly knew others would send) links of the victims' trailer videos on MindGeek's Tubesites to social media accounts of people in the victim's social circles, including friends, family, co-workers, employers, teachers, and classmates.  By sending links to trailer versions of the video to people who knew the victim, those people would then share the links with others acquainted with the victim, thereby causing the videos to go viral amongst everyone victim knew within 24 to 48 hours of the video being released. By making the video go viral like this, GirlsDoPorn was able to sell monthly subscriptions to customers who otherwise had zero interest in subscribing to GirlsDoPorn (or any other monthly pornography paysite for that matter), but who simply wanted to see the victims' full-length video out of curiosity.

103.   GirlsDoPorn had something of a cult following.  Numerous websites and forums existed for the sole purpose of doxing[14] GirlsDoPorn's victims.  Anonymous internet users ("trolls") created and congregated on online forums where the sole purpose was to identify GirlsDoPorn's victims by name, glean personal information about them, and harass them.  The trolls shared any information they could find on the forums, including the model's name, email addresses, high school, biographical information, and links to the victims and their families' social media accounts.  Armed with the woman's social media and contact information, trolls sent links to the victim's video to people connected to her on social media.  Other trolls contacted the women personally to attack, bully, shame, and sexually proposition them.  Some trolls contacted and harassed the victims' family members, friends, classmates and church members.

104.   PornWikiLeaks.com was the most notorious doxing website in the pornography business.  Pornography actors worked hard to keep their personal

---

[14] dox (däks) *slang*: to publicly identify or publish private information about (someone) especially as a form of punishment or revenge.  See, https://www.merriam-webster.com/dictionary/dox

information private so as to avoid harassment (or worse) from stalkers and trolls. PornWikiLeaks.com's business model was to publish personal information of people in the pornography industry (*i.e.,* "dox" them) and charge them a fee to remove the personal information.

105.    GirlsDoPorn's victims were doxed on PornWikiLeaks.com as early as 2012. The doxing of GirlsDoPorn victims became so great in PornWikiLeaks.com's general forum that, in July 2015, PornWikiLeaks.com created a special forum dedicated solely to GirlsDoPorn's victims called, "Girlsdoporn.com GDP Girls Do Porn Exposed real names and personal family info." By early 2016, the special forum had hundreds of thousands, if not millions, of posts related to GirlsDoPorn's victims.

106.    In November 2015, GirlsDoPorn purchased PornWikiLeaks.com to use as a marketing tool due to the high level of traffic visiting the site. In January 2016, advertisements linking to GirlsDoPorn's subscription paysites began appearing in the PornWikiLeaks.com forums where the victims were being doxed.

107.    Plaintiffs are informed and believe and allege thereon that MindGeek—like everyone else in the pornography industry—was acutely aware of PornWikiLeaks.com, its doxing practices, and the GirlsDoPorn special forum thereon. Some of the posts on PornWikiLeaks.com were narratives from GirlsDoPorn's victims detailing the fraud and coercion used by GirlsDoPorn as part of its recruitment and filming process.

108.    The doxing forums, virality of the videos, and publicly available videos on MindGeek's Tubesites created significant traffic to GirlsDoPorn's paysite, where it maintained ten to fifteen thousand subscribers per month.

109.    The Federal Bureau of Investigation estimates GirlsDoPorn made over $17 million from its sex trafficking operation between 2009 and 2019.[15]

///

///

---

[15] See, https://www.justice.gov/usao-sdca/pr/girlsdoporn-owners-and-employees-charged-sex-trafficking-conspiracy

**d.  MINDGEEK MADE MILLIONS SELLING, MARKETING, AND EXPLOITING VICTIMS' VIDEOS THROUGH ITS PARTNERSHIP WITH GIRLSDOPORN**

110.   From at least 2011 until the end of 2019, MindGeek contracted with GirlsDoPorn to be partners in MindGeek's Content Partner Program and Viewshare Program.  In so doing, MindGeek created dedicated channels for GirlsDoPorn's videos on MindGeek's Tubesites containing trailer versions of the victim's videos.

111.   Pursuant to their partnership, MindGeek hosted around 70 videos on the GirlsDoPorn channel on Pornhub.com alone.  As of fall 2019, those 70 videos had more than 700,000 subscribers and were collectively viewed almost 700,000,000 times.  The GirlsDoPorn channels on YouPorn.com, Tube8.com, and RedTube.com featured anywhere from 100 to 200 videos featuring sex trafficking victims, which also collectively had hundreds of millions of views.  By August 2019, the videos on GirlsDoPorn's channels on all of MindGeek's Tubesites collectively had nearly one billion views.  This does total not account for the hundreds of videos featuring GirlsDoPorn's victims that were also uploaded to the general libraries on MindGeek's Tubesites.  Many of those videos also had millions of views each.

112.   The MindGeek-GirlsDoPorn partnership allowed MindGeek to sell, market, and otherwise exploit videos featuring GirlsDoPorn's victims for its own financial gain.  Plaintiffs are informed and believe MindGeek generated millions of dollars in affiliate fees and premium subscriptions from selling, marketing, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture, including Plaintiffs.

**e.  MINDGEEK CONTINUED TO PARTICIPATE IN GIRLSDOPORN'S SEX TRAFFICKING VENTURE BY MARKETING, SELLING AND EXPLOITING VICTIM'S VIDEOS YEARS AFTER MINDGEEK LEARNED GIRLSDOPORN USED FRAUD, INTIMIDATION, AND COERCION AS PART OF ITS CUSTOMARY BUSINESS PRACTICES**

113.   Section 1591 defines sex trafficking as "recruit[ing], entic[ing], harbor[ing], transport[ing], . . . or solicit[ing] by any means a person…knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion[,] or any

combination of such means will be used to cause the person to engage in a commercial sex act." Pursuant to subsection (e)(3) of Section 1591, a "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." As early as 2009, MindGeek knew, or should have known, GirlsDoPorn was using force, fraud, and coercion to get its victims to engage in commercial sex acts for many different reasons.

i. **GirlsDoPorn Publicly Admitted to Using Fraudulent Tactics to Lure Young Women into a Hotel Room Under False Pretenses**

114. First, from the time GirlsDoPorn.com launched in 2009, anyone paying the slightest attention to the pornography business or doing the slightest due diligence of its business partners understood GirlsDoPorn used force, fraud, and coercion to get its high school and college-aged victims to appear in its pornographic videos.

115. As of 2010, GirlsDoPorn's homepage indicated:

> Girlsdoporn is the only website that uses only 100% amateur girls. There are a lot of websites out there that <u>claim</u> they have first timers only . I myself have joined these kinda websites and then days later started recognising the girls on other websites all over the internet and been dissapointed . This is why I built Girlsdoporn.com here you will find nothing but amateurs. I refuse too shoot any girls who have prior exerience . All the girls you will finrised d on my site are normal everyday girls you would find in the city streets - malls - colleges and normal 9-5 jobs . I personally hunt out each and every one for your viewing pleasure. You would be suphow quickly the offer of quick cash turns these girls into part time pornstars. Everything you read or see on this website is 100% real and true. We have no need too trick or lie too you.. ENJOY GUYS ! (sics in original.)

GirlsDoPorn's niche is enigmatic in that most, if not all, women would not consent to appearing in a sex video that will be published on dozens of free websites that could be easily accessed by friends and family. Not long after GirlsDoPorn launched its website ///

in 2009, GirlsDoPorn publicly laughed about fraudulently inducing a victim to a hotel room under the false pretense of a clothed modeling job.  A caption to a video read:

> This smokin hot 18 y/o teen named jessica was trying too find some money so that she could get a boob job done. **She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha** :)  (sics in original, emphasis added.)

These posts were available to MindGeek in 2011 when it accepted GirlsDoPorn into its Content Partner Program and began selling, marketing and exploiting videos featuring GirlsDoPorn's victims.  Upon information and belief, MindGeek did no due diligence regarding GirlsDoPorn's business practices prior to partnering with GirlsDoPorn in its Content Partner Program.

### ii.   Victims Complained Directly to MindGeek

116.   Second, MindGeek's Tubesites include a takedown portal where GirlsDoPorn's victims repeatedly complained to MindGeek about the fraud and coercion employed by GirlsDoPorn throughout the entire process and the significant emotional distress and harassment they suffered as a result of MindGeek's continued publication of their videos.

117.   For example, on August 8, 2016, Jane Doe No. 11 asked MindGeek to remove her video from PornHub.com by submitting the following request to PornHub.com's takedown portal.

> Reason:  Im going to kill myself if this stays up here.  I was scammed and told this was only going to be on dvds in another country.  Please im begging you please ill pay!
>
> Agree to Distribution: No.  (sics in original.)

118.   On August 13, 2016, Jane Doe No. 11 sent MindGeek another takedown request for her video, which MindGeek published on its website, Tube8.com:

///

> They scammed me and told me it was only going to dvds in another country.  Please this is ruining my life.

119.   On May 31, 2017, after MindGeek continued to publish her video on PornHub.com, Jane Doe No. 11 sent another request to remove her video.

> I WAS SCAMMED. THIS COMPANY LIED TO ME ABOUT THIS BEING ON THE INTERNET! THEY TOLD ME IT WOULD ONLY BE AVAILIBLE ON DVD IN AUSTRALIA. MY WORK FRIENDS AND FAMILY ALL KNOW AND THIS VERY LINK IS BEING SENT AROUND. I WANT TO JUST DIE  (sics and capitalization in original.)

Jane Doe No. 11's video was on MindGeek's Tubesites until after GirlsDoPorn's principals were arrested in October 2019 when MindGeek finally decided to take action.

120.   In another instance, a victim sent a takedown request on December 14, 2016, advising MindGeek:

> I was told this video went to a private viewer, and now it is all over the internet.  I was lied to, and this isn't okay.  I have reached out to them with no response.

121.   In January 2016, Jane Doe No. 36 submitted a content removal request to MindGeek, begging to have her video removed because of the lack of consent and harassment she was under.

> That's what I am trying to explain is that I did not consent to being online!!!   :(((( me and other girls are being brutally harassed."  (sics in original.)

122.   Jane Doe No. 36 followed up with MindGeek a few days later advising the Defendants she and her boyfriend were in therapy because of the continued publication of the videos.

123.   These are just some of many examples of take down requests MindGeek received notifying MindGeek that GirlsDoPorn used fraud and coercion to get the women to engage in commercial sex acts and the corresponding harassment and suicidal

tendencies the victims had as a result of the continued publication of the video.  Plaintiffs have been informed and believe MindGeek received dozens, if not hundreds, of similar takedown requests from GirlsDoPorn victims over the years and never conducted an investigation of the repeated claims of fraud or coercion perpetrated by its content and viewshare partner, GirlsDoPorn.

### iii. Third-Parties Complained to MindGeek

124.   Third, in addition to hearing directly from GirlsDoPorn's victims, third party "takedown companies" hired by GirlsDoPorn's victims notified MindGeek that GirlsDoPorn's victims did not consent to their videos being online.  Such companies exist to help people remove their likenesses from the Internet.  These entities send Digital Millennium Copyright Act ("DMCA") takedown notices to websites publishing pictures or videos obtained without consent.  Many of GirlsDoPorn's victims hired takedown companies to assist with the removal of their videos from the Internet, including from MindGeek's Tubesites.  These third-party companies sent hundreds, if not thousands, of notices to MindGeek advising MindGeek that it was publishing the victim's videos without the victim's consent.

### iv. The Obvious Fraud in the Videos

125.   Fourth, the content of GirlsDoPorn's videos shows GirlsDoPorn lied to the young women about the publication of the video.  All GirlsDoPorn videos begin with a five to ten-minute "interview" of the victims.  The victim's responses in the interviews made clear they believed the video would not be published on the Internet or available to anyone in the United States.  Further, no content or dialogue in the interviews clarified the production company was GirlsDoPorn or intended to post the subject videos on GirlsDoPorn.com or any website, for that matter.  Finally, in these interviews, the women often expressed how they would be ostracized if the video were made public—something MindGeek and GirlsDoPorn knew would occur *en masse* once the video was published and marketed on MindGeek's Tubesites, especially considering the doxing occurring on ///

PornWikiLeaks.com, which, as mentioned above, was a notorious website known to all in the pornography industry.

### v.      The Obvious Coercion in the Videos

126.    Fifth, the video content made clear the victims were subjected to coercion and did not consent to all of the sex acts portrayed in the videos.  Some of GirlsDoPorn's videos depict victims who are in visible distress, including, in some instances, bloodstained sheets and condoms.  In other videos, tracks of the victim's tears can be seen in the victim's makeup—the victim obviously having been in tears while the camera was not rolling or having been edited out by GirlsDoPorn.  In some videos, furniture can be seen piled in front of the hotel room door.  Since at least 2016, numerous online forums available from a simple Google search of "girlsdoporn" detailed these signs of duress at length.

### vi.     The Alcohol and Drug Abuse Obvious in the Videos

127.    Sixth, GirlsDoPorn's victims' videos that MindGeek marketed, sold, and exploited include underage women who are clearly under the influence of drugs and/or alcohol based on the victim's gait, blurred eyes, and slurred speech.  Alcohol and marijuana paraphernalia are visibly strewn about the hotel room in the background of numerous videos.

### vii.    The Publicly Available GirlsDoPorn Admissions

128.    Seventh, GirlsDoPorn operated an online forum[16] that includes firsthand accounts of the fraudulent and coercive tactics it used.  For example, the forum includes an account directly from GirlsDoPorn's owners of a woman locking herself in the bathroom to avoid continuing with the filming process, only to have GirlsDoPorn's employees pound so hard on the door to get her to finish the video that hotel management came to the room to investigate the disturbance.  In the narrative, GirlsDoPorn jokes

///

---

[16] Available at www.forum.doporn.com.

about taking the money it had paid the victim and mocked the victim for calling her mother for help.

### viii.   **The Publicly Available Victim Survival Stories**

129.    Eighth, numerous victims have also come forward publicly to detail the force, fraud, and coercion they underwent from GirlsDoPorn.  In 2016, one victim published a detailed account of the fraud on Reddit.  It reads:

> One day, I answered an ad for "beginmodeling.com" and after that, my life would never be same. From the minute Johnathan contacted me, I was lied to repeatedly, manipulated, and coerced into filming. A fake website, fake references from "past models", the entire premise is a lie.
>
> […]
>
> He'll convince you that no one will ever see it, it's for Australia/foreign markets only, it's only released on DVDs, etc. I knew nothing about the industry before this, how was I to know I was being naive? If you refuse, they tell you you'll have to reimburse them for the flight/hotels. You're all alone, surrounded by people you don't know, and you only have one choice.
>
> Dre will offer to smoke with you, Johnathan will offer you a drink, before you know it, they've got cameras out and they're recording you. They read you lines.   "I am not under the influence and I consent to the filming.."  They're pulling out contracts. They don't give you time to read them. "Begin Modeling" is written at the top. Why? This isn't modeling at all! They give you a little script for your pre-interview. They tell you exactly what to say if you won't say what they want you to. It's all fake.  They are extremely smart. And extremely manipulative.
>
> […]
>
> I cry at one point. They switch angles so you can't see my face. I start to bleed. They switch again, and then abandon the sex all together.  "Do you know what a facial is?" I didn't.

(A true and correct copy of the entire publication is attached hereto as Exhibit 2.)

130.   Another victim detailed her account with GirlsDoPorn online explaining how GirlsDoPorn lured her to San Diego under the guise of modeling only to be forced to film pornography.  (A true and correct copy of the entire publication is attached hereto as Exhibit 3.)

131.   In 2013, even Miss Teen Delaware fell victim to GirlsDoPorn's scheme after she responded to a modeling advertisement.  According to a story HuffingtonPost.com published, MindGeek offered this GirlsDoPorn victim $250,000 to be the spokeswoman for the MindGeek's freesite, YouPorn.com.

### ix.   **GirlsDoPorn Provided MindGeek with Unbelievable Responses after Victims Complained to MindGeek**

132.   Ninth, as part of the DMCA process, when a victim sent a takedown notice to MindGeek, GirlsDoPorn had the opportunity to respond.  GirlsDoPorn's responses were from a purported Chief Executive Officer with a clearly fake name for an entity purportedly incorporated in the tiny third world nation of Vanuatu.  GirlsDoPorn's response to takedown notices sent to MindGeek often stated: "My name is Jordan Powers and I am the CEO of BUBBLEGUM FILMS /GIRLSDOPORN.COM."  The signature block "Jordan Powers" responded with stated:

> Thank you.
> BUBBLEGUMFILMS INC
> c/o GT Group Limited
> 1st Floor Pacific Building
> Port Vila, Vanuatu 65774
> DMCA@MOMPOV.COM

133.   Furthermore, on information and belief, neither "Bubblegum Films, Inc." nor any other dubious Vanuatu entities GirlsDoPorn used was a party to GirlsDoPorn's contracts with MindGeek for the Content Partner Program and Viewshare Program.  Rather, on the GirlsDoPorn side, the parties and signatories to these agreements were Pratt and/or his San Diego, California-based GirlsDoPorn entity, BLL Media, Inc.

GirlsDoPorn also listed Bubblegum Films, Inc. and the Vanuatu address as its 2257 location.  Consequently, MindGeek was aware that GirlsDoPorn maintained a fake international front for its operation out of a tiny remote island in the Pacific.

134.   In the event the above dubious correspondence was not unbelievable enough, in 2011, media widely publicized that authorities shut down GT Group Limited, which purportedly incorporated Bubblegum Films, Inc., because it was a criminal operation helping launder money for criminal enterprises, such as drug cartels and gunrunners.[17]

### x.   The Publicity of, and MindGeek's Participation in, the State Court Action

135.   Tenth, on June 2, 2016, four plaintiffs sued GirlsDoPorn for fraud and privacy claims in the State Court Action.  By March 2017, there were twenty-two (22) plaintiffs in that case.  The lawsuit garnered significant press, some of which targeted MindGeek's role in publishing the victims' videos.  Each of the plaintiffs in the State Court Action filed numerous public declarations detailing the fraud and coercion they underwent.  As early as 2017, the San Diego Superior Court found plaintiffs were more likely than not going to prevail at trial.

136.   On September 19, 2017, the plaintiffs in the State Court Action served MindGeek with a subpoena seeking documents related to takedown requests for PornHub.com, YouPorn.com, and Redtube.com.  Later in the action, GirlsDoPorn designated MindGeek's very own DMCA attorney, Lawrence Walters, as an expert on affiliate marketing issues.  Plaintiffs in that action deposed Mr. Walters.  He was scheduled to testify in persona but did not appear after the criminal charges were filed.

137.   Further, in January 2019, the San Diego Superior Court found there was a "substantial probability" plaintiffs would prevail on their fraud claims, which, under California law, required clear and convincing evidence of the fraud.  Based on the

---

[17] See, *Inside the shell: Drugs, arms and tax scams,* available at https://www.icij.org/investigations/offshore/geoffrey-taylor/

findings, the San Diego Superior Court issued an order allowing plaintiffs to do pretrial financial discovery for punitive damages under Civil Code section 3295.

138.   Despite its knowledge of the ongoing State Court Action, MindGeek continued to publish and profit from the GirlsDoPorn victim's videos, completely ignoring the dozens of public declarations and hard evidence of its fraud and coercion.

**xi.   MindGeek Attempted to Purchase GirlsDoPorn During the State Court Action**

139.   Eleventh, upon information and belief, around 2018, while the State Court Action was pending, MindGeek entered into a Letter of Intent with GirlsDoPorn seeking to purchase GirlsDoPorn's video library and that, during the due diligence for this prospective acquisition, MindGeek further learned of the fraud and coercion GirlsDoPorn use to recruit and groom its victims causing MindGeek to back out of the purchase. MindGeek continued to partner with GirlsDoPorn pulling out of the transaction.

**f.   MINDGEEK DESIGNED ITS INTERNAL POLICIES AND PROCEDURES TO WILLFULLY KEEP ITS EMPLOYEES AND OFFICERS IGNORANT OF THE PERVASIVE AMOUNT OF SEX TRAFFICKING VICTIMS' VIDEOS BEING MARKETED, SOLD AND EXPLOITED ON ITS WEBSITES**

140.   Plaintiffs are informed and believe that, from 2011 until October 2019, MindGeek had no policies or procedures to investigate prospective content partners' business practices or reputation prior to accepting the partner into its Content Partner Program or Viewshare Program.  Consequently, MindGeek had no idea if the videos it marketed, sold, and exploited under those programs featured victims of sex trafficking, rape, or were underage.  Further, upon information and belief, from 2011 until 2019, MindGeek had no policies or procedures to investigate allegations of sex trafficking committed by its content partners or standards by which its contents partners would be held to remain in such programs.

141.   Upon information and belief, even after it partnered with GirlsDoPorn, MindGeek never investigated or questioned GirlsDoPorn about its business practices

despite MindGeek obtaining knowledge of GirlsDoPorn's fraudulent and coercive practices detailed in the victims' complaints, public accounts of abuse, or in the State Court Action filings and testimony.

142.    Plaintiffs are informed and believe, from 2009 until October 2019, MindGeek did not employ enough properly trained content moderators to review the footage on its websites for acts of sex trafficking, rape or underage women.  Further, upon information and belief, MindGeek failed to have any internal policies or procedures requiring content partner account representatives (such as those working directly with GirlsDoPorn) to report evidence of sex trafficking the representatives discovered in their dealings with the content partners to anyone else within the organization.

**V.**

**HISTORY AND PURPOSE OF SECTION 1595**

143.    Congress designed the Trafficking Victims Protection Reauthorization Act (**"TVPRA"**) to deter and punish, both criminally and civilly, sex traffickers and third parties who benefit from sex trafficking ventures.  When Congress enacted Section 1595 in 2003, the statute created a civil private right of action for victims against "the perpetrators" of the sex trafficking.  In 2008, Congress broadened the scope of Section 1595 to include *third parties* who knew, *or should have known*, they were profiting a sex trafficking venture.  Section 1595 currently states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (**or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter**) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

///

///

///

18 U.S.C. § 1595(a) (emphasis added).[18]

144.   In 2015, the First Circuit Court of Appeal held the Communications Decency Act (47 U.S.C. § 230) **("Section 230")** provided immunity to online companies for Section 1595 lawsuits even if the company knowingly assisted sex traffickers.  See, *Doe v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016).  However, the First Circuit concluded by recommending any solution be made through the legislature. *Id*. at 29.

145.   As a result of the decision in *Backpage.com*, Congress amended Section 230 as part of the Fight Online Sex Trafficking Act ("FOSTA").  Section 230 now states it shall have "[n]o effect on sex trafficking law," and shall not "be construed to impair or limit…any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title." *Id.*  The amendment to Section 230 is retroactive, applying "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after ... enactment." *See, 132 Stat. 1253, § 4(b); see also, Woodhull Freedom Found. v. United States,* No. 18-5298, 2020 WL 398625 (D.C. Cir., June 24, 2020).

# VI.

## <u>CAUSE OF ACTION</u>

### <u>18 U.S.C. § 1595</u>

### (All Plaintiffs Against All Defendants)

146.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

147.   GirlsDoPorn was a "sex trafficking venture" within the meaning of Section 1595.  GirlsDoPorn recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited Plaintiffs knowing a combination of

---

[18] "Section 1595 opened the door for liability against facilitators who did not directly traffic the victim, but benefitted from what the facilitator should have known was a trafficking venture." *Marriott Int'l, Inc.*, 2020 WL 1939678, *supra*, at *7, quoting Gallant Fish, No Rest for the Wicked: Civil Liability Against Hotels in Cases of Sex Trafficking, 23 BUFF. HUM. RTS. L. REV. 119, 138 (2011).

force, threats of force, fraud, coercion, and threatened abuse of law and legal proceedings would be used to get Plaintiffs to engage in commercial sex acts. GirlsDoPorn had a custom and practice of using force, threats of force, fraud, coercion, and threatened abuse of legal proceedings as part of its recruiting and filming practices and used such practices in recruiting the overwhelming majority, if not all, of its victims.

148.   Plaintiffs are all victims of GirlsDoPorn's sex trafficking venture within the of meaning of Section 1591. GirlsDoPorn used fraud, coercion and intimidation to get Plaintiffs to perform sex acts, which GirlsDoPorn filmed, and then distributed on MindGeek's Tubesites through MindGeek's' Content Partner and Viewshare Programs. Plaintiffs were all trafficked after January 2011.

149.   As early as July 2009, and definitely by June 2016, MindGeek knew or, at the bare minimum, should have known, GirlsDoPorn operated a sex trafficking venture that wholly relied on a combination of force, threats of force, fraud, and coercion to get its victims (everyday high school and college women) to engage in commercial sex acts on film.

150.   MindGeek knowingly benefitted from and participated in GirlsDoPorn's sex trafficking venture by, among other things:

        a.      partnering with GirlsDoPorn through its Content Partner Program and Viewshare Program;

        b.      marketing, selling, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture;

        c.      earning millions of dollars in affiliate fees and premium subscriptions from videos featuring GirlsDoPorn's victims, including Plaintiffs' videos; and

        d.      hosting GirlsDoPorn's victims' videos in the general library of its freesites, which resulted in increased web traffic to MindGeek's Tubesites which, in turn, generated affiliate fees and subscriptions from third party paysites and MindGeek's own paysites, such as Brazzers.com and RealityKings.com.

151.   As a proximate result of MindGeek's knowing financial benefit and participation in GirlsDoPorn's sex trafficking venture, Plaintiffs have suffered damages, including, but not limited to, severe emotional distress, significant trauma, attempted suicide, and social and familial ostracization.  Further, MindGeek has received ill-gotten gains by selling, marketing and exploiting videos featuring Plaintiffs' likenesses.

152.   Plaintiffs are informed and believe and thereon allege MindGeek's employees, officers, directors and/or managing agents had knowledge of GirlsDoPorn's sex trafficking venture or recklessly disregarded such.

153.   MindGeek's actions were intentional, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of the Plaintiffs' rights.  Plaintiffs are entitled to punitive damages to punish MindGeek for its actions and to deter others from acting similarly in the future.

## VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally:

a.   Awarding Plaintiffs compensatory damages in an amount that exceeds one million dollars for each plaintiff;

b.   Awarding Plaintiffs restitution for all monies MindGeek earned marketing, selling and exploiting Plaintiffs' videos;

c.   Awarding Plaintiffs punitive damages in an amount that exceeds one million dollars per plaintiff;

d.   Awarding Plaintiffs their attorney fees;

e.   Awarding Plaintiffs their costs and expenses;

f.   Awarding Plaintiffs pre-judgment and post-judgment interest;

g.   Permanently enjoining the Defendants from hosting Plaintiffs' videos and/or profiting therefrom;

h.      Declaring Mindgeek, S.a.r.l., MG Freesites, Ltd., and Mindgeek USA Corporation as alter egos; and

i.      Granting such other and further relief as this Court deems just and equitable.

## VIII.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all triable issues of fact.

RESPECTFULLY SUBMITTED:


Dated: December 15, 2020                By:    _s/ Brian M. Holm_____
                                               Brian M. Holm
                                               John. J. O'Brien
                                               **Attorneys for Plaintiffs**
                                               E-mail: brian@holmlawgroup.com
                                                         john@theobrienlawfirm.com