# Exhibit 1

1
2
3
4
5
6
7

F I L E D
Clerk of the Superior Court

APR 2 7 2020

By: R. Smith, Clerk

8        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9           **COUNTY OF SAN DIEGO, CENTRAL DIVISION**

10  JANE DOE NOS. 1 - 22, inclusive, individuals;

11              Plaintiffs,

12  v.

13  GIRLSDOPORN.COM, a business organization,
    form unknown; MICHAEL J. PRATT, an
14  individual; ANDRE GARCIA, an individual;
    MATTHEW WOLFE, an individual; BLL
15  MEDIA, INC., a California corporation; BLL
    MEDIA HOLDINGS, LLC, a Nevada limited
16  liability company; DOMI PUBLICATIONS,
    LLC, a Nevada limited liability company; EG
17  PUBLICATIONS, INC., a California
    corporation; M1M MEDIA, LLC, a California
18  limited liability company; BUBBLEGUM
    FILMS, INC., a business organization, form
19  unknown; OH WELL MEDIA LIMITED, a
    business organization, form unknown; MERRO
20  MEDIA, INC., a California corporation;
    MERRO MEDIA HOLDINGS, LLC, a Nevada
21  limited liability company,
22
            Defendants.
23

LEAD CASE NO.:
Case No. 37-2016-00019027-CU-FR-CTL

CONSOLIDATED WITH:
Case No.: 37-2017-00033321-CU-FR-CTL
Case No.: 37-2017-00043712-CU-FR-CTL

**STATEMENT OF DECISION**

Judge: Hon. Kevin A. Enright
Dept.: 904

Trial Date: August 19, 2019

24
25
26
27
28

                    STATEMENT OF DECISION

EXH. 1 - 001

1    Having considered the pleadings, evidence presented, and arguments of counsel, and having

2    assessed the credibility of the witnesses, the Court filed the Proposed Statement of Decision.

3    Having also considered Plaintiffs' Proposed Corrections and Amendments to Proposed Statement

4    of Decision, the Court now files this Statement of Decision.

5    **I.    STATEMENT OF DECISION**

6    This is an action for fraud, concealment, false promise, misappropriation of likeness (both

7    statutory and common law), and violation of Business and Professions Code sec. 17200 brought by

8    Plaintiffs Jane Does 1 through 22 (collectively, Plaintiffs) against Defendants GirlsDoPorn.com,

9    Michael Pratt, Matthew Wolfe, Andre Garcia, BLL Media, Inc., BLL Media Holdings, LLC, EG

10   Publications, Inc., M1M Media, LLC, Merro Media, Inc., Merro Media Holdings, LLC, and Domi

11   Publications, LLC (collectively, Defendants).

12   Jane Does 1-22 were represented by Edward Chapin, Esq. and Cara Van Dorn, Esq. of

13   Sanford, Heisler & Sharp, LLP, John O'Brien, Esq. of Stokes O'Brien, LLP, and Brian Holm, Esq.,

14   of the Holm Law Group, PC.

15   Defendants GirlsDoPorn.com, Michael Pratt, Andre Garcia, Matthew Wolfe, BLL Media,

16   Inc., BLL Media Holdings, LLC, EG Publications, Inc., MIM Media, LLC, Bubblegum Films, Inc.,

17   Merro Media, Inc. and Merro Media Holdings, LLC were represented by Aaron Sadock, Esq. and

18   Bonnie McKnight, Esq. of Panakos Law, APC and Daniel Kaplan, Esq. of the Law Offices of

19   Daniel Kaplan.

20   Defendant Domi Publications, LLC was represented by George Rikos, Esq. of the Law

21   Offices of George Rikos.

22   Plaintiffs sought and received defaults against Clockwork Productions, Inc., Oh Well Media

23   Limited, and Sidle Media Limited.

24   **II.    FINDINGS OF FACT**

25   **A.    <u>Summary and Overview of Defendants' Business Plan</u>**

26   Defendants run an online pornography business, including most notably a subscription

27   website called GirlsDoPorn.com. The site features sex videos of young women between the ages of

28   18 and 23. Defendants' business is premised on the construct that the women in the videos are not

-2-
**STATEMENT OF DECISION**

1   professional porn stars but are amateur college-aged women filming pornography for the first and
2   only time. Subscribers are meant to be left with the impression that the women in Defendants'
3   videos are everyday women that they could encounter in their communities, campuses, and daily
4   lives.

5     Defendants are aware that the models recruited for GirlsDoPorn do not intend to pursue a
6   career in adult entertainment. The women are mostly students with careers ahead of them who have
7   only even considered Defendants' solicitations to film a pornographic video due to some immediate
8   and pressing financial need.

9     In accordance with this one-time-only amateur paradigm, Defendants' business is dependent
10  on recruiting a constant stream of new models in order to generate fresh website content. The Court
11  finds Plaintiffs have proven that Defendants use fraudulent practices to facilitate such recruitment.
12  Defendants take considerable, calculated steps to falsely assure prospective models that their videos
13  will never be posted online, come to light in the United States, or be seen by anyone who might
14  know them. Defendants' assurances of privacy and security are reinforced by paid "references"—
15  women hired who are or pose as previous models and (in accordance with a script) provide new
16  recruits with false comfort that the experience is safe and enjoyable, and that the videos have never
17  appeared online or been discovered by anyone in the models' lives.

18    Once a newly-recruited woman has flown to San Diego, she finds herself alone in a hotel
19  room with two men about to shoot a pornographic video. At this point, Defendants have her sign
20  documents containing dense and ambiguous legalese, which Defendants falsely describe as being
21  the written version of what she has already agreed to. Defendants rush and pressure the woman to
22  sign the documents quickly without reading them and engage in other deceptive, coercive, and
23  threatening behavior to secure their signatures as described below. The Court finds these putative
24  contracts invalid and unenforceable—part and parcel of Defendants' fraudulent scheme.

25    Defendants' representations are false. Contrary to their explicit promises that the videos will
26  never appear online, Defendants publish the videos on their paid subscription website and many
27  popular free "tube" sites such as Pornhub.com. They also use extensive affiliate marketing and
28  other techniques to maximize web traffic to their sites. Plaintiffs believe that Defendants increase

EXH. 1 - 003

1  viewership of the videos by deliberately leaking and disseminating their true identities and personal

2  information—including by sending the videos directly to the models' friends, family members,

3  classmates, employers, and social media contacts. This is similar to a direct-marketing promotional

4  device that makes the videos "go viral" in the models' communities. When the women inevitably

5  learn what Defendants have done with their videos, many complain to Defendants, begging them to

6  remove the videos from the internet. In response, Defendants usually simply ignore any such

7  messages and block the complaining model.

8  Defendants' tactics have caused the videos to become common knowledge in Plaintiffs'

9  communities and among their relations and peers—the very thing that Plaintiffs feared and that

10  Defendants expressly assured them would not happen. As a result, Plaintiffs have suffered and

11  continue to suffer far-reaching and often tragic consequences. Collectively, they have experienced

12  severe harassment, emotional and psychological trauma, and reputational harm; lost jobs, academic

13  and professional opportunities, and family and personal relationships; and had their lives derailed

14  and uprooted. They have become pariahs in their communities. Several Plaintiffs have become

15  suicidal. This Court finds that Plaintiffs' injuries are directly attributable to Defendants' fraudulent

16  scheme and that Defendants' conduct warrants both compensatory and punitive damages, as well as

17  equitable relief.

18  Defendants have sought to evade accountability for their actions by funneling the fruits of

19  the enterprise to overseas companies. Defendant Michael Pratt declared bankruptcy.

20  Accordingly, the Court determines that each of the Defendants are jointly and severally

21  liable to the Plaintiffs here and issues appropriate relief, as set forth below.

22  **B.    Defendants' Pornography Enterprise**

23  **i. The Websites**

24  ***GirlsDoPorn.com*** ("GirlsDoPorn" or "GDP") is a pornography website featuring young

25  women, ages 18 to 23, engaging in intercourse with a male actor. GDP's female models have never

26  appeared in a pornographic video before and represent that they will not do so again. GDP

27  publishes exclusive content featuring young female models who cannot be seen elsewhere. (Ex.

28

1576.1.)[1] Defendants recruit the women, produce the videos, and solely control the content that appears on GirlsDoPorn.com, and it is undisputed that pornographic videos and photographs of all Plaintiffs were published on GirlsDoPorn.com. GirlsDoPorn earns money by selling subscriptions to view the complete video content in the members-only section. As set forth below, the Court finds that Defendants own or control the rights to the GirlsDoPorn.com content, trademark, and domain name.

*GirlsDoToys.com* ("GirlsDoToys" or "GDT") is a pornographic website featuring young women in "solo" scenes (*i.e.*, using sex toys). The women are usually the same as those who shoot boy-girl GDP videos because Defendants do not separately recruit women for solo videos. Defendants shoot, produce, edit, and publish the videos for GDT, and the website earns money through subscription sales. Defendants control all aspects of the website. As explained below, the Court finds that Defendants own or control the rights to the GirlsDoToys.com trademark and domain name, as well as the content on the site.

*MomPOV.com* ("MomPOV") is a pornographic website featuring "mature" women over 30 engaging in sexual intercourse with a male actor who is holding the camera. Defendants recruit the women, produce and edit the videos, and publish the videos on the website, which—like GDP— earns revenue by selling subscriptions. Prior to February 2015, MomPOV was operated alongside GirlsDoPorn and GirlsDoToys. Since February 2015, certain aspects of MomPOV were shifted into a separate entity created solely for that purpose.

### ii. The Individual Defendants and their Agents

*Defendant Michael Pratt*, originally from New Zealand, conceived the idea for GirlsDoPorn.com in 2006 while he was living in Brisbane, Australia. (Deposition of Michael Pratt, Volume I, December 6, 2018 ["Pratt Depo. Vol. I"] at 14:5 – 15:6.) He moved to the United States in 2007 and launched the website in 2009. (Deposition of Michael Pratt, Volume III, taken May 6, 2019 ["Pratt Depo. Vol. III"] at 152:18 – 153:6.) He has owned and operated GirlsDoPorn through

---

[1] GirlsDoPorn's channel on Pornhub advertising: "Real amateur girls having sex on video for the very first time… You will not find these girls on any other website – all girls are 100% exclusive – this is the only and only time they do porn."

-5-

**STATEMENT OF DECISION**

1    a series of different entities through the years but has always maintained ultimate control of the

2    website as well as those individuals he hires to assist him in producing videos for his websites.

3    (Pratt Depo Vol. I, at 60:21 – 61:4.) Pratt recruits models and has served as videographer, and then

4    edits and publishes the videos online himself. (Pratt Depo Vol. 1 at 64:7 – 11; 185:11 – 21; 208:4 –

5    209:23). Pratt receives 100% of the profits made by GirlsDoPorn.com. (10/02/19 Trial Tr. 127:6 –

6    10.)

7        .   Pratt also co-founded the website MomPOV.com with Douglas Wiederhold in 2010,

8    (Wiederhold Depo at 39:3 – 7, 124:19 – 22), and the website GirlsDoToys.com with Matthew

9    Wolfe in 2014. (10/3/19 Trial Tr. 110:19 – 22; Ex. 1052 [Letter of Intent].). Pratt was involved in

10   the recruitment of and/or served as the videographer for Jane Does 3, 4, 5, 9, 11, 13, 14, 15, 18, 19,

11   20, and 22.[2] As videographer, Pratt often presented documents to models to sign and answered any

12   questions they had surrounding the shoot.

13       **Douglas Wiederhold** (not a defendant) was hired by Pratt to serve as the male performer for

14   GirlsDoPorn videos in 2007. (Deposition of Douglas Wiederhold, taken July 17, 2018

15   ["Wiederhold Depo"] at 106:9 – 22). In 2010, he and Pratt co-founded MomPOV.com.

16   (Wiederhold Depo at 39:3 – 7, 124:19 – 22). Wiederhold also served as the male performer in

17   MomPOV videos and generally handled operations of the website since its inception. He stopped

18   shooting videos for GirlsDoPorn in or around 2012. (*Id.* at 49:25 – 50:5). Wiederhold did not

19   interact personally with any of the Plaintiffs.

20       **Defendant Matthew Wolfe**, a childhood friend of Pratt from New Zealand, joined Pratt in

21   the United States and began providing services for Pratt's pornography business in 2011. (10/2/19

22   Trial Tr. 9:6 – 9.) Wolfe's duties include or have included payroll, bookkeeping, billing, technical

23   assistance, recruiting, and videography. (10/2/19 Trial Tr. 25:13 – 26:2, 134:7 – 8.) As

24

25       [2] (10/01/19 Trial Tr. 9:5-10; 21:14-16 [Jane Doe 3]; 8/28/19 Trial Tr. 83:23-84:9 [Jane Doe 4];
     9/18/19 Trial Tr. 21:20-22:8 [Jane Doe 5]; 9/30/19 Trial Tr. 16:19-18:9 [Jane Doe 9]; 9/10/19 Trial Tr.
26   121:13-25 [Jane Doe 11]; 9/09/19 Trial Tr. 38:10-39:6 [Jane Doe 13]; 10/15/19 Trial Tr. 28:13-14; 52:17-21
     [Jane Doe 14]; 8/20/19 Trial Tr. 201:15-17; 202:2-18 [Jane Doe 15]; 9/24/19 Trial Tr. 11:4-23 [Jane Doe
27   16]; (Deposition of Jane Doe 18, March 22, 2019 ["Doe 18 Depo."] 92:10-13 [Jane Doe 18]); 9/09/19 Trial
     Tr. 212:6-9 [Jane Doe 19]; 9/16/19 Trial Tr. 7:2-7, 12:3-9 [Jane Doe 20]; and Deposition of Jane Doe 22,
28   January 22, 2019 ["Doe 22 Depo."] at 238:20-239:2 [Jane Doe 22].)

**STATEMENT OF DECISION**

1  videographer, he often answered questions posed by models and presented documents to them to

2  sign. (Trial Tr. 08/22/19 at 37:24 – 38:4 and Deposition of Jane Doe 21 taken on May 4, 2019 at

3  107:20 – 111:19.) In 2011, Wolfe and Pratt purchased the domain GirlsDoToys.com and Wolfe has

4  filmed many of the videos. (10/3/19 Trial Tr. 110:19 – 22.) He was produced as the PMQ for the

5  entities that run GirlsDoPorn and GirlsDoToys in this case. (10/2/19 Trial Tr. 88:1 – 7.) In his

6  testimony, Pratt deferred to Wolfe as more knowledgeable on many issues relating to his

7  businesses. (Pratt Depo Vol. 1 at 32:6 – 9). Wolfe was involved in the recruitment of and/or served

8  as videographer for Jane Does 1, 2, 5, 7, 9, 10, 12, 14, 17, 21, and 22.[3]

9      ***Defendant Andre Garcia*** was hired by Pratt to serve as the male talent and "casting

10  director" for GirlsDoPorn.com (Pratt Depo. Vol. I, 54:1 – 3.) Garcia earns a commission for each

11  model he recruits and is paid an hourly rate on top of those commissions. (Pratt Depo Vol. 3 at

12  151:8 – 11). As male talent, Garcia often presented the documents to models to sign and answered

13  questions they posed surrounding the shoot. (Trial Tr. 09/10/19 at 136:7 – 16; 137:18 – 23; Trial Tr.

14  09/10/19 at 136:7 – 21.) Garcia is the male talent appearing in each of the Plaintiffs' videos and was

15  involved in the recruitment process of or otherwise made representations to Jane Does 1, 2, 3, 4, 5,

16  6, 7, 8, 10, 11, 12, 13, 14, 18, 19, 20, and 21.[4]

---

[3] Jane Doe 1 (Trial Tr. 09/11/19 at 150:23-151:7), Jane Doe 2 (Trial Tr. 09/25/19 at 52:16-20; 62:13-17), Jane Doe 5 (Trial Tr. 09/18/19 at 27:2-8), Jane Doe 7 (Deposition of Jane Doe 7 Volume 2 taken on August 8, 2018 ["Jane Doe 7 Depo Vol. 2"] at 253:20-22; 284:7-10), Jane Doe 9 (Trial Tr. 09/30/19 at 29:10-14), Jane Doe 10 (Trial Tr. 10/07/19 at 126:13-15), Jane Doe 12 (Trial Tr. 08/22 at 35:13-22), Jane Doe 14 (Trial Tr. 10/15/19 at 89:6-12), Jane Doe 17 (Trial Tr. 08/29/19 at 182:15-21), Jane Doe 21 (Deposition of Jane Doe 21 taken on May 4, 2019 at 105:3-5), and Jane Doe 22 (Deposition of Jane Doe 22 taken on January 22, 2019 at 276:16-21).

[4] JD 1 (Trial Tr. 09/11/19 at 152:5-14), 2 (Trial Tr. 09/25/19 at 54:6-15), 3 (Trial Tr. 10/01/19 at 12:6-11), 4 (Trial Tr. 08/28/19 at 85:19-86:18), 5 (Trial Tr. 09/18/19 at 10:11-17), 6 (Trial Tr. 08/27/19 at 23:5-7), 7 (Jane Doe 7 Depo Vol. 2 at 284:22-285:1), 8 (Deposition of Jane Doe 8 taken May 11, 2018 at 73:11-20), 10 (Trial Tr. 10/07/19 at 112:26-113:5, 11 (Trial Tr. 09/10/19 at 135:20-136:21), 12 (Trial Tr. 08/22/19 at 15:15-18), 13 (Trial Tr. 09/09/19 at 26:3-12), 14 (Trial Tr. 10/15/19 at 17:23-25), 18 (Deposition of Jane Doe 18 taken on March 22, 2019 at 132:15-133:4), 19 (Trial Tr. 09/09/19 at 220:17-221:8), 20 (Trial Tr. 09/16/19 at 26:7-21), and 21 (Deposition of Jane Doe 21 taken May 4, 2019 at 48:22-49:4; 59:24-25).

**STATEMENT OF DECISION**

**EXH. 1 - 007**

1    ***Theodore ("Teddy") Gyi*** worked as videographer for GirlsDoPorn and GirlsDoToys from

2    November 2015 through April or May 2017. (8/29/19 Trial Tr. 73:10 – 22.) As part of his job, Gyi

3    also assisted with chauffeuring women around San Diego and often presented documents to models

4    to sign and answered questions they posed surrounding the shoot. (Trial Tr. 8/21/19 at 84:1 – 14)

5    Wolfe and Pratt instructed Gyi on how to handle questions posed by models. (8/29/19 Trial Tr.

6    86:11 – 21). Gyi served as videographer for Jane Does 6, 8, 11, 13, 15, 18, 19, and 20.[5]

7    ***Valorie Moser*** worked for Pratt as an administrative assistant from March 2015 until 2018.

8    (9/20/19 Trial Tr. 61:14 – 19.) She organized contracts, receipts, and expenses, and performed

9    QuickBooks and payroll. (*Id.* at 62:24 – 63:4.) She also chauffeured models around San Diego and

10   helped get models prepared for their shoot. (Trial Tr. 9/20/19 at 77:3 – 23.) In or around 2018, Pratt

11   asked Moser to assist with recruiting certain women BLL Media had been unable to convince to

12   shoot a video. (Trial Tr. 09/23/19 at 93:9 – 23). Pratt instructed Moser on what to say and what not

13   to say when recruiting, and Moser took notes during that conversation. (Trial Tr. 09/20/19 at 89:15

14   – 91:15). Moser did not interact personally with any of the Plaintiffs.

15   ***Kevin Holloway***, a now-deceased attorney out of Wichita, Kansas, assisted Pratt in forming

16   the first entity that would eventually become the pornography enterprise at issue today. (Ex. 1660.1

17   [Articles of Incorporation for Clockwork Productions, Inc. filed November 29, 2006].) Holloway

18   also incorporated entities in Vanuatu on Pratt's behalf. (Pratt Depo. Vol. I, 243:12 – 15 [KH set up

19   BGF].) Pratt claims that Holloway owned of all of the videos produced for GirlsDoPorn and

20   GirlsDoToys by way of these Vanuatu entities,[6] but, for the reasons stated below, the Court finds

21   that Pratt owned and controlled these entities as well as the rights to the videos.

22

23

24

25   [5] JD6 (Trial Tr. 8/27/19 at 58:21-23), 8 (Deposition of Jane Doe 8 taken May 11, 2018 at 153:12-15, Trial Ex. 342.3), 11 (Trial Tr. 09/10/19 at 131:4-5), 13 (Trial Tr. 09/09/19 at 26:13-17), 15 (Trial Tr. 08/21/19 at 72:3-8), 18 (Deposition of Jane Doe 18 taken on March 22, 2019 at 130:17-18), 19 (Trial Tr. 09/09/19 at 218:13-14), and 20 (Trial Tr. 09/16/19 at 70:3-9).

26

27   [6] Pratt claims he struck a deal with Holloway in 2006, and that Holloway owns Oh Well Media Limited. (Pratt Depo. Vol. I, 62:7 – 9, 67:1 – 9; 102:8 – 103:4; 117:19 – 119:12 [explaining KH gave MP equipment, MP hasn't compensated him]; 271:7 – 277:11 [MP transferred the rights to OWM because that's the way it was supposed to be].)

28

-8-

1     *Reference Models.* Defendants hired reference models to assist with recruiting by

2 communicating with prospective models to assuage their objections and doubts about filming a

3 pornographic video. (Pratt Depo. Vol. II, 188:19 – 22.) Pratt, Wolfe, and/or Garcia instruct

4 reference models on what to say when they speak with prospective models. The reference models

5 who communicated with Plaintiffs in this case include ***Kailyn Wright, Amberlyn Nored Clark,***

6 ***Alicia McKay,*** and ***Cat Wilkens.***

7     Defendants hired other individuals to assist with their business operations, including ***Alex***

8 ***Martinez*** who provided DMCA takedown services for the Websites (Deposition of Alejandro

9 Martinez taken on April 17, 2018 at 46:21 – 47:1); ***Alex Foster,*** who acts as a videographer for

10 GirlsDoPorn and "any other productions" the Defendants may shoot, including GirlsDoToys (Pratt

11 Depo Vol. 1 at 53:16 – 25); ***Cameron Brown,*** who performed DMCA copyright removal services

12 for the company, like Mr. Martinez. (Pratt Depo Vol. 1 at 54:4 – 6); and ***Kevin Gibson*** who was a

13 porn producer working for GirlsDoPorn alongside Mr. Pratt from at least November 2016 until

14 October 2018 (Trial Tr. 10/29/19 at 40:25 – 41:12). Defendants hired Jamia McDonald, Kevin

15 Gibson's then-girlfriend, to repeatedly harass Plaintiffs' counsel with phone calls every day for

16 $300 a week. (Trial Tr. 10/29/19 at 47:24 – 48:16). None of these individuals personally interacted

17 with the Plaintiffs in this case.

18     **iii.  The Entities**

19     Defendants used more than a dozen entities to operate their three pornographic websites.

20 Defendants admit to owning, either directly or indirectly, some of the entities, including BLL

21 Media, Inc.; BLL Media Holdings, LLC; Domi Publications, LLC; MIM Media, Inc.; Merro

22 Media, Inc.; Merro Media Holdings, LLC; EG Publications, Inc.; UHD Productions, LLC; EBB

23 Marketing, Inc.; and Hayst Holdings, Limited.

24     Defendants deny holding an ownership interest in several other related entities, including

25 Clockwork Productions, Inc., Bubblegum Films, Inc., Oh Well Media, Ltd., Sidle Media Ltd., and

26 Torque Asset Management, LLC. In fact, these are the entities that, at one time or another, have

27 purported to hold the rights to the videos Defendants produce, the domain name of their websites,

28

-9-

**STATEMENT OF DECISION**

1 | and the trademark of their brands—the entirety of Defendants' assets. Each of these entities exists

2 | under the laws of the Republic of Vanuatu—a tiny, remote island in the South Pacific.

3 |      The Court received no evidence of writings establishing the Vanuatu entities' separate and

4 | independent status. The Court received no evidence of consideration paid to Defendants by these

5 | entities in exchange for ownership rights to the videos and websites. Not only do Defendants claim

6 | that they do not own these entities, but they claim to have no knowledge of the person who does

7 | own them.

8 |      Taking into account each Party's ability to provide evidence (Cal. Code Evid. § 412; CACI

9 | No. 203 [Party Having Power to Produce Better Evidence]) and noting the absence of evidence

10 | supporting Defendants' theory, the Court finds: there are no contracts, no consideration, and no third-

11 | party owners, known to Defendants, because Defendants themselves own these entities.

12 |      As explained in detail below, the evidence at trial supports a finding that all entities are a

13 | single business enterprise. Therefore, the Court treats them as one.

14 |      **C.**    **Defendants' Deceptive and Unfair Business Practices**

15 |      Over the course of a 99-day trial, the Court heard from 22 Plaintiffs (live and by deposition)

16 | who provided credible testimony. The Court also heard from seven non-plaintiff models who

17 | testified about one of the most humiliating and devastating experiences of their young lives.

18 | Plaintiffs further called four women Defendants hired as reference models; these witnesses

19 | admitted to lying to prospective models such as the Plaintiffs in this action even though, by telling

20 | the truth, they implicated themselves in a fraudulent scheme. Finally, Plaintiffs also called four of

21 | Defendants' former employees, whose testimony, in part, corroborated that of the Plaintiffs.

22 |      In contrast, only one individual Defendant, Wolfe, appeared live, and he provided guarded,

23 | and at times inconsistent testimony. Pratt, on the other hand, fled the country, ignoring a properly

24 | served notice to appear and an arrest warrant issued by this Court, opting instead to testify by

25 | deposition. In evaluating the evidence, the Court considers Defendants' failure to credibly explain

26 | or deny Plaintiffs' evidence against them. (CACI No. 205.)

27

28

**STATEMENT OF DECISION**

### iv. Defendants Use Deceptive Recruiting Practices

The success of Defendants' business turns on their ability to induce young women who would not otherwise consider filming pornography to fly to San Diego and shoot a pornographic video. Defendants' success in doing this is based on several practices: first, they drew women in through bait-and-switch advertisements for clothed modeling; second, they offered enough money to overcome the woman's general compunction against the idea of pornography; and third, they lied about a significant concern the women have—where and how the video will be distributed and who will be able to see it. Finally, by carefully concealing their own identities at every stage of the recruiting process, Defendants severely curtail the women's ability to investigate the truth of these misrepresentations, concealments, and to protect themselves against Defendants' fraudulent scheme.

#### 1. *Defendants Post Misleading Craigslist Advertisements Which Direct Recruits to Their Websites*

Defendants post advertisements on Craigslist.com that purport to seek women for clothed modeling work in towns and cities all over the United States and Canada. (10/2/19 Trial Tr. 120:2 – 14.) These facially benign ads offer to pay women ages 18 to 22 with little to no modeling experience a large sum of money—typically around $5,000—for photo and/or video shoots. (E.g., (8/27/19 Trial Tr. 12:3 – 10) [JD 6]; (8/29/19 Trial Tr. 183:17 – 21) [JD 17]; (9/9/19 Trial Tr. 212:19 – 24) [JD 19].) The ads also direct prospective models to Defendant-owned modeling websites such as www.BeginModeling.com, www.ModelingGigs.com, and www.ModelingWorks.com, which also appear to advertise clothed modeling work. (Ex. 1543.1) The websites contain an application form where prospective models can enter their names, ages, height, weight, location and contact information and attach photographs. (Ex. 1543.1.)

Neither the Craigslist ads nor these websites contain any indication that nudity or pornography is involved. (10/2/19 Trial Tr. 143:26 – 144:19 [Wolfe testifying this is because Craigslist removes ads related to pornography].) Contrary to Defendants' explanation, the Court finds that Defendants deliberately used deceptive advertisements and websites to mislead women about the nature of the work; Defendants aimed to cast a wider net to attract a certain type of

-11-
**STATEMENT OF DECISION**

1    applicant—women who would not intentionally respond to a solicitation to appear in a

2    pornographic video.[7] This is consistent with Defendants' depiction of GDP models as making a

3    one-time-only stint into pornography.

4         Women can apply for the purported modeling work through Craigslist by email or the

5    application page on Defendants' modeling websites by submitting name, age, height, weight,

6    location, email address, phone number, and pictures. (Ex. 1543.1) If the applicant meets

7    Defendants' criteria, she will receive an email from Defendants. (10/2/19 Trial Tr. 120:25 – 28.)

8                            **2.** ***Defendants Send Deceptive Emails Designed to get the Woman on***

9                                      ***the Phone***

10        Defendants use a few different stock emails to respond to applicants, but the one received

11   by most of the Plaintiffs in this case is the stock email from "Jonathan." (E.g., Exs. 121.2; 151; 276;

12   612.)[8] This email does not contain the word pornography[9] but instead states "[t]his is a legitimate

13   adult gig for an established Southern California company." (*Ibid.*)[10]

14        The stock email makes the "gig" sound fast, easy, and safe and begins assuaging women's

15   concerns right off the bat: "None of your personal information will be given out in the video or

16   afterwards, no names etc. are used in the video." (*Ibid.* [sic in original].) The email also represents,

17   "We have shot over 200+ models, you can speak or Skype with as many as you want and talk to

18   them about their experience with us." In reality, although Defendants *have* shot hundreds of

19   models, they only permit a prospective model to speak with a few select "references"—some of

20   whom are not actual previous GDP models but have been hired to give fraudulent testimonials. In

21

---

22       [7] All Plaintiffs testified they would not consider responding to an ad for pornography. Most testified
23   they did not consider even nude modeling.

    [8] Defendants used a few other stock emails: one from "Mike" (Ex. 453.) and one from "Robb" (Ex.
24   277.)

25       [9] Defendants instruct their employees not to use the word "pornography" or "porn." (9/23/19 Trial
Tr. 225:21-25 [Valorie Moser explaining that Pratt suggested she use the word "adult video" as opposed to
26   "pornography" in recruiting models]; Ex. 1695.54 ["adult video" hand-written at the top of the page.)

27       [10] Some women find the term "adult gig" to be vague and believe it may refer to nude modeling as
opposed to hardcore pornography. (Sept. 9, 2019 Trial Tr. 214:23-215:5 [Jane Doe 19 unsure whether the
28   email meant porn or nude photo shoot].) Some do not learn the ad is for pornography until they arrive at the
shoot. (Aug. 29, 2019 Trial Tr. 194:12-195:8 [Jane Doe 17 believed this email referred to nude modeling].)

-12-

**STATEMENT OF DECISION**

**EXH. 1 - 012**

1   any case, Defendants channel new recruits solely to particular references who have been instructed

2   and paid to present Defendants' false narrative.

3        Although some Plaintiffs responded to this first email, each Plaintiff testified that the idea of

4   filming a pornographic video triggered concerns about where the video would be distributed and

5   who would be able to see it. Plaintiffs were all aware of the existence and proliferation of internet

6   pornography but wanted to hear more about this particular offer because the email indicated that

7   their identities would be protected and suggested that the other women who had shot a video did not

8   regret it. (E.g., 10/1/19, Trial Tr. 13:10 – 17 [JD 3]; 9/10/19, Trial Tr. 120:3 – 5 [JD 11]; 8/22/19,

9   Trial Tr. 18:5 – 20:19 [JD 12]; 9/24/19, Trial Tr. 12:10 – 14 [JD 16]; 9/16/19 Trial Tr. 12:14 – 22

10  [JD 20].) This job also offered notably high pay for what appeared to be very little work.[11] Many

11  Plaintiffs testified that, although they ordinarily would not consider doing pornography, this offer

12  was uniquely enticing.

13       If women do not respond to this initial email, Defendants do not give up. Instead, they send

14  a follow-up email sometimes increasing the amount of pay and offering clothed modeling and more

15  detailed assurances. (Exs. 278; 618; 810.)  Some Plaintiffs responded to this email specifically

16  because of the offer to do clothed modeling.[12] (E.g., (8/21/19 Trial Tr. 18:16 – 19:12) [JD 15];

17  (8/29/19 Trial Tr. 187:13 – 188:17) [JD 17].) In fact, clothed modeling has never been part of

18  Defendants' business. The Court finds that Defendants make this offer with no plan or intention to

19  fulfill it and include it in this email solely for the purpose of misleading women about the nature of

20  the job in order to elicit a response from those who would not otherwise respond.

21       Several Plaintiffs testified they found this second email particularly persuasive. It provides

22  more details about the types of girls who have done a shoot: "All the girls that I shoot are first

---

[11] Indeed, many Plaintiffs testified they were in precarious financial situations and although some admitted this pressure impacted their decisions, all steadfastly stated that *even given their financial situations* they would not have done the video if they had known it would be widely published online and available in the United States. (See, e.g., Jane Doe 4, Jane Doe 5, Jane Doe 9, Jane Doe 19.)

[12] The legitimacy of this offer is buttressed by the additional statement, "Clothes form [sic] BCBG and Bebe are provided by us and you can keep them." (Exs. 278 [JD 6]; 340 [JD 8]; 618 [JD 13]; 720 [JD15]; 810 [JD17].) [JD 17 saying that she believed it because it included this statement about clothes … (9/3/19 Trial Tr. 104:6-17).)

-13-

**STATEMENT OF DECISION**

1  times. I shoot cheerleaders, sorority girls, preppy college girls, IG [Instagram] models with 70k

2  followers and models of that caliber." (*Ibid.*) Several Plaintiffs testified that these representations

3  helped to lure them in because the type of girls described were relatable to them—Jane Doe 15 was

4  on her collegiate cheerleading team; Jane Doe 13 was in a sorority. Plaintiffs also interpreted this

5  statement to mean that these women (who led lives similar to their own) had not been negatively

6  impacted by shooting the videos and had continued to lead their normal lives. (E.g., (8/21/19 Trial

7  Tr. 23:22 – 24:2) [JD 15].)

8        The follow-up email also says, "We have over 50 models that you can speak or

9  Skype/Facetime with." Defendants even send pictures of recent models who look like ordinary

10  women who are happy and safe. (Exs. 285; 618; 818.) Many Plaintiffs testified that these pictures

11  were relatable and made them more comfortable. (E.g., (8/22/19 Trial Tr. 22:14 – 23:1, 27:4 – 16)

12  [JD 12]; (10/15/19 Trial Tr. 75:2 – 14) [JD 14]; (Deposition of Jane Doe 22, January 1, 2019 ["Jane

13  Doe 22 Depo."] at 152:4 – 7) [JD 22].) Defendants also send pictures of the hotel rooms, the sets,

14  camera equipment, and the male performers, which Plaintiffs testified improved their comfort level

15  because they felt that Defendants were being open and generous with information and because the

16  images looked professional and legitimate. (E.g., JD 6 [8/27/19 Trial Tr. 34:4 – 10]; JD 14

17  [10/15/19 Trial Tr. 75:15 – 24].)

18        It should be noted that Defendants also present the experience as a glamorous opportunity to

19  travel to Southern California and enjoy expensive amenities they could not ordinarily afford. One

20  indicated that this depiction influenced her decision to respond to the ad.  Other Plaintiffs testified

21  that these representations assisted in convincing them that Defendants ran a legitimate, professional

22  operation. (E.g., JDs 6, 17).

23        **3. *Defendants Falsely Promise More Pay than they Intend to Provide***

24        The Court also finds that it is Defendants' business practice and strategy to offer as much

25  money as needed to entice a recruit to San Diego for a shoot, but sometimes with no intention of

26  actually following through. This often involved increasing the offers until a candidate agreed. For

27  example, Valorie Moser testified that Pratt instructed her to "[m]ake an offer of a price that was

28  high enough to get the model on a plane." (9/20/19 Trial Tr. 115:15 – 24 ["high-balled" or

-14-
**STATEMENT OF DECISION**

1   "exaggerated" amounts were frequently quoted].) Defendants used this strategy with multiple

2   Plaintiffs. (E.g. Jane Doe 6, JD 8, JD 10, JD 15, JD 16, JD 21.) Jane Doe 6, in particular, did not

3   reply to Jonathan's email until he increased the offer from $5,000 for two videos to $7,000 for one

4   video. She testified that she would not have agreed to accept any less. (8/27/19 Trial Tr. 172:2 –

5   174:2.)

6        Defendants sometimes do not honor their promises regarding pay. Once a model has arrived

7   at the hotel room in San Diego and has stripped down to begin filming, Defendants at times use a

8   pretext (a supposed flaw in her appearance) to pay her less than the agreed-to amount.[13] (E.g. Jane

9   Does 10, 12, 13, 15, 19 and 20.) Defendants have never previously informed the model that her pay

10  is not fixed but is contingent and subject to change. Some Plaintiffs would not have agreed to the

11  videos had they known that Defendants claimed the unilateral discretion to slash their pay, often by

12  thousands of dollars. However, by the time models have arrived in San Diego and filming is about

13  to begin, they have no choice but to relent and proceed with the shoot. Defendants threaten them

14  with consequences if they do not do so.

15       The Court finds that Defendants deliberately mislead some models by increasing or

16  overstating the amount of pay offered with little intention to fulfill that promise.[14]

17                    **4.  *Defendants Misrepresent Facts and Make False Assurances on the***

18                         ***Phone***

19       Defendants' goal is to initiate a phone call with a prospective model as quickly as possible.

20  (Exs. 277 [JD6]; 510 [JD 12]; 621 [JD 13]; 714 [JD 15]; 944 [JD 21]; 994 [JD 22].) When a model

21

22

23   ──────────────

        [13] This is often accompanied by cruel or cutting commentary which humiliates the models.

24      [14] Defendants' conduct is illustrated by the testimony of Jane Doe A, a third-party model who was
25   recruited and shot her video during trial. (10/31/19 Trial Tr. 41:9-15, 42:11-24, 46:5-16, 55:1-20, 98:12-14.)
     Jonathan (Garcia) first offered her $6,000 for a boy-girl shoot and $2,000 for a solo shoot and slowly raised
26   the amount until he had offered her $10,000—$6,000 for the boy-girl shoot and $4,000 for the solo.
     (10/31/19 Trial Tr. 127:28-129:2.) Defendants had already shut down the website where solo videos are
27   posted, GirlsDoToys, and stopped filming such videos. (10/7/19 Trial Tr. 38:8-18; 11/25/19 Trial Tr. 177:1-
     9.) Garcia augmented Defendants' offer for the part of the shoot that he knew would not occur. Jane Doe A
28   was not given a chance to shoot the solo scene when she traveled to San Diego and received $6,000 instead
     of the promised $10,000. (10/31/19 Trial Tr. 129:3-6, 61:23-26.)

                                                -15-
                                     **STATEMENT OF DECISION**

1   asks questions by email or text, Defendants answer *some* questions in writing,[15] but if a prospective

2   model asks about where the video will be distributed, Defendants *always* ask to discuss it over the

3   phone. (Exs. 9.1 [JD1]; 218 [JD5]; 371.1 – 2, 372.7 [JD 9]; 725 [JD15]; 779.2 [JD 16].) The Court

4   finds that Defendants deliberately avoid written communications about distribution with

5   prospective models because Defendants misrepresent where and how the videos will be distributed.

6   Defendants produced no written communications to the contrary. (CACI 203, 205.)

7         Based on consistent testimony at trial, the Court finds that, during the initial phone call

8   between Defendants and prospective models, Defendants assure the women that the video will

9   never be seen by anyone they know because it will only be distributed on DVD in a foreign

10  country; it thus will never be available in the United States, and it will never be published online.

11  While the details of Defendants' representations varied slightly,[16] the part of the message that

12  mattered to the prospective models remained the same—"it's not going online and no one in the

13  United States will find out." The specific destination represented simply made these material

14  representations credible and believable to Plaintiffs.

15        Every Plaintiffs' significant concern (aside from her physical safety) was where the video

16  would be distributed and who would be able to see it. Nearly every Plaintiff asked questions and

17  expressed her concerns about distribution during the phone calls with Defendants. Some Plaintiffs

18  testified they did not have a chance or need to ask questions because Defendants told them what

19  they wanted to know as soon as they got on the phone. (E.g., JD 22 [Jane Doe 22 Depo. 150:12 –

20  151:18].) Some explained their particular situations and reasons that they were concerned about

21  distribution of the video. (JD 1 [9/11/19 Trial Tr. 157:14 – 19], JD 9 [9/30/19 Trial Tr. 15:17 – 25],

22  JD 12 [8/22/19 Trial Tr. 20:20 – 21:3], JD 15 [8/21/19 Trial Tr. 23:8 – 13].) Defendants assured

23  each woman that they had done this many times before and the videos had never appeared online

24

25        [15] (E.g., Ex. 875.1-2 [JD 19 asking about the male talent]; Ex. 511 [JD 12 asking about models that have filmed with the company].)

26        [16] Sometimes Defendants said the DVD would be sent to a single "private collector" in Australia

27  (JD1, JD5, JD10, JD19), sold exclusively in Australia (JD4, JD6, JD7, JD9, JD11, JD12, JD17, JD20), New Zealand (JD16), Australia and New Zealand (JD 22), South America (JD 3), Australia and South America

28  (JD 18), the UK (JD15), "overseas" (JD2, JD8), or "to men on fishing boats overseas" (JD14), to "exclusive members with paid subscriptions" (JD13), or "to a small overseas audience (JD21).

-16-

STATEMENT OF DECISION

1   and no one in the United States had ever found out. As set forth in the Court's findings regarding

2   the individual Plaintiffs (see below), Defendants had a ready answer for any questions asked. (See,

3   e.g., (9/18/19 Trial Tr. 13:8 – 16) [JD 5] [Defendants said the private collector signed a contract

4   that he would not redistribute DVD]; (10/16/19 Trial Tr. 49:2 – 11) [JD 14] [Defendants said the

5   DVD was encrypted and could not be copied]; (8/26/19 Trial Tr. 181:19 – 25) [JD 15] [Defendants

6   said that if the video did somehow end up online, they had ways of taking it down].) A truthful

7   answer to questions about distribution would have upset Defendants' scheme by revealing the true

8   nature of the enterprise.

9            Nor was there any particular act of diligence that would have revealed the truth to Plaintiffs

10   and other women ensnared in Defendants' scheme. Defendants' use of aliases and other business

11   names and websites ensured that a prospective model who checked Defendants' reputations on the

12   internet would not learn that they owned and operated a popular website called GirlsDoPorn and

13   that their videos were strewn across dozens of other websites.[17]

14            Defendants argued that Plaintiffs did not do their due diligence because they did not obtain

15   an explanation for how Defendants could guarantee that a video (once distributed in any medium)

16   would not be uploaded onto the internet. However, Defendants' scheme was remarkably successful

17   for a reason, and the sheer number of GDP models—numbering in the hundreds—attests to its

18   effectiveness. Plaintiffs were young individuals with no experience in the pornography industry.

19   Defendants, on the other hand, were significantly older and held themselves out as experienced

20   professionals with knowledge of how the videos would actually be distributed and who would

21   actually have access to them. Plaintiffs asked Defendants extensive questions regarding their

22   concerns, and Defendants provided answers that placated those concerns and, to a person of

23

---

24   [17] This point is driven home by the testimony of third-party model B.F. who testified that she spent
     hours researching BeginModeling.com before agreeing to appear in the video. (9/24/2019 Trial Tr. 208:2 –
25   209:3.) Deep in the internet, she found a story from a woman that sounded similar to what Defendants had
     told her. (Id. at 209:11 – 17.) B.F. immediately texted Jonathan and asked him outright whether he had
26   anything to do with GirlsDoPorn. (Id. at 209:19 – 23.) Jonathan, who first asked to speak with her on the
     phone, denied the allegation, saying: "'No. We know who that company is. That's not us. Your video would
27   only be going on DVDs to Australia. It's not going to be online. It's not going to be in the US.'" (Id. at
     209:24 – 210:2, 212:11 – 18.) He then provided her with contact information for three reference models who
28   backed up his story. (Id. at 212:21 – 213:13.)

**STATEMENT OF DECISION**

1 │ Plaintiffs' age, education, and experience, seemed quite reasonable. Plaintiffs had no ability to

2 │ independently verify the information Defendants provided and little reason to do so. The record

3 │ establishes that Plaintiffs relied upon Defendants' assurances, as Defendants knew and hoped they

4 │ would.

5 │ Defendants affirmatively stated in no uncertain terms that they would not distribute the

6 │ videos via the internet, but would target them exclusively for very limited DVD production in

7 │ overseas locales. They then proceeded to do exactly the opposite, guaranteeing that the videos

8 │ would be widely published on the internet and disseminated in Plaintiffs' communities. What *might*

9 │ have conceivably transpired if the videos had instead been sold to a single private collector in

10 │ Australia, for instance, is beside the point.

11 │ Defendants are persistent in their recruiting efforts. Several Plaintiffs testified that

12 │ Defendants called and texted them multiple times a day every day. Jane Doe 20, for example,

13 │ agreed to do the shoot and booked a flight, then got cold feet and backed out. She testified that Pratt

14 │ called and texted her, comforted and convinced her until she finally relented. (09/16/19 Trial Tr.

15 │ 19:16 – 27) [JD 20].

16 │ Defendants also use other means of communication to convince women to trust and believe

17 │ them. Defendants offer to Facetime or Skype with women while they are at another shoot to show

18 │ them around the set, introduce them to the model being filmed, and let them see the atmosphere.

19 │ (JD 6 (8/27/19 Trial Tr. 44:23 – 45:3); JD 15 (8/21/19 Trial Tr. 62:14 – 63:13); JD 20 (9/16/19

20 │ Trial Tr. 16:16 – 17:5).) Several Plaintiffs testified that this communication made them more

21 │ comfortable and increased their trust in Defendants; Jane Doe 6 testified that the photos Defendants

22 │ sent of money, previous models, and the hotel rooms "looked like everything they were promising

23 │ [her]," (08/27/19 Trial Tr. 34:4 – 10).

24 │ ### 5. *Defendants Pay Reference Models to Repeat their Fraudulent*

25 │ ### *Misrepresentations*

26 │ One of Defendants' most effective recruitment techniques was the use of reference models

27 │ to speak to prospective models and bolster Defendants' misrepresentations. Knowing that their own

28 │ assurances would only take them so far, Defendants hired women to speak with prospective models

-18-

STATEMENT OF DECISION

1    and provide a so-called "first-hand" account of their experience working with Defendants. (See

2    9/20/19 Trial Tr. 95:13 – 96:3 [Pratt asked Moser to assist in recruiting women with whom he had

3    been unsuccessful because he thought "they would be more responsive to a female voice"].) In

4    reality, this is yet another deception.

5        As mentioned above, Defendants state in their very first email to prospective models that

6    there are hundreds of women who have shot videos with Defendants and would be happy to share

7    their experiences. (Ex. 276.1.) Defendants typically mention the references again on the phone and

8    then put the prospective model in touch with at least one reference.

9        Defendants use three types of reference women. The first type consist of women who have

10    recently shot a video with Defendants and have not yet learned that the videos are released online.

11    The second type consists of prior models who are in fact aware that the videos are published online.

12    The third type consists of women who have never actually shot a video with Defendants but who

13    are paid to say that they have. Reference women from each category testified at trial.

14        ***Amberlyn Clark*** was friends with Andre Garcia when he asked her to act as a reference to

15    assist him in recruiting models in or around 2016. (8/20/19 Trial Tr. 147:10 – 16; 148:19 – 25.)

16    Clark knew Garcia was an actor and recruiter for GirlsDoPorn.com when she agreed to act as a

17    reference. (*Id.* at 149:1 – 13.) She has never filmed a video with Defendants. (*Id.* at 151:9 – 15.)

18        Clark testified that Garcia instructed her to tell prospective models that the videos "wouldn't

19    be put online and that they would go to private collectors" located "[o]utside of the U.S." (*Id.* at

20    150:4 – 25.) He also instructed her to assure models that "no one would find out." (*Id.* at 158:2 – 7.)

21    Clark admitted to acting as a reference for "just a handful" of women and that she was compensated

22    based upon Defendants' attractiveness rating for each woman. (*Id.* at 157:1 – 5; 158:9 – 21.) Clark

23    acted as a reference for at least two Plaintiffs, Jane Does 6 and 15.

24        ***Kailyn Wright*** was an unsuspecting reference at first but continued acting as a reference

25    even after she learned the truth.[18] (Deposition of Kailyn Wright, May 13, 2019 ["Wright Depo."] at

26

27      [18] Before she became a reference model, she testified that she shot a video with Defendants after

28    seeking assurances that the video would not be published online and that she would not have agreed to shoot
the video if she had known it would be released on websites such as Pornhub. (Wright Depo. 41:9 – 42:04.)

**STATEMENT OF DECISION**

1   22:16 – 23:1.) She testified that Defendants paid her to talk to potential models and "make them

2   feel comfortable and like, reassure them, like, it was fine and legit." (*Id.* at 14:5 – 8.) Defendants

3   instructed Wright that, if a prospective model asked her where the videos would go, "to tell them it

4   would not be going online and that it was going overseas to wealthier countries." (*Id.* at 15:20 –

5   16:3.) When asked why she told women that their videos would not be released online when she

6   knew that this was not true, she stated, "Because that's what they told me to say. That's what they

7   were paying me to say." (*Id.* at 23:4 – 10.)

8        Wright testified that when she was recruiting models for Defendants, she had a text message

9   saved on her phone that she would send to the women. (*Id.* at 35:8 – 11.) She identified Exhibit

10  745, produced by Jane Doe 15, as the text message she sent to prospective models. (*Id.* at 37:9 –

11  15.) Wright was a reference for several Plaintiffs, including Jane Does 1, 15, 17, and 21.[19]

12       ***Taylor Rodgers*** also acted as a reference for prospective models, but she did so *only* prior to

13  learning that her video had been posted online. (Deposition of Taylor Rodgers, April 13, 2019

14  ["Rodgers Depo."] at 33:12 – 34:02.) Rodgers shot two videos with Defendants based on Pratt's

15  assurances that the video would "absolutely not" be online and was "only going to be distributed in

16  Australia to some rich guy." (*Id.* at 22:7 – 23:6.) Prior to shooting the video, she received 3 to 4

17  references from Pratt and spoke with each one. (*Id.* at 16:10 – 17:13.)

18       After she filmed her first video, Pratt and Garcia offered to pay her to speak with

19  prospective models and she agreed because, at that time, she believed that Defendants had told her

20  the truth. (*Id.* at 33:19 – 34:13.) Pratt texted her "examples of what to say" and she "knew from

21  talking to girls prior you're just trying to make the girl feel comfortable." (*Id.* at 34:6 – 16.) As

22  instructed (and as she believed to be true), Rodgers told between five and seven women that "the

23  videos would not be distributed anywhere except for to DVD to a guy in Australia." (*Id.* at 33:12 –

24  15; 36:24 – 37:6.) One of the prospective models she spoke to was Jane Doe 12.

25       Rodgers shot a second video before learning her first video was online. (*Id.* at 40:12 –

26  41:11.) After she learned that her video was online, Rodgers was "upset" that she had encouraged

27

28       [19] Defendants' financial records show 56 payments to Wright from May 18, 2015 until February 3,
    2016. (Ex. 1677.433-.842.)

-20-
**STATEMENT OF DECISION**

1   women to shoot a video based on what turned out to be false information and stopped acting as a

2   reference. (*Id.* at 49:14 – 17.)[20]

3   ***Alicia McKay***, another woman who shot a video with Defendants based on the same false

4   statements, agreed to be a reference because she believed what they told her about distribution was

5   true. (Deposition of Alicia McKay, Volume I, November 13, 2018 ["McKay Depo. Vol. I"] at 53:8

6   – 54:14.)[21] After she learned that the video was online, Pratt asked her to continue as a reference.

7   (*Id.* at 63:20 – 64:7.) She asked what she was supposed to say when someone asked about

8   distribution. Defendants instructed that she could be evasive and direct the prospective model to

9   Garcia. (*Id.* at 65:13 – 67:17; 76:11 – 77:6.) A recording McKay made of her phone call with

10  Garcia was played during trial. Garcia told her to talk to prospective models on the phone rather

11  than by text. (72:3 – 13.) He said that she did not have to answer a lot of questions; she should just

12  tell them "one, you're going to get paid; two, everything's paid for; three, it's legit - - you know,

13  it's not a bunch of weirds, anything like that, and that's it." (72:19 – 73:2.) If the women ask about

14  where the video will go, "just try to get her on the phone" and explain that there are three different

15  brands and "it depends on which ones you're doing. . . . don't ever use any names or anything like

16  that because we [. . .] don't want to, you know, make it seem worse than it is." (73:4 – 73:17.)

17  McKay acted as a reference for Jane Doe 6.[22]

18      Several Plaintiffs testified that they were eager to speak to the reference(s), asked pointed

19  questions about distribution, and likely would not have filmed their video if the references had not

20  confirmed Defendants' representations about distribution. (JD 1, 5, 6, 12, 15, 20, 21, 22.) Some

21  Plaintiffs stated that communicating with the references increased their trust in Defendants and

22

23  [20] Defendants' suggest that Rodgers' testimony is less than credible because she appeared in multiple pornographic videos after learning her video was online. Rodgers credibly testified as to the impact of Defendants' conduct on her life as well as her lack of personal incentive to testify.

24

25  [21] Like Rodgers, after she learned the first video was online, McKay decided to do another because "I figured at that point I was kind of, for lack of a - - I was screwed at that point, for lack of a better word, and I didn't get the full compensation of funds, so I figured, you know what, it's leaked. I'm getting blown

26  up by friends and family, so I might as well go and do it." (McKay Depo. 62:12 – 21.)

27  [22] Defendants suggest that McKay is not credible because she has engaged in certain types of sex work such as escorting, exotic dancing, and "camming." (McKay Depo. 113:14 – 114:20.) The Court

28  disagrees. McKay was forthcoming in her testimony and voluntarily made numerous statements contrary to her interests.

-21-
**STATEMENT OF DECISION**

1   solidified their decision to shoot the video. (JD 2, 3, 11, 13, 14, 16, 17, 18, 19.) A few Plaintiffs

2   were given or offered references but did not contact the references for a variety of reasons, but all

3   stated that just being offered the references made Defendants' statements seem supported and

4   legitimate.[23]

5        Defendants' methods of inducing women to believe their representations about the limited

6   scope of distribution has been honed over nearly a decade. Prior to hiring reference women to

7   cajole prospective models, Defendants directed women to a website called Bubblegumcasting.com

8   where they could view testimonial videos of young women praising their experiences working with

9   Defendants. While some Plaintiffs required more convincing than others, all Plaintiffs ultimately

10  believed Defendants' promises about limited distribution of the videos.

11       Defendants push women to make a decision quickly. Several Plaintiffs recalled Jonathan

12  pressuring them to let him book a flight to San Diego within the first few days, assuring them that

13  they could always change their flight or cancel it. (E.g., 08/21/19 Trial Tr. 25:19 – 24 [Before Jane

14  Doe 15 got off her first phone call with Garcia, he already booked her hotel and flight]. See also

15  10/15/19 Trial Tr. [Jane Doe 14 testified that she had not committed to the gig when Garcia booked

16  her flight].) Several Plaintiffs testified that they still had not made up their minds at the time their

17  flights were purchased. Still in their home state, hundreds or thousands of miles away from

18  Defendants, some Plaintiffs felt they had not made a commitment and could still decide against

19  shooting the video up until the time that they boarded the plane to San Diego. All Plaintiffs who

20  flew boarded the plane in reliance on Defendants' assurances.

21              *ii.   Once the Women Arrive in San Diego, Defendants Give them No*

22                   *Opportunity to Learn the Truth and Little Choice in Completing the Shoot*

23       Upon arriving in San Diego, women are picked up from the airport by one or more of the

24  Defendants or one of their employees, such as videographer Theodore "Teddy" Gyi or makeup

25

26  _____

27       [23] Jane Doe 4 "didn't want anyone else to know that [she] was doing it." (08/28/19 Trial Tr. 88:15-16.) Jane Doe 8 believed Defendants given "they were providing the references and... all of this
    information." (Deposition of Jane Doe 8, May 11, 2018 ["Jane Doe 8 Depo."] at 79:19-20.) Jane Doe 9 did

28  not call because she did not think the Defendants "were going to give [her] someone to call and... have
    negative things to say about the experience." (9/30/19 Trial Tr. 140:1-3.)

-22-

STATEMENT OF DECISION

1  artist Riva Yousif. Defendants and their employees are friendly and make the woman feel

2  comfortable. (Jane Doe 3 testified that her "fight or flight system" calmed down after talking to

3  Pratt and Garcia in the car to the hotel, 2019/10/01 Trial Tr. 20:19 – 27; Jane Doe 6 depicted Riva

4  as a "motherly figure," 2019/08/19 Trial Tr. 49:8 – 9.) Sometimes they go straight to the hotel to

5  check the woman in; other times, they take the woman shopping or out to eat. Sometimes they go to

6  one of the Defendants' apartments to socialize before the shoot.

7          Many women continued to ask questions to confirm what they were told over the phone;

8  they receive the same answers and assurances, often from a different person than they spoke with

9  on the phone. Other women were already fully convinced by Defendants' representations and did

10  not feel a need to ask further questions. Defendants' employees know how to answer questions

11  about distribution: they should confirm the video will not be online, they should never mention

12  GirlsDoPorn.com, and they should reassure models that everything will be fine. (08/29/19 Trial Tr.

13  86:3 – 9 [Teddy Gyi testified that he "was told to tell [women] that there was no videos [sic] posted

14  online"]. 09/20/19 Trial Tr. 68:18 – 22; 170:14 – 171:3 [Val Moser testified that she "was asked to"

15  sign an NDA; Moser also testified that Michael Pratt instructed her not to disclose distribution to

16  models per her NDA].) The Court finds that Pratt, Wolfe, and Garcia all knowingly gave false

17  information to multiple Plaintiffs in San Diego. Gyi and Yousif also participated in the scheme by

18  misrepresenting or concealing facts as instructed by Defendants.

19          The shoots take place in a hotel room (often the same hotel room where the model stayed or

20  will stay) in San Diego, either that day or the following. In the hotel room, the videographer (Pratt,

21  Wolfe, or Gyi) sets up the lights and camera equipment, and the model's hair and makeup are done

22  by a professional makeup artist (usually Yousif). Some women reported a pleasant, relaxed

23  atmosphere in the hotel room prior to the shoot. Typically, everyone engaged in small talk; if the

24  model posed further questions about distribution of the videos, Defendants continued to answer

25  with the same responses.

26                    *1. Defendants Offer Women Drugs and/or Alcohol Before the Shoot*

27          More often than not, Garcia offers alcohol and/or marijuana to the model, regardless of her

28  age, before the shoot and encourages her to drink or smoke in order to calm her nerves and loosen

-23-

**STATEMENT OF DECISION**

1   up. Approximately half of the Plaintiffs accepted the offer and six Plaintiffs reported feeling

2   significantly intoxicated prior to the shoot.

3           Of the 28 models who testified at trial, Defendants offered alcohol or marijuana to 7 who

4   were underage.  This includes McKay, who was 19 years old when Garcia offered her alcohol and

5   marijuana prior to the shoot. (McKay Depo. 23:24 – 24:15; 42:17 – 22; 50:3 – 14.)

6           Only Jane Does 4 and 16 claim that they were so thoroughly intoxicated that they cannot

7   recall portions of the evening during which the videos were shot. Both show signs of intoxication in

8   their videos. Jane Does 1, 8, 15, 17, and 18 testified that they felt moderate symptoms of

9   intoxication.  For most of the Plaintiffs, the alcohol or marijuana served to diminish their defenses

10  and make them less alert.[24]

11                          **2.  *Defendants Attempt to Show Apparent Consent***

12          Defendants are aware of the fact that women who agree to shoot a pornographic video based

13  on the promise that it will not be published online will be very upset when Defendants post the

14  video online. In preparation, Defendants had Plaintiffs sign documents just before the filming

15  occurred.

16                          *a.  Defendants Surprise Women with Documents to Sign*

17                              *Moments Before the Shoot*

18          Just before filming, Defendants present women with at least one document to sign.

19  Defendants do not provide the documents to the model before she arrives at the shoot—even if she

20  asks whether there are any papers to sign—and purposely wait until minutes before the shoot begins

21  to inform the model that she is expected to sign documents immediately so that filming can begin.

22  (E.g., Jane Doe 5 emailed Garcia asking "Is there any contracting involved," which was ignored,

23  09/18/19 Trial Tr. 12:1 – 13:19. Jane Doe 5 testified that she did not know she would be handed

24  documents until right before filming, *Id.* 22:9 – 21.)  This delay is not for lack of opportunity.

25  Many women testified that they spent hours with Defendants and their employees (eating, driving

26

27          [24] Defense expert Dr. Mark Kalish testified that when he reviewed Plaintiffs' videos, he did not see

28  visible indicators of intoxication. But most of the Plaintiffs did not claim to be so severely intoxicated that
    one would necessarily observe such symptoms.

-24-
**STATEMENT OF DECISION**

**EXH. 1 - 024**

1   around, shopping, or socializing in the hotel room or one of the Defendants' apartments) prior to

2   Defendants' presenting the documents for them to sign. (E.g., 08/27/19 Trial Tr. 49:22 – 50:4; 51:3

3   – 8; 54:4 – 8; 54:16 – 56:20 [Yousif drove Jane Doe 6 around San Diego, purchased her food, and

4   dropped her off at her hotel. After spending a night there, she spent time socializing in Garcia's

5   apartment with another model and then played video games there. Next, Jane Doe 6 went shopping

6   with Yousif, returned to Garcia's apartment, got her hair and makeup done, took nude photographs,

7   then went to the hotel to film].)  By the time the documents are presented, many women have

8   consumed alcohol and/or marijuana at Defendants' behest; Defendants urge them to do so in order

9   to relax, lower their inhibitions, and enable them to go through with the shoot.

10          Although Defendants testified to the contrary, the credible evidence at trial indicated that

11   they do not permit women much uninterrupted time to read or review the documents before signing

12   them.  Defendants consistently discourage the models from reading, and they rush and/or distract

13   the models while they are completing the documents. (Jane Does 1, 2, 3, 5, 7, 8, 9, 11, 12, 13, 14,

14   15, 16, 17, 18, 19, 20, 21, 22.)  Some women testified that Garcia, Wolfe, and/or Pratt became

15   irritable and aggressive when they asked questions about the documents or requested time to read

16   them. Others testified that they were badgered to sign hastily and did not feel that they had the

17   option of asking for more time. The Court finds that Defendants used these tactics to reduce the

18   likelihood that women would read and understand what they were signing.

19          When handing the documents to a model, the Defendants briefly explain the purpose and

20   content of what she is being asked to sign. These representations are false and designed to induce

21   the women to sign without further question. In some instances, Defendants actually tell the model

22   that the documents state that the video will not be released online or in the United States and that

23   her name and privacy will be fully protected. Sometimes, Defendants represent that the documents

24   were "just to prove that [she is] 18," (08/28/19 Trial Tr. 93:9), or to show Defendants were "not

25   forcing [her] to do this," (09/10/19 Trial Tr. 136:14). In other instances, Defendants are vague,

26   saying, "This is just about the basic agreements, everything we spoke about," (09/09/19 Trial Tr.

27   51:4 – 5), or "just kind of a formality." (08/22/19 Trial Tr. 37:16.)

28

1    Defendants know that these representations about the documents are false. They are

2    designed to build on and reinforce Defendants' prior statements and promises that the videos would

3    not be released online, would only be on DVD overseas, and would never be seen by anyone in

4    America. The Court finds that these representations are deliberate efforts to deceive models about

5    the content and purpose of the documents in order to induce the women to sign. By presenting the

6    documents as consonant with and merely memorializing previous conversations and agreements,

7    Defendants also seek to prevent models from recognizing that these are critical legal documents by

8    which they will be purporting to give up their rights for the first time.

9    These false representations are effective because, even if read carefully, the documents

10    themselves do not directly contradict Defendants' specific, express promises about how the videos

11    will be used; they do not clearly indicate that the videos *will* be published online on

12    GirlsDoPorn.com (which is never identified), as well as dozens of free tube sites, and marketed

13    broadly on affiliate websites.  Instead, the documents contain broad, vague releases couched in

14    disorganized, complicated legalese.  In essence, upon presenting the documents, Defendants profess

15    to be cutting through the dense legal language and explaining its purported practical import and

16    effect: It means only that Defendants will sell the videos on DVD to overseas clients—as they have

17    repeatedly stated and agreed.

18    The "Artists Agreement and Release 2257 Declaration" ("2257 Declaration") is a document

19    containing the model's name, date of birth, and driver's license or passport information that federal

20    law requires both the "model" and the "producer" to sign under penalty of perjury after the

21    producer examines the picture identification of the model to ensure that the model is over the age of

22    eighteen.  All Plaintiffs signed a 2257 Declaration for each of their videos.

23    On the reverse side of the 2257 Declaration is the Model/Talent Release,[25] a one-page

24    document containing seven paragraphs of small font with no portions highlighted or set off from the

25

26    _____

27    [25] All Plaintiffs signed the 2257 Declaration and the Model/Talent Release. Some Plaintiffs signed
an additional document.

28

-26-

**STATEMENT OF DECISION**

1    rest of the text in any way to signal importance.  The very first sentence of the document contains

2    140 words of prolix legalese:

> For and in consideration of my engagement as a model by
> Clockwork Productions Inc on behalf of BLL Media Inc., hereafter
> referred to as the photographer, on terms or fee hereafter stated, I
> hereby give the photographer, his legal representatives and assigns,
> those for whom the photographer is acting, and those acting with
> his permission, or his employees, the right and permission to
> copyright and/or use, reuse and/or publish and republish videos,
> films, photographs, pictures or portraits of me, or in which I may
> be distorted in character, or form, in conjunction with my own
> fictitious name, on reproduction thereof in color, or black and
> white made through any media by the photographer at his studio,
> or elsewhere, for any purposes whatsoever, including the right to
> sub license such rights; including the use of any printed matter in
> conjunction therewith.

12    (E.g., Ex. 633.) This sentence is a grammatical labyrinth, which misspells the names of both

13    entities, and expressly grants many rights that Defendants have never used or ever considered

14    using.  For example, the sentence specifically covers "photographs, pictures or portraits,"

15    reproductions "in black and white," and "printed material."  It does not, however, mention

16    GirlsDoPorn.com, nor the words "internet," "online," or "website."  It is thus designed to obscure

17    what will actually be done with the videos and to encourage continued reliance on Defendants'

18    repeated representations, promises, and testimonials from hired "references."

19        Paragraph 3 contains another sentence that Defendants rely upon to support their claim that

20    the models consented to online distribution:

> You and your subsidiaries, successors, licensees and assignees may
> copyright, use and reuse, publish distribute, edit, excerpt, exhibit and
> otherwise exploit my name real or fictitious or any other name
> provided and created by Clockwork Productions Inc on behalf of
> BLL Media Inc, likeness, performance, voice, pictures, and
> statements, including those of me nude or semi-nude (collectively,
> my "Appearance"), for any and all uses, in whole or in part, in any
> and all media and manners, for the Program or any other program,
> throughout the world in perpetuity, without limitations, including in
> connection with the advertising, exploitation and publicizing of the
> Program or any other program.

27    (Ex. 633.) Defendants point to the phrase ". . . in any and all media . . . throughout the world in

28    perpetuity..." to show that Plaintiffs should have known where the video would be published.  But

-27-

STATEMENT OF DECISION

1   rather than conveying useful information to the model, this sentence merely obscures the true nature

2   and character of where the video will be distributed.

3        Finally, Defendants argue that the text of the Model/Talent Release precludes the claims

4   now before the Court, based upon the following:

5           I hereby release and discharge you and your successors, licensees and
        assignees, from any and all claims, demands, or causes of action that I

6           may have, whether for libel, violation of my right of privacy or
        publicity, or any other matter arising out of or in any manner connected

7           with use of my Appearance or the exercise of the rights granted herein.

8   (Ex. 633.) The models testified that, even at the time of trial (years later and after consulting with

9   attorneys), they found these statements confusing and incomprehensible. Moreover, as set forth

10  below, this type of exculpatory waiver is illegal and void in light of Defendants' fraud.

11       Many models also signed a second document called "Model/Talent Release and

12  Independent Contractor Agreement" (hereinafter "IC Agreement"). There are several iterations of

13  this document in the record,[26] but most Plaintiffs signed the version that, on the first page, contains

14  "Recitals" that state:

15          WHEREAS, BMI has undertaken the design and development of an
        adult-oriented content; and

16          WHEREAS, videos, photographs, and any other media that includes

17          nude and semi-nude images of Models, may comprise a significant
        portion of the content; and

18          WHEREAS, Model, voluntarily, is willing to create exclusive video

19          and/or photographic content (both adult-oriented and otherwise,
        collectively "Adult Content") for BMI under a "work made for hire"

20          arrangement as that term is defined by the United States Copyright
        laws; and

21          WHEREAS, Model understands that BMI shall own all world-wide

22          intellectual property rights, copyright, trademark, services mark,
        patents, in and to all of the videos/photos taken of the Model, and any

23          and all other content created for BMI for any other BMI purposes;

24

     [26] Another version of the IC Agreement contains Recitals that come closer to effective disclosure of

25  Defendants' website and intention to post the videos online: "WHEREAS, BMI has undertaken the design
and development of a website ("website"); and WHEREAS, videos, photographs, and any other media that

26  includes images of Models will comprise a signification portion of the website content . . ." This version of
the IC Agreement was signed by only one Plaintiff, Jane Doe 16, who testified that she was so intoxicated

27  prior to, during, and after the shoot that she does not recall signing the documents or any of the
representations made to her about the documents.

28

STATEMENT OF DECISION

EXH. 1 - 028

1
2
3

NOW, THEREFORE, in consideration of the foregoing and the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, it is hereby agreed as follows:

4 (Ex. 25.) The IC Agreement goes on to list twenty-one numbered and detailed terms, some

5 containing several subparts, covering eight pages in all. It is not until the bottom of the second

6 page, in Paragraph 7 entitled "Model Representations and Warrantees" that the document

7 references the internet, stating, "Model represents and warrants that she has not modeled for any

8 other online Website and agrees hereafter not to model for any other online Website or other form

9 of adult publication. Model acknowledges that BMI shall have the exclusive rights to Model's

10 likeness for online purposes or for any other purposes." Defendants argue that models *can deduce*

11 from these two sentences that BMI runs a website and plans to use her video "for online

12 purposes." But Defendants have repeatedly professed otherwise and bury this "disclosure" in a

13 lengthy legalistic document that models are not permitted to read and digest. The import of the

14 section is a restriction on the model's outside activities, not a representation regarding Defendants'

15 use of the videos. The Court accordingly finds that the IC Agreement also fails to adequately

16 disclose Defendants' website and pre-designed intention to publish the videos online.

17               *b.   Defendants Film Women Reading a Verbal Script*

18        Immediately before filming, Defendants hand women a sheet of paper (the "Script") and

19 instruct them to read it for the camera. Women rarely have a moment to skim the Script before the

20 camera is rolling and they are told to read. This Script says:

21        I {real name} am doing this scene for BLL Media of my own free will and I am of

22        sound mind and body. I am not under the influence of drugs or any mind altering

23        substances.

24        I know the pictures and footage filmed today on _____ [date] will be used in the

25        scene name _____ [first name]

26        After this scene is filmed I know I have released all rights whatsoever to the footage.

27        Anything contained in the footage may be used however BLL Media chooses.

28

-29-

STATEMENT OF DECISION

1    All other model agreements are stated in the model release, I willingly signed to do

2    this scene.

3    (Ex. 754.) Some women read without comprehending, think little of it and do not ask any questions

4    (such as Jane Does 1, 2, 4 – 8, 12, 15, 19, 20, and 21). Some women do ask questions, at which

5    point Defendants simply continue to misrepresent, giving a flippant explanation such as "so that we

6    know that [you're] sober" (08/27/19 Trial Tr. 68:13 – 14); for "testing the sound and the levels on

7    the camera" (08/21/19 Trial Tr. 89:2); for "giving [us] permission to film [you]," (09/30/19 Trial

8    Tr. 25:3); or even "to cover [our] butts" (10/16/19 Trial Tr. 65:24).

9    Some women are confused by the Script because they are saying that they are "not under the

10   influence of alcohol or any other mind-altering substance," but they have just consumed alcohol

11   and/or marijuana provided to them by Defendants and in Defendants' presence prior to reading.

12   These women conclude, quite understandably, that the Script is of little import. (See Jane Doe 15's

13   testimony: "everybody... in the room knew that I wasn't [of sound mind] because we had just

14   smoked," 08/21/19 Trial Tr. 88:21 – 22.)

15   Most Plaintiffs testified that the Script did not raise any red flags. For those who testified

16   that they did find the Script puzzling or concerning, they also testified that Defendants' explanation

17   and continued assurances assuaged their doubts and put their minds at ease. (E.g., Jane Doe 10

18   testified she had no questions about the script because Defendants told her it was "the same thing I

19   was signing in the documents." 10/08/19 Trial Tr. 68:28.)

20   The Court finds that by misrepresenting the purpose and meaning of the Script, Defendants

21   continued to conceal material facts about the video's intended online destination, including the

22   name of the website(s) on which it would appear.

23                    c.   *Defendants Conduct a Staged Interview*

24   Prior to beginning the sexual portion of the video, Defendants place the women on the bed

25   and conduct an interview to "personalize" her for the audience. Defendants do not tell women about

26   the interview before they travel to San Diego. The interview consists of Defendants asking the

27   women personal questions about their sexual histories and preferences. Defendants instruct models

28   to act "flirty and perky" and often give them scripted lines to repeat in response to certain

-30-

STATEMENT OF DECISION

1   questions, (Jane Doe 18 Depo. 144:21). Nearly every woman says she is "excited to shoot, but

2   nervous" when asked how she is feeling (09/11/19 Trial Tr. 179:2). If Defendants do not like a

3   woman's answer to a particular question, they stop filming, coach her on what to say (or not say)

4   and re-shoot the scene. (E.g., Jane Doe 10 testified that Defendants instructed her on what to say,

5   and they would stop and start the interview portion to make sure she got it right, 10/08/19 Trial Tr.

6   70:28 – 71:7.)

7        Some women are uncomfortable answering truthfully so they make up answers that they

8   think Defendants will like or they just use the answers Defendants suggest. (E.g., Jane Does 1, 2, 8,

9   9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22.) Other women just go ahead and answer highly

10   personal questions because they believe that no one in the United States will ever see the video.

11   (E.g., Jane Does 3, 5.) Several Plaintiffs testified that they would not have agreed to the interview

12   or answered many of the questions if they had known that Defendants planned to post it on the

13   internet.

14        At trial, Defendants used these interviews as evidence to rebut some Plaintiffs' claims that

15   they were frightened or wanted to leave, but could not do so. However, video of a woman acting

16   outwardly "happy and flirty" in a staged interview is not persuasive evidence of the woman's actual

17   state of mind. Defendants manipulated the interviews by coaching women on what to say and how

18   to act and by carefully editing the video afterwards. Women needed to comply if they were to be

19   paid.

20        It is not disputed that some Plaintiffs were fully taken in by Defendants' ruse, were not

21   frightened, and felt quite comfortable with the experience as a whole. Video of these women

22   cheerfully answering questions she believes no one will ever see does not necessarily undermine

23   her fraud claim and in fact, shows how thoroughly she believed Defendants.

24   ### 3. Defendants Use Coercive Tactics if Necessary

25        After the interview, the sexual portion of the video begins. Based on a stipulation among the

26   Parties, the Court will not address this portion of the shoot except to note that it typically takes

27   much longer than the advertised thirty minutes, often several times as long. Moreover, the woman's

28   entire body, including her face, is fully visible to the viewer throughout, while the male actor's face

**STATEMENT OF DECISION**

1   is never in the frame. Andre Garcia was the male actor in all of Plaintiffs' videos. Defendants

2   presented no evidence they informed any Plaintiff only her face (and not Garcia's) would be in the

3   frame.

4         Further, the Court does consider the testimony of several Plaintiffs that, at some point

5   during the shoot, they asked to stop, but Defendants would not permit them to leave until they had

6   the footage they wanted. This fact is important because Defendants argued repeatedly that Plaintiffs

7   "chose" to be in San Diego, "chose" to sign the documents, and "chose" to go through with the

8   shoot.

9         Defendants' argument ignores the obvious implicit power dynamic invariably present in the

10  room: The women are alone in a hotel room with two men they barely know who, although friendly

11  at first, become aggressive and agitated if the women express hesitation or a desire to leave. Several

12  Plaintiffs testified that they had second thoughts prior to or during the shoot but felt they were not

13  in a position to try to leave.

14        Plaintiffs were also acutely aware of the risks of leaving the shoot. First, Defendants held

15  and controlled Plaintiffs' plane tickets home and most Plaintiffs could not afford to purchase a

16  ticket home or pay for a hotel room. Second, aware that Defendants had nude pictures and, in some

17  cases, pornographic video of them, Plaintiffs did not want to do anything to rock the boat for fear

18  that Defendants might retaliate. Furthermore, many women did not want anyone to know what they

19  were doing and therefore had not told anyone and did not want to call anyone for help.

20        In fact, ten Plaintiffs reported that they asked or tried to leave at some point before or during

21  the shoot, but Defendants insisted that they complete the shoot because the Defendants had already

22  spent the time and money to get the woman there and to get set up. When Jane Doe 16 asked not to

23  go through with the video shoot, Defendants threatened her to pay the cost of her plane ticket and

24  hotel room—a cost that she could not afford. (09/24/19 Trial Tr. 24:9 – 18.) This testimony shows

25  what happens when a woman tries to withdraw her consent. The Court's finds that, once in the hotel

26  room, Plaintiffs lacked had any feasible means of egress until Defendants declared that the shoot was

27  completed and released them.

28

**STATEMENT OF DECISION**

### 4. *Defendants Encourage Women to do a Solo Video*

After the shoot involving sexual intercourse with Garcia, Defendants ask women to film a "solo" video (i.e., using a sex toy). Defendants tell women that the solo video will be distributed in the same limited manner as the first video. Continuing to believe Defendants' representations, many Plaintiffs proceed to film a solo video.

All Plaintiffs who shot more than one video with Defendants did so before their first video was published online. Plaintiffs had no way to discover that Defendants had lied to them before their videos appeared online. That some women shot more than one video does not mean that they were not defrauded. To the contrary, it is consistent with their testimony that they were deceived into filming the videos.

### iii. **Defendants Widely Distribute the Videos for Financial Gain Regardless of the Consequences to the Models**

Defendants have never sold their pornographic videos on DVD format. (10/3/19 Trial. Tr. 150:5 – 10; 10/2/19 Trial Tr. 109:6 – 17 [Wolfe admitting that, as far as he knows, all pornographic videos Pratt and his companies have produced have *only* been distributed on the internet].) Contrary to their many representations, Defendants published Plaintiffs' videos on the internet. On top of this, Defendants used an aggressive marketing strategy to encourage as many people as possible to view the videos. Defendants publish the boy-girl videos on GirlsDoPorn.com and the solo videos on GirlsDoToys.com. The full-length videos are published only in the "members' area" of Defendants' subscription websites; these can only be accessed by purchasing a subscription. However, Defendants also post still images from the shoot and short clips from the video on the website's publicly accessible homepage as an advertisement to entice people to purchase a subscription. Videos and images of each Plaintiff appeared on the publicly available homepage.

### 1. *Defendants Post Clips of the Videos on Popular Free "Tube" Websites*

Once a video is posted on their subscription websites, Defendants embark on an aggressive advertising campaign to maximize the number of people who see or learn about the video, visit

-33-

**STATEMENT OF DECISION**

1   their website, and purchase a subscription.  This effort includes making clips of the videos available

2   on popular free "tube" sites, affiliate marketing, and ensuring that people who personally know the

3   female model learn about the video—piquing their curiosity and making it "go viral."

4        In order to advertise for their subscription sites, Defendants post clips of their videos,

5   including Plaintiffs' videos, on free "tube" sites, which are popular and heavily trafficked.  During

6   the relevant time period, Defendants had dedicated channels on numerous tube sites, including

7   Pornhub.com, XVideos.com, and XnXX.com, among others.  (See, e.g., Exs. 1582.7; 1585.)  The

8   GirlsDoPorn channels on free tube sites contain mostly 5- to 7-minute clips of videos filmed by

9   Defendants, along with advertisements for and links to Defendants' subscription websites.  (See,

10  e.g., Exs. 1582.7; 1585.)  Pratt and Wolfe both testified that Pratt personally posts all the videos to

11  the GirlsDoPorn channels on the tube sites. (Pratt Depo. Vol. I, 209:10 – 23; 10/2/19 Trial Tr.

12  151:13 – 153:16.) Pratt also writes the captions posted on the tube sites. (Pratt Depo Vol. II, 427:19

13  – 21; 432:10 – 22.)

14       Free tube sites are popular, and Defendants' channels on these sites receive an enormous

15  amount of traffic. The GirlsDoPorn channel on Pornhub is a popular channel on Pornhub, with

16  more than 700,000 subscribers and more than 600 million views. (Ex. 1576.1.) All or nearly all of

17  the Plaintiffs' videos were, at some point, available for free on GDP's Pornhub channel. (See Ex.

18  1576.) According to the view-counter on Pornhub, Plaintiffs' videos have been viewed anywhere

19  from a few hundred thousand times to thirty-five million times.[27] (Ex. 1576.) Each Plaintiff's video

20  was, at some point, available for free on public, non-subscription sites. (See Exs. 1576, 1581,

21  1582.)

22            *2.   Defendants Intentionally "Dox" (Publicly "Out") Their Models or*

23                 *Permit and Encourage Internet "Trolls" to Do So*

24       Each Plaintiff has proven that after her video(s) were placed online, they spread throughout

25  her social circles, including friends, family, co-workers, employers, teachers, and classmates. As a

26  result, most Plaintiffs experienced merciless harassment. The Court finds that Defendants knew at

27

28       [27] Pratt admitted that he believes the number of views listed on Pornhub's videos accurately reflects
     the actual number of times a video has been viewed. (Pratt Depo. Vol. II, 427:13 – 429:22.)

STATEMENT OF DECISION

1   the time they recruited each and every Plaintiff that this result was inevitable. The Court further

2   finds that Defendants deliberately profited from the videos being leaked to Plaintiffs' personal

3   circles and communities. At best, Defendants knowingly stood by while this happened, in order to

4   increase website traffic and corresponding profits, while falsely assuring models that this nightmare

5   scenario could never occur. At worst, Defendants encouraged and facilitated this outing process and

6   even participated directly.

7        The spread of Plaintiffs' videos throughout their social circles does not happen by chance; it

8   is the foreordained outcome of a deliberate campaign by online "trolls" to identify and humiliate

9   women who appear in pornographic videos. Stemming from a perverse fascination with (and

10  perhaps distain for) women who appear in pornography, anonymous internet users ("trolls")

11  congregate on online forums such as PornWikiLeaks.com (Ex. 1735 [full list by episode number]),

12  NameThatPorn.com (Ex. 1702 ["The List"]), and 8chan.net (Ex. 480), to identify these women by

13  name and glean personal information about them. The trolls share the information they find—

14  including a model's name, biographical information, links to her social media accounts, and other

15  contact information—on the forum,[28] and then the harassment begins. Armed with the woman's

16  social media and contact information, some trolls spend their time sending links to her video to

17  people connected to her on social media. Other trolls contact the models personally to attack, bully,

18  and shame them, or to comment on their videos and proposition them.

19       Defendants admit they have been aware of such lists for years. (Pratt Depo. Vol. II, 350:21 –

20  351:18; 10/2/2019 Trial Tr. 131:10 – 132:17). In fact, Defendants have something of a cult following

21  on these forums. Numerous websites and forums exist for the sole purpose of outing and doxing GDP

22  models. (See, e.g., Ex. 178 [Instagram account called "GirlsDoPornRealName"]; Pratt Depo. Vol. II

23  351:25 – 352.2 [Pratt discussing "real IDs, maybe Girls Do Porn or just something dot blog spot"].)

24  At one time, PornWikiLeaks hosted a forum called, "Girlsdoporn.com GDP Girls Do Porn Exposed

25  real names and personal family info." (Ex. 1658.) Pratt knew about this forum and the information

26

27       [28] This process is called "doxxing," a slang term that means "to publicly identify or publish private

28  information about (someone) especially as a form of punishment or revenge." (*Dox definition*, MERRIAM-
WEBSTER.COM, https://www.merriam-webster.com/dictionary/dox.)

STATEMENT OF DECISION

1  about GDP models that was posted there. (Pratt Depo. Vol. II 354:22 – 356:10 [Pratt acknowledged

2  seeing "their real names, social medias, pictures of the videos," knew the name of the forum, and the

3  subtitle claiming the information came from him].) Defendants actually owned the PornWikiLeaks

4  forum at the time Plaintiffs' information was posted there.

5         The Court notes that Plaintiffs need not show that Defendants personally leaked the names

6  or participated in the harassment, although there is evidence that they did. It is enough that

7  Defendants knew that Plaintiffs' names would be leaked, that the videos would be sent to many of

8  the people they knew, and that they would be harassed. The Court has little doubt of Defendants'

9  actual knowledge of these eventualities. Dozens of prior models complained to Defendants about

10  their names being leaked in connection with the videos and about being harassed as a result—the

11  earliest in the record is dated July 1, 2013. (Ex. 208.168 [email from Jane Doe 4 to

12  jordan@girlsdoporn.com complaining about harassment and being lied to about distribution].) Pratt

13  was certainly aware of PornWikiLeaks in particular in February 2015 when he purchased a domain

14  called PornWikiLeaks.org. (Ex. 1744)

15         Despite this knowledge, Defendants never informed prospective models of the doxing lists

16  and complaints of harassment. (10/2/19 Trial Tr. 132:15 – 134:10 [Wolfe testifying that he knew

17  about the lists and found them concerning but never told a model about them].) In fact, Defendants'

18  business model depended on convincing models that these consequences—well-known to

19  Defendants—were not within the realm of possibility. Defendants therefore continued to include

20  the same misrepresentation in their initial recruitment email -- None of your personal information

21  will be given out in the video or afterwards, no names etc. are used in the video."—as late as May

22  22, 2019. (Ex. 5400.2 [Garcia's email to Jane Doe A].)

23         Defendants immediately benefitted from doxxing of their models. Publication and

24  dissemination of the models' names and personal information increased views and traffic to

25  Defendants' tube channels, increased name ID for their brand, and boosted subscription sales.

26         The PornWikiLeaks forum specifically dedicated to identifying the women who appear on

27  GDP at one point contained a prominent banner that read, ". . . real names and personal family info

28  Right from the owner of Girlsdoporn.com . . . he Exposes real names and personal family info of

-36-

**STATEMENT OF DECISION**

1   the closet whores he films." (Ex. 1658.4 [screenshot from July 29, 2015].) This banner, published

2   on a site owned by Defendants, provides the most straightforward and plausible explanation of how

3   GDP models' information was routinely made available. At minimum, Defendants knowingly

4   permitted the banner to remain, encouraging members of the forum to continue their activities and

5   attribute them to Defendants. Defendants offer no alternative explanation.

6       GDP model names were released in a manner that strongly suggests that Pratt was involved.

7   internet archival history records show that on numerous occasions, multiple models were "outed"

8   on the forum on the same day, with posts including names, pictures, social media accounts, email

9   addresses, and other personal information.[29] (See, e.g., Ex. 1658.4, .7, .12, .15, .26, .29, .32, .35

10  [eight models outed on July 27, 2015]; Ex. 1658.46, .49, .62, .65, .69, .72, .75, .78, .82, .223, .225

11  [eleven models outed on Sept. 17, 2015]; Ex. 1658.88, .91, .94, .97, .100, .103, .182, .185, .188,

12  .190, .193, .196, .198, .202 [fourteen models outed on Sept. 18, 2015].) The coordinated mass

13  releases indicate that Defendants themselves were controlling the flow of leaked information; again,

14  Defendants offer no alternative explanation.

15      Defendants recognized the traffic and notoriety their websites received on the

16  PornWikiLeaks forum and sought to maximize the benefit they received from it. Records from

17  GoDaddy show that the domain name PornWikiLeaks.com was transferred into Pratt's account as

18  of November 12, 2015. (Exs. 1744.551 – 552, 1744.978.) Defendants claim that Pratt purchased

19  PornWikiLeaks so that he could *take down* the names of GDP models posted there. However, the

20  internet archival data for PornWikiLeaks belies this purported explanation. After the transfer, the

21  GDP doxxing pages were actively maintained for nearly *seven months*, until eight days after this

22  lawsuit was filed. (Ex. 1577.157; Ex. 1658.280–287.)

23      All of this evidence points to the conclusion that Pratt owned and controlled PornWikiLeaks

24  for at least seven months during which time he could have removed the GDP forum but chose not

25  to. Instead, he continued to enjoy the financial benefit that PornWikiLeaks provided to his

26

27

28      [29] The Court notes that this was the information that Defendants collected from candidates when they
        responded to the initial Craigslist modeling ads.

-37-

**STATEMENT OF DECISION**

1   pornography business and only sought to clean up the website *after* Plaintiffs filed their lawsuit.

2   Defendants failed to offer a credible alternative explanation.

3        One particular piece of evidence confirms the likelihood, if not a reasonable certainty, that

4   Pratt himself posted information about GDP models on PornWikiLeaks. The name and episode

5   number of M.F., a third-party model who testified by deposition, were posted on the forum on July

6   31, 2015, along with similar information regarding several other GDP models. (Ex. 1658.18.) That

7   post also included one semi-nude and three nude pictures of M.F. (Ex. 1658.18 – 23.) M.F. testified

8   that she took those pictures in her college dorm room at Pratt's request, and then sent them to Pratt

9   and to no one else. No one else but Pratt could have had access to these photos because she deleted

10  them within one week. (Deposition of M.F. taken on April 1, 2019 at 13:7 – 25; 14:20 – 15:8.)

11       Defendants' ownership and control of PornWikiLeaks is not an isolated incident but part of

12  a pattern that shows that Defendants' business practices include exploiting models' real names for

13  private gain. After first testifying that GirlsDoPorn has never used models' real names to market its

14  website, Wolfe admitted that he owned multiple domain names containing a prior model's name.

15  (10/3/19 Trial Tr. 150:23 – 153:18; see also Ex. 1744.557 [showing Pratt owned a domain name

16  containing the same model's name].)[30]

17       In sum, the Court finds that Defendants not only disseminated Plaintiffs' videos online but

18  went a step further to widely publish Plaintiffs' identities as it suited their interests.

19       ***3. Defendants Ignore Models' Complaints or Threaten Legal Action***

20       When models eventually learn that their videos are published online and widely available to

21  anyone in the United States, they often complain to Defendants. Of the twenty-two Plaintiffs,

22  twelve presented documentary evidence that they attempted to contact Defendants after finding

23  their videos online. (Ex. 208.167 [JD4], Ex. 1729 [JD6], Ex. 473, 474 [JD11].) Several Plaintiffs

24  testified that they attempted to contact Defendants but did not have a written record.

25       When Defendants received these complaints and requests, they responded in a number of

26  ways. Several Plaintiffs testified that their complaints were ignored and their phone numbers

27

28      [30] There is evidence that a GoDaddy account associated with Pratt registered a domain name
    containing Jane Doe 1's real name on September 13, 2016. (Ex. 1744.1262 – 1272.)

**STATEMENT OF DECISION**

EXH. 1 - 038

1   blocked. (e.g. Jane Does 1 (Trial Tr. 09/11/19 at 211:24 – 212:22) and 9 (Trial Tr. 09/30/19 at

2   34:15 – 22).) According to testimony, Pratt, Wolfe, and Garcia actually instructed their employees

3   to block models' phone numbers as soon as the shoot was done. (Wright Depo. 24:22, 24:25 – 25:5;

4   Trial Tr. 09/20/19 at 122:2 – 25.)

5       Reference model Kailyn Wright testified that Defendants told her that if any of the models

6   contacted her to complain, she should block the model's phone number and not respond. (Wright

7   Depo. 24:22 – 25:05.) Garcia is recorded telling McKay to "add them [prospective models] online

8   for a little bit and then un-follow or block after they shoot." (McKay Depo. 75:11 – 17.)

9       If Defendants did respond to a complaint personally, they often did so in a threatening

10  manner. (Ex. 253 [Jane Doe 5]; Ex. 886 [Jane Doe 19]; and Ex. 924 [Jane Doe 20].) For example,

11  when Taylor Rodgers learned her videos were online, she called and texted both Pratt and Garcia,

12  accusing them of lying to her. (Rodgers Depo. 43:7 – 18.) Pratt responded by text, saying, "you

13  don't know what we are capable of, we have your social security number." He threatened to report

14  her to the IRS and take other unspecified actions. (Id. at 44:1 – 15.) As Rodgers' video continued to

15  spread, her name became attached to it and people in her town obtained her phone number. Rogers

16  then contacted Pratt again. (Id. at 47:8 – 25.) This time, he confirmed that her name should not be

17  attached to the video and said he would try to get it removed. This never happened. (Id. at 48:2 –

18  11.)

19      In some instances, Defendants appeared to be willing to help the women solve the problem

20  of public disclosure but never actually took any action. (Ex. 923 [JD20], Ex. 789 [JD16], Ex.

21  5405.54-62 [JDA].) In other cases, Defendants referred complaints to Panakos Law, which sent the

22  women cease and desist letters threatening legal action. (Ex. 49 [JD1], 837 [JD 17], Ex. 1740.15 –

23  16.)

24      Defendants also threaten legal action if a prior model attempts to tell her story as a warning

25  to others. For example, Jane Doe 17 posted advertisements in the "gigs" section on Craigslist that

26  unmasked Defendants as GirlsDoPorn and warned women not to respond. (Ex. 834.) Panakos Law

27  quickly removed the posts and dispatched a cease and desist letter to Jane Doe 17 that contained

28  semi-nude pictures of Jane Doe 17. (Trial Tr. 09/03/19 at 79:13 – 25, referring to Ex. 837.)

-39-

**STATEMENT OF DECISION**

1    Whenever a model contacts a website to attempt to remove a video, Defendants respond by

2    sending the signed documents and asserting that the model is making a false claim. (E.g., Doe 8

3    Depo. 42:7 – 43:25.) However, when models request a copy of the documents they signed at the

4    shoot, Defendants ignore the request or refuse to honor it. (Exs. 43, 58 [JD1], Ex. 253 [JD5]; Ex.

5    758 [JD15].)

6         ### 4. *Defendants Profit Handsomely from their Fraudulent Scheme*

7    Pratt estimated that, shortly before this lawsuit was filed, GirlsDoPorn generated $2.5

8    million per year, and GirlsDoToys generated approximately $18,000 per year.[31] He also estimated

9    that he has approximately 200 unpublished videos on hand and that each video has a fair market

10   value of between $30,000 and $40,000. (Pratt Depo. Vol. III, 56:10 – 16, 62:1 – 10.) The rights to

11   trademarks and domain names also have intrinsic values.

12   The Court finds that Domi was not forthcoming in producing financial information during

13   discovery, so the revenue and value of Domi cannot be estimated. However, Pratt admits that he

14   received a salary of approximately $4,000 per week, or $19,000 to $20,000 per month, from

15   Domi.[32] A portion of Defendants' revenue came from their own affiliate site, Forum.DoPorn.com,

16   which Pratt estimated brought in $2,500 per week.[33]

17   The Parties stipulated that Defendants received a total of $1,025,831.50 in profits from the

18   use of the twenty-two Plaintiffs' videos. (11/4/2019 Trial Tr. 40:15 – 19.) Thus, it is undisputed that

19   Defendants derived $46,628.70 from the use of each Plaintiff's video(s).

20   Plaintiffs' financial expert Robert Taylor offered opinions on two matters. First, he was

21   asked to project the economic benefit of Pratt's library of unpublished videos. He testified that he

22   estimated the "present value of the economic benefit that will inure to Mr. Pratt from what I have

23   been informed is a library of in excess of 200 previously unuploaded or unviewed videos" to be

24   $4,672,194. (11/4/19 Trial Tr. 45:7 – 14.)

25

26   [31] (Pratt Depo. Vol. II, 399:22-400:6.) As of May 2019, Pratt estimated that he received
      approximately $150,000 per month from subscription sales processed by CCBill. (Pratt Depo. Vol. III,

27   76:25-77:17.)

28   [32] (Pratt Depo. Vol. I, 254:20-255:5; Pratt Depo. Vol. III, 101:2-101-7.)

     [33] (Pratt Depo. Vol. III, 122:24-125:9; 127:5-127:9.)

STATEMENT OF DECISION

1     Second, Taylor was asked to estimate the net worth of Pratt's entire non-Domi enterprise.

2  Taylor testified that this net worth analysis was based on incomplete and outdated evidence. Taylor

3  testified that he would have preferred to receive "much more current data" to use in his analysis to

4  permit the "most accurate assessment." (11/4/19 Trial Tr. 50:24 – 51:25.) In his opinion,

5  performing the analysis with the data he had "wouldn't be as accurate or precise as if [he] had the

6  information as of current." (*Id.* at 52:1 – 9.) But he gave the most accurate estimate he could based

7  on the information Defendants provided.

8     To do so, Taylor started with the projected income above and added the net tangible assets

9  of BLL Media, Inc. and Merro Media, which he extracted from the respective balance sheets for

10  each entity as of December 31, 2018. (*Id.* at 49:19 – 17.) BLL Media's net assets were worth

11  $1,009,593. (Ex. 5317; Ex. 1677.1247 – 1248 [Total Equity].)[34] Merro Media's net assets were

12  worth $204,805. (Ex. 5317; Ex. 1677.1273 – 1274 [Total Equity].) Taylor also added the value of

13  other assets, including Pratt's home in Rancho Santa Fe and Pratt's Lamborghini. (*Id.* at 48:18 –

14  49:10.) According to Pratt's bankruptcy schedule, his home netted $507,545 and his car netted

15  $93,082. (Ex. 5317.) The sum of these amounts is $6,487,219.

16     Based on the evidence, the Court accepts Taylor's analysis and finds that Defendants' non-

17  Domi pornography enterprise is worth an estimated $6,487,219.

18              *5.  Defendants' Conduct After Plaintiffs' Brought this Lawsuit*

19                   *a.  Defendants Retaliated Against Plaintiffs*

20     Shortly after Jane Doe 1 retained counsel in an effort to obtain a copy of the documents she

21  signed and get her videos removed from the internet, the Court finds Defendants leveled significant

22  harassment against her. Jane Doe 1's GDP sex video was suddenly and immediately sent to dozens

23  of students, professors, and administrators at her law school. (Exs. 60, 63, 90 – 92, 97.)

24

25

---

26     [34] Taylor explained that, "The net tangible assets are the amounts that are reported on the balance
27  sheet at the end of 2018. The present value of the projected income is projecting future income from an
    existing library of videos, and it's just taking that future income and determining the present value of it. They
28  are two separate time periods. One currently exists on a balance sheet, or at least it's reported on a balance
    sheet, and the other one is future income. They are separate." (11/4/19 Trial Tr. 50:8 – 17.)

**STATEMENT OF DECISION**

While Defendants deny they had anything to do with this harassment, the record indicates that it is more likely than not that they were behind the harassment. Shortly after Jane Doe 1 contacted Defendants, an article appeared on a popular gossip website, which focused on the fact that she was a law student and maliciously impugned her character and intelligence. (Ex. 77.) This article contains one telltale detail suggesting that Defendants are behind it—the unfounded accusation that Jane Doe 1 "escorts in Vegas over the summer." (*Id.*) Jane Doe 1 testified that this is something Garcia asked her to say during the interview prior to her video but she refused and said she was a hotel receptionist. (Trial Tr. 09/11/19 at 191:16 – 192:11.) She said that no one had ever accused her of such a thing before and that she believed the comment in the article could only have come from Garcia or Wolfe. (Trial Tr. 09/11/19 at 236:1 – 11.)

The Court finds that Pratt, disguised as "Taylor Ann Fairchild," personally took action to spread Jane Doe 1's video to important people in her life, including her employer (Ex. 99), her college soccer coach (Ex. 115), and her sister (Ex. 97).[35] The same Ann Fairchild account also contacted Jane Doe 21's mother revealing the video. (Ex. 963.)

### b. *Defendants Attempted to Tamper with Witnesses*

Two witnesses have testified that Defendants or someone on their behalf have offered them money to either refuse to speak with Plaintiffs' counsel or to engage with Plaintiffs' counsel to learn information for Defendants. After the lawsuit was filed, Defendants, through employee Kevin Gibson, offered to pay reference woman Alicia McKay $10,000 in exchange for any information she could provide about or from the Plaintiffs' attorneys. (McKay Depo. 90:19 – 91:22; 96:23 – 97:10.

Reference woman Amberlyn Clark also testified that Garcia offered her approximately $1,000 to "compensate [her] for [her] troubles of having to deal with this" and to "not talk to anyone who had been contacting [her]." (8/20/19 Trial Tr. 167:22 – 169:6.)

---

[35] Plaintiffs' cyber expert Charles DeBarber testified that emails sent from the Fairchild account were sent from the same computer as emails sent by Mike@Bll-Media.com, which is undisputedly Pratt's email account. (Trial Tr. 09/25/19 at 229:3-24; Ex. 1777 – 1779, 1781 – 1782.)

-42-

**STATEMENT OF DECISION**

c.   *Defendants Attempted to Harass and Intimidate Plaintiffs'*
*Counsel*

Defendants have also taken highly unethical actions against Plaintiffs' counsel either in hopes of intimidating them or simply to punish them. Plaintiffs offered numerous articles that have been published online that contain outrageous accusations about Plaintiffs' counsel. (Ex. 1704.) The testimony of Witness Jamia McDonald strongly suggested Pratt was responsible. (10/29/19 Trial Tr. 49:24 – 50:17 [discussing Ex. 1722.1].) Some of these false articles were posted on two websites that Pratt owned and controlled at one point, suggesting that he had a hand in publishing them or at least had the ability to remove them. (Ex. 1704 [adultfyi.com] and Ex. 1744.978 [PornWikiLeaks.com].)

Ms. McDonald also testified that she was hired by Gibson to call both Plaintiffs' attorneys as many times a day as possible, at all hours, in order to pester them and subsume their time. (Trial Tr. 10/29/19 at 47:16 – 27). She received $300 per week for doing so. (*Id.* at 48:2 – 16).

d.   *Defendants Do Not Improve Their Business Practices in*
*Response to this Lawsuit but Instead, Adjust their Scheme So*
*They Can to Continue to Recruit New Models*

In the face of a lawsuit by twenty-two previous models and despite reference women and former employees coming forward to testify, Defendants have done nothing to change their business practices to solve any of the problems raised by the Plaintiffs. Wolfe testified that GirlsDoPorn.com is *still* not disclosed anywhere in their documents. (Trial Tr. 10/02/19 at 94:10 – 95:15, 96:9.)

The testimony of Jane Doe A made clear that Garcia is still using the same recruiting practices that are at the core of this lawsuit. (Trial Tr. 10/31/19 at 36:15 – 37:14; 41:5 – 14.) As of May 2, 2019, Garcia was still sending the same initial stock email. (Ex. 5400). Defendants created a new modeling website, CaliforniaModeling.com, that looks similar to BeginModeling.com (Ex. 5409), which may not be as useful as a recruiting tool because it has been discussed by name in this lawsuit.

-43-
STATEMENT OF DECISION

### iv. Individual Plaintiff Factual Findings

Having considered the testimony and credibility of each witness, as well as the evidence, the Court finds the following facts:

#### Jane Doe 1

In July 2015, Jane Doe 1, clerking part-time at a law firm in Nevada, after completing her first year of law school, was in need of additional money to cover her expenses, so she applied for modeling jobs on Craigslist. (9/11/19 Trial Tr. 147:25 – 148:21.) After responding to Defendants' ad, she received Jonathan's stock email. Jane Doe 1 exchanged emails and texts with Jonathan before speaking to him on the phone. (See Ex. 5; Ex. 9.1 [Jane Doe 1 asked by text, "where does the footage end up?" Jonathan responded, ". . . I rather me explain everything to you over the phone. It's more professional and easier."].)

Over the phone, Jonathan told Jane Doe 1 that the video "was just for this one guy in Australia on one DVD that couldn't be copied. He wouldn't know my name, I wouldn't know his. It was just all going to be confidential. There was going to be, like, documents that represented this, that no one else could see it, it would never be online, and my name would never be attached to it." (9/11/19 Trial Tr. 157:5 – 10.) Jonathan asked her to send him "nude photos for approval by the owner," which he assured her would be kept "completely confidential," so she complied. (*Id.* at 163:4 – 18.)

Jane Doe 1 believed Jonathan because she specifically told him she was in law school and he said he shared her concerns about confidentiality, saying "I can't have my friends or family knowing anything either." (*Id.* at 157:23 – 25; 210:8 – 16.) He told her "he had shot models before for this collector, and they had never had any issues, and no one ever found out about it." (*Id.* at 158:1 – 5.)

Jane Doe 1 also spoke with reference model Kailyn Wright via FaceTime prior to traveling to San Diego. Wright's reassurances had a "massive impact" on her decision to do the shoot. (*Id.* at 168:8 – 10.) Upon arriving in San Diego, Jane Doe 1 continued seek and receive assurances about confidentiality and distribution from both Jonathan (whom she identified as Garcia) and Ben (whom she identified as Wolfe), the videographer. (*Id.* at 170:17 – 173:8.)

-44-
**STATEMENT OF DECISION**

1     In the hotel room, Jonathan encouraged Jane Doe 1 to consume alcohol to calm her nerves,

2  and she "felt the effects of the alcohol"[36] by the time she was handed the documents to sign. (*Id.* at

3  174:5 – 10.) Ben also distracted her by filming her and asking her questions while she attempted to

4  review and sign the documents.[37] (*Id.* at 183:18 – 22.) She asked for time to read the documents but

5  was told there was no time. (*Id.* at 180:17 – 181:24 [when she asked questions, Jonathan "asked me

6  to cooperate and not be so difficult"].) She asked for a copy of the documents and was told she

7  would receive one later, but she never did. (*Id.* at 182:3 – 9.)

8     She read the script without asking questions because she believed she knew how the video

9  would be used. (*Id.* at 190:13 – 191:7 ["I knew I wasn't of sound mind and body, that I had been

10  drinking, but they knew that as well because Jonathan was drinking with me."].)

11     Jane Doe 1 was convinced by Jonathan's continual need to seek the approval of "the owner"

12  by text or phone prior to and during the shoot, by Ben's Australian accent, and by both Jonathan

13  and Ben's repeated assurances. (*Id.* at 172:20 – 173:8, 174:11 – 179:3.) Believing the ruse, Jane

14  Doe 1 shot three videos with Defendants and even agreed to act as a reference before she learned

15  that Defendants released her video online in October 2015. (*Id.* at 200:13 – 201:24)

16     Jane Doe 1 learned her videos were online in October 2015 when she received a call from

17  her boyfriend, followed by a link. (*Id.* at 210:20 – 211:14.) She immediately called Jonathan, then

18  Ben, multiple times but neither answered, so she texted saying it was an emergency but never

19  received a response. (Ex. 9.28, 9.32 – 33.) A few days later, when she tried to call again and found

20  the number had been disconnected, she realized that they were part of the scheme. (9/11/19 Trial

21  Tr. 212:11 – 22.) Jane Doe 1 also texted reference model Kailyn Wright, who quickly confirmed

22  her suspicions. (Ex. 44.1.)

23

_____

24     [36] In describing the effects she felt, Jane Doe 1 stated, "I struggled changing between outfits. When
the collector/owner was picking out my outfit, I stumbled. When I got up from the desk, at one point I just

25  got really light-headed and a bit dizzy. There was another point where, when I used the restroom, I wiped
and I missed throwing it into the toilet." (Sept. 11, 2019 Trial Tr. 188:18-24.) Filling out the documents was

26  "a little bit difficult" because she felt "intoxicated at that point." (*Id.* at 183:16-21.)

27     [37] Jonathan and Ben instructed Jane Doe 1 on how to answer the questions. She mostly responded as
they requested, with one exception: they asked her to say she was an escort in Las Vegas. She refused

28  because "it was illegal, and there were a million other things we could come up with for creating the story."
(9/11/19 Trial Tr. 191:12 – 193:2.)

**STATEMENT OF DECISION**

1       She sent an email to an address she found on the GirlsDoPorn website (Ex. 47), but this time

2  she received a response—a cease and desist letter from Panakos Law threatening to seek a

3  restraining order. (Ex. 49.) At this point, Jane Doe 1 retained Mr. O'Brien, who contacted Mr.

4  Sadock on October 28, 2015 requesting copies of the agreements at issue, (Ex. 43.1 – 2.), which

5  were not produced at that time.

6       Within days, students, professors, and deans at her law school began receiving calls and

7  emails referencing or containing links to her video. (Exs. 60 [11/12/15]; 63; 1653.97; 1653.250

8  [11/18/15]; 1653.249 [11/22/15]; 90, 91, 93 [all 12/12/15].) Approximately 60 emails of this type

9  were sent to her law school. (Ex. 1653.303 – 307; 9/11/19 Trial Tr. 221:14 – 22.) When Jane Doe 1

10  received a threatening phone call, she began to fear for her safety and so reached out to her dean for

11  assistance and filed a police report. (Ex. 1653.120; 9/11/19 Trial Tr. 228:2 – 15.)

12       On November 20, 2015, Jane Doe 1 received a message from someone forwarding her an

13  article about her from TheDirty.com, a popular gossip website, which was also forwarded to her

14  law school. (Ex. 77.2 – 14; 1653.250.) This article, viciously attacked Jane Doe 1 and, importantly,

15  contained an accusation that she "escorts in Vegas over the summer." (Ex. 77.2.) This detail led

16  Jane Doe 1 to believe that the article came from either Garcia or Wolfe, who were the only two

17  people in the room when Garcia encouraged her to say on the video that she was an escort in Vegas.

18  (9/11/19 Trial Tr. 236:1 – 11.)

19       In or around the end of December 2015, the Court finds that Pratt, disguised as "Ann

20  Fairchild," began reaching out to important people in Jane Doe 1's life and informing them about

21  the video.[38] He sent an email disclosing the video to the law firm where she was working (Ex. 99)

22  and to her college soccer coach (Ex. 115), as well as a Facebook message to her sister. (Ex. 97.)

23

24      [38] Plaintiffs' cyber security expert Charles DeBarber concluded that the probability that the Ann
Fairchild account was operated by anyone other than Michael Pratt was "way past lottery odds." (9/26/19
25  Trial Tr. 74:13 – 75:6.) He testified that after sending "honeypots" (emails that contain a mechanism that
creates an auto-response when opened) to mike@BLL-media.com and to the Ann Fairchild account and
26  receiving responses to both including IP address and VPN information, "there was no other reasonable
conclusion but the same person behind that BLL Media [account] was the same as Ann Fairchild." (Id. at
27  60:2 – 61:23.) Given that the two "pings" had "the same IP address for that VPN and the same user-agent
string [which roughly identifies the type of device] within six minutes," there was no other reasonable
28  conclusion. (Id. at 60:4 – 7; 62: 2 – 13.)

-46-

STATEMENT OF DECISION

1   Jane Doe 1 believes that the communications disclosing the video to her law school, employer,

2   former coach, and sister came from Defendants or someone acting on their behalf as a form of

3   retaliation for her decision to retain an attorney and take action.

4       On November 10, 2015, Jane Doe 1 learned about PornWikiLeaks from Kailyn Wright. (Ex.

5   44.7 – 9.)[39] She visited the forum but did not see any information about herself until November 26,

6   2015—well after the first emails were sent to her law school and after the article in The Dirty

7   appeared. (Ex. 112.1.) Within days, pictures and links to her social media, law school website,

8   modeling profile on ModelMayhem.com, the article on TheDirty, her college soccer team website,

9   and her current employer were posted on the forum. (Ex. 112.1 – 9.)

10      The release of the video had and continues to have a significant impact on Jane Doe 1,

11  perhaps more so because of her chosen career path. As a result of the messages to her law school,

12  Jane Doe 1, who was previously very active in law school, stopped participating in school events

13  and activities, and began to hate school. (9/12/19 Trial Tr. 14:3 – 7, 20:4 – 17.) She struggled to

14  focus in class; she had to have a friend walk her to class because she frequently threw up on the

15  way to class due to the anxiety of being seen in public. (Id. at 70:21 – 71:4.) Although she

16  completed law school and passed the bar exam, Jane Doe 1 no longer wishes to be an attorney

17  because of the impact the video has had on her reputation. (Id. at 73:1 – 9.) Jane Doe 1 testified that

18  she used to want to be a mother, but now she feels that she cannot because she would not want to

19  put a child through what she is going through. (9/12/19 Trial Tr. 76:7 – 15.)

20      Jane Doe 1 experienced fear and paranoia after receiving a threatening phone call in which a

21  male voice called her a disgrace and stated her address and where she walked her dog. (Id. at 69:11

22  – 19 [at the time she happened to live in the same apartment building as at least one of the

23  defendants].) She has severe anxiety and depression for which she has been prescribed multiple

24  medications. (Id. at 67:5 – 10; 9/17/19 Trial Tr. 118:16 – 25.) She has twice attempted suicide: first,

25  by taking a bottle of pills within a month or two after the video appeared online, and second, in

---

[39] Jane Doe 1 used PornWikiLeaks to contact other models filmed by Defendants as research for her own case. She told them her story, informed them that she was filing a lawsuit, and let them know that they could likely join if they wanted. If these women responded, she referred them to her attorneys. (9/12/19 Trial Tr. 38:10 – 39:25; 40:1 – 3 [nobody encouraged her to recruit plaintiffs for the lawsuit].)

**STATEMENT OF DECISION**

1   2018, when she attempted to load her boyfriend's pistol, but it discharged accidentally and lodged a

2   bullet into the floor. (9/12/19 Trial Tr. 76:16 – 77:15.)

3        The Court finds Jane Doe 1 to be credible.

4   **Jane Doe 2**

5        After responding to a Craigslist ad for modeling in early 2015, Jane Doe 2 received

6   Jonathan's stock email.[40] Jane Doe 2 testified that when she spoke on the phone with Jonathan, "I

7   asked him numerous times if anyone I know would know, if it was private, and he reassured me

8   many times that I had nothing to worry about." (9/25/19 Trial Tr. 56:22 – 24.) Jonathan told Jane

9   Doe 2 the video would be distributed on DVDs overseas; he never mentioned online distribution or

10  GirlsDoPorn.com. (*Id.* at 57:2 – 12.) She was told the video was for a "private buyer." (*Id.* at

11  110:15 – 18.) Jonathan asked her for nude photographs, so she took and sent some pictures without

12  showing her face. (*Id.* at 24:14 – 16.)

13       Jane Doe 2 received contact information for three reference models. (*Id.* at 59:1 – 6.) She

14  spoke to one of the references who assured her "I didn't have to worry about it in terms of my

15  concern of where the videos would go and who would see it and my privacy." (*Id.* at 58:8 – 11.)

16  She did not contact the other two references, but was reassured by the fact that he had provided so

17  many. (*Id.* at 59:8.)

18       In person, when Jane Doe 2 asked both Jonathan (whom she identified as Garcia) and Isaac

19  (whom she identified as Wolfe), the videographer, about distribution of the video, "[t]hey said not

20  to worry about it and that we already talked about it." (*Id.* at 67:15 – 25; 118:3 – 24.) Prior to the

21  shoot and prior to receiving the paperwork, Jane Doe 2 inhaled Garcia's second-hand marijuana

22  smoke. (*Id.* at 64:13 – 17.) However, she believes she was not intoxicated. (*Id.* at 119:16 – 21.)

23       When Garcia presented her with the documents to sign, Jane Doe 2 attempted to read them

24  but "they were not very clear to fully read and understand." (*Id.* at 65:10 – 11.) She testified that

25  she asked for time to read the Model/Talent Release, but "[t]hey rushed me and told me that we

26  already went over it and to sign it." (*Id.* at 124:11 – 24; see also 123:2 – 8.) Jane Doe 2 asked about

27

28      [40] Jonathan states in an email: "Phone calls are more professional, direct and informative." (Sept. 25, 2019 Trial Tr. 56:1-2).

-48-
**STATEMENT OF DECISION**

**EXH. 1 - 048**

1   the script when Isaac/Wolfe handed her the paper, but he simply instructed her to read it into the

2   camera. (*Id.* at 66:2 – 11.)

3       Based on Defendants' representations, Jane Doe 2 filmed two videos, both of which

4   Defendants later published online. (*Id.* at 69:22 – 70:1.) Garcia reached out asking her to do a third

5   video but she did not respond. (Ex. 149.) Jane Doe 2 testified definitively that she would not have

6   filmed the videos if she had known that Defendants owned and operated a website and that the

7   video would be public. (9/25/19 Trial Tr. 96:24 – 97:13.)

8       When she learned that the video was online from her boyfriend at the time, Jane Doe 2 was

9   "scared and anxious." (*Id.* at 69:22 – 70:22.) Soon thereafter, she learned that everyone at her job

10  knew about the video and people were gossiping, so she stopped going to work without giving

11  notice. (*Id.* at 94:14 – 17.) Many people from her high school who learned about the video called

12  her derogatory names and she lost friends as a result. (*Id.* at 93:24 – 94:6; Ex. 138 [harassment from

13  someone she believed to be a friend].) Her family found out about the video, and even they have

14  lost friends as a result. (9/25/19 Trial Tr. 13 – 21.)

15      Jane Doe 2 received harassment through social media, including "many unwanted pictures

16  of random guys and their private areas." (*Id.* at 87:14 – 88:23; Exs. 147, 148, 150.) People have

17  used the video to blackmail her, threatening to spread the video to her friends, family, and

18  boyfriend if she did not do something for them. (9/25/19 Trial Tr. 87:3 – 9.)

19      Jane Doe 2 attempted to change her appearance because she was afraid of going out in

20  public and being recognized. (*Id.* at 95:22 – 96:4.) She testified that she isolated herself ("I went to

21  work or school and would just come straight home, nothing else") and avoided all interactions. (*Id.*

22  at 94:21 – 95:6.) She has experienced severe anxiety and panic attacks, which still occur today. (*Id.*

23  at 95:2 – 6.)

24      The Court finds Jane Doe 2 to be credible.

25                          **Jane Doe 3**

26      Jane Doe 3 was 19 years old and attending college in San Diego when she received an email

27  from Defendants in the fall of 2013 saying they saw her profile on Explore Talent and asking her to

28  fill out an application on BeginModeling.com. (10/1/19 Trial Tr. 10:20 – 11:2.) Thereafter, she

-49-

**STATEMENT OF DECISION**

1   received the stock email from Jonathan. (Ex. 151.) She did not respond until March 2014 when she

2   became behind on her rent and was in danger of eviction. (*Id.* at 13:10 – 17.) When Jane Doe 3 and

3   Jonathan spoke on the phone, he told her "that it was going to be exclusively on DVD in South

4   America, and that my name would never be associated with it. . . . He assured me that it would not

5   be on the Internet." (*Id.* at 15:9 – 23.)

6          Jane Doe 3 exchanged text messages with the reference model, who confirmed that the

7   video was "completely anonymous" and a comfortable experience. (*Id.* at 18:20 – 24.) She testified

8   that this communication "helped solidify my decision" and made Jonathan seem more trustworthy.

9   (*Id.* at 18:25 – 19:5.) Jane Doe 3 met Jonathan (whom she identified as Garcia) and Ben (whom she

10  identified as Pratt) at an apartment on Market Street before they drove together to a hotel to shoot

11  the video. (*Id.* at 19:25 – 21:7 [explaining that although she was scared at first, she became

12  comfortable with Defendants while chatting in the car on the way to the hotel].)

13         In the hotel room prior to the shoot, Jane Doe 3 asked Pratt about distribution twice,

14  specifically whether it was still going to be distributed as a DVD in South America; he assured her

15  that "it's definitely going to be" and told her not to worry about it. (*Id.* at 21:22 – 28.) Jane Doe 3

16  trusted Defendants because "they offered up a lot of information. They reassured me on multiple

17  occasions it wasn't going to be online." (*Id.* at 61:11 – 17.)

18         When Ben gave Jane Doe 3 the documents to sign, he told her it "was basically just going

19  over everything we agree upon" and told her she could pick a stage name. (*Id.* at 22:13 – 16; 24:2 –

20  3 [writing "Marie" as a stage name].) While she was signing, Pratt distracted her by filming and

21  interviewing her, asking personal questions. (*Id.* at 22:23 – 23:8.) She skimmed the document but

22  found it confusing; she signed based on Defendants' repeated representations. (*Id.* at 23:24 – 24:1.)

23  She asked for a copy of the documents she signed, and Pratt said he would mail her a copy but

24  never did. (*Id.* at 24:19 – 23.) Jane Doe 3 was never asked to read a script.

25         During the interview on the bed, Pratt asked Jane Doe 3 about past sexual experiences and

26  relationships. (*Id.* at 25:3 – 4.) Believing no one she knew would ever see the video, she shared

27  personal information about herself as well as other people that she would not have shared if she had

28

-50-

**STATEMENT OF DECISION**

EXH. 1 - 050

1  known the video was destined for the internet. (*Id.* at 25:1 – 24.) Jane Doe 3 testified she would not

2  have shot the video if she had known it would be online. (*Id.* at 77:26 – 28.)

3       Jane Doe 3 learned that her video was online in July 2014 when her manager pulled her

4  aside while she was at work and told her that a video of her was "going around." (*Id.* at 27:15 – 22.)

5  She was humiliated and had what she would later learn was her first panic attack. (*Id.* at 27:24 –

6  28:11.) She withdrew from the group of co-workers with whom she socialized frequently. (*Id.* at

7  28:15 – 20.) Soon thereafter, her friends from school began to discover the video. (*Id.* at 29:4 –

8  30:9.)

9       A friend of a friend attempted to blackmail her into having sex with him by threatening to

10  spread the video if she did not accept his advances. (Ex. 172; 10/1/19 Trial Tr. at 30:12 – 33:6 [she

11  was so frightened by this that she locked her front door and her bedroom door].) Jane Doe 3 and her

12  boyfriend at the time eventually broke up because of the video; "He would constantly bring it up

13  and we were really never able to move on from that." (10/1/19 Trial Tr. 34:16 – 19.)

14       She ultimately moved to Florida "for a fresh start" and because San Diego was "tainted" for

15  her after the video came out. (*Id.* at 35:2 – 8.)

16       Jane Doe 3, her friends, family members (E.g., Ex. 175, 5426 [harassment received by

17  mother]; Ex. 5424 – 5425 [friends being harassed], and current boyfriend are all harassed on social

18  media. (10/1/19 Trial Tr. 36:11 – 14; 40:15 – 24; see, e.g., Exs. 162 – 166, 170, 173, 174.) Now,

19  more than five years later, she still receives comments and messages and she is still impacted

20  emotionally by them. (10/1/19 Trial Tr. 36:15 – 18; 41:21 – 24; 39:17 – 26 [most recently, people

21  from her hometown learned about the video]; 50: 2 – 4; Ex. 5318.)

22       Jane Doe 3 believes the release of the video has impacted her long-term mental health. She

23  continues to experience acute anxiety that more people will learn about the video, along with

24  elevated anxiety generally; she now has panic attacks, which she never had before the video was

25  released. (10/1/19 Trial Tr. 57:10 – 58:8.) She is concerned that her 13-year-old brother or his

26  friends will discover the video; she is concerned the video will affect her ability to go to medical

27  school, and she "can't even think about a family." (*Id.* at 59:4 – 13.)

28       The Court finds Jane Doe 3 to be credible.

-51-
**STATEMENT OF DECISION**

**EXH. 1 - 051**

**Jane Doe 4**

Jane Doe 4 was a 20-year-old unemployed student living in North Carolina when she saw a Craigslist ad for modeling that directed her to "BubblegumCasting.com." (Aug. 28, 2019 Trial Tr. 79:1 – 18.) On the website, Jane Doe 4 saw and watched three videos depicting "just girls in regular tank tops. They seemed very happy." (*Id.* at 80:20 – 81:6.) Prior to flying to San Diego, Jane Doe 4 communicated with Garcia and Pratt by email, text, phone call, and FaceTime. (*Id.* at 85:6 – 20.) Pratt and Garcia told her "it was only going to be sent to a DVD store in Australia, my name wouldn't be attached, no one would ever know. . . . They said it wouldn't go on the internet." (*Id.* at 86:2 – 18.) Speaking with Garcia and Pratt over FaceTime made her feel more comfortable. (*Id.* at 85:19 – 86:22 [she asked again about distribution and they reassured her].)

Defendants offered Jane Doe 4 contact information for a reference model but she did not contact her because she "didn't want anyone else to know that I was doing it. . . . Just the offer made me feel a little bit more comfortable." (*Id.* at 88:9 – 18.)

When Jane Doe 4 asked about distribution again in the car after arriving in San Diego, Defendants continued to reassure her. (*Id.* at 89:25 – 90:5 ["They told me the same thing they kept telling me, Australia and no one would ever know, don't worry."].) Upon arriving in the hotel room, Pratt gave Jane Doe 4 approximately 5 to 6 alcoholic beverages from the minibar, which she testified made her feel "dizzy, lightheaded, especially when I sat down." (*Id.* at 91:15 – 92:12.)

Defendants put a stack of money and a piece of paper on the desk for Jane Doe 4 to sign; she counted the money, which was $2,000, the amount she was promised. (*Id.* at 92:23 – 94:20.) When she asked why she needed to sign anything, "They told me just to prove that I was 18, just reiterated what they already told me about distribution." (*Id.* at 93:2 – 12.) She attempted to read the documents, but she found it difficult in her intoxicated state. (*Id.* at 93:15 – 94:6.) She does not recall reading the script into the camera, and she appeared intoxicated in the video. (*Id.* at 94:21 – 95:2.)

After the sexual portion concluded, Defendants left abruptly and, feeling upset, Jane Doe 4 left the room. When she returned, most of the money they had given her was gone—there was an envelope of money, which contained a few $20s and a stack of $1s, totaling $400. (100:21 –

-52-

1   101:21.) Since Pratt was the only person with a key to the room to her knowledge, she believes he

2   took the money. (101:22 – 102:4.)

3          Jane Doe 4 discovered the video had been released online about two months after the shoot,

4   in late June 2013, when her friend informed her that the video was circulating through her college

5   campus and a neighboring campus. (103:7 – 104:14; 111:19 – 112:7 [she ultimately learned that

6   hundreds or maybe a thousand people at these schools knew about the video].) Jane Doe 4

7   immediately sent an email to GirlsDoPorn begging them to take it down, saying "I never authorized

8   it to be put online. I was told it would be sent to a DVD in Australia only," and asking for her

9   contract. (Ex. 208.168.) She described the harassment and her desperation; she threatened legal

10  action, but she never received a response. (*Id.*)

11         Jane Doe 4 was forced to transfer to a school in another state to find a "fresh start." (112:8 –

12  12.) Upon starting school in Florida, Jane Doe 4 joined a sorority, but she was kicked out three

13  weeks later because someone found the video. (*Id.* at 114:4 – 22; Ex. 208.54 – 56.) The video

14  spread quickly, and she soon received text and social media messages about it, especially on the

15  school's message board. (Ex. 208.59 – 76, 208.169.) One of her roommates posted a tweet saying,

16  "MY ROOMMATE IS A PORNSTAR" and played the video over the speakers in the house so that

17  Jane Doe 4 would hear it. (8/28/19 Trial Tr. 114:23 – 117:13 [she felt betrayed because she thought

18  this was a friend].) Someone vandalized her car by painting male genitalia on the windows. (Ex.

19  208.57 – 58.)

20         Soon, people from her hometown in New Jersey discovered the video when someone posted

21  it on her high school's Facebook page. (*Id.* at 112:15 – 23.) Both her immediate and extended

22  family found out. When her mother and father found out, she felt as if she "completely failed them

23  as a daughter. . . . that was my worst nightmare." (*Id.* at 113:1 – 16.) Although her parents have

24  been very supportive, her extended family has not been so forgiving—she no longer has much of a

25  relationship with her extended family and avoids family gatherings. (*Id.* at 113:17 – 21; 135:9 –

26  16.)

27         Jane Doe 4 has continued to be harassed on social media, via text, and even in person.

28  "People who recognize me from the video, if they see me, people call me names. They take pictures

-53-

**STATEMENT OF DECISION**

1  of me." (*Id.* at 134:2 – 15.) The video has impacted her romantic relationships. The person she was

2  dating at the time the video was released was harassed and ridiculed her as a result. Another

3  boyfriend broke up with her specifically because he and his family learned about the video. (*Id.* at

4  138:14 – 23.)

5  After the video was released in Florida, Jane Doe 4 was ridiculed for her body, so she

6  started making herself vomit to lose weight. (*Id.* at 136:15 – 23.) Jane Doe 4 testified that,

7  emotionally, she is "not the same person at all anymore." She has experienced debilitating anxiety,

8  depression, paranoia, fear, and anger as a result of the video. She has trouble focusing and trusting

9  people. She has cried "thousands" of times over the video and has not had a full night's sleep since

10  it was released. (*Id.* at 135:17 – 136:9.) She has sought medical treatment from her primary doctor,

11  a psychiatrist, and a therapist regarding her symptoms. (*Id.* at 136:24 – 137:6.)

12  The Court finds Jane Doe 4 to be credible.

13  **Jane Doe 5**

14  Jane Doe 5 was 17 years-old[41] and living alone in Florida when she first communicated with

15  Defendants about doing a pornographic video after responding to a modeling ad on Craigslist.

16  (9/18/19 Trial Tr. 8:19 – 9:1.) In an email, Jane Doe 5 asked Jonathan whether he could provide

17  "any clips or anything from the company's work" and whether there was "any contracting

18  involved." (*Id.* at 12:13 – 13:5; Ex. 218.) Jonathan responded, "I can go over everything with

19  precise detail. It's more direct and professional, is there a number I can reach you at?" (9/18/19

20  Trial Tr. 12:22 – 13:2; Ex. 218.)

21  When she spoke with him on the phone, Jonathan explained that "the video was for a private

22  collector" located in Australia and no one else would ever see it. 9/18/19 Trial Tr. 13:12 – 22.) He

23  further stated that "the video would be sent in a sealed envelope and he [the collector] was legally

24  contracted not to redistribute or produce the video we were making." (*Id.* at 13:13 – 16.) Jonathan

25  told her that her name and information would never be released, which made her feel confident. (*Id.*

26

27  ───────────────────

    [41] Defendants were on notice Jane Doe 5 was only 17 years old when they recruited her and when
28  they booked her flight to San Diego. (17:17-18:10 [noting Defendants had to use her birthday to book her
    flight.)

-54-

**STATEMENT OF DECISION**

1    at 14:11 – 15.)  Jonathan told her it would not be on the internet, and he never mentioned

2    GirlsDoPorn.com. (*Id.* at 14:24 – 15:2.)

3          Jane Doe 5 spoke with a reference model named Hailey who assured her "that everything

4    was safe, that they weren't scammers . . . most importantly that it never got back to her, it never

5    went online, and no one ever found out about it." (*Id.* at 16:19 – 17:6.)

6          Although she was only 17 at the time, Defendants asked her to send nude pictures of herself.

7    (*Id.* at 16:5 – 14.) Defendants booked Jane Doe 5's flight so that she arrived in San Diego on her

8    18th birthday. (*Id.* at 19:2 – 11.)

9          Once in San Diego, Garcia invited Jane Doe 5 out to a club with his friends to celebrate her

10   birthday with dancing and drinking. (*Id.* at 19:12 – 20.)[42] The following day, Pratt purchased a

11   birthday cake to use in the video to emphasize her age. (*Id.* at 20:17 – 21:5 ["He said the private

12   collector really liked how young I was and wanted to make like a scene with it to show that I was

13   just turning 18."].)

14         In the hotel room, Pratt instructed Jane Doe 5 to read the script into the camera, explaining

15   that "it was just something saying that I was sober and not under the influence of drugs or alcohol."

16   (*Id.* at 22:5 – 8.)  Pratt also gave her documents to sign and began rushing her. Jane Doe 5 testified,

17   "I told them I was sorry, I just wanted to make sure I knew what I was signing. And Michael told

18   me it was - - what I just read pretty much, that it was just me saying I was sober and not under the

19   influence." (*Id.* at 22:12 – 21.)  Garcia and Jane Doe 5 smoked marijuana together both the night

20   before and after the shoot finished. (*Id.* at 20:6; 25:6 – 7.)

21         Believing Defendants representations, Jane Doe 5 filmed two videos (the first with Garcia

22   and Pratt as videographer, the second with Wolfe as videographer) and, before her videos were

23   released online, was paid to act as a reference for 3 to 4 prospective models. (*Id.* at 26:3 – 20.) After

24   filming with Defendants but before Defendants released her video online, Jane Doe 5 participated

25   in an adult film produced by Reality Kings as a background actor; she took off her clothes but did

---

27         [42] Jane Doe 5 believes that Garcia purchased her alcoholic beverages. He told her that "it was fine"
     for her to drink but "to not drink too much because the private collector didn't want me to be hungover or

28   have glazed-over eyes in the video. And that Michael was going to be upset if he found out that we went
     out." (*Id.* at 19:21-20:3.)

STATEMENT OF DECISION

1   not engage in any sexual acts—because she knew that video was going to be released online and

2   she "didn't want that to be on the Internet." (*Id.* at 28:13 – 29:17.)[43]

3        Jane Doe 5 was considering doing a third shoot when her boyfriend advised her to obtain a

4   copy of the documents she signed. (*Id.* at 34:5– 35:17.) She asked Pratt via text for a copy of her

5   documents, and, rather than complying, Pratt asked, "Whats the deal your trying to fuck us over or

6   something?" [sic] and never sent her the documents. (Ex. 253.)

7        Shortly thereafter, she learned her video was online on several free porn sites, and she was

8   devastated to find that her name was listed in the comments and people she knew were

9   commenting. (Ex. 243.) Jane Doe 5 saw her name and links to all of her social media published on

10  PornWikiLeaks along with her episode number. (Ex. 241.) She started "getting bombarded with

11  harassment." Angry and upset, she sent Pratt and Garcia a text sarcastically thanking them for

12  putting her whole video on Pornhub and informing them that she was "being harassed by [her]

13  entire hometown." (Ex. 238.)

14       Jane Doe 5's social media was flooded with comments from strangers and people she knew:

15  "They were all just sending me nasty things, soliciting, trying to solicit sex from me, sending me

16  links and pictures and videos. Someone made a Facebook page with pictures of me with ejaculate

17  on my face as the profile picture and where they would have discussions about the video, share

18  their collages that they were making." (9/18/19 Trial Tr. 43:25 – 44:14; e.g., Ex. 251, 249, 246.)

19       Her family learned about the video and refused to talk to her. (9/18/19 Trial Tr. 39:4 – 8.)

20  Her mother received a Facebook message from a woman who sent a screenshot of Jane Doe 5

21  having intercourse with Garcia and commented in Spanish, "Your daughter is a slut." (*Id.* at 45:21 –

22  46:11; Ex. 268.) Her mother was "livid. At first she was saying the same mean things that people on

23  the Internet were saying." (9/18/19 Trial Tr. 50:21 – 51:13 [someone left a note on her mother's car

24  at the church referencing the video].) Jane Doe 5's younger sister (who was 12 – 14 years old at the

25

26

27  _____

28  [43] Noting she was not the main focus of the video, Jane Doe 5 testified that she decided to do the
    Reality Kings video even though she knew it would be published online because she is "comfortable being
    topless." (*Id.* at 30:19-25.)

-56-

**STATEMENT OF DECISION**

1    time) was approached about the video many times, harassed and solicited for sex on Facebook. (*Id.*

2    at 51:21 – 52:5.)

3        Jane Doe 5 received harassing messages from an ex-boyfriend threatening to send the video

4    to her mother (Ex. 254) and to her father on Christmas day. (Ex. 250, 255.) Her father later received

5    links to her video from multiple people. (9/18/19 Trial Tr. 50:5 – 16.) Even though she changed her

6    phone number due to harassment from the video, people have still found it and called to harass her

7    as recently as two weeks before she testified at trial. (*Id.* at 59:6 – 18.)

8        The release of the video has had a profound impact on her mental health. Prior to the

9    release, she had never experienced anxiety or had a panic attack. Since the video, she experiences

10   anxiety daily and has suffered more than ten panic attacks. She has become very depressed and

11   isolated herself from her friends and family. She was prescribed a sedative because she struggles to

12   sleep at night. (*Id.* at 59:19 – 60:20.)

13       Since the video's release, she has sought medical treatment numerous times, been on Zoloft,

14   Celexa, beta blockers, and Trazodone, but had to stop taking antidepressants because they

15   interfered with her work. People tell her she has developed a very unhealthy drinking habit.

16   Overall, the video has done significant damage to her interpersonal relationships and professional

17   life. (*Id.* at 60:22 – 61:12.)

18       She has many concerns about the future—what will happen when she gets married, whether

19   she should have children, whether it is possible for her to still have a successful career in academia.

20   (*Id.* at 61:13 – 22.)

21       The Court finds Jane Doe 5 to be credible.

22                              **Jane Doe 6**

23       Jane Doe 6 was 18 years old, finishing her freshman year of college in Louisiana, working

24   15 to 20 hours per week, and living paycheck-to-paycheck when she responded to Defendants'

25   Craigslist ad for modeling in May 2016. (9/27/19 Trial Tr. 10:5 – 17.) When she first received

26   Jonathan's stock email offering $5,000, she did not respond. (*Id.* at 18:9 – 15 [Ex. 276].)  When

27   Jonathan increased the offer twice to $7,000 (apparently for one shoot with the option of doing a

28   second) and told her she could bring a friend, she responded. (*Id.* at 26:3 – 29:7 [Ex. 278, 284].)

-57-

**STATEMENT OF DECISION**

1  The offer to let her bring a friend and to let her "talk to as many girls as possible" made her feel

2  more comfortable. (*Id.* at 26:21 – 29:18.)

3      Over the phone, Jonathan explained that the video would only be sold on DVD in Australia,

4  "it would never reach the Internet," and her "name would never be attached in any type of way."

5  (*Id.* at 31:11 – 32:5.) When Jonathan sent her pictures, "it looked like everything he was promising

6  me. I mean, they had nice cars. The hotel rooms looked very nice. It looked very professional. The

7  girls looked happy. They had their money in their hand, smiling. They looked safe." (*Id.* at 34:4 –

8  13 [Ex. 285].)

9      Although Jane Doe 6 thought Jonathan seemed trustworthy, she had not made up her mind

10  to do the video until she spoke with two reference models on the phone. (*Id.* at 38:17 – 20.) The

11  first, Amberlyn [Nored Clark], reassured Jane Doe 6 that Defendants were truthful and that they did

12  in fact send the video on DVDs to Australia, that "she's shot with them before and she's never had

13  a problem. . . . And she said that no one ever found out about it." (*Id.* at 42:16 – 43:1.) The second

14  reference also reassured her that the video "does not go on the Internet whatsoever." (*Id.* at 43:3 –

15  12.) Jane Doe 6 decided to do the video after speaking with the references "[b]ecause they seemed

16  really genuine and [...] they assured me that they have never had problems with it, and [...] it felt

17  really good hearing that from another woman that has filmed with them that they have never gotten

18  harassment or it does not go on the Internet. So it was a lot of reassurance." (*Id.* at 43:13 – 23.)

19      Upon arriving in San Diego, Jane Doe 6 continued to seek assurance. When Reva Yousif

20  picked her up from the airport, Jane Doe 6 told her she was "really nervous about being there" and

21  "having second thoughts." (*Id.* at 49:2 – 4.) Ms. Yousif was "reassuring me that everything is

22  going to be okay; just make your money, like no one is ever going to know about it. And I kind of

23  thought of her as a motherly figure, like she was very comforting and very sweet, and I really liked

24  her." (*Id.* at 49:5 – 10.)

25      On the day of the shoot, Garcia offered Jane Doe 6 marijuana, but she refused. (*Id.* at 57:1 –

26  8.) In the hotel room, cameraman Teddy Gyi and Garcia had Jane Doe 6 perform a "strip tease"

27  before asking her to sign any documents or read the script; she did both wearing a robe, after

28  getting fully naked on camera. (*Id.* at 60:4 – 15; 67:9 – 20.)

STATEMENT OF DECISION

1    Upon receiving the documents, Jane Doe 6 tried to read the documents but found them

2    confusing; "Teddy was paraphrasing every section of it for me so that I could understand. . . . He

3    said that this paragraph just means that no names are going to be used and everything is kept

4    confidential. This paragraph means that we have - - like this gives us the right to put it on DVD

5    format to Australia." (*Id.* at 62:15 – 25.) Jane Doe 6 believed Teddy because he was, at that point,

6    the fifth person to assure her of the things she had been promised. (*Id.* at 63:7 – 13.) While she

7    filled out the documents, Teddy filmed her and asked her questions, which was distracting. (*Id.* at

8    63:18 – 64:18.) Teddy also asked her to read a script into the camera, which was, he explained, to

9    show that she was sober, no one had forced her to be there, and that it meant she was letting them

10   distribute the video on DVD in Australia. (*Id.* at 68:7 – 15; 70:5 – 24.)

11   Based on the representations of Defendants and their agents, Jane Doe 6 filmed one video.

12   After filming, Garcia again reassured her that no one would find out about the video when she

13   continued expressing concerns. (*Id.* at 73:13 – 25 ["He was like, 'I've done hundreds, and no one

14   knows who I am. Everything is okay. You will be fine.'"].) Jane Doe 6 testified that no one ever

15   mentioned GirlsDoPorn.com or indicated the video would be online; she stated definitively that she

16   would not have done the video if anyone had. (*Id.* at 58:9 – 14.)

17   Jane Doe 6 learned her video was online in early August 2016 when someone from her high

18   school texted her some pictures from her video. She was distraught and immediately started looking

19   for ways to remove it. (*Id.* at 87:8 – 22.) She quickly discovered her video on many free websites,

20   including Pornhub, and sent emails to all of the websites she could find, begging them to take her

21   video down. (*Id.* at 97:12 – 24 [e.g., Exs. 312, 313, 315, 316, 317].)

22   She did not try to contact Jonathan after the video was released because she was afraid of

23   him and did not trust him. (*Id.* at 144:23 – 145:4.) Instead, she contacted the email address listed on

24   GirlsDoPorn.com, begging them to remove the video and offering to purchase the rights because

25   she was lied to, and the video was ruining her life to the point of being suicidal. (*Id.* at 156:6 –

26   158:18 [Ex. 1729].) The responses she received were vague, taunting, and unhelpful. (*Id.*)

27   People from her high school, elementary, middle school, coworkers, and regulars at her

28   work all found out about the video. (*Id.* at 114:25 – 115:3) Working as a waitress, customers and

-59-

**STATEMENT OF DECISION**

1  coworkers both confronted her about the video and watched it in her presence; ultimately, she was

2  forced to quit. (*Id.* at 117:12 – 18:16, 118:23 – 120:7.) Jane Doe 6 did not return to college that fall

3  because she was not mentally stable enough to do so, which she attributes entirely to the video's

4  release online. (*Id.* at 121:17 – 23.)[44]

5      Jane Doe 6's mother learned about the video when her friend's husband showed her a clip

6  of the video. (*Id.* at 177:2 – 11.) Nearly one year after the video was released, people from the town

7  where she went to high school started finding out, and she received another wave of harassment.

8  (*Id.* at 134:13 – 22 [e.g., Exs. 307, 308, 309, 314].) The video also affected her relationship with her

9  boyfriend of seven years. He still holds it over her head and brings it up in every argument, saying

10  that nothing he did could be as bad as the video. (*Id.* at 162:4 – 14.)

11      The release of the video online has changed her life significantly. She feels like she has been

12  in hiding—she cannot connect with or trust people; she avoids public settings because if someone

13  recognizes her from the video, she immediately has a panic attack. (*Id.* at 159:5 – 11.) She has

14  engaged in self-harm and attempted suicide by overdosing on depression medication shortly after

15  she discovered her video online. When the attempt failed, she became angry with herself. (*Id.* at

16  159:12 – 16.) Once, she went to the hospital to try to get help such as prescription medication, but

17  the staff tried to admit her into a mental hospital instead. (*Id.* at 160:10 – 13.)

18      She has sought medical treatment for her emotional distress. She was finally able to see a

19  therapist when she got health insurance approximately a year ago. (*Id.* at 159:25 – 160:8.) She has

20  been prescribed four different medications for depression, one to help her sleep, another one for

21  anxiety. (*Id.* at 160:19 – 24.) These measures have helped, but she continues to have suicidal

22  thoughts to this day.

23      The Court finds Jane Doe 6 to be credible.

24                      **Jane Doe 7**

25      Jane Doe 7's case is unique in that, prior to arriving in San Diego for the shoot, her

26  communications with Defendants occurred through her friend, Lindsay, rather than directly.

27

28      [44] After filming, she learned about another girl at her college who had a similar experience. She saw
the horrific treatment she received, and decided she could not handle that. (*Id.* at 120:14 – 121:16.)

**STATEMENT OF DECISION**

1   (Deposition of Jane Doe 7, June 17, 2018 ("Doe 7 Depo. Vol. I") 26:1 – 10.) She never saw a

2   Craigslist ad or an email from Defendants; instead, Lindsay spoke to Defendants and convinced

3   Jane Doe 7 to accompany her from Texas to San Diego for what she was told would be "nude

4   modeling to make money," based on representations Defendants made to Lindsay. (*Id.* at 69:2 – 8.)

5   Jane Doe 7 also "didn't find out it was actually, like, filming pornography till I got there." (*Id.* at

6   69:21 – 24.)

7          Jane Doe 7 testified that Lindsay "said verbatim what [Defendants] told her. It was going to

8   be Australia only and not in the United States and not online." (*Id.* at 70:16 – 25.) Lindsay told Jane

9   Doe 7 that this was the information "Matt" gave her. (*Id.* at 71:21 – 72:2.) Jane Doe 7 testified that

10  she and Lindsay took approximately one week to decide whether or not to do the shoot and that

11  Lindsay "was in contact with him [Matt] every day" during that time and that he "made it sound

12  very reassuring." (*Id.* at 72:12 – 73:3 ["I asked her to ask them repeatedly, and she said they kept

13  assuring her that nothing bad was going to happen, and it was only going to be in Australia."].)

14         Soon after Lindsay and Jane Doe 7 arrived in San Diego, Defendants began making

15  representations—for the first time, directly to Jane Doe 7—regarding a DVD being released in

16  Australia. (*Id.* at 84:18 – 85:2.) She remembers specifically telling Defendants, "If anything was

17  released in the United States or online or anything was accessible to, like, my family or friends, that

18  it would completely ruin my life." (*Id.* at 85:16 – 20.) When Jane Doe 7 expressed her concerns

19  about anonymity to Wolfe and Garcia on multiple occasions, they both verbally assured her, "You

20  have nothing to worry about. It's not going to be online. It's not going to be in the US." (*Id.* at 86:8

21  – 19.)

22         Upon arriving in the hotel room and learning that the shoot involved pornography, Jane Doe

23  7 became scared and, although no one threatened her, felt she was unable to leave. (*Id.* at 83:3 – 21;

24  see also 75:10 – 76:13 ["of course, I was freaking out, but I didn't really have a choice."].)

25         When Wolfe gave Jane Doe 7 documents to sign, Defendants did not give her a chance to

26  read them and rushed her to sign, saying, "This is what we've already talked about. You already

27  know what's going to happen." (*Id.* at 80:8 – 81:2 ["they were rushing me because Lindsay was

28  next, and they had to get two people in in one day."].) Jane Doe 7 requested time to review them,

-61-
**STATEMENT OF DECISION**

1  but Wolfe said no. (Deposition of Jane Doe 7, August 8, 2018 ["Doe 7 Depo. Vol. II."] 315:6 – 13.)

2  She asked Wolfe one final time to confirm the video would only be sold in Australia, to which he

3  responded, "Yes, yes, yes. Just sign, sign, sign." (Doe 7 Depo. Vol. I, 89:4 – 13.)  When she read

4  the script into the camera, she was not concerned because she considered it in the context of the

5  representations already made to her. (Doe 7 Depo. Vol. II, 320:13 – 25.)

6        Jane Doe 7 testified that if she had known the video would be published online, she would

7  not have gone through with it but "would have taken off running." (*Id.* at 327:9 – 14.)

8        During the shoot, Jane Doe 7 began bleeding and experiencing pain. She testified, that she

9  went in the bathroom, locked the door, and "I told them I didn't want to do it anymore," but they

10  knocked on the door and told her, "We already paid you $2,000. You have to come out here and do

11  it. The bleeding will stop as soon as you start intercourse again." (Doe 7 Depo. Vol. I, 154:1 – 9.)

12  She eventually finished the video.

13        Jane Doe 7 learned that her video was posted online from a friend who confronted her about

14  it. (*Id.* at 27:13 – 16.)[45] The same day, she called Wolfe and asked him about distribution, but he

15  hung up on her. (*Id.* at 26:12 – 20; Doe 7 Depo. Vol. II, 253:19 – 254:3.) She googled Bubblegum

16  Casting, found an email address, and sent an email asking that the video be removed because she

17  did not know it would be online. (Ex. 332.)

18        Everyone at her job found out about the video, which she knows "[b]ecause they make fun

19  of me every single day I go to work." (Doe 7 Depo. Vol. I, 33:20 – 34:13.) She has been bullied by

20  "too many people to count." (*Id.* at 137:11 – 13.) She continues to be harassed and bullied at work.

21  (Doe 7 Depo. Vol. II, 213:14 – 24.)

22        The video has impacted her personal relationships. Her boyfriend at the time came home

23  from work crying one night, saying "I found out something about your past, and it's disgusting."

24  (Doe 7 Depo. Vol. I, 35:1 – 10.) She attributes their breakup to the video being published online:

25  "He never really got over [the video], over the fact that people knew about that and that people

26  were talking about it." (*Id.* at 36:6 – 37:4.)

27  

28        [45] Jane Doe 7 cannot bear to search for her video online but has been told by friends that it is on
many websites. (Vol. II, 257:24 – 258:2; 260:18 – 19.)

STATEMENT OF DECISION

1    While Jane Doe 7 acknowledges that she has a history of anxiety, she testified that it has

2  gotten "progressively worse throughout 2015 to 2018." (*Id.* at 59:9 – 18.) In the last three to four

3  years, she has been "[a]fraid to leave my house; afraid that people are talking about me constantly;

4  no one wanting to be with me, date me; afraid of not getting a job." (*Id.* at 61:23 – 62:7.)

5    In December 2017, she stopped going to college because her anxiety and depression, which

6  she attributes to the video, made it too difficult. (*Id.* at 47:9 – 20.) Even leaving her house, driving,

7  and going to work are very difficult. (Doe 7 Depo. Vol. II, 184:16 – 21.) She has always wanted to

8  go to graduate school but can't imagine that happening now. (Doe 7 Depo. Vol. I, 124:4 – 11.)

9    Jane Doe 7 testified that she has tried to change her appearance as much as possible,

10  including her hair, her teeth, her lips, and her tattoos, to avoid people recognizing her. (*Id.* at 67:19

11  – 68:12.)

12    The Court finds Jane Doe 7 to be credible.

13                                      **Jane Doe 8**

14    Jane Doe 8 was attending graduate school in San Diego when she found Defendants' ad on

15  Craigslist looking for a job to supplement her student loans and the money she earned babysitting.

16  (Deposition of Jane Doe 8, June 11, 2018 ["Doe 8 Depo."] at 22:19 – 23:6.) Despite receiving a

17  scholarship, she needed more money to cover basic living expenses such as rent and food. (*Id.*

18  65:24 – 66:20.) In April 2016, Jane Doe 8 responded to the ad for modeling by email.

19    When Jonathan sent his stock email offering $4,500 for two adult shoots (Ex. 338), Jane

20  Doe 8 did not respond because she had no interest in making an adult video. (Doe 8 Depo. 68:24 –

21  69:9.) Jonathan increased the offer twice, but she still did not respond. (Ex. 340.) By July 2016,

22  Jane Doe 8's financial situation had become "desperate," so she finally responded. (*Id.* at 73:1 – 5;

23  105:6 – 9.) When she and Jonathan (whom she believed to be Garcia) spoke on the phone for 45

24  minutes to 1 hour, he explained "the videos would not be online in the United States, they would

25  only be on DVDs overseas." (*Id.* at 74:25 – 76:22 ["He told me that they were putting together a

26  [...] collection of videos that would take years to be put together, so by the time mine came out it

27  would be years later."].) He said she would be "all done up so [she] wouldn't be recognizable" and

28  that "the references would be able to confirm any worries and fears that [she] might have, that they

-63-
**STATEMENT OF DECISION**

1   never had a problem with anything going viral, nothing being released in the United States." (*Id.* at

2   76:25 – 77:10.)

3       This distribution plan sounded reasonable because "my understanding was that the videos

4   would be in Australia and New Zealand and I thought that Australia had very strict censor laws

5   around their Internet so I assumed that's why they needed the DVDs, rather than just being able to

6   access the plethora of online." (*Id.* at 83:2 – 25.) Jane Doe 8 confirmed multiple times that the video

7   would not be released online, which was "extremely important" to her. (*Id.* at 77:13 – 25.)[46]

8       After seeing the pictures of prior models and the set, she felt "that they were being truthful

9   to what they said" and "felt safe after seeing this." (*Id.* at 151:24 – 152:19; Ex. 342.) Jonathan

10   texted her information for two to three references, but she "felt that if they were providing the

11   references and providing me all of this information that I didn't have any reason to not believe what

12   they were telling me." (Doe 8 Depo. 79:09 – 21.)

13       Based on Jonathan's assurances, Jane Doe 8 agreed to film a video for $1,500. (*Id.* at 81:16

14   – 25.) On the day of the shoot, she met Riva in the lobby of an apartment building. They did not

15   talk in detail, but Riva "reassured [her] that they were nice guys." (*Id.* at 87:1 – 13.) Jane Doe 8

16   declined the marijuana Garcia and the videographer offered her, but she did drink some wine that

17   she brought with her. (*Id.* at 88:15 – 89:7.) By the time the shoot began, she had finished the bottle

18   of wine and felt "tipsy." (*Id.* at 91:22 – 92:5.)

19       After changing locations, Garcia paid Jane Doe 8 in cash and presented the contracts, which

20   she signed without reviewing them because:

21           I didn't feel like I had time to and, as that was being handed to me I

22           was reassured that everything in it was everything that we had talked
        about via phone so I didn't feel the need to read what they had

23           already promised to me, because they made it seem like what was in
        here was what we had talked about.

24

25   (*Id.* at 113:10 – 19.) "And they were very late to both shoots, so it was kind of under the premise of,

26   you know, we're running behind, let's get going, just sign this and we can get started." (*Id.* at

27   _____

28      [46] Jane Doe 8 rented pornographic DVDs from a sex store a few times during college. (*Id.* at 145:9 –
10.)

STATEMENT OF DECISION

1    114:12 – 15.) When Garcia presented her with the documents, saying "this is everything we talked

2    about on the phone, . . . nothing to be worried about, it's just protocol," Jane Doe 8 "clarified that

3    that meant nothing goes online." (*Id.* at 131:20 – 25.)

4         Even after carefully reading the Model/Talent Release at the deposition, Jane Doe 8 stated,

5    "nothing in here is striking me as going against what they had said, you know, even when it says we

6    can use it as we so please, or […] saying we can use it however they feel fit I figured that meant

7    what we had discussed, being the video -- or the DVDs overseas." (*Id.* at 115:15 – 21.) She

8    explained, "had it said this video will appear online on their website then yes, but there is nothing

9    like that that I'm seeing in this contract, per my understanding of it." (*Id.* at 116:16 – 20; 118:4 – 19

10   ["it's a very long run-on sentence, so I don't a hundred percent know what some of the words in it

11   mean either," such as perpetuity, successors, licensees, and assignees].)

12        Reading the verbal script, Jane Doe 8 believed she was still operating under the same

13   agreement that they had reassured her repeatedly about. (*Id.* at 135:8 – 136:5.) She asked Garcia if

14   she should still read the portion about alcohol if she had been drinking, and they said yes. (*Id.* at

15   136:11 – 13.) During the interview, Garcia instructed her to "act excited, flirty, and fun"; she had to

16   stop and reshoot several answers he did not like. (*Id.* at 138:17 – 18; 140:7 – 142:20.)

17        Jane Doe 8 returned for a second shoot as nothing occurred at the first shoot gave her

18   concerns. (*Id.* at 159:3 – 15.) She brought alcohol and, as Defendants arrived two hours late, had six

19   to seven drinks while waiting for them. (*Id.* at 160:11 – 161:24;[47] 162:24 – 163:1 [estimating her

20   intoxication level was "an eight out of ten"].) Again, Garcia offered her marijuana, and she

21   declined. (*Id.* at 165:23 – 166:10.) Garcia represented that the documents were as the same as last

22   time and rushed her to sign them. (*Id.* at 168:1 – 19.) The videographer (whom she identified as

23   Gyi) asked her to "pretend to sign a document on camera." (*Id.* at 132:4 – 11.) In the video, her

24   eyes are half open and she shows signs of inebriation.

25        When Defendants first released her video online, Jane Doe 8 "contemplated ending [her]

26   life multiple times but then [she] thought that [she] couldn't even do that because the headlines

27

28

---

[47] She may have taken a Percocet earlier that day due to an athletic related injury. (*Id.* at 162:2 – 3.)

**STATEMENT OF DECISION**

1  would probably have something to do with the videos." (*Id.* at 206:18 – 25 [describing herself as

2  "very depressed"].) The week after the video was released, she called and texted a suicide hotline;

3  three years later, she still suffers from suicidal ideation. (*Id.* at 208:10 – 18.)

4        Jane Doe 8 has received limited harassment because as soon as she started receiving

5  messages mentioning the video from high school and college acquaintances, she "immediately

6  blocked 90 percent of [her] phone contacts and deactivated [her] social media." (*Id.* at 48:7 – 49:3;

7  50:3 – 12 [explaining why the harassment stopped quickly].)[48] Neither her parents nor her current

8  employer know about the video, but she experiences severe anxiety that they will. (*Id.* at 230:10 –

9  13.)

10        In an effort to remove the video from two websites (GirlsDoPorn.com and "a Tinypost

11  website"), Jane Doe 8 sent DMCA take-down requests and listed as the reason "[t]hat it was not

12  supposed to be online, that it was against what I believed to be what was happening. . . . I believed

13  that when I created the video it was never to be seen online, and that's not what happened." (*Id.* at

14  42:7 – 43:18.) The DMCA eventually replied that "the owners of the website wouldn't take the

15  video down because [she] didn't have rights to it." (*Id.* at 43:19 – 25.)

16        In addition to depression that she experiences multiple times per week, Jane Doe 8 has

17  isolated herself and stopped being social. (*Id.* at 229:3 – 19.) She describes how her emotional

18  distress from the video has manifested:

19            I live in fear just because of this, I would say about every day of my
20            family finding out, of my employer finding out, of [...] friends that
          don't know yet finding out in my social circle being even further
21            diminished, I've lost friends that I've had for years, you know, every
          time my parents' phone rings and [...] they sound confused on the
22            phone I think that it must be something related to this, or if they send
          me a text that I need to call them, that's where my thoughts go first,
23            anytime my boss calls me into her office I think oh God, someone
24            must have known, even at work sometimes if parents [in her therapy
          practice] are looking at me a little differently I think oh they must
25            know.

26  (*Id.* at 207:1 – 15.)

27

28

---

[48] Garcia has attempted to connect with Jane Doe 8 on Instagram twice. (Ex. 360.)

**STATEMENT OF DECISION**

EXH. 1 - 066

1        Jane Doe 8 commented that she believed Defendants, in part, based on her "belief that no

2    one would have a company that was [de]frauding people and if they did that they -- they would

3    have been caught." (*Id.* at 208:4 – 9.)

4        The Court finds Jane Doe 8 to be credible.

5                **Jane Doe 9**

6        When Jane Doe 9 responded to Defendants' Craigslist ad in February 2014, she "was

7    struggling financially and didn't feel like [she] had many options." (10/30/19 Trial Tr. 8:13 – 19

8    [father had just had a double lung transplant, so she did not want to ask her parents for help].) In

9    response, Jane Doe 9 received an email from BubblegumCasting.com offering $2,500 to shoot a 25-

10   minute adult video. (Ex.371.) This early iteration of the stock email stated, "NO names or personal

11   information is used in our videos or given out to any third parties period" and contained a link to

12   BubblegumCasting.com "for references from previous models who have worked with us." (*Id.*)

13   When she visited the website, she saw videos of models wearing Bubblegum Casting shirts "talking

14   about how comfortable they were." (10/30/19 Trial Tr. 14:9 – 17.)

15       Jane Doe 9 responded asking "where this would go once it's finished, in terms of a site, and

16   if other sites could borrow or use the film for their sites? I would really want it to be as confidential

17   as possible." (Ex. 371) She testified at trial that she asked this question to ascertain whether it was

18   going to be online, and stated that, if so, she would no longer be interested. (10/30/19 Trial Tr.

19   11:13 – 18.)

20       Once on the phone with "Matt" (whom she identified as Pratt), she "told him that [she] was

21   trying to become a teacher, so [she] needed it to be confidential." (*Id.* at 15:21 -- 25.) Matt said it

22   would be "discreet and professional" and the video "would be distributed on DVD overseas if I

23   chose to take that option." (*Id.* at 15:28 -- 16:6.) She told Matt, "that would be the only way that I

24   would be comfortable doing it. And that I would never want my name to be attached to it…. He

25   said that was completely understandable, most of the girls request the same thing, and that with it

26   going overseas I have little to no risk of that ever happening." (*Id.* at 16:8 – 15; 17:16 – 19 [DVDs

27   distributed specifically to Australia].) After a few follow-up calls for reassurance, Jane Doe 9

28   agreed to do the shoot.

1   At the airport en route to San Diego, Jane Doe 9 felt nervous and called Matt for

2 reassurance. He offered to connect her with reference models, but she opted against it because she

3 did not think it would be helpful. (*Id.* at 139:27 – 140:3 ["I don't feel like they were going to give

4 me someone to call and they were going to have negative things to say about the experience."].)

5 Ultimately, she agreed to film because she believed Matt was telling her the truth, that

6 "[d]istribution was going to be overseas to Australia, and my name was never going to be attached

7 to it. I was certain of that or else I would not have flown here." (*Id.* at 17:10 – 19.)

8   Pratt picked Jane Doe 9 up from the airport, and they drove to pick up Garcia and then

9 continued on to a hotel. As she prepared for the shoot, Pratt set up; he "took a chair that he didn't

10 want in the scene and pushed it against the door of the hotel room." (*Id.* at 20:6 – 10 [noting she felt

11 somewhat trapped].)[49]

12   Once she had finished her hair and makeup, Matt hurried her to sign the model release

13 agreement, explaining there was no need to read the document because "it was just giving them

14 permission to film me, and that it was just a summary of the things we had talked about." (*Id.* at

15 24:18 – 25:16.) When she skimmed the document, it was "very dense," but she did not see anything

16 that caused her concern, so, trusting Matt, she signed it. (*Id.* at 26:8 – 27:21 ["I had no reason to

17 believe that five minutes before I'm going to do this that the game would be changed on me."].)

18 When she asked what to write for her "stage name," Matt said she should just write her real name

19 "because it was not going to be necessary to have a stage name. [The video] wasn't going to be

20 released so there was no reason for [her] to create one." (*Id.* at 28:3 – 8.)

21   Next, Matt handed her the script, asked her to read it into the camera, quickly explaining

22 that she was just giving them permission to film her, and pressed "play." (*Id.* at 28:12 – 29:9

23 [noting she had no time to process the meaning of what she read].) As soon as she finished the

24 script, Matt coached her through the interview, then they began filming. (*Id.* at 29:19 – 30:22.)

25

26

27

28

[49] As she got ready, she began feeling overwhelmed and asked to step outside, but Matt refused, saying it would be too difficult to move the furniture in front of the door. His refusal made her more uncomfortable. (*Id.* at 21:5 – 24.)

STATEMENT OF DECISION

1    After the shoot, Matt took Jane Doe 9 back to his apartment for the solo shoot. Once there,

2  she was asked to repeat the same process of signing documents and reading the script, which she

3  did. (*Id.* at 31:21 – 33:3 [noting that nothing had happened to cause her concern].)

4    Jane Doe 9 then returned home to Texas, and approximately one month later, learned the

5  video was online when a high school acquaintance sent her a link to the video. (*Id.* at 33:4 – 22.)

6  She immediately felt "[h]umiliated. Betrayed. Deceived. Like [her] life was being ruined in that

7  moment." (*Id.* at 34:6 – 9.) She clicked on the link and saw, not only was her video online, but her

8  name was already associated with it. (*Id.* at 34:11 – 14.) She immediately called the phone number

9  she had for Matt, but it went straight to voicemail. She continued calling until her number was

10  blocked. (*Id.* at 34:15 – 25.) Jane Doe 9 then went to the Bubblegum Casting website looking for

11  contact information but found none. (*Id.* at 35:1 – 4.)

12    She endured severe harassment in the months that followed: people called her and left

13  messages or contacted her on social media calling her offensive names. (*Id.* at 35:26 – 36:2.)

14  Someone sent a link to her video to people in her hometown (a small town in Washington), and her

15  parents soon found out about it. (*Id.* at 36:3 – 15.)

16    When Jane Doe 9 found a post on PornWikiLeaks containing her picture and quotes about

17  her teaching philosophy from her professional LinkedIn page, she felt "humiliated" and

18  "exploited." (*Id.* at 36:17 – 23; 37:18 – 27; Ex. 382.2.) She also found posts on multiple websites

19  identifying her by name. (Exs. 386.1; 387.1.)

20    Shortly thereafter, Jane Doe 9 was dismissed from her teaching job because the faculty and

21  students at her school had found an article about her on TheDirty.com. (*Id.* at 39:20 – 28, 40:9 –

22  22.) When the principal at the school where she worked sent her a copy of the article, which

23  contained her picture and name, the name of her school, and a caption stating she had "no business

24  working with school children unless she wants to teach them about the fine art of having sex on

25  camera," she felt "like the problem was only worsening instead of resolving." (Ex. 392; Doe 9

26  Depo. 41:12 – 42:1.) Upon learning this article was the first search result on Google, she

27  "immediately panicked" and knew that she would have to seek legal counsel to resolve this growing

28  problem. (*Id.* at 42:19 – 43:12.)

**STATEMENT OF DECISION**

Jane Doe 9 also learned that the principals and human resources personnel at her school received anonymous emails about the video, saying she should not be working with students. (*Id.* at 43:15 – 19; see, e.g., Ex. 393.) Jane Doe 9 also received threatening emails through her publicly accessible school email about the video, signaling "that they knew what was going on with the school district." (Doe 9 Depo. 44:16 – 28.) Her text messages with the principal at the school show her distressed and desperate state of mind. (Exs. 388; 390.)

In the aftermath of losing her job, Jane Doe 9 she began experiencing anxiety and panic attacks so severe that she had to be hospitalized for "anxiety and panic disorder" and prescribed Lorazepam. (Doe 9 Depo. 49: 1 – 20.)[50] She hired an attorney who was able to negotiate a resolution in which she would receive pay through the end of her contract. (*Id.* at 49:23 – 50:7.)

Jane Doe 9 moved to a new city because of the video and found another job in her chosen field in the new city the following year. (*Id.* at 50:10 – 51:8.) The faculty and staff at her new school have not yet learned about the video but she is "fearful every day" that they will. (*Id.* at 51:11 – 52:7 ["I'm afraid of losing my job every day. I'm fearful that, you know, if I get called down to the office and I don't know what for, I am fearful that the exact same thing is going to happen to me all over again."].)

Immediately after finding the video on GirlsDoPorn, Jane Doe 9 quickly sought ways to remove the video, using the Google Removal Tool with no luck. (*Id.* at 35:10 – 23.) She also sought "help from reputation websites, where they delete or suppress your information through a Google tool," but none of these efforts have yielded much success. (*Id.* at 52:8 – 27.)

The Court finds Jane Doe 9 to be credible.

**Jane Doe 10**

In July 2015, Jane Doe 10, a San Diego resident at that time, met Defendants through her friend Kaitlyn McLain who, having shot two videos, told her "[t]hat no one would ever see it. No

---

[50] Jane Doe 9 experienced some depression after filming but before release of the video. It got worse after the release. (*Id.* at 102:11 – 14; 132:17 – 19.) Although some portion of her more recent anxiety attacks appear to stem from issues with her mother, the video release is partly to blame. (*Id.* at 104:14 – 18; 133:3 – 134:1; 136:1 – 15.)

1  one has seen hers. She had done one a month or two previous to the [second] one [. . .] and that it

2  was easy money. It was fast. And no one would ever see it." (10/7/19 Trial Tr. 113:12 – 24.)

3        Based on those assurances and trusting her friend, Jane Doe 10 agreed to talk to "Jonathan."

4  (*Id.*) After exchanging a few texts, Jonathan called her to explain that she could shoot one video for

5  $5,000 and that the video would go on DVD to Australia. (*Id.* at 125:21 – 27.) She asked whether

6  anyone would ever see the video in the United States, and Jonathan replied, "No, that it was going

7  to be on a DVD that couldn't be replicated. It was for a buyer living in Australia, a single guy." (*Id.*

8  at 126:3 – 10.)

9        She was willing to send Jonathan nude pictures because he told her that he "needed to show

10  the buyer pictures of me to . . . see if the guy was interested." (127:2 – 12 [she trusted Jonathan

11  because her "good friend had already done two shoots, and she had had no problems, and I trust

12  her."].) Jane Doe 10 testified that if McLain had told her video was published on the internet, she

13  would not have even spoken to Jonathan; but, based on McLain's and Jonathan's assurances, she

14  agreed to do the shoot. (*Id.* at 128:9 – 12.) Once the buyer had approved her pictures, they set up a

15  shoot. (Exs. 412, 415, 416.)[51]

16        Jane Doe 10 had previously done exotic dancing and "camming," which she described as "a

17  face-to-face interaction with another person [via] a live feed, and someone chooses to talk to you,

18  and basically you choose whether or not you're clothed. You have control over the whole thing."

19  (10/7/19 Trial Tr. 128:26 – 129:9.) Importantly, she testified that she had never interacted with

20  someone in the United States on the cam site; "[y]ou can block certain IP addresses with the

21  company that I worked with. So I blocked United States and England as well." (*Id.* at 129:10 – 16;

22  130:10 – 11 [she did camming for about one month].) Jane Doe 10 worked as an exotic dancer

23  several years prior to shooting the video. She testified that, to her knowledge, no one in her life was

24  aware that she had stripped or done camming. (*Id.* at 130:12 – 131:26 [first time she disclosed

25  either fact to anyone was in deposition].)

26

27

28      [51] One of Jonathan's emails stated $4,000 instead of $5,000, so Jane Doe 10 clarified with him and confirmed that she would receive $5,000. He assured her that she would. (139:8 – 17 [discussing Ex. 412].)

**STATEMENT OF DECISION**

**EXH. 1 - 071**

1       On the day of the shoot, Jane Doe 10 met Defendants at a hotel downtown. (*Id.* at 141:9 –

2   16.) She met the male talent who was introduced to her as Dre (Garcia), and Riva did her makeup

3   while Wolfe set up the camera equipment and lights. She asked numerous times to make sure the

4   video would not be available in the United States and "the three people that were there told me and

5   confirmed with me that no one would ever see it. It was going to Australia." (*Id.* at 126:14 – 21 [not

6   yet realizing that Garcia and Jonathan were the same person, she believed she confirmed what

7   McLain told her with four different people].) All three reassured her.

8       Jane Doe 10 was nervous, so while Riva was doing her makeup, Riva comforted her saying,

9   "'Oh, don't worry honey. He's going to love it. You're going to do great,'" which Jane Doe 10 took

10  to be a reference to the private collector in Australia. (*Id.* at 154:3 – 13.) She also expressed to

11  Wolfe her concern about someone she knows seeing the video, but he reassured her that would not

12  happen (*Id.* at 154:16 – 4 [she trusted Wolfe more because "his accent seemed to tie that the video

13  was going to Australia."].) Garcia offered her marijuana; she does not recall whether she accepted.

14  (*Id.* at 155:8 – 18.)

15      Despite promising to pay $5,000, on the day of the shoot, after sending pictures to "the

16  private buyer," Defendants said he would only pay $2,500 because she "looked old" and had

17  bruises on her body. (*Id.* at 157:1 – 17.)

18      When Defendants gave her documents to sign, Wolfe and Garcia told her "it was just a

19  contract between me and the buyer, just confidentiality stuff." (*Id.* at 159:16 – 25.) Defendants

20  filmed and interviewed Jane Doe 10 while she filled out the documents. Defendants instructed her

21  to "talk to the private collector," lie about her age, and disclose information about her sexual

22  history, which she found distracting. (*Id.* at 158:4 – 21 [noting she would not have answered the

23  questions if she had known the video would be online].) After signing, Jane Doe 10 was instructed

24  to read a script into the camera; she was told "it was just the same thing I had signed, just reading

25  aloud." (*Id.* at 160:11 – 25.)

26

27

28

**STATEMENT OF DECISION**

1    Thereafter, the sexual portion of the shoot commenced.[52] She asked to leave several times

2    because the shoot had dragged on for many hours. She asked to leave so that she could get some

3    food with a plan to leave and not return. (*Id.* at 183:6 – 9.) Although no one overtly tried to

4    intimidate her, they would not let her leave. (*Id.* at 181:27 – 182:15.)

5        After the shoot, Jane Doe 10 learned that Garcia and Jonathan are the same person when she

6    received a text from Jonathan's number that was obviously written by Garcia. (*Id.* at 137:23 –

7    138:7; Ex. 414.1, 414.5.)

8        Jane Doe 10 learned her video was online when Jane Doe 1 contacted her as part of her

9    investigation of this case. (10/7/19 Trial Tr. 163:9 – 13.) She "was kind of in a state of panic" and

10   when she began searching the internet, she went on Facebook and found her video posted on her

11   mother's page. (*Id.* at 163:15 – 22 [she quickly flagged it and had the video removed].) To her

12   knowledge, her father is not aware of the video, though she worries he will find out. She is not sure

13   whether her mother knows but she cannot bring herself to talk to her about it, especially because

14   her mother is "very religious." (*Id.* at 163:20 – 164:11.)

15       Jane Doe 10's name, Facebook account, and a picture of her with her mother were all posted

16   on PornWikiLeaks. (Ex. 431.) Links to her video spread across her social media, and she received

17   many messages that she found harassing. (E.g., Exs. 445 [message from a stranger using her name

18   to create a sexual pun; shows attempt to call her]; Ex. 446, Ex. 448.) Someone used a screenshot

19   from Jane Doe 10's video to make an inappropriate meme, which Jane Doe 10 saw spread around

20   numerous websites. (Ex. 442.1; 10/7/19 Trial Tr. 176:1 – 12.) She testified that being "contacted by

21   strangers constantly" and being the target of inappropriate comments impacts her emotional state.

22   (10/7/19 Trial Tr. 177:18 – 23.)

23

24

25   [52] Shortly after she arrived at the hotel, Jane Doe 10 noticed that she had begun menstruating, so she
     asked to reschedule the shoot. Garcia said there was no need, that they had dealt with this before and would

26   just use a sponge. When she resisted, Garcia said they had already spent the money on the shoot and would
     lose money if they cancelled now. (*Id.* at 141:25 – 142:16.) Describing the shoot, she recalled, "several times

27   in the middle of the shoot that while we were having sex, blood would start coming out. And they would
     have to stop like mid-shoot, like mid-filming to clean up." (*Id.* at 143:14 – 21.) She also testified that she

28   recently watched the video footage produced by Defendants and saw no scenes where blood is visible that
     she believes they filmed. (*Id.* at 143:24 – 144:3.)

-73-

**STATEMENT OF DECISION**

EXH. 1 - 073

1       The video's release online has impacted her romantic relationships. Jane Doe 10 testified

2   that two boyfriends had "talked down to [her]" or "[held] it over [her] head." (*Id.* at 180:17 –

3   181:2.) One previous boyfriend "tried to get [her] to sleep with him by threatening to release [her]

4   video to more people if [she] didn't sleep with him." (*Id.* at 181:3 – 8.)

5       Jane Doe 10 is still being harassed today. She now works as a manager overseeing several

6   employees. She was recently contacted by a previous employee who sent her a screenshot of the

7   video and commented on it. (*Id.* at 195:12 – 20.)

8       The Court finds Jane Doe 10 to be credible.

9                       **Jane Doe 11**

10      In March 2016, Jane Doe 11 was finishing her last year of college in Tennessee when she

11  responded by email to a Craigslist ad for modeling, hoping to earn spending money. (9/10/19 Trial

12  Tr. 117:3 – 14.) She received a response from Mike@ModelingWork.com, offering $5,000 for a

13  shoot lasting 30 minutes of "regular sex" and promised "nothing weird, kinky [sic] or strange

14  happening." (Ex. 453.) The email advertised, "We have several channels of distribution depending

15  on the level of anonymity you wish to attain." (Ex. 453.1.) Jane Doe 11 noted that the email said,

16  "None of your personal information is released or included in any part of the video or after to keep

17  your identity as private as possible." (Ex. 453.2.) While she was "[d]efinitely not" interested in a

18  career in pornography, based on the promise of anonymity, Jane Doe 11 was interested in learning

19  more. (9/10/19 Trial Tr. 120:6 – 121:4.)

20      Jane Doe 11 next spoke on the phone with "Mike," a man with an Australian accent whom

21  she later identified as Pratt. (*Id.* at 121:13 – 25.) In addition to explaining the logistics, Pratt told her

22  "it would be not online. It would be distributed DVD in Australia. And that there were reference

23  models that I could speak to, that he could provide me with." (*Id.* at 123:13 – 17.) She asked

24  questions to ensure she would remain anonymous and the video would not be online anywhere;

25  Pratt assured her of both. (*Id.* at 123:18 – 25.) He called and texted nearly every day until she

26  agreed to do the shoot. (*Id.* at 122:21 – 23.)

27      Pratt requested that she send nude pictures, and as he assured her he would keep them

28  confidential, she obliged. (*Id.* at 124:11 – 18.) Still unsure, Jane Doe 11 obtained the names and

1   contact information for two reference women, who she contacted via text to ask about their

2   experiences shooting with Pratt. (*Id.* at 125:2 – 126:3.) The first reference told Jane Doe 11:

3
> [S]he's done it before, I had nothing to worry about, it wouldn't be
> online. They treat you so well, they treat you like a princess. If you
> want a Starbucks, you can get a Starbucks. She said it's never - -
> she's not had any issues. No one she knows has ever found out. [...]
> She just kept on telling me it's only a DVD in Australia. She has not
> had any issues. She then went on to even give me her Instagram. I
> looked her up. She seemed like a normal girl, nothing unusual to me.

8   (*Id.* at 128:17 – 129:4.) The second reference again confirmed that the video would not go online,

9   that she had not had any issues; she offered to Facetime and talk, but Jane Doe 11 declined because

10  she did not want the reference to see her face. (*Id.* at 129:15 – 24.) She testified that texting with the

11  reference woman and getting to see her social media was impactful because she was "just looking

12  normal and like she is still continuing to live her life after doing a video." (*Id.* at 130:3 – 9.) Based

13  on these assurances, she flew to San Diego to shoot a video.

14      Upon arriving in San Diego, Jane Doe 11 was picked up from the airport by Pratt and

15  "Teddy" Gyi, the videographer. Pratt and Teddy both reassured her that it would not go online, she

16  had nothing to worry about, and it would be quick and easy. (*Id.* at 131:1 – 132:12.) In the hotel

17  room, Teddy offered Jane Doe 11 alcohol, which she declined. (*Id.* at 132:24 – 133:2.)

18      While Riva did her hair and makeup, Garcia (*not* the model she chose) arrived. He drank all

19  of the alcohol in the minibar, took some pills, which he told her were Viagra and Molly and smoked

20  marijuana. (*Id.* at 133:19.) Riva reassured Jane Doe 11 that she had done makeup for many girls

21  who all had good experiences and that she did not need to worry. (*Id.* at 134:24 – 135:5.) Garcia

22  also confirmed the video would not be online. (*Id.* at 135:20 – 23.)

23      When Garcia handed her documents to sign, he emphasized they were in a hurry because

24  her makeup took so long, then flipped through the pages quickly, pointing out different parts,

25  saying "'This is where it says not online. . . . Here's were not forcing you to do this. Your free will.

26  Everything that I have told you is just in this document.'" (*Id.* at 136:7 – 16.) By this time, Jane

27  Doe 11 estimated that she had been reassured about the scope of distribution more than thirty times.

28

STATEMENT OF DECISION

1   (*Id.* at 137:7 – 9.) She trusted what he told her about the documents and because he was "berating"

2   her to hurry, she signed them quickly without reading. (*Id.* at 137:10 – 138:1.)

3        Defendants paid Jane Doe 11 $5,000 and handed her a piece of paper to read to the camera,

4   explaining, "'Again, this is just to show we don't have a gun pointed at your head that we're

5   forcing you to have sex on camera.'" (*Id.* at 138:6 – 19.) Trusting them, she did as they asked. For

6   the interview, they instructed her to act flirty and happy and asked sexual questions. Because she

7   believed that no one she knew would see it, she answered them. (*Id.* at 139:1 – 12.)

8        On May 1, 2016, in the middle of final exams, Jane Doe 11 learned her video was online

9   when a friend texted her a screen shot of the video. (*Id.* at 173:9 – 174:2.) Panicking, she quickly

10  tried to justify what she had done, explaining to her friend, "They said it would only be in

11  Australia" and "I only did it for money." (Ex. 471.6 – 471.7.) She was so distraught that her friends

12  were concerned that she may attempt to harm herself, so they stayed with her through the night and

13  took her to the school counseling service the next day. (9/10/19 Trial Tr. at 175:3 – 18 [recalls

14  feeling and expressing that she "didn't want to be alive"]; 178:4 – 25.)

15       The video spread like wildfire. In fact, Jane Doe 11 learned from the student council

16  president that "everyone was watching it in the library, so much so that the Internet essentially

17  crashed and the school had to shut it down." (*Id.* at 179:10 – 16.) The student council president also

18  informed her that "the administration actually had to watch the video. They all congregated in a

19  room to watch it to I guess make sure I didn't say the university name in the video." (*Id.* at 180:10 –

20  13.)

21       The following morning, Jane Doe 11 took action to get the video removed from the internet.

22  She started by sending Pratt an email stating, "This is not spam but a life or death situation. Please

23  contact me[....] Please. I beg of you[.]" (Ex. 473.) When he did not respond, she sent another email

24  that evening:

25           Please. I beg of you. I need the video down. My whole school found
26           it, and the quicker it's down the easier it will be and my parents will
              be less likely to pursue legal action to get it taken down. This may
27           even be in the media and be completely terrible for me. My future is
              already ruined and I see no reason to live. Please help me. Help me
28

-76-
**STATEMENT OF DECISION**

1  survive. I will wire you back the money, plus more. Help me. I beg of you.

2

3  (Ex. 474.) When she still received no response, Jane Doe 11 contacted an attorney who sent a detailed

4  demand letter to Pratt two days later. (Ex. 476.)

5  Ultimately, the Defendants offered to take the video down for $15,000, but she decided not

6  to accept the offer because the video had spread to so many other websites that paying to remove it,

7  from only one would not accomplish much. (9/11/19 Trial Tr. 8:1 – 11.) Further, she did not trust

8  Defendants to adhere to the agreement. (*Id.* at 8:12 – 20.) After declining, Jane Doe 11 tried hiring

9  another service to help her remove online content, which only worked for a day before everything

10  she paid to remove had returned. (*Id.* at 9:21 – 10:4.)

11  Jane Doe 11 testified that she was devastated to see her video on many websites, including

12  most notably, Pornhub.com, which described her in derogatory, vulgar language and displayed that

13  the video had more than 9 million views. (Exs. 496; 1576.2.) Soon, she learned that her name and

14  personal information had been connected to her video and posted on numerous forums, along with

15  links to her Facebook profile. (E.g., Exs. 489; 480.) These anonymous users also posted her

16  brother's, sister's, and church's Facebook profiles, saying "'Let's all harass them. Let's send it to

17  her family, send it to her pastor. Let's ruin her life. She should kill herself. What a slut.'" Such

18  comments made her question her desire to live. (9/11/19 Trial Tr. 20:13 – 21:12 [describing the

19  basis for her belief that someone did send the video to her pastor].)

20  When she returned to school for summer classes, another student sent her nude pictures of

21  himself and attempted to break into her dorm room, which frightened her enough to call campus

22  police. (*Id.* at 25:16 – 25.) After deactivating her social media for a stretch of time in order to avoid

23  harassment, she eventually reactivated her accounts. Even using the most stringent privacy settings,

24  she still received what she estimates to be one hundred harassing messages. (E.g., Ex. 482.)[53]

25  The release of the video also impacted Jane Doe 11's personal relationships. Although her

26  family has been very supportive, her boyfriend at the time was not. Shortly after the video was

27  released, she drove to meet him at his apartment. When she arrived, he was sitting on his couch

28

---

[53] Jane Doe 11 has a social media presence and participates in beauty pageants.

-77-

**STATEMENT OF DECISION**

EXH. 1 - 077

1   with a glass of water and a 9-millimeter handgun. (9/11/19 Trial Tr. 27:15 – 21.) When she walked

2   into the room, he became hysterical, pointed the gun at her and then at himself, threatening to kill

3   himself and saying it would be her fault. (*Id.* at 27:23 – 28:7.)

4       Jane Doe 11 testified that the video being released online has had a huge impact on her

5   emotionally: "…I'm sitting here four years later, and it still kills me inside. I have gone through

6   major depression. I wanted to kill myself. I have isolated myself. I was afraid to show my face

7   anywhere. It's consumed my brain." (*Id.* at 29:19 – 24.)

8       The Court finds Jane Doe 11 to be credible.

9                                   **Jane Doe 12**

10      In January 2015, when Jane Doe 12 had just turned 20 years old, was a college student, and

11  living in Florida, she found an advertisement on Craigslist for modeling, which lead her to

12  Defendants. (8/22/19 Trial Tr. 14:24 – 15:5.) The advertisement did not mention pornography.

13  (*Id.*) She was on Craigslist looking for jobs because she needed money for school and living

14  expenses; she was struggling a lot financially, and her family could not help her. (*Id.* at 14:17 – 23,

15  15:6 – 8, 101:9 – 14.) She had approximately $50 in her bank account. (*Id.* 15:9 – 13.)

16      After responding to the Craigslist advertisement, Jane Doe 12 received a canned email reply

17  from Jonathan, who she identified at trial as defendant Garcia. (*Id.* 14:12 – 16; Trial Ex. 5301.)

18  The email stated to her that Defendants were "an established Southern California company," stated

19  "[n]one of [her] personal information [would] be given out in the video or afterwards," and offered

20  her $6,000 total ($5,000 for a male/female adult video and $1,000 for a solo video). (Trial Tr.

21  17:18 – 18:22; Trial Ex. 504.) The email stated Defendants had shot over 200 models, and that

22  Jane Doe 12 could speak with any of them. (*Id.*)

23      Jane Doe 12 had some reservations, and wanted to know more about the job, including

24  where it would go, and who would see it. (*Id.* 20:20 – 21:3.) She emailed defendant Garcia for

25  more details and said she wished to speak with Defendants' prior models. (*Id.* 21:4 – 6.) Garcia

26  emailed back that he would explain it all on the phone, and would put Jane Doe 12 in contact with

27  prior models. (*Id.* 21:20 – 25.) He also sent her photos of what he said were prior models, with

28  money and looking happy. (*Id.* 27:7 – 16; Trial Ex. 510.)

-78-

**STATEMENT OF DECISION**

1       When Jane Doe 12 and Garcia spoke over the phone, he told her that the video was going to

2  be a DVD in Australia, and not sold in the United States. (*Id.* 28:8 – 15.) Garcia also referred her

3  to Taylor Rogers, who told Jane Doe 12 the video went on DVD, she had shot with Defendants, and

4  nobody will ever find out. (*Id.* 24:4 – 15.) Garcia's and Rodgers' statements significantly

5  influenced her decision to do the video shoots. (*Id.* 24:16 - 21, 29:8 – 11 [Rodgers "made me feel

6  like they were telling me -- what they were telling me was true, kind put my doubts at ease,

7  made me feel comfortable with the entire situation.")

8       Jane Doe 12 eventually flew to San Diego and Garcia and Wolfe picked her up at the

9  airport. (*Id.* 32:16 – 33:12.) Garcia and Wolfe both repeated the representations that her video

10  would be a DVD in Australia. (*Id.* 33:13 – 23.)

11       At the first video shoot, the "solo scene," Wolfe spoke with Jane Doe 12 about the

12  documents. "He just kind of said that this was -- these were just kind of a formality. They are

13  everything we had discussed before about my pay and that it was going to be a DVD and just kind

14  of not super important." (*Id.* 37:9 – 19.) While she tried, she did not read the documents. "He kind

15  of distracted me, asking me like kind of small talk and random questions. He was kind of rushing

16  me a little bit because he kept on saying they were behind. And it was late at night." (*Id.* 37:21 –

17  38:4.)

18       Wolfe also handed her the verbal script, told her to read it into the camera, not telling her

19  what it was for – and Jane Doe 12 did not think it was a contract. (*Id.* 38:10 – 17.) Jane Doe 12

20  then filmed the "solo video" for Wolfe. (*Id.* 38:23 – 24.)

21       At the second video shoot, Defendant did not pay Jane Doe 12 the $5,000 as promised—

22  "They would only be able to pay me 4,000 for the video because I had cellulite on my legs." (*Id.*

23  39:15 – 40:11.) She also did not read the documents, testifying, "Because they did the same thing

24  they did the first time. Isaac and Jonathan asked me questions during it, kind of small talk. Kind of

25  distracted me. Again kind of rushing me because I was supposed to get a flight later that day. (*Id.*

26  40:12 – 19.) Garcia and Wolfe represented the documents "were the same documents as before, just

27  going over pay and everything that we had discussed about what the DVD would be." (*Id.* 41:6 --

28  10.) Again, Defendants handed her the verbal script, told her to read it into the camera, not telling

-79-

STATEMENT OF DECISION

1  her what it was for -- and Jane Doe 12 did not think it was a contract. (*Id.* 41:13 – 21.) Jane Doe 12

2  then filmed the video with Garcia as the actor. (*Id.* 42:21 - 43:2.) Garcia also said the videos would

3  not be on the internet. (*Id.* 32:2 – 9, 40:20 -- 41:2.)

4      Later, Jane Doe 12 learned her video was published online, which surprised her. "I started

5  freaking out.  I wondered how this guy that I knew had seen this video or had found this video. I

6  just kind of panicked at that point and just kind of freaked out.  All the blood drained from my

7  face." (*Id.* at 46:8 – 13.) Jane Doe 12 found her video on approximately 20 free pornography sites,

8  including www.Pornhub.com, which also referenced her real name. (*Id.* at 47:1 – 48:25.)  This

9  made her feel "really helpless" and she wanted "to go to a deserted island where no one could find

10 [her]." (*Id.* at 49:12 – 17.)

11      While she tried to flag the videos to get them offline, she did not contact Defendants,

12 because "they had a lot of [her] personal information, so [she] was a little afraid of what they could

13 possibly do with that." (*Id.* at 48:19 – 24.)

14      Once Jane Doe 12's video was published, a "fan page" on a website, Tumblr was created.

15 (*Id.* at 51:24 – 52:5.) The last time she checked www.Pornhub.com, the website reflected her video

16 had around 30 million views, which made her afraid to go outside, feeling everyone had seen her in

17 "a very private manner that [she] never wanted people...to see." (*Id.* at 62:14 – 63:3.) Jane Doe 12

18 also saw information about herself, such as her name and links to her social media, on the website

19 www.pornwikileaks.com, which upset her. (*Id.* at 63:4 – 64:1.)

20      As to why she believed Garcia and Wolfe, she testified "Because they had told me over and

21 over again that it was going to be a DVD.  They told me that I could talk to any references.  I

22 believed Taylor and what she said to me because I didn't think another girl would lie to another girl

23 about something like that.  And they constantly assured me." (*Id.* 64:6 – 14.)

24      She "would have liked to have known what GirlsDoPorn was...would have liked to have

25 known what their true intention and where [her] video was going." (Id. 93:18 – 93:5.) She wished

26 she would have known "where they would be posting it.  And [she] would have liked to have

27 known that [her] anonymity was not guaranteed. There are people out there that sole purpose is to

28 find out the names of people in porn videos." (*Id.*)

-80-

**STATEMENT OF DECISION**

1    Jane Doe 12 was also harassed on social media, text messages and phone calls, receiving

2   messages and friend requests from hundreds of strangers (which continues to this day), with

3   relation to her video with Defendants. (*Id.* 64:25 – 65:20; 67:16 – 68:8; 72:22 – 25; 80:14 – 25; Ex.

4   537, 538.) Harassment included statements to her, "Very ugly," "Any GDP still," and "Are you the

5   Girl from GirlsDoPorn?" (*Id.* 69:12 – 17, 74:2 – 5.) As to distress from this, she said, "Just again it

6   makes me kind of want to disappear and kind of change my name and move to a different country.

7   Just makes me not want to be around people and just kind of a reminder of how betrayed I felt."

8   (*Id.* 68:10 – 15.) She "felt [her] privacy was invaded and just completely kind of thrown out the

9   window on something that [she] never thought would be all over the Internet for everyone to see

10  and people [she] know to see." (*Id.* 74:19 – 23.) She even received messages for sexual

11  propositions. (*Id.* 75:3 – 8.) She was afraid to go outside, and afraid of new people. (*Id.* 77:4 –

12  10.)

13    Strangers also messaged Jane Doe 12's mother online, which terrified Jane Doe 12. (*Id.*

14  83:14 – 19; Ex. 593.) Strangers also messaged Jane Doe 12's boyfriends. (*Id.* 86:24 – 87:2; Ex.

15  577.)

16    Jane Doe 12 stopped going to school, has cried hundreds of times, and moved to a town

17  where she did not know anyone. (*Id.* 87:8 – 88:11.) Her family relationships were damaged, as

18  were her hometown and college relationships. (*Id.* 89:4 – 23; 90:11 – 22.) She lost weight, lost

19  sleep, and had nightmares about the video. (*Id.* 90:23 – 91:16.) She is concerned about her career

20  and future relationships with significant others, has already lost some due to the video, and she is

21  concerned the video will impact her ability to have a family of her own someday. (*Id.* 91:17 –

22  92:17, 93:18 – 94:6.)

23    As to her emotional state, she testified:

24    A. […] I kind of became very depressed. I had suicidal thoughts at
      points of just either swerving out on the road into a tree or a ditch or
25    something. Even at one point Googled, like, what over-the-counter
      medications that I could take and what were the effects, and I tried to
26    overdose.
      Q. Why were you thinking about killing yourself?
27    A. Because my name and everything -- my life got flipped, turned
      upside down, and my name had been completely dragged through the
28

-81-

**STATEMENT OF DECISION**

1   mud, and I didn't feel like I could recover from anything like that.  I
    didn't know how to recover because everybody in my life that's been
2   important to me has changed their opinion about me pretty much and
    how they feel about me.

3

4   (*Id.* 89:12 – 90:5.)

5        The Court finds Jane Doe 12 to be credible.

6   **Jane Doe 13**

7        In September. 2015, Jane Doe 13 was 20 years old entering her final year of college in

8   Florida when she began looking for jobs on Craigslist to help pay for college after her family

9   business fell apart. (9/09/19 Trial Tr. 27:9 – 28:4). In her initial email to Defendants, she wrote,

10  "...my only request is full discretion" because she wanted to have control over where her face or

11  name would be published and how it would be published in an attempt to protect herself. (*Id.* at

12  29:15 – 23; Ex. 607.) She received Jonathan's stock email offering $6,000 for two shoots and

13  guaranteeing her name and personal information would not be used. (Ex. 612). She ignored the

14  email, as well as Jonathan's two follow-up emails, because she was not interested in on-screen

15  nudity in an adult video. (Id. at 30:17 – 25; Exs. 617; 618.)

16       Having applied to a separate Craigslist ad, Jane Doe 13 later received an email from "Mark"

17  at ModelingGigs.com, to which she responded about one month later when "time was...running out

18  a little" and her need for money grew. (9/09/19 Trial Tr. 36:19 – 37:2; Ex. 619 [again emphasizing,

19  "I would like to make sure discretion is the main priority."].) She spoke with Mark on the phone,

20  who spoke with an accent "not fully Australian or fully American" and represented that the video

21  would be published on DVDs exclusively in Australia and that it would never be published

22  anywhere else (Id. at 38:12 – 18, 39:1 – 6.) Jane Doe 13 was not comfortable with flying across the

23  country but said she would reconsider if they were to film in Florida or New York. (Id. at 39:7 –

24  21).

25       Jane Doe 13 eventually came into contact with Jonathan, who she later realized had a

26  connection with Mark. (Trial Tr. 09/09/19 at 40:18 – 41:4). In the process of deciding whether to do

27  the shoot, Jane Doe 13 had frequent communication with Jonathan, including a FaceTime call in

28  which she saw that Jonathan was in fact a "real person" and another model prepping for her shoot.

-82-
**STATEMENT OF DECISION**

1    She testified that they made it seem fun and relaxed, and that there was nothing to worry about. (Id.

2    at 42:16 – 43:1). Prior to the shoot, Jane Doe 13 received text messages from references Cat

3    Wilkens (Id. at 43:4 – 19; Ex. 627) and Kailyn Wright (Ex. 628). She testified that Ms. Wright's

4    text messages made her feel like she was her friend and that the shoot was both professional and

5    that there was nothing to worry about. (Id. at 44:6 – 14). Jane Doe 13 ultimately agreed to film a

6    video, which was filmed in New York City at the Grand Hyatt Hotel. (Id. at 41:19 – 25).

7         Jane Doe 13 met with videographer Gyi and Garcia at the hotel; both made her feel

8    comfortable. (Trial Tr. 09/09/19 at 46:2 – 15). However, Garcia became angry at Jane Doe 13 upon

9    realizing she had shown up to the shoot in full makeup, saying that she was wasting their time

10   because they would have to redo her makeup. (Id. at 47:5 - 12). After her makeup was redone, Jane

11   Doe 13 started to have a gut feeling that something was wrong. (Id. at 47:16 – 22).

12        Shortly thereafter, Jane Doe 13 went to the bathroom and got her period. Thinking this was

13   her way out, she walked out of the bathroom and told Garcia she got her period unexpectedly and

14   that she could reschedule. (*Id.* at 47:25 – 48:10). Again, Garcia became angry and hostile,

15   complaining that they flew out to New York for this shoot. Garcia then pulled Jane Doe 13 into the

16   bathroom and, without her consent, inserted a sponge into her vagina to block the menstrual

17   bleeding and said, "That's it. We're good to go." It was at this point that Jane Doe 13 didn't think

18   she had the option to leave. (Id. at 48:11 – 19).

19        Defendants then asked Jane Doe 13 to undress so they could take nude photos of her to send

20   to the boss per their "protocol." She ultimately found out that she was not adequate enough looking

21   for the boss and that she would not be paid the amount she was promised because she had cellulite

22   and breast reduction scars. (Trial Tr. 09/09/19 at 48:20 – 49:11). She was promised $5,000 but was

23   paid $3,500. (Id. at 49:12 – 16).

24        After being paid, the Defendants presented Jane Doe 13 with documents that she was rushed

25   to sign. (*Id.* at 49:17 – 21). Defendants made it seem like the documents were all for production,

26   and that it was just something needed to get the shoot going. (Id. at 49:21 – 24). Jane Doe 13 tried

27   to skim the documents and, in doing so, read the names "BLL Media" and "Clockwork

28   Productions." She asked Garcia what these two companies were, to which he responded, "that's just

-83-

**STATEMENT OF DECISION**

1  the production company." (Id. at 50:1 – 11). Jane Doe 13 did a Google search for "BLL Media" and

2  found a generic modeling site with nothing that stood out to her—no pornographic videos. (Id. at

3  50:12 – 23). Once Garcia saw that she was Googling something, he rushed her further, saying, "this

4  is just the basic agreements, everything we spoke about" and reinforced the prior representations of

5  the video never going online and that it would be on DVD in Australia. (Id. at 50:24 – 51:19).

6  Garcia was holding the documents, flipping through them and telling her where to sign and initial.

7  (Id. at 52:4 – 19).

8        After signing the documents, Gyi handed her the script and told her "just read this. It's for

9  the camera." Upon reviewing and reading the document, Jane Doe 13 questioned the portion of the

10 paper that said she was giving her rights to them. Teddy told her that this would be just for the

11 camera, just for the production. (Trial Tr. 09/09/19 at 53:4 – 54:7). She didn't think much of it at

12 the time because Garcia and Gyi continued to appease any doubts she had during the shoot. (Id. at

13 54:8 – 11). Jane Doe 13 read the script with those assurances in mind and then filmed an interview

14 she was coached through before filming the sexual portion of the video. (Id. at 54:12 – 56:7).

15       Despite her horrible experience at the shoot, Jane Doe 13 left the hotel thinking that the

16 distribution terms she agreed to with Defendants were still intact, not believing that they would

17 exploit her. (Trial Tr. 09/09/19 at 57:2 – 15)

18       On or around January 10, 2016, Jane Doe 13 found out her video was on the internet. One of

19 her best friends initially confronted her, and she fell into such shock that she had to be carried into

20 her apartment. (Trial Tr. 09/09/19 at 59:7 – 15). At the time she found out, she was in front of her

21 school's entire fraternity and sorority community. (Id. at 59:16 – 21). In her apartment, her friends

22 had to stay and watch her because she was repeatedly saying "I'm going to kill myself." (Id. at 60:2

23 – 6). Jane Doe 13 testified that, after the video was published online, everyone at her school and in

24 her hometown knew—everyone was talking about it and messaging her about it. (Id. at 62:1 – 5).

25 Eventually, Jane Doe 13 felt like she owed her sorority an explanation and went before 150 girls in

26 a room, broke down, and told her story. (Id. at 63:3 – 23).

27       After her video went public, Jane Doe 13 had to remove herself from all social media

28 because she was getting an influx of harassment and messages to such an extent that she could not

**EXH. 1 - 084**

1   handle it anymore. (Trial Tr. 09/09/19 at 66:21 – 67:1). She did not attend the first week of classes

2   after the video was released because she was still coming to terms with its release. She was scared

3   and embarrassed, feeling like she could not go anywhere without ridicule. (Trial Tr. 09/09/19 at

4   67:21 – 68:8).

5       Defendants' release of the video had far-reaching effects. Jane Doe 13 received a large

6   amount of harassing messages from strangers on social media. (Exs. 659, 661, 665) She testified

7   that messages such as these were like a stab to the heart that brings her back to the initial trauma of

8   the video shoot with Defendants. (Trial Tr. 09/09/19 at 71:22 – 72:8). Jane Doe 13 testified to

9   seeing her real name and corresponding GDP episode number on PornWikiLeaks.com, which made

10  her feel livid and exposed to a massive invasion of privacy on a public forum where users were

11  determined to rip her and others apart. (Id. at 91:5 – 92:6); Ex. 663). As a direct result of the video,

12  Jane Doe 13 was kicked out of her sorority and off her cheerleading team. (Id. at 94:2 – 5).

13      The day after she found out her video was online, Jane Doe 13 reached out to GirlsDoPorn,

14  begging for the video's removal. (Ex. 646 [stressing that she was "on the verge of committing

15  suicide because of this awful person who thought it was okay to lie to and exploit a young girl like

16  this."].) No one at the company responded to her email. (Trial Tr. 09/09/19 at 69:6 – 7). She even

17  tried to contact all the phone numbers for the people involved with her shoot, including Jonathan,

18  Garcia, and Gyi. No one answered except for Gyi, who only responded to her pleas for help by

19  saying that he was not at liberty to disclose any information. (Trial Tr. 09/09/19 at 69:15 – 70:7).

20      Jane Doe 13 took further action to remove her video from the internet without any

21  assistance whatsoever from Defendants. She testified that, when she found a link to her video, she

22  would send it to the "DMCA Defender," whom she contacted to help her take it down from

23  wherever it appeared online. (Trial Tr. 09/09/19 at 75:3 – 8; 76:3 – 22.; Ex. 678.)

24      She fears losing respect in her industry and being treated differently or even being fired

25  because of the video. (Trial Tr. 09/09/19 at 86:16 – 87:1). She testified that the video release is akin

26  to having a nightmare every night where if she gets a call or text, she thinks it has to do with

27  someone else finding out about the video. (Trial Tr. 09/09/19 at 87:2 – 5). The video has impacted

28

-85-
**STATEMENT OF DECISION**

1 her dating life, even seeing her boyfriend get harassed by people approaching him to disparage Jane

2 Doe 13. (Trial Tr. 09/09/19 at 88:9 – 17).

3   Due to the video's release, Jane Doe 13 sought professional help by seeing a psychiatrist.

4 She was having trouble getting out of bed, focusing, and sleeping. She was prescribed Vyvanse.

5 (Trial Tr. 09/09/19 at 84:17 – 11).

6   The Court finds Jane Doe 13 to be credible.

7     **Jane Doe 14**

8   Jane Doe 14 was 18-years old and living in Calgary when she saw a Craigslist ad for

9 modeling in California that directed her to "BeginModeling.com." (10/15/19 Trial Tr. 16:21 –

10 17:12.) After submitting the application in July 2014, she received the stock email from Jonathan.

11 (*Id.* at 17:23 – 25; Ex.684.4 ["None of your personal information will be given out in the video or

12 afterwards, no names etc are used in the video."].) Jane Doe 14 spoke on the phone with Jonathan

13 more than once. (*Id.* at 19:14 – 20:23.) While on the phone, Jonathan told her that "it was going to

14 be on DVDs and going to be sent overseas and said only, like, men on fishing boats were going to

15 be able to watch it." (*Id.* at 20:9 – 11.)

16   After the phone conversation, Jane Doe 14 was still unwilling to do the gig. She wanted

17 more information, so Jonathan sent her an email with the contact information for a reference model.

18 (*Id.* at 20:12 – 15.) Jane Doe 14 exchanged text messages with the reference model, who shared her

19 positive experience and confirmed that her video never got published on the internet, "just over

20 DVD and, like, sent overseas or to Australia." (10/15/19 Trial Tr. 22:18 – 27; Ex. 686.)

21   Jonathan also sent Jane Doe 14 photos of different women surrounded by professional

22 equipment, holding money and smiling, and posing next to computers that had the

23 "BeginModeling.com" webpage displayed in the background. (Ex. 692.) The photos in the email

24 made Jane Doe 14 "trust him more". (10/15/19 Trial Tr. 24:27 – 25:6.).

25   Jonathan (whom she identified as Garcia) and Mike (whom she identified as Pratt) picked

26 up Jane Doe 14 from the airport and drove her to the hotel. (*Id.* at 25:18 – 27.) The next day, they

27 picked her up and drove her to their apartment. Prior to the shoot, Garcia gave Jane Doe 14 a drink

28 that had vodka because she was nervous and shy and he said the drink "would, like, loosen [her]

**STATEMENT OF DECISION**

1    up." (*Id.* at 27:18 – 28:9.) Jane Doe 14 did not remember being given any documentation prior to

2    the shooting of the first solo, for which Pratt was the videographer (*Id.* at 28:10 – 14.) Then, Pratt

3    made her another drink and she shot a second solo with Wolfe. (*Id.* at 28:20 – 28:26.)

4         Prior to flying to San Diego, Jane Doe 14 had not been told about a second solo shoot nor

5    had she agreed to do one. (*Id.* at 28:27 – 29:1.) She had agreed to do photos, one solo scene and the

6    boy/girl scene for $5,000. (*Id.* at 25:12 – 17.) In total, before filming the boy/girl scene, Jane Doe

7    14 estimates she had between four and seven drinks over a period of 10 to 12 hours. (10/16/19 Trial

8    Tr. 11:11 – 14.) Jane Doe 14 felt like she needed to accept all the drinks because she was

9    "extremely nervous and uncomfortable in the environment." (*Id.* at 104:8 – 10.)

10        When Garcia and Pratt gave Jane Doe 14 the documents to sign, they started asking her

11   questions as she was trying to fill them out. (10/15/19 Trial Tr. 31:2 – 6.) She was not able to read

12   the paperwork because she kept being distracted with awkward questions (such as favorite sex

13   positions); because she had been drinking; and because they had already told her many times what

14   she would be signing. (*Id.* at 31:7 – 15.) They told her that she was "[j]ust giving them, like, the

15   right to make the DVDs and the overseas and, you know, basically that." (*Id.* at 31:22 – 27.) After

16   signing, Jonathan told Jane Doe 14 that she needed to read a script into the camera and that "it was

17   basically just to cover their butts" since she had been drinking. (*Id.* at 32:2 – 9.)

18        During the interview, Jane Doe 14 had to refilm portions several times because Pratt did not

19   like her answers. Each time, Pratt would get angry and shout, this would make her uncomfortable

20   and fearful of what he could do. (*Id.* at 34:25 – 35:8.)

21        Even though Jane Doe 14's first scene was shot in the morning, the final shoot was not over

22   until 2:00 a.m. (*Id.* at 36:6 – 8.) While filming the sexual portions of the video, Jane Doe 14 asked

23   to stop because she was in a lot of pain, but this made Pratt angry, so he was screaming and yelling.

24   (*Id.* at 36:9 – 12; 37:8 – 13.) At one point, she started crying and asked to leave, but Pratt told her

25   that she was not leaving until they finished filming. (*Id.* at 37:26 – 38:3.)

26        About one year after filming, Jane Doe 14 learned that her video was online from a friend

27   who told her that people were sending the video around in her hometown. (*Id.* at 39:8 – 40:4.) She

28   was living in a new city at the time, but she had intended to move back to her hometown where all

-87-

**STATEMENT OF DECISION**

1  her friends lived. (*Id.* at 42:12 – 17.) Since the video was released, she has not been back to her

2  hometown for fear of being harassed. (*Id.* at 40:13 – 18.) Jane Doe 14 has family in her hometown

3  that she has not been able to visit because she is afraid of going back to a place where everyone

4  knows about the video and where she can be harassed. (*Id.* at 42:21 – 43:2.)

5       Jane Doe 14's friend told her that everyone she went to school with had the video and that

6  screenshots had been posted on Instagram. (*Id.* at 40:24 – 41:1.) After finding out, Jane Doe 14

7  cried and thought she was going to pass out, but she tried to hide her feelings for fear of her

8  boyfriend finding out. (*Id.* at 41:8 – 20.) She immediately deleted her social media accounts and

9  changed her phone number for fear of harassment and of people contacting her. (*Id.* at 43:21 – 44:7;

10  44:17 – 27.) Jane Doe 14 found her name and episode number along with comments on

11  "WikiLeaks;" this made her feel "pretty devastated." (*Id.* at 51:16 – 21.)

12       She hired DMCA Defender to assist her in the process of getting the videos removed. (*Id.* at

13  43:3 – 17.) Panakos Law filed a federal lawsuit against Jane Doe 14 for trying to have her video

14  removed. (*Id.* at 45:19 – 22.)

15       The release of the video has impacted Jane Doe 14's relationship with her family, friends,

16  and ex-boyfriend. (*Id.* at 45:23 – 46:2.) She is no longer close with her mother as she feels she has

17  disappointed her. (*Id.* at 46:3 – 15.) Jane Doe 14's mother found out about the video through a

18  Facebook message. (*Id.* at 46:17 – 22.) Jane Doe 14's large group of friends from her hometown

19  decreased to only one because most of them have assumed the worst after the release of the video.

20  (*Id.* at 48:5 – 16.) She feels humiliated and she wishes she could tell her side of the story. (*Id.* at

21  49:3 – 8.) Jane Doe 14's relationship with her ex-boyfriend suffered as a result of the release of the

22  video. He struggled to understand, and she is constantly worried that his family will find out. (*Id.* at

23  47:8 – 15; 47:26 – 48:4.) She has fears that her coworkers might find out. (*Id.* at 50:13 – 20.)

24       Since the release of the video Jane Doe 14 has suffered from debilitating anxiety. (*Id.* at

25  49:9 – 13.) She is uncomfortable in social settings, and testified that when people stare at her, she is

26  always wondering if it's because they saw the video. (*Id.* at 49:15 – 18.) Approximately once a

27

28

-88-

**STATEMENT OF DECISION**

1 | month she has horrific night terrors.[54] (*Id.* at 50:9 – 12.) While she has always been a relatively

2 | quiet person, she had not struggled with anxiety or night terrors prior to the release of the video. (*Id.*

3 | at 49:9 – 11; 50:3 – 5.) She has not sought out a therapist because she does not know how to talk

4 | about what happened to her. (*Id.* at 52:3 – 7.)

5 |       Jane Doe 14 wishes she would have known that her video would be posted online, and her

6 | name would be released prior to flying to San Diego. (*Id.* at 52:8 – 12.) Jane Doe 14 joined this

7 | lawsuit to get the rights to her video and "to ensure this doesn't keep happening to other women."

8 | (*Id.* at 52:25 – 28.)

9 |       The Court finds Jane Doe 14 to be credible.

10 |                          **Jane Doe 15**

11 |       As an 18-year old who had just begun college, Jane Doe 15 perused Craigslist ads for jobs

12 | and found a modeling ad that took her to beginmodeling.com. (08/20/19 Trial Tr. 188:9 – 190:4.) In

13 | February of 2016, after applying, she received the stock "established Southern California company"

14 | email from Jonathan N. (Ex. 719.1.) Jane Doe 15 did not respond to the email, and two days later

15 | Jonathan followed up with three offers – one for a boy-girl shoot, another for a solo, and a third for

16 | clothed modeling. (08/21/19 Trial Tr. 16:2 – 18. Ex. 720.) Jane Doe 15 responded to this second

17 | email because of the offer to do clothed modeling for $300. (08/21/19 Trial Tr. 18:19 – 20.)

18 |       After a few back-and-forth emails, Jonathan had a phone call with Jane Doe 15 in which he

19 | insisted on shooting a boy-girl adult scene. He stated that he would fly her to San Diego and pay for

20 | her hotel to film her having sex; he offered her $5,000 for 30 minutes of sex. He repeatedly stated

21 | that the video would end up on DVD in Australia, the UK, and "a few other really remote

22 | countries." (08/21/19 Trial Tr. 20:1 – 13.) He also underscored how pirating DVDs was illegal, and

23 | that he could help take the video down if it went online. (8/26/19 Trial Tr. 181:19 – 25.) Although

24 | she was only interested in doing clothed modeling, Jane Doe 15 figured $5,000 was a lot of money.

25 |

26 |

27 |       [54] Jane Doe 14 describes night terrors as follows: "[b]asically I feel like I'm awake but I'm asleep and

28 | I feel someone, like, trying to grab onto me and then I force myself awake, but it happens over and over and over again." (10/15/19 Trial Tr. 49:23 – 26.)

**STATEMENT OF DECISION**

1   At the time she was worried about putting more financial pressure on her mother, who had three

2   kids in college. (08/21/19 Trial Tr. 21:17 – 24.)

3   What drew Jane Doe 15 to the offer was Jonathan's representation of distribution. He

4   purported that he had shot "200-plus women," some of whom were "Instagram models and sorority

5   girls," none of whom had "been found out." (*Id.* 21:1 – 3; 10 – 12.) Jane Doe 15 emphasized the

6   point of distribution in email (Ex. 725) and over the phone (08/21/19 Trial Tr. 25:5 – 10). Jane Doe

7   15 was still hesitant about going through with the shoot as she did not want her face and name "out

8   there." (Ex. 725.) However, before her phone call covering details with Jonathan ended, he had

9   already sent her contact information for reference models, her flight information, and her hotel

10  reservation. (08/21/19 Trial Tr. 25:19 – 24.) By this time, Jane Doe 15 still was not set on filming a

11  pornographic video. (*Id.* 27:11 – 18.)

12  To ease her concerns about safety, Jane Doe 15 texted the reference model Kailyn Wright.

13  Kailyn corroborated Jonathan's representation that the video ended up on DVD to "wealthier

14  countries." (Ex. 745.4) She also purported that nothing would go online. (*Ibid.*) Jane Doe 15 "really

15  valued her opinion" since these representations came from "another girl who had done it."

16  (08/21/19 Trial Tr. 50:21 – 22.) She went on to text Jonathan that Kailyn "smoothed all [her]

17  worries." (Ex. 744.) As she boarded the plane, Jane Doe 15 believed she was to film 30 minutes of

18  sex for DVD in Australia and the UK for $5,000. (08/21/19 Trial Tr. 69:9 – 14.)

19  The cameraman Teddy Gyi picked Jane Doe 15 up from the airport in San Diego. As they

20  drove to the hotel, Jane Doe 15 asked Teddy about distribution. He reaffirmed Jonathan's claim that

21  the adult video would not be on the internet and that it would only go on DVD in Australia. He

22  added that "Internet porn is cheap" and that there was more value in a physical DVD. (*Id.* 73:8 –

23  16.) They arrived at the hotel, Riva Yousif walked into the room to do her makeup, and then

24  Jonathan (whom Jane Doe 15 identified as Andre Garcia) entered the room. (*Id.* 79:4 – 18.)

25  Shortly after walking in, Jonathan shared his marijuana with Jane Doe 15. (*Id.* 80:15 – 22.)

26  Then, while high, Jane Doe 15 was presented with paperwork. Jonathan and Teddy engendered a

27  sense of urgency; Teddy flipped through a contract, telling her "this is what we talked about, this is

28  no internet there. . . it's going on DVD in Australia. . . no names." (*Id.* 83:19 – 84:10.) Jane Doe 15

-90-

**STATEMENT OF DECISION**

1 | tried reading the contract, but she could not understand it. Moreover, she was still high as she

2 | reviewed the paperwork, and Teddy rushed her through signing various pages. (*Id.* 84:11 – 85:8.

3 | 08/26/19 Trial Tr. 180:13 – 21.) When she returned home, Jane Doe 15 texted Jonathan asking for a

4 | copy of the contract, but he ignored her request. (08/21/19 Trial Tr. 105:10 – 13.)

5 | After presenting the contracts, Jonathan counted out $3,000 and paid Jane Doe 15. This

6 | amount was $2,000 less than what was promised, but Jane Doe 15 felt she was not in a position to

7 | challenge the men in the room. (*Id.* 85:17 – 86:2.) Jonathan disclosed later through text that she was

8 | paid less because she was "pale and bruised." (*Id.* 87:6 – 7.)

9 | Defendants then presented Jane Doe 15 with a short script to read into the camera. Jonathan

10 | claimed that the script was "to get levels on the sound" and test the camera. (*Id.* 87:17 – 23.) Jane

11 | Doe 15 believed the script had no legal significance because it had her state she was of sound mind

12 | and body, but everyone in the room knew she had smoked marijuana with Jonathan. (*Id.* 88:18 –

13 | 22.)

14 | Next, Jane Doe 15 underwent coaching for an interview about her life and previous sexual

15 | encounters. Jonathan and Teddy instructed her to describe her time there as "an awesome

16 | experience" and to "sexualize it." (*Id.* 90:7 – 17; 93:2 – 6.) Jane Doe 15 answered the intimate

17 | questions truthfully because she presumed her answers would only be heard on DVD in Australia.

18 | (*Id.* 93:7 – 14.) Jane Doe 15 testified that she would not have answered the questions truthfully had

19 | she known her video would be published online. (*Id.* 93:15 – 18.)

20 | Jane Doe 15 discovered her video online in April of 2016 when a high school acquaintance

21 | of hers sent her the link to her video from ImagePost.com. (08/22/19 Trial Tr. 7:1 – 15.) She was in

22 | class at the time when she opened the link. Later in the day, her friend explained that people at the

23 | school were disseminating the video and identifying her. (*Id.* 16:8 – 18.) Her significant other tried

24 | offering support but he was upset about the publication. Her mother and two sisters also discovered

25 | the video. Jane Doe 15 testified that the release of the video damaged her family's trust in her. (*Id.*

26 | 23:18 – 20.)

27 | A day after finding the video, she sent her first email to mike@bll-media.com complaining

28 | about the misrepresentations of distribution and of what occurred during the shoot. (Ex. 763.) Jane

**EXH. 1 - 091**

1    Doe 15 tried calling Jonathan's number multiple times, but the calls eventually stopped going

2    through. (08/22/19 Tr. Transcript 37:7 – 16.)

3          As a result of having her likeness on the internet, Jane Doe 15 endured harassment through

4    social media and texts from strangers that caused emotional distress. She was kicked off her

5    cheerleading team because of the video. (08/21/19 Trial Tr. 70:18.) Her answers during the

6    interview portion of filming have been the subject of strangers' harassing texts. (*Id.* 95:6 – 12.) She

7    turned to drinking alcohol in order to sleep, which added friction to her relationship with the person

8    she was seeing. (08/22/19 Trial Tr. 190:7 – 16.) She testified that she felt depressed. (08/26/19 Trial

9    Tr. 202:25.) She was prescribed sertraline and hydroxyzine, and she still takes both today. (*Id.*

10   152:5 – 8.) Jane Doe 15 worried about how she could be a mother now with the video out.

11   (08/22/19 Trial Tr. 16:19 – 23.) Had she known about distribution and the aftermath of the video,

12   Jane Doe 15 testified that she would not have done it. (08/21/19 Trial Tr. 70:8 – 19.)

13         The Court finds Jane Doe 15 to be credible.

14                              **Jane Doe 16**

15         Jane Doe 16 was 19-years old, living with her parents, and paying for college expenses and

16   rent when she responded to a modeling Craigslist ad in July 2014. (09/24/19 Trial Tr. 8:7 – 22.) She

17   then exchanged emails with "Mark," who insisted on a phone call to give her more details. Mark

18   represented that the adult video would be distributed on DVD only in New Zealand. He also told

19   Jane Doe 16 that she could bring a friend for support, which was "a deal breaker" for her. (*Id.* at

20   16:2 – 24.) She and Mark had subsequent calls wherein Mark reaffirmed many times over that the

21   DVD will be sold on a small island country. She questioned the DVD format since it seemed

22   outdated, but Mark claimed that he knew the niche overseas market. He also explained how DVDs

23   were "secured and protected" and "unable to be copied." Mark told Jane Doe 16 that he could pay

24   her $3,000 for a boy-girl shoot and $2,000 for a solo photoshoot. (*Id.* at 17:2 – 13; 18:18 – 19:22;

25   20:6 – 14.)

26         Mark put Jane Doe 16 in contact with a reference model who texted her about her

27   experience filming. The model stated that she had a great experience and that she had "plans to

28   work with Mark again." She corroborated Mark's representations of distribution and purported that

**STATEMENT OF DECISION**

1  Jane Doe 16's "name would be protected." Hearing these claims from another woman encouraged

2  Jane Doe 16 to go through with the plan as it sounded safe. (*Id.* at 18:2 – 12.)

3       Jane Doe 16 and her friend, Courtney, flew to San Diego on August 1, 2014. Mark (whom

4  she identified as Michael Pratt) and Andre Garcia picked them up. They dropped them off at their

5  hotel, and the next day they reconvened to film. Mark and Cliff, the hair and makeup artist, arrived

6  to set up. Jane Doe 16 began feeling nervous, so she asked Mark if she could only do the photo

7  shoot. Mark rebuffed her request, telling her that if she refused to do the video, she would have to

8  reimburse him for the hotels and flights. Jane Doe 16 proceeded with the video. (*Id.* at 22:2 – 5;

9  23:23 – 24:18.)

10       To calm Jane Doe 16's nerves, Mark offered her rum and coke drinks. She did not eat much

11  that day, so after her second or third drink she "was definitely intoxicated." (*Id.* at 25:4 – 13.) As

12  Defendants were preparing to film, Jane Doe 16 asked again about distribution. Mark reassured her

13  that the DVD would only be in New Zealand, and her name would not be attached. These

14  representations were reiterated multiple times. (*Id.* at 25:14 – 18; 145:17 – 24.)

15       Next, Mark and Garcia paid Jane Doe 16 $3,000 and had her sign paperwork. Jane Doe 16

16  was very intoxicated as she filled out the documents. Defendants claimed the documents were but a

17  formality. They rushed her through it because they "were running out of daytime for the shoot."

18  Due to her alcohol consumption, Jane Doe 16 did not recall the substance of the documents; nor

19  could she recollect signing the documents or reading a script into the camera. She did remember

20  how Mark and Garcia instructed her to act bubbly and excited for an interview. (*Id.* at 25:24 –

21  27:16.)

22       After filming the boy-girl video, Jane Doe 16 and her friend, Courtney, were transported to

23  Mark's apartment. There, Mark paid her $1,200 – despite indicating that he would pay her $2,000

24  for the photo shoot earlier – and gave her more alcohol. Jane Doe 16 took enough shots to black

25  out. She went through with the photo shoot, falling over as she posed. (*Id.* at 28:1 – 29:17.)

26       The day after the video and photoshoot, Jane Doe 16 and her friend, Courtney, flew home.

27  The two women noticed that Mark and Garcia blocked their numbers. (*Id.* at 29:24 – 30:3.) Jane

28  Doe 16 and her boyfriend grew suspicious of the ordeal, prompting her to email Mark and ask for

**STATEMENT OF DECISION**

1    information. She did not receive a response. However, she did receive a phone call that played an

2    audio clip of her interview with Mark. (*Id.* at 30:16 – 31:4.)

3          In March of 2015, Jane Doe 16 found her video online when her boyfriend informed her that

4    his friend found her adult film on a website. News of the video spread quickly. Her college

5    classmates found the video and disseminated it. (Ex. 789.) An acquaintance from Jane Doe 16's

6    high school created a website that displayed only her video. She moved to her college town as

7    opposed to moving back in with her parents because people at her church discovered the adult film.

8    She received lewd harassment and solicitations for sex from strangers through Facebook and

9    Instagram. (Ex. 791.) Moreover, Jane Doe 16 discovered her personal information on

10   PornWikiLeaks. Consequently, her father and three sisters faced harassment, with messages

11   emphasizing how Jane Doe 16 was a "porn star." (09/24/19 Trial Tr. 32:20 – 33:2; 39:1 – 7; 45:21 –

12   46:23; 47:8 – 11.)

13         With coworkers, college peers, and strangers laughing at her about the video, Jane Doe 16

14   dropped out of college. She joined the military which helped for a time, but after being discharged

15   for an injury, she plummeted again. Jane Doe 16 "slipped back into being anxious, depressed, and

16   dependent on alcohol." (*Id.* at 37:6 – 38:25.)

17         One night, after having an anxiety attack, Jane Doe 16 drank and picked up a DUI. After the

18   citation, she began receiving treatment for her alcoholism and mental health. She underwent

19   inpatient treatment twice, first for a month and again for three months. (*Id.* at 39:9 – 20.) Jane Doe

20   16 was prescribed Klonopin, but on one occasion she consumed an entire bottle in an effort of

21   "intentional overdose." (*Id.* at 41:1 – 42:1.) Her sister took her to a hospital, and after leaving she

22   underwent four months of outpatient treatment.

23         Today, five years after filming the video, Jane Doe 16 continues to have many concerns

24   about the video. She worries that the video will remain online. She hopes to work in a school,

25   though she fears she will never be able to now that her name is attached to this video. She worries

26   about how her son will navigate school with classmates and their parents discovering her video. She

27   testified that she "need[s] the rights to this video so [she] can move on with [her] life." (*Id.* at 51:6 –

28   21.)

-94-

STATEMENT OF DECISION

1    The Court finds Jane Doe 16 to be credible.

2    **Jane Doe 17**

3    Jane Doe 17 was 19-years old in July 2015 when she first came into contact with the

4    Defendants in this matter. She was looking for modeling jobs on Craigslist to have more money in

5    her pocket for college, which led her to Defendants' ad. (Trial Tr. 08/29/19 at 183:2 – 21).

6    Defendants' ad led her to another website, BeginModeling.com, which showed clothed female

7    models. (Trial Tr. 08/29/19 at 185:11 – 14; 186:2 – 6). Shortly thereafter, Jane Doe 17 received a

8    form response email from Jonathan at jobs@beginmodeling.com. (Ex. 810). Jane Doe 17 responded

9    by saying that she would want to do clothed modeling, since that was what she was used to and

10   what she was looking to do on Craigslist. (Id. at 188:9 – 17). She followed up shortly thereafter to

11   express her willingness to do lingerie as another option, but Jonathan made it clear to her that

12   wasn't a priority for him because he was "in the business of making money." (Ex. 811).

13   A month later, in response to a separate submission by Jane Doe 17 on Craigslist, Jonathan

14   reached out one more time with an offer of $4,000 for film or $1,000 for photo, according to what

15   Jane Doe 17 thought at the time. She understood the $1,000 photo offer to be, if anything, tasteful

16   nudity. It never crossed her mind that this was pornography, nor was it ever mentioned. (Ex. 816;

17   Trial Tr. 08/29/19 at 194: 12 – 195:8.)

18   After the email exchanges, Jane Doe 17 spoke with someone named Stephen on the phone,

19   someone she testified to having a thick Australian accent. (Trial Tr. 08/29/19 at 195:9 – 13; 195:24

20   – 196:1). At trial, she identified Defendant Wolfe as "Stephen." (Id. at 182:15 – 19). Stephen told

21   her over the phone that she would be taking photos the whole time. Stephen told her he had worked

22   with multiple NFL cheerleaders, Instagram models, and other people like that. This made Jane Doe

23   17 excited for this opportunity. (Id. at 196:19 – 197:3). At or around the time she spoke to Stephen,

24   Jane Doe 17 received another email from Jonathan with photos of models attached. (Ex. 818.) After

25   seeing Exhibit 818, she still believed that the job was for a photo shoot because she saw images of

26   happy, smiling girls that were fully clothed—nothing indicated to her that this was pornography.

27   (Trial Tr. 08/29/19 at 198:2 – 7).

28

-95-
**STATEMENT OF DECISION**

1       Besides Stephen, Jane Doe 17 also spoke to a reference named Kailyn. Kailyn told her that
2   the people she worked with were really nice, and that they made her feel comfortable. She did not
3   have any discussions about distribution with Kailyn because she didn't think she had to, since she
4   believed it was just a modeling shoot that was fully clothed or tasteful nudity. (Trial Tr. 08/29/19 at
5   200:2 – 24). Nothing about the conversation with Kailyn led Jane Doe 17 to believe that the job
6   would be for pornography. (Id. at 201:7 – 9.)

.7      Jane Doe 17 met Stephen on the day of the shoot outside of the Omni Hotel in San Diego.
8   (Trial Tr. 08/29/19 at 201:10 – 13.) At the shoot, male model Andre Garcia offered her marijuana,
9   which she initially refused because she didn't want her eyes to be bloodshot for the pictures she
10  would be taking. (Id. at 203:11 – 19.) At some point, Stephen left the room and returned around
11  noon. It was at this time that he casually mentioned shooting pornography by saying what sexual
12  positions would be done. (Id. at 204:12 – 22.) Jane Doe 17 reacted immediately by saying no.
13  Stephen and Garcia immediately explained where this newly revealed pornography video would be
14  going—they represented that the videos would be distributed on DVD overseas in Australia. (Id. at
15  204:25 – 205:10.) At no time did anyone in the room mention any of their websites. (Id. at 205:18 –
16  20.) Jane Doe 17 still said no to these new terms, and Stephen became very agitated and said that
17  she was wasting their time and money. (Id. at 205:11 – 17.)

18      Stephen and Garcia ultimately convinced Jane Doe 17 to film the video. She did so only
19  because she felt scared of what would happen if she tried to leave. She feared having the nude
20  photos the Defendants had her send prior to the shoot disseminated in retaliation. (Trial Tr.
21  08/29/19 at 205:21 – 206:3). The Defendants offered Jane Doe 17 another $4,000 for filming the
22  video on top of the photo shoot she thought she was supposed to do. She received that payment. (Id.
23  at 206:2 – 8.) Before being convinced to do the video, Jane Doe 17 was given one cranberry vodka,
24  despite being underage at the time. (Id. at 206:9 – 18).

25      After convincing her to film the video, Stephen provided Jane Doe 17 a stack of papers. He
26  claimed it was a contract and he rushed her through it. Stephen pointed at every paragraph and
27  summarized what each of them said; he specifically said that the film would be overseas in a DVD
28  store in Australia. (Trial Tr. 08/29/19 at 206:21 – 207:7). As she was filling out the documents,

**EXH. 1 - 096**

1  Defendants were asking her questions, which she testified as being distracting and not allowing her

2  to read the document. (Id. at 215:16 – 216:9.) Shortly thereafter, she accepted Garcia's offer of

3  marijuana because she wanted to numb herself. (Id. at 209:1 – 10.)

4      After the contracts, Stephen gave a verbal script to Jane Doe 17 to read into the camera

5  which, in part, made her say she was not under the influence of any mind-altering substance. She

6  did not believe this to be true, since she had just smoked and drank a cranberry vodka in

7  Defendants' presence. She read the statement into the camera because they told her to; she thought

8  it was something they needed for their database. She was not concerned about reading her name as

9  part of the script because she didn't think that they would put that part of the video anywhere. (Trial

10  Tr. 08/29/19 at 209:21 – 211:18.) Jane Doe 17 then participated in a coached interview with the

11  Defendants prior to the sexual portion of the video. (Id. at 212:12 – 20; 214:19 – 215:3.) She would

12  never have answered the questions in the interview had she known the video would be published

13  online due to their sensitive nature. (Id. at 216:22 – 217:9.) During the actual filming process, Jane

14  Doe 17 asked to leave the room but was instead told to get air on the balcony. She cried multiple

15  times during the filming and was simply told to go to the bathroom and fix her makeup. (Id. at

16  222:12 – 21.)

17      Jane Doe 17 first learned her video was released online in October of 2016. (Trial Tr.

18  08/29/19 at 217:24 – 218:2.) She was alerted on Instagram to a page that was GirlsDoPorn that

19  featured a clothed photo of herself on a bed. Eventually this led Jane Doe 17 to realize her video

20  was on the GirlsDoPorn.com website with a "Coming Soon" banner on it. (Id. at 218:3 – 19.) Jane

21  Doe 17 testified to this being the worst thing ever because she had to anticipate her video being

22  released online—it took around six days from the time she found out about the video for it to be

23  officially released. (Id. at 219:6 – 19.) In those six intervening days, Jane Doe 17 filed a police

24  report because she wanted to see if there was a way she could take the video down before it came

25  out. (Id. at 219:20 – 24.) Nothing came of the police report, to her knowledge. (Id. at 227:4 – 6.)

26      Jane Doe 17 endured emotional distress and suffered extensive harassment from people both

27  known and unknown as a result of the video's release. She went home to California from Tucson

28  after finding out about her video. She told her mom everything about her experience with

-97-
**STATEMENT OF DECISION**

**EXH. 1 - 097**

1   Defendants; she was really embarrassed. (Trial Tr. 08/29/19 at 220:15 – 24.) Despite returning to

2   Tucson for classes, she was extremely scared to actually walk to class in fear of being recognized.

3   She didn't really even go to class and started failing as a result of the publication of the video. (Id.

4   at 222:22 – 223:5; 224:23 – 25.) Jane Doe 17 even testified that her ex-boyfriend's fraternity played

5   her video during their chapter meeting. She frequently had people approach her at parties to show

6   her the video. She was dubbed the "porno girl." (Id. at 223:24 – 224:9.) She ultimately left her

7   university because of the harassment she was getting and corresponding failing grades. (Id. at 223:6

8   – 15.) Jane Doe 17 also experienced harassment on social media where she was threatened with

9   having the video exposed to members of her family. (Trial Tr. 09/03/19 at 34:15 – 35:1; Ex. 840.)

10  Strangers posted her video and episode number on her mother's Yelp business page, something that

11  shocked her as her mother and her business had nothing to do with the video. (Trial Tr. 09/03/19 at

12  36:23 – 37:9; Ex. 844.)

13          Jane Doe 17 sought out treatment as a result of the emotional distress she suffered because

14  of the video. She saw two therapists and one psychiatrist. She attended several sessions with these

15  specialists. (Trial Tr. 08/29/19 at 225:21 – 226:5.) She began taking a supplement called GABA to

16  address sleep problems caused by anxiousness, which she did not have prior to the video's release.

17  (Id. at 226:8 – 19.)

18          In an attempt to stop other girls from falling for the same lie she fell into, Jane Doe 17

19  began posting on Craigslist to explain that the Defendants' photo shoots will actually end up being

20  pornography shoots. (Trial Tr. 08/29/19 at 227:16 – 228:16.) In response to her postings on

21  Craigslist, Defendants—through their counsel, Aaron Sadock—sent Jane Doe 17 a cease and desist

22  letter that included her nude photos threatening her with a lawsuit if she continued making the

23  posts. The letter was addressed to her parents' house. (Id. at 229:2 – 22; Ex. 837.)

24  The Court finds Jane Doe 17 to be credible.

25          The Court finds Jane Doe 17 to be credible.

26                              **Jane Doe 18**

27          Jane Doe 18 needed money for college when she found Defendants' ad on Craigslist.

28  (Deposition of Jane Doe 18, March 22, 2019 ["Jane Doe 18 Depo."] at 246:13 – 16.) She was

**STATEMENT OF DECISION**

1  looking for part-time fitness modeling or clothed modeling jobs. (Doe 18 Depo. 90:9 – 12.) In

2  December 2015, Jane Doe 18 responded to an ad that mentioned "18- to 22-year-old girls photo

3  shoot." (*Id.* at 188:15 – 20; 91:10 – 11.) This was the first time that she became aware of the

4  existence of www.modelinggigs.com (*Id.* at 90:18 – 21.) She was 21 years old when she responded

5  to the ad by email. (*Id.* at 189:23 – 25.)

6        After submitting clothed photos, headshots and her contact information, Jane Doe 18

7  received an email from mark@modelinggigs.com (*Id.* at 91:22 – 92:13.) After the initial email, Jane

8  Doe 18 and the Defendants exchanged a few emails regarding the clothed photo shoot. (*Id.* at 94:5 –

9  7.) The emails also mentioned the option of doing an adult video, however it was not the only

10  option. (*Id.* at 94:15 – 95:2; 96:13 – 17.) In the days that Jane Doe 18 communicated via email with

11  the Defendants, she went to modelinggigs.com to learn more about the website, and "[t]here were

12  no nude or pornographic images on it. It was all clothed models." (*Id.* at 93:8 – 10.) She kept

13  communicating with the Defendants because she "believed clothed photo modeling was also an

14  option." (*Id.* at 97:7 – 10.)

15        Following the first few emails, Jane Doe 18 had a phone call with a man with an accent. (*Id.*

16  at 98:19 – 22.) He told Jane Doe 18 that she could either do clothed modeling or a pornographic

17  video, but that she would make more money if she did the pornographic video. (*Id.* at 98:22 – 99:1.)

18  If she decided to do the video, she would be "promised anonymity. They [the videos] would only be

19  distributed in Australia and South America via DVD. No one would ever find out that [she] had

20  done it. Amongst other things." (*Id.* at 99:1 – 4.) Defendants insisted on providing Jane Doe 18 with

21  details regarding the pornographic video in case she would warm up to the idea. (*Id.* at 99:10 – 12.)

22  Jane Doe 18 told the Defendants that she had no desire to do a pornographic video, and she

23  discussed it at length over the phone. (*Id.* at 95:16 – 19; 99:5 – 8.)

24        Also over the phone, Jane Doe 18 asked Defendants about the type of clothing, they told her

25  that "they do a lot of male and female clothed photo shoots for multiple clothing companies." (*Id.* at

26  100:23 – 101:4.) Jane Doe 18 had asked the Defendants for examples of past photo shoots, and they

27  told her to refer to their website. (*Id.* at 102:16 – 19.) While on the phone call, Defendants gave

28  Jane Doe 18 the contact information for one of their references. (*Id.* at 102:13 – 15.)

-99-

**STATEMENT OF DECISION**

1    Jane Doe 18 reached out to the reference, Kat, via FaceTime and text messages. (*Id.* at

2    115:13 – 15.) She asked the reference whether "it was safe, if they were shady." (*Id.* at 115:17 –

3    18.) The reference woman told Jane Doe 18:

4        "If I wanted to do a photo shoot it would be wholesome, fun, easy; but I

5        should really consider doing the pornography because it was really fun, she

6        enjoyed it, they're easy to work with, no one would ever know, I would

7        make more money, and I should get out of my comfort zone."

8    (*Id.* at 116:1 – 6.) As she had previously told the Defendants, Jane Doe 18 told the reference that

9    doing a pornography video made her uncomfortable. (*Id.* at 116:8 – 9.)

10    In the email exchange after the phone call, Defendants asked Jane Doe 18 to provide them

11    with nude photos because they wanted to see her body dimensions. (*Id.* at 106:24 – 107:2.) She was

12    a bit apprehensive at first, but Defendants reassured her that "it would be completely anonymous,

13    no one would ever see them; it was simply to get [her] look." (*Id.* at 107:10 – 15; 108:3 – 7.) She

14    had spoken with the Defendants multiple times, so she felt comfortable with their reassurances. (*Id.*

15    at 109:5 – 6.)

16    The compensation regarding the photo shoot was discussed on a phone call.  Jane Doe 18

17    was told that she would be paid "roughly one to two thousand dollars." (*Id.* at 106:17 – 20.) Prior to

18    flying to San Diego, Jane Doe 18 was still under the impression that she would be paid one to two

19    thousand dollars if she did the photoshoot, and $4,500 if she agreed to do a pornography video. (*Id.*

20    at 116:23 – 117:1.) Prior to flying to San Diego, Jane Doe 18 had continually told Defendants that

21    she would not do the pornographic video option. (*Id.* at 117:2 – 6.) Jane Doe 18 flew to San Diego

22    thinking that she would do a photo shoot that would last "between 30 minutes and an hour and a

23    half." (*Id.* at 102:8 – 12.)

24    Once in San Diego, Jane Doe 18 was picked up at the airport in a black Escalade, "an Asian

25    man was driving. He introduced himself as Teddy." (*Id.* at 118:10 – 12.) Both, on the car ride and at

26    Garcia's apartment (Garcia introduced himself as Dre), Teddy and Garcia kept using the phrase

27    "photo shoot" (*Id.* at 120:9 – 14.) Jane Doe 18 kept asking Teddy, Garcia, and the makeup artist

28    questions such as: "[w]here are we going? What time? How long is it going to take? Lots of

-100-

STATEMENT OF DECISION

1 │ different things. And they kept brushing off [her] questions, not replying. (*Id.* at 122:8 – 11.) Before

2 │ going to the location where Defendants would do the photo shoot, they told Jane Doe 18 that they

3 │ needed to take a nude picture to make sure that her measurements were right. (*Id.* at 123:14 – 18.)

4 │ Jane Doe 18 was very uncomfortable with this request, "Mark was yelling on the phone", but

5 │ Garcia reassured her that the picture would not go anywhere and that her face would not be on it.

6 │ (*Id.* at 123:18 – 124:1.) Eventually Jane Doe 18 took the nude picture because they had reassured

7 │ her, she was uncomfortable, and she felt outnumbered. (*Id.* at 124:18 – 125:1.)

8 │       On the way to the hotel, "Garcia stopped in an alleyway to pick up marihuana from

9 │ someone." (*Id.* at 127:24 – 25.) While in the car, Teddy reassured Jane Doe 18 that they were "just

10 │ going to go do the photo shoot." (*Id.* at 128:18 – 24.) Defendants told Jane Doe 18 that they usually

11 │ filmed in a house on the beach, but that it was currently being remodeled, so they had to do it at the

12 │ hotel. (*Id.* at 129:2 – 6.) Once at the hotel room, Garcia told Jane Doe 18 to change, she asked for

13 │ the clothing, but he said to wear anything, that they were just going to film an interview. (*Id.* at

14 │ 130:17 – 22.)

15 │       After changing in the bathroom, Jane Doe 18 came out and she saw Teddy and Garcia

16 │ standing next to the desk and on it they had laid out some paperwork. (*Id.* at 132:10 – 16.) Jane Doe

17 │ 18 had to sign the documents without reviewing them because:

18 │         Garcia is standing right here. He is the one holding the paper,
19 │         flipping, telling me, Sign here, sign here, initial here, sign here.
   │         Doesn't let me read anything. I said, Okay, what is this? Can I read it?
20 │         And he goes, It's everything we've already talked about. It's just the
   │         release for images. It's just saying we have the right to use your image
21 │         exactly how we said we would. And I said, Wait. What? My image? I
   │         was confused. And I don't particularly enjoy signing things that I
22 │         haven't read. I don't do that. So I asked them immediately, Can you e-
   │         mail me a copy of this for my records? And Garcia said, Yeah, yeah,
23 │         yeah, of course. And he goes, Do you want me to get the money first?
24 │         And I was like, What?

25 │

26 │ (*Id.* at 132:15 – 133:5.) Jane Doe 18 never got a copy of the documents. (*Id.* at 133:10 – 11.) She

27 │ asked the Defendants if she could read the documents before signing them, but they again pressured

28 │ her, yelled and rushed her. (*Id.* at 134:21 – 135:1.) Garcia kept telling her that the documents were

-101-
STATEMENT OF DECISION

1    everything that they had talked about, "you know everything that's in here already." (*Id.* at 135:2 –

2    4.) She had talked with the Defendants many times, so she trusted their assurances of what was in

3    the documents. (*Id.* at 135:4 – 6.) At one point, she tried to grab the documents in order to read

4    them, but Garcia pulled it away from her hands. (*Id.* at 137:14 – 22.) At that moment, she did not

5    feel that she could leave the room because Defendants were standing over her; they had taken her

6    phone and they had unplugged the phone in the hotel room. (*Id.* at 137:8 – 13.)

7         After the documents were signed, Teddy and Garcia started explaining the video to Jane

8    Doe 18. They told her the same information regarding confidentiality and distribution that they had

9    told her on the phone prior to flying to San Diego. (*Id.* at 139:13 – 19.) She felt completely trapped

10   after she understood that they wanted her to do the pornographic video. (*Id.* at 141:9 – 13.) At this

11   point Jane Doe 18 was terrified, she did not know if she was going to be murdered or human

12   trafficked. (*Id.* at 141:15 – 19.) After wanting to leave and being blocked by Garcia, she was "kind

13   of just waiting to be told what to do, trying to survive and get out of it." (*Id.* at 143:19 – 22.)

14        Reading the verbal script, Jane Doe 18 was told to "[j]ust say this into the camera really

15   quick." (*Id.* at 145:17.) Defendants told her that she needed to read something into the camera, "so

16   that they could get the settings and everything right and make sure that [her] voice was right." (*Id.*

17   at 149:23 – 150:1.) As soon as Jane Doe 18 finished reading the script, Defendants started giving

18   her drinks and marijuana. (*Id.* at 145:17 – 20.) Jane Doe 18 had never smoked marijuana prior to

19   that moment; she was given between two and four shots of vodka; and according to the Defendants

20   the alcohol and the drugs were intended to help her not be nervous. (*Id.* at 145:21 – 146:3; 145:19 –

21   20.) She did not want to smoke, but Garcia insisted that it would calm her down. (*Id.* at 152:3 – 4.)

22   Jane Doe 18 testified that that was probably "one of the highest times [she had] ever been in [her]

23   life." (*Id.* at 146:18 – 19.)

24        Following the verbal script, Jane Doe 18 was coached to be "flirty and perky, energetic,

25   smiley. They told [her] specific things to say"; if they did not like her answer "they would restart

26   and tell [her] to say something slutty, or, No, we don't like that; say this." (Id. at 144:21 – 145:1.)

27        Garcia forced Jane Doe 18 to engage in intercourse. (*Id.* at 171:10 – 17.) At one point she

28   was bleeding vaginally, and she felt pain due to the angle in which Garcia was pulling her arms, she

1  asked for him to stop and she tried to run out of the hotel room. (*Id.* at 178:19 – 179:1.) Both Garcia

2  and Teddy blocked the door, then Garcia physically "shoved [her] back into the room towards the

3  bed." (*Id.* at 179:11 – 20.)

4          Jane Doe 18 did not feel comfortable calling the police since the Defendants had threatened

5  her to release online what they had filmed so far. (*Id.* at 182:10 – 12.) The next day Mark called her

6  and told her that he had cancelled her flight home and that she needed to do a solo shoot. (*Id.* at

7  185:6 – 9.) Defendants had initially told Jane Doe 18 that if she decided to do the pornographic

8  video, she would be paid $4,500, yet she was only paid $3,500. (*Id.* at 156:7 – 14.) She was told

9  that she would get the rest of the money the next day when she did a solo. Jane Doe 18 had never

10  been told about a solo nor had she agreed to do one. (*Id.* at 156:14 – 19.)

11         Jane Doe 18 discovered that her video was online in February 2016, "[a] boy from high

12  school sent [her] the link". (*Id.* at 160:10 – 16.) After the online release of her video, she was not

13  able to get ahold of the Defendants, "they had deleted all of the numbers or changed the numbers."

14  (*Id.* at 245:21 – 24.) A few friends from Jane Doe 18's time at college found out about the video.

15  (*Id.* at 48:2 – 11.) Upon finding out that it was online, she told her family and friends. (*Id.* at 161:15

16  – 21.)

17         After the online release of the video, Jane Doe 18 has missed work multiple times, she has

18  had to withdraw from school more than once, and consequently sustained a financial loss of about

19  $30,000. (*Id.* at 283:1 – 6.) She is afraid of having to use her name.  As a result she does not apply

20  for jobs like she used to. (*Id.* at 283:7 – 12.) She has deleted social media or changed the privacy

21  settings, so that the accounts are extremely private. (*Id.* at 288:3 – 7.)

22         Jane Doe 18 has sought medical treatment after discovering that her video was released

23  online. (*Id.* at 274:16 – 18.) She has been treated for "low blood pressure and migraines as a result

24  of anxiety as a result of the video." (*Id.* at 280:11 – 12.) After the online release, she was prescribed

25  antidepressants, sleep medication, and Adderall. (*Id.* at 281:10 – 19.) Later she reached out to a

26  different health care provider for counseling. (*Id.* at 281:20 – 21.) Jane Doe 18 has been inpatient in

27  a mental facility and has had to acquire an emotional support dog. (*Id.* at 287:21 – 23.)

28

-103-

**STATEMENT OF DECISION**

1    Jane Doe 18 visited the emergency room on different occasions for alcohol poisoning and

2    suicidal ideations. (*Id.* at 281:5 – 8.) She has also been admitted at a hospital ER and kept inpatient

3    for over 24 hours because of suicidal ideations. (*Id.* at 280:16 – 19.)

4    Some of the symptoms that Jane Doe 18 has experienced as a direct result of shooting the

5    pornographic video include throwing up when overly upset, depression, sadness, hyperventilating,

6    panic attacks, breaking out in urticaria, and hives. (*Id.* at 42:16 – 43:5; 48:20 – 22.)

7.   To think about her experience with the Defendants gives Jane Doe 18 post-traumatic stress

8    and major depression.  She said that "[t]he only reason that [she] joined this trial was to make sure

9    that these guys can't do this to any more girls." (*Id.* at 286:5 – 9.)

10   The Court finds Jane Doe 18 to be credible.

11   **Jane Doe 19**

12   In November 2016 (after this lawsuit had commenced and Defendants appeared), when Jane

13   Doe 19 was 21 years old, was between jobs, and living in Washington, she found an advertisement

14   on Craigslist for modeling, which lead her to Defendants. (9/9/19 Trial Tr. 212:6 – 213:22.)  The

15   advertisement did not mention pornography.  (*Id.*)  She was on Craigslist looking for jobs because

16   she had bills to pay, including her car payment.  (*Id.*)

17   After responding to the Craigslist advertisement, "Mike" replied to Jane Doe 19 with a

18   canned email. (Ex. 875.)  The email stated to Jane Doe 19 "Photoshoots and other opportunities…"

19   "We have several channels of distribution depending on the level of anonymity you wish to

20   attain…" and "none of your personal information is released…to keep your identity private…."

21   (*Id.*)

22   Eventually, "Mike" called Jane Doe 19.  She testified, "and when we were on the phone, he

23   said that he had a private collector in Australia, and everything was confidential and discreet.  And

24   it was a 30-minute shoot.  He just said "shoot."  And that it was only to the level that I was

25   comfortable with." (9/9/19 Trial Tr. 214:13 – 22.)  At this point, she did not know the video

26   involved sex.  (*Id.* 215:4 – 5.)

27   The private collector in Australia was important to Jane Doe 19.  "It was important to [her]

28   that this was going to be confidential and that it wasn't going to be online." (*Id.* 215:6 – 12.)  Mike

-104-

**STATEMENT OF DECISION**

1    did not mention GirlsDoPorn or internet distribution. (*Id.* 215:13 – 16.) Mike gave her reference

2    models to speak with. Jane Doe 19 texted them. They appeased her questions and concerns, and

3    said it was a pleasant experience. (*Id.* 215:17 – 216:2.)

4         Jane Doe 19 "would have liked to know that there was a website that they post this on and

5    repost this on for free people to see, that was girlsdoporn.com. If I knew that that was like actually

6    what they were doing, if I knew there was already a lawsuit out for them, and they had done this to

7    multiple other women…." (9/10/19 Trial Tr. 27:11 – 20.)

8         She would have liked to know that other women had already sued the defendants for fraud,

9    and she would not have flown to California or signed any documents, if she had known. (*Id.*

10   27:21:28:6.) She believed Defendants because Michael Pratt was "very reassuring that this was just

11   for a private collector on a DVD to Australia. And Andre [Garcia] confirmed that story. Riva

12   [Yousif] confirmed that story. Teddy [Gyi] confirmed that story." (*Id.* 28:7 – 13.) "So when you

13   hear something over and over and over again, you believe them." (*Id.*)

14        "Mike" bought airfare to fly Jane Doe 19 from Seattle to San Diego. She believed the job

15   was "some sort of like professional studio and that it was just going to be a photo shoot, and it

16   could include nude and up to with someone else, but I did not think that it was going to be sex."

17   (9/9/19 Trial Tr. 216:10 – 23.)

18        The shoot was to occur the night Jane Doe 19 flew into San Diego, but it was postponed to

19   the next day. (*Id.* 218:10 – 219:25.) The next morning, three men and Riva Yousif showed up at

20   Jane Doe 19's hotel room, which scared her. (*Id.* 220:1 – 10.) Garcia arrived with documents,

21   which Jane Doe 19 signed, after the men told her the shoot was for a "DVD, a private collector on a

22   DVD over to Australia, and everything was going to be confidential. (*Id.* 220:17 – 221:8.) This

23   reassured Jane Doe 19's concerns and she was rushed signing given her departure flight from San

24   Diego. (*Id.*) Theodore Gyi also handed her the verbal script, told her to read it into the camera,

25   which she did not think was a contract. (*Id.* 222:17 – 223:1.)

26        Defendants then paid her $3,000, not the $4,000 Mike had offered, with Garcia reasoning,

27   "her body was a 10, but face a 7." (*Id.* 222:2 – 10.) After paying her another $40 for parking,

28

**STATEMENT OF DECISION**

1  Defendants for the first time told Jane Doe the shoot was sex, and with Garcia. (*Id.* at 223:9 –

2  224:1.) Jane Doe 19 then filmed the video with Garcia as the actor. (*Id.* at 225:8 – 9.)

3      After returning to Washington, Jane Doe 19 eventually learned her video was on the internet

4  when she received a "blocked email and text messages with a link to [her] video saying, "I found

5  you." (9/10/19 Trial Tr. 12:6 – 13.) The message had link to her video on www.PornHub.com.

6  (*Id.* 12:14 – 15.) A man she was dating received a message, "I found your girl." (*Id.* 12:21 –

7  13:11; Ex. 888.) Her friends and their boyfriends also discovered the video. (*Id.* 14:5 – 18; Ex.

8  889.) Jane Doe 19 then found her video on approximately 10 websites, some with an episode

9  number, which she and her friend tried to report to take down. (*Id.* 15:21 – 16:8.) Jane Doe 19 also

10  reached out to "Mike," testifying:

11      I called Mike because I was very upset. I felt betrayed that what they

12      had told me wasn't true. And when I called him, he told me that he
       didn't know who I was and hung up. And I tried calling again and

13      again, and he -- he just stopped answering. And then when I texted
       him that I was upset and I would get a lawyer, he told me that I was a

14      joke and they have everything on video.

15  (*Id.* 16:9 – 18; Ex. 886 [Mike Pratt writing "LOL" and "your [sic] a joke.)

16      As a result of the video release, Jane Doe 19's video spread by word of mouth in the Seattle

17  area, and she had to break up with her boyfriend, who would blackmail her with it, and pass it

18  around to acquaintances and friends at bars and parties. (Id. 20:2 – 15.) Jane Doe 19 came across

19  approximately 100 people who had learned of the video, and she eventually had to delete social

20  media. (*Id.* 20:16 – 21.) She was harassed on social media with random messages, including

21  propositions for sex from strangers. (*Id.* 22:24 – 23:5.)

22  The video release affected her emotionally:

23      Q. And how did the release of the video on the Internet affect you
       emotionally before you moved to Vegas?

24      A. Well, at one point, I drove my car to a cliff, and there was no

25      barrier, you can drive, and I sat there and sat in my car contemplating
       for a couple of hours listening to music and wondering if maybe the

26      best way to make it all stop was just to not be here.
       Q. What were you thinking of doing on the top of the cliff?

27      A. Driving my car off.

28

STATEMENT OF DECISION

1 | (*Id.* 24:3 – 13, 26:20 – 21 ["I have cried in my car when I was going to leave this world."].)

2 |     Eventually, Jane Doe 19 had to move from the Seattle area to Las Vegas. "I had to move

3 | away from that state. It was where I grew up, and I had a lot of friends, and my family lives there,

4 | and I had -- my life was ruined, and it was too much to handle, so I thought maybe going to a new

5 | state would help me at least try and give myself a fresh start." (*Id.* 23:19 – 24:2.) She now has

6 | an emotional support dog, a psychiatrist diagnosed her with anxiety and depression, she has taken

7 | medication, gone to therapy, lost sleep and weight, and cried thousands of times. (*Id.* 24:16 –

8 | 26:24.)

9 |     Jane Doe 19 is concerned about the future:

10 |         [T]his will haunt me for the rest of my life. That if I have kids, this is

11 |         what they are going to think of me. That if I start a new job, this is --

         they will know about it and confront me. That if I did reactivate, like,

12 |         my Facebook or something, I would receive countless messages,

         whether they were supportive or not, it still is horrific to read about

13 |         and be a part of.

14 | (*Id.* 26:25 – 27:10.)

15 |     The Court finds Jane Doe 19 to be credible.

16 | **Jane Doe 20**

17 |     In October 2015, 21-year old Jane Doe 20 was a fulltime student in Florida working two

18 | jobs to pay all of her expenses by herself. She was living paycheck to paycheck and sought extra

19 | money when she sent an application to ModelingWork.com. (09/16/19 Trial Tr. 7:15 – 8:26; 10:19

20 | – 23.) Jane Doe 20 then received an email from mike@modelingwork.com that detailed an offer to

21 | shoot 30 minutes of sex. The email purported that there were "several channels of distribution

22 | depending on the level of anonymity" desired. (Ex. 904.1 – 2.)

23 |     Following a short back-and-forth in email, Jane Doe 20 had a phone call with Mike who

24 | explained the video would only be on DVD in Australia. He claimed that the video would not

25 | appear in the US or on the internet, and he assured her that she could speak to reference models

26 | upon request. Mike also mentioned that Jane Doe 20 would be paid $5,000 for the job. Jane Doe 20

27 | testified that he "was very convincing" over the phone. (09/16/19 Trial Tr. 15:1 – 16; 16:4 – 15.)

28 | Jane Doe 20 had subsequent calls with Mike wherein he showed her his office, employees, and a

1   male actor named Josh. Seeing what looked to be a normal and professional office made Jane Doe

2   20 feel more comfortable. (*Id*. at 16:16 – 17:15.)

3         Another aspect of recruitment that drew Jane Doe 20 in was contacting a reference model.

4   She texted and spoke with Cat Wilkens, who reaffirmed that her videos were not online nor in the

5   US. Jane Doe 20 also followed Cat on Instagram, which further cemented the idea that Defendants

6   ran a legitimate operation that protected the privacy of normal young women. (*Id*. at 17:27 – 19:4.)

7         Jane Doe 20 did not make the original flight Mike booked for her because she "ended up

8   getting cold feet." (*Id*. at 19:21.) Mike, however, remained persistent, continued comforting her,

9   and ultimately convinced her to get on a plane to San Diego. Mike (whom Jane Doe 20 identified as

10   Michael Pratt) picked Jane Doe 20 up from the airport and drove her to the hotel where she would

11   stay for the night. During the car ride, Mike reassured her that the video would not appear online.

12   (*Id*. at 20:14 – 27.)

13         The next morning, Mike, Andre Garcia, and a second male actor Josh arrived at the hotel.

14   Jane Doe 20 noticed that they seemed irritated and in a hurry. They took her to another hotel where

15   the shoot would take place. Jane Doe 20 asked Garcia about distribution, and he verified what Mike

16   had claimed about being overseas. (*Id*. at 27:5 – 10.) She went to take a shower, and Josh joined her

17   without asking; she felt uncomfortable, but she proceeded because she did not know how adult

18   shoots went. After the shower, the videographer and makeup artist entered the room. (*Id*. at 22:2 –

19   23:22.)

20         Garcia disclosed to Jane Doe 20 that they would reduce her pay to $2,500 because Mike did

21   not expect her to have a large tattoo on her back. Jane Doe 20 was shocked by the explanation as

22   her application photos displayed her tattoo clearly. (Ex. 899.) He then surprised her by asserting

23   that she had to shoot with two male actors. Jane Doe 20 felt uncomfortable yet powerless. She

24   "didn't want to get on anybody's nerves," so she went with what the men directed. (09/16/19 Trial

25   Tr. at 24:15 – 26:3.)

26         Next, Garcia handed Jane Doe 20 documents to sign. He rushed her through signing the

27   paperwork, representing it as "just for tax purposes and stuff [they] had already talked about." (*Id*.

28   at 26:18 – 19.) Jane Doe 20 did not have time to read the document. Garcia then gave her a script to

**STATEMENT OF DECISION**

1   read into the camera. He purported that this script was to show she "wasn't being held against [her]

2   will." (*Id.* at 28:7.) After filling out the documents, Jane Doe 20 sat on the bed for an interview

3   wherein she was coached to act flirty and answer personal sexual questions. She was uncomfortable

4   with both the interview and the sexual filming, the latter of which took at least double the time

5   initially stated. (*Id.* at 29:2 – 22.)

6          Early in 2016, Jane Doe 20 received Snapchat messages from friends with links to her video

7   online. Her immediate response was to ignore the influx of messages. Soon thereafter, her family,

8   co-workers, and strangers discovered the video. She lost many friends, some of whom sent hurtful

9   messages. (*Id.* at 30:21 – 32:23.) For example, her now ex-boyfriend sent emails in which he

10  claimed that the pornographic film defined Jane Doe 20. He focused on his own shame and disgust,

11  emphasizing that she made "the most disgusting thing possible." (Ex. 921.)

12         Jane Doe 20 endured emotional distress as a result of the harassment from friends and

13  strangers. She suffered from extreme anxiety, panic attacks, depression, insomnia, and undereating.

14  (09/16/19 Trial Tr. at 52:26 – 53:3.) On one occasion, Jane Doe 20 underwent a panic attack that

15  sent her to the ER, where physicians prescribed her Lorazepam. Jane Doe 20 continues to

16  experience these symptoms. She now has additional worries concerning her nine-month old child,

17  she worries about his growing up in her hometown where people continue to approach her about

18  her video. She also has concerns about her career and how she can provide for him financially. (*Id.*

19  at 53:6 – 54:14.)

20         Jane Doe 20 took some measures to try to remove the video before procuring legal

21  representation. She sent a notice to a porn tube site disseminating her video.  She stated  that

22  showing her likeness was a violation of privacy. (Ex. 922.) She also emailed Michael Pratt pleading

23  with him to take it down, but he replied, "LOL good one." (Ex. 923.3)

24         Jane Doe 20 testified that she wished she had been told where the video would end up, that

25  they would short her on payment, and that they would have her film with two men. She joined the

26  lawsuit so that her video could be removed and so that nobody else endures what she went through.

27  (09/16/19 Trial Tr. 54:18 – 55:7.)

28         The Court finds Jane Doe 20 to be credible.

-109-

**STATEMENT OF DECISION**

**Jane Doe 21**

In May of 2015, Jane Doe 21 had just been fired from her job. She was 20 years old, transferring to a new school, living with her parents, and she had to pay for her college tuition. (Deposition of Jane Doe 21, May 4, 2019 ["Doe 21 Depo."] at 36:4 – 11; 50:9.) After applying to around 50 jobs through Craigslist with no luck, she received the stock "legitimate adult gig" email from BeginModeling. (*Id.* at 36:12 – 17; 42:15 – 20.)

Jane Doe 21 spoke with Jonathan on the phone, and she asked about safety, STD testing, and distribution. Jonathan assured her he could provide the health bill, and he purported the video would not be published online. (*Id.* at 69:24 – 70:7.)

Jonathan then sent her reference model contact information. Jane Doe 21 felt more comfortable communicating with a woman about the experience. The reference model, Kailyn, texted her that it was a great experience, that Defendants would provide "luxury accommodations," and that the video would not be online. (*Id.* at 87:4 – 88:4.) Her conversation with the reference model was "the deciding factor in whether or not [the video shoot] was safe." (*Id.* at 59:10 – 15.)

By the time she was boarding the plane, Jane Doe 21 was told she would fly from Newark, New Jersey to San Diego, California to film a sex video. (*Id.* 94:25 – 95:3.) She was under the impression the video would be for a "small overseas audience on DVD." She believed she would be paid $3,000 for 30 minutes of filming. (*Id.* at 71:15 – 72:22.)

Jonathan (whom she identified as Andre Garcia) picked Jane Doe 21 up from the airport and checked her into a hotel. He walked her into the room, then told her his boss needed more pictures. He instructed Jane Doe 21 to strip, making her feel "scared and vulnerable," and later that night he forced her to have sex with him. (*Id.* at 95:9 – 11; 97:15 – 98:13.) The next day, after getting her makeup and nails done at a shopping center, Jane Doe 21 returned to her hotel for the shoot. (*Id.* at 102:2 – 25.)

At the hotel, Jane Doe 21 met with the videographer, Matthew Wolfe, and Jonathan. Wolfe set up for filming while she had her tattoo covered up.[55] Jane Doe 21 asked several times for STD

---

[55] Jane Doe 21 testified that Wolfe went by an alias, but she could not remember what it was. (Doe 21 Depo. at 103:23 – 104:4.)

-110-

**STATEMENT OF DECISION**

test results, but her request was denied repeatedly. (*Id.* at 105:3 – 106:3.) Next, Wolfe and Jonathan handed Jane Doe 21 documents and stood over her shoulder to rush her aggressively through paperwork. They told her to hurry because they were starting late. At the same time, Wolfe and Jonathan asked Jane Doe 21 for forms of identification. In this flurry, with two men she did not know between her and the door of the room, Jane Doe 21 had no time to read what she signed. Wolfe purported that the contract was to ensure she did not "run off and become a porn star after filming." (*Id.* at 107:20 – 108:22.) Given the constant reassurances by Wolfe and Jonathan, Jane Doe 21 believed the contracts entailed what their verbal agreement was. (*Id.* at 120:7 – 12.)

Defendants also provided Jane Doe 21 with a script to read on camera. Jane Doe 21 was scared about being in the room, so she read through it quickly. Based on Defendants' representations in the room, she believed the paper was but a formality. Although the script read that she was to film voluntarily, Jane Doe 21 felt she was pressured into doing so. She claimed she had no escape, and she did as Matthew Wolfe told her. (*Id.* at 132:19 – 133:25.) Jane Doe 21 proceeded to film, and she was paid $3,000. (Ex. 961.)

When filming concluded, Jane Doe 21 smoked the marijuana Jonathan offered her to numb herself. She then cried herself to sleep. (Doe 21 Depo. 142:12 – 18.) The next day, she was kicked out of the hotel onto the street. Unsure of where to go, she texted Jonathan asking what to do since she had no way home. Jonathan picked her up and brought her to his apartment, where Wolfe was. Jonathan then drove her to the airport, and she flew home. (*Id.* at 143:12 – 145:5.)

Upon returning home but before the video was released, Jane Doe 21 experienced depression and she was withdrawn from others. (*Id.* at 148:2 – 7.) In or around June of 2015, Jane Doe 21 discovered her video online when multiple people messaged and called her about it. (*Id.* at 150:9 – 12.) She was receiving messages across all platforms – Facebook, email, Twitter, text messages. All of her friends found out, as did her siblings, family, and fiancé. (*Id.* at 152:8 – 153:8.) Jane Doe 21 testified that she lost all but two friends. (Id. at 166:9 – 11.) She felt she could not go out in public out of fear that someone would recognize her from the video. Her classmates at her new school also found her video, which in turn compelled Jane Doe 21 to miss classes so she would not draw attention to herself. (*Id.* at 154:23 – 5; 157:8 – 24.)

STATEMENT OF DECISION

1    Jane Doe 21 had not only her personal information and social media profiles posted around

2    YouTube and PornWikiLeaks, but also her family's information. Exhibit 966 catalogues various

3    threads across multiple websites posting links and personal information of Jane Doe 21, her family

4    members, and even her mother's company page. Michael Pratt's fake Facebook profile Ann

5    Fairchild also contacted Jane Doe 21's mother multiple times, though she never responded. (Ex.

6    963.)

7        Because of her emotional distress from the video's release, Jane Doe 21 required extensive

8    medical treatment. She lost 20 pounds in the course of two months following the online publication,

9    so she began seeing a nutritionist. (Doe 21 Depo. 160:7 – 18.) She also began seeing a doctor who

10   diagnosed her with "plenty of psychological issues" and with anemia; furthermore, her "organs

11   were on the verge of failure." (*Id.* at 163:4 – 22.) Before the video's release, Jane Doe 21 had no

12   eating problems. After the video, however, she struggled to get out of bed, and the doctor told her

13   that her anemia was due to her poor diet. Jane Doe 21 continues to have an eating disorder today,

14   four years after the video. (*Id.* at 162:23 – 163:22.) She also continues to see a therapist, who

15   diagnosed her with complex PTSD and prescribed her sertraline, an antidepressant. (*Id.* at 169:22 –

16   170:3; 172:13 – 18.) Jane Doe 21 testified that her relationship with her parents is still not the same

17   and it never will be. (*Id.* at 210:9 – 10.)

18       The Court finds Jane Doe 21 to be credible.

19                                    **Jane Doe 22**

20       In January 2015, Jane Doe 22 responded to a Craigslist advertisement for modeling with the

21   headline "Females Escape the Snow and Make 5K". (10/22/19 Jane Doe 22 Depo. 132:1 – 5.) She

22   didn't know what the ad was going to entail, she was just focused on the $5000 payment. (*Id.* at

23   133:4 – 10; 133:13 – 17.) In conversations with defendants, Jane Doe 22 was told the video would

24   be on DVD, distributed only in Australia and New Zealand, not in the United States. (*Id.* at 152:15

25   – 20.) This information was very important to her because had Jane Doe 22 known the video would

26   be released online, she would not have done it. (*Id.* at 155:9 – 12.)

27       Before coming to San Diego, Jane Doe 22 had communicated with defendants and they had

28   informed her it would be an adult shoot. At some point thereafter, she realized it was going to be a

-112-

**STATEMENT OF DECISION**

1  pornographic video. (*Id.* at 144:2 – 20.) Jane Doe 22 recalls that she discussed her concerns with
2  them over the phone and not in emails. Her emails were short and to the point. (*Id.* at 185 12 – 24.)

3         The number one reason Jane Doe 22 was willing to do a pornographic video was money.
4  She needed money. This was the only reason she did the video. (*Id.* at 162:15 – 20, 257:24 – 25.)
5  Jane Doe 22 needed money because she was in college, had to pay for her apartment, didn't have a
6  car, was unable to obtain a job without a car and could not rely on friends or family for money. (*Id.*
7  at 162:15 – 8.)

8         Jane Doe admittedly contacted defendants to do a subsequent video shoot because she had a
9  lot of money stolen from her placing her in financial straits. Thus, she made a second trip to San
10  Diego where she shot another video. (*Id.* at 183:11 – 184:2.)

11         Jane Doe 22's concerns about distribution of the pornographic video were addressed by
12  defendants telling her the video would only be released on DVD in Australia and New Zealand, so
13  that ruled out other forms of distribution in other places. (*Id.* at 147:24 – 148:4, 153:3 – 7.) After
14  speaking with the defendants, she committed to doing the video because of what they told her. (*Id.*
15  at 169:7 – 11.) Defendants told Jane Doe 22 that the video was not going to be distributed in the
16  United States and that it would only be distributed in Australia and New Zealand on DVD. Based
17  upon that she felt her friends and family would not be going to Australia to buy pornography. (*Id.* at
18  152:11 – 20.) Had Jane Doe 22 known the video would be released online she would not have done
19  the pornographic shoot. (*Id.* at 154:9 – 12; 155:25 – 156:3.)

20         The Defendants gave Jane Doe 22 information about references that she should contact and
21  photos of other girls who appeared safe and smiling. (*Id.* at 152:4 – 7.) Before coming to San
22  Diego, Jane Doe 22 called the references she had been provided by defendants. In the calls she was
23  told not to worry about STDs because protection was being used. She was also told by the
24  references that they had never seen anything online of themselves. They also reinforced the belief
25  that the DVD would only be distributed in New Zealand and Australia. (*Id.* at 160:11 – 161:6.) At
26  no time before shooting the video did Jane Doe 22 have any inkling that it would be released on the
27  internet. (*Id.* at 154:12 – 15.)

28

1    Prior to shooting the video, defendants gave Jane Doe 22 documents that she signed. They

2    didn't say review it. They said sign this. She did not review them thoroughly. She read a little bit

3    but didn't get far because they were rushing along. (*Id.* 189: 1 – 20.) Jane Doe 22 recalls she was

4    not given time to read the documents and was told that they were going to outline it for her, so she

5    should just fill out the bottom now. (*Id.* 201:8 – 17.) Jane Doe 22 did not ask defendants to show

6    her in any of the contracts that she signed where it said the videos would only be distributed on

7    DVD in Australia or New Zealand, because they had programmed it in her head that they had a plan

8    for them. She trusted that they wouldn't tell her not to read just to hurry up and sign it. (*Id.* at 217:4

9    – 16.) She specifically recalls she did not ask about distribution before signing the documents in the

10    hotel room because she had already been told multiple times that the video would only be

11    distributed in New Zealand or Australia on a DVD. (*Id.* at 213:13 – 20.) Jane Doe 22 was relying

12    on the defendants to relate truthful information to her about distribution. (*Id.* at 214:13 – 16; 214:19

13    – 23; 214:25 – 215:7.)

14    Jane Doe 22 was not concerned about the words in the script that she read on camera

15    because she trusted that the defendants were going to do what they said they would do with the

16    footage. She just knew that they were going to put it on DVD in Australia. The fact the statement

17    didn't say "BLL will only use this footage for DVD in Australia" didn't raise a red flag because she

18    already had that in mind from what the defendants had told her. (*Id.* at 244:24 – 245:14; 245:15 –

19    16; 245:20 – 246:4; 246:6 – 22; 247:2 – 6; 248:7 – 14; 249:12 – 250:23.)

20    Jane Doe 22 recalls learning that her video was online in August 2015. She can't recall

21    exactly how she learned about it but remembers receiving harassing messages thereafter. (*Id.* at

22    284:2 – 12.) She has been approached by people from her high school about having done a

23    pornographic video and her ex-boyfriend would blackmail her by threatening to send the link to the

24    video to everybody that they knew. (*Id.* at 193:19 – 22; 194:19 – 195:2.) She no longer has any of

25    the messages she received because she deleted them out of shame and didn't want anyone to be able

26    to see the message and find out something about them. (*Id.* at 26:20 – 26:5, 26:8, 26:11 – 19.)

27

28

-114-

STATEMENT OF DECISION

1   Jane Doe 22 recalls communications via a Facebook post with someone named Ann

2   Fairchild in which she was informed about Girls Do Porn and that there was a lawsuit. (*Id.* at 25:2 –

3   4; 25:13 – 26:1.)

4   Prior to 2015, Jane Doe had been treated by her family doctor for anxiety. He prescribed

5   Lexapro for her. (*Id.* at 114:5 – 10; 115:9 – 14.) She only took Lexapro for a matter of months and

6   was not actively treating at the time of the video shoot. (*Id.* at 115:17 – 25.) At some point

7   following shooting of the video, Jane Doe 22 sought treatment for anxiety and depression. She

8   cannot recall the name of the psychologist. (*Id.* at 116:4 – 16.) The reasons she saw a psychologist

9   stem from the emotional distress she experienced in shooting the video. She's lost relationships, has

10  a son whose father is unknown, feels hopeless about her future because people that she cares about

11  have called her vile names, such as "whore" and "slut," telling her that she will never be anything

12  more than that. She feels this was very damaging to her self-esteem causing her to go into

13  depression and have anxiety attacks. She thinks she would still be in school, maybe not be a single

14  parent and would be on a whole different path in life. She wouldn't be on the career path that she's

15  currently on. In sum and substance, she feels the pornographic video shoots have ruined her life.

16  (*Id.* at 116:4 – 16; 309:3 – 310:2.)

17  Jane Doe 22 attended college but dropped out before learning her videos were posted online.

18  (*Id.* at 61:8 – 18.)

19  Currently, Jane Doe 22 is employed and has worked as an entertainer since September 2017.

20  (*Id.* at 97:8 – 18, 102:10-18.) Before that, she worked as a customer service representative. Her

21  duties involved order entry, taking phone calls and parts knowledge. She ceased working there in

22  roughly September 2016. (*Id.* at 104:20 – 23; 105:7 – 21; 106:1 – 6.) Jane Doe 22 quit this job

23  because she was in a bad place. She was distressed with people knowing about the videos. (*Id.* at

24  106:7 – 15.)

25  The Court finds Jane Doe 22 to be credible.

26  **v.  Defendants Use Shell Entities to Obfuscate their Corporate**

27  **Relationships and Hide Assets**

28

STATEMENT OF DECISION

Defendants have constructed a complicated network of entities, transferred assets overseas, and kept scant corporate records. None of the Defendants could really explain the corporate structure; both Pratt and Wolfe pled ignorance on basic subjects that most small business owners or managers would know. Plaintiffs offered sufficient evidence to show that the various Defendant businesses and additional related entities operate together as essentially one unit.

### I. *Defendants Use Six Entities to Operate GirlsDoPorn.com*

When Pratt first launched GirlsDoPorn.com, he did so through two entities: Clockwork Productions, Inc. and Bubblegum Films, Inc. These two original entities were later replaced by the BLL Media, Inc. enterprise. Wolfe was produced as the PMQ witness for all topics relating to the entities that run GirlsDoPorn, yet he lacked basic information and no one else was produced to explain the corporate structure.

***Clockwork Productions, Inc.*** was incorporated by Kevin Holloway on November 29, 2006 in Nevada. (Ex. 1660.28-32.) Plaintiffs assert that Holloway started Clockwork Productions on Pratt's behalf due to Pratt's immigration status at the time;[56] Defendants have not offered an alternative explanation. Clockwork Production's corporate filings list Holloway as president, secretary, treasurer, and director as of February 19, 2007. (Ex. 1660.28-32.) As of June 15, 2009, Pratt is listed as president, secretary, and director, yet Pratt claims to have no recollection of holding those positions. (Ex. 1660.5; Pratt Depo. Vol. I, 295:20 – 296:19.) Wiederhold was also listed as a director of Clockwork Productions as of that date. (Ex. 1660.8.) Holloway later replaced Pratt as the president, secretary, treasurer, and director of Clockwork Productions in 2014. (Pratt Depo. Vol. I, 303:19 – 304:16.)

Although Clockwork Productions was supposedly dissolved in 2013 (10/17/19 Trial Tr. 164:10 – 20), Defendants continued to list Clockwork Productions as the contracting party on

---

[56] (Wiederhold Depo. 335:15 – 23 ["[Q.] Why were you signing anything for Clockwork Productions in your mind?

[A.] At the time Michael asked me to sign it so he could start a processing account. He wasn't an American at the time and I was and he needed an American to create an account."].)

-116-

**STATEMENT OF DECISION**

1  several Plaintiffs' Model/Talent Releases. (See, e.g., Exs. 34; 297.) Defendants were unable to

2  explain.[57] (Pratt Depo. Vol. II, 436:15 – 441:5; 10/3/19 Trial Tr. 112:21 – 113:3.)

3       **Bubblegum Films, Inc.** was incorporated in Vanuatu on December 11, 2006. (Ex. 1377;

4  Pratt Depo. Vol. I, 243:12 – 19.) The ownership of Bubblegum Films is uncertain. Pratt's verified

5  discovery responses state unequivocally that he was the "sole owner" of Bubblegum Films. (Ex.

6  1377.)[58]

7       Bubblegum Films held the rights to the videos filmed for GirlsDoPorn and GirlsDoToys

8  before those rights were transferred to Oh Well Media and Sidle Media, respectively, on November

9  6, 2016. (Exs. 3282; 3283.) Pratt conceded that he was the sole director of Bubblegum Films when

10  all of its assets (the entire library of videos filmed for GDP and GDT) were assigned to other

11  entities. (Pratt Depo. Vol. I 267:25 – 268:6.)[59]

12       **BLL Media, Inc.,** incorporated in California in 2013, currently produces the videos that

13  appear on GirlsDoPorn.com. Pratt wholly owns BLL Media, Inc. indirectly through BLL Media

14  Holdings, LLC. BLL Media, Inc. is managed by Pratt, employs all of the individuals who run the

15  business, and holds most of the assets used in running GirlsDoPorn.com. "Clockwork Productions,

16  Inc., and the services it provided were replaced and picked up by BLL Media, Inc., after it was

17  incorporated." (10/3/19 Trial Tr. 114:10 – 17.)

18

19

20

---

21     [57] When asked about Clockwork Productions' relationship with BLL Media, Inc. and why
Clockwork Productions appears on these documents, Pratt said he "would just be guessing." (Pratt Depo.
22  Vol. II, 436:15 – 441:5.) When asked the same question at trial, Wolfe claimed that "there are a couple of
contracts that were - - had errors on them, but they were since fixed or transferred, or there was a transfer
23  agreement for them as well." (10/3/19 Trial Tr. 112:21 – 113:3.)

24     [58] Pratt questioned whether this was accurate and attempted to explain by saying "our company
structure was completely messed up, and we were in the process of fixing everything. So maybe I was, but
25  I'm – I don't think it was supposed to be set up like that as far as I know." (Pratt Depo. Vol. I, 242:17-
243:10.) Pratt claimed that he has "no idea" who owns Bubblegum Films, yet he believed Bubblegum Films
26  owned the domain GirlsDoPorn.com before Oh Well Media gained ownership. (*Id., see also* 269:17-271:3.)

27     [59] In a DMCA take-down request submitted to MindGeek on April 25, 2016, "Jordan Powers,"
identifying himself as the "CEO of BUBBLEGUM FILMS / GIRLSDOPORN.COM," claims that
28  Bubblegum Films "own[s] the exclusive copyrights" of the content on GirlsDoPorn.com. (Ex. 7006
[signature line on page 2 directs MindGeek to "DMCA@MOMPOV.COM"].)

STATEMENT OF DECISION

1   **BLL Media Holdings, LLC** was formed in Nevada on February 5, 2013 and is wholly

2   owned by Pratt. (Ex. 1168.) This entity apparently exists solely to hold BLL Media, Inc. and other

3   assets.

4   Defendants created three new entities to operate GirlsDoPorn.com. The Court finds, that the

5   purpose of creating these entities was to obfuscate Defendants' corporate status and relationships

6   and to evade accountability for Defendants' wrongdoing.

7   The three entities are as follows:

8   **(1) UHD Productions LLC** is a Wyoming entity Defendants formed as the "new company

9   for production." (10/3/19 Trial Tr. 115:27 – 116:6.) Yet UHD Productions has never had any

10   employees. (*Id.* at 117:8 – 10.) Both Wolfe and Pratt claim to be unaware of who owns UHD

11   Productions. (*Id.* at 116:23 – 26; Pratt Depo. Vol. I, 50:4 – 10.)

12   UHD Productions purports to be the contracting party on numerous Plaintiffs' documents.

13   (JD 8 [Ex. 349] and JD 19 [Ex. 882].) According to Wolfe, Defendants began listing UHD

14   Productions on their model contracts because "when the lawsuit hit, that prevented us from

15   completing those things. But it was - - UHD was the production arm of the company." (10/2/19

16   Trial Tr. 109:20 – 110:1.) The UHD Productions, LLC name would not have been recognized.

17   When asked whether UHD Productions operated out of the same physical office as BLL Media,

18   Wolfe equivocated.[60]

19   **(2) EG Publications** is a corporation that, according to Pratt, "just does our payroll, payroll

20   for the company." (Pratt Depo. Vol. I, 41:2 – 12.) According to Wolfe, EG Publications "was

21   supposed to be kind of like an admin company," providing services for BLL Media, Inc. (10/3/19

22   Trial Tr. 114:19 – 115:2.) Yet EG Publications does not have any employees. (*Id.* at 117:5 – 7.)

23   Despite being the PMQ for the issue, Wolfe claims he does not know who owns this entity and has

24   no knowledge of the corporate structure. (*Id.* at 115:3 – 25, 117:1 – 4.)

25

26

27   [60] Wolfe responded, "I don't know technically where it would have operated out of, but some of
these companies were set up when we were trying to fix things and errors like this, and then the lawsuit

28   happened, and we didn't get time to finish all that, so it never really came to be." (10/3/19 Trial Tr. 116:7 –
20.)

-118-

**STATEMENT OF DECISION**

1    Wolfe testified that EG Publications holds bank accounts where the money processed from

2    GirlsDoPorn.com subscription sales is deposited. (10/2/19 Trial Tr. 80:12 – 21.) The only evidence

3    in the record indicates that EG Publications is wholly owned by BLL Media Holdings, LLC. (See

4    Pratt Depo. Vol. III at 84:12 – 23 [discussing the assets he listed in his bankruptcy filing].)

5    **(3)** *Oh Well Media Limited*, a Vanuatu entity formed on September 4, 2015, is the final

6    piece of the puzzle. (Ex. 1673.116-117 [minutes of first meeting referencing date of incorporation].)

7    The ownership of this entity was disputed at trial. As of September 4, 2015, corporate documents

8    show Pratt is the sole shareholder of Oh Well Media. (Ex. 1673.116-117 [minutes of first meeting

9    showing resolution to transfer all shares of the company to Pratt].)  Plaintiffs offered a share

10   certificate and a Register of Members showing Pratt as sole shareholder.  (Ex. 1673.118-120.) Pratt

11   disputes that he owns Oh Well Media and claims that Kevin Holloway is the true owner.[61] (Pratt

12   Depo. Vol. I, 270:5 – 271:24.)

13   Defendants transferred ownership of all valuable assets related to GirlsDoPorn from

14   Bubblegum Films and BLL Media, Inc. (two entities that Pratt owns) to Oh Well Media (an entity

15   supposedly owned by Holloway). On November 6, 2015, an "Assignment of Assets" is signed

16   purporting to transfer ownership of the rights of the videos Defendants produced for GDP, and the

17   domain name GirlsDoPorn.com from Bubblegum Films to Oh Well Media Ltd. (Ex. 3283.1-7.)

18   BLL Media, Inc. also transferred video rights to Oh Well Media. Defendants produced one

19   Assignment of Assets dated October 1, 2014. (Ex. 3320.1 – 5.) This transfer is dubious on its face.

20   First, Oh Well Media did not exist at that time and would not be formed for nearly a year. Second,

21   this assignment purports to transfer the rights to at least five videos that were shot in *2015*. (Ex.

22   3320.4.)

23   The more fundamental problem is that the record contains no evidence that consideration

24   was paid to the assignors, which means that Pratt has purportedly transferred his life's work from

25   _____

26   [61] Pratt claims that he does not own Oh Well Media, but he also uses the entity interchangeably with himself and with his companies, BLL Media, Inc. and BLL Media Holdings, LLC. (Pratt Depo. Vol. I,

27   60:21-61:25, 57:3-10 [specifying that when he says they produce content for "ourselves," he means for Oh Well Media].) He is unsure whether BLL Media or Oh Well Media owns the GirlsDoPorn.com domain. (*Id.*

28   at 60:21-61:4.) He is unsure whether he is recruiting models on behalf of both BLL Media and Oh Well Media (*Id.* at 64:2-14.)

**STATEMENT OF DECISION**

1  an entity he owned to an entity that he did not own without receiving anything in return. Pratt

2  contends that he received a written licensing agreement, but failed to produce it at trial. (Pratt Depo.

3  Vol. III, 99:5 – 12.)

4        Pratt claims that he believes Kevin Holloway owns Oh Well Media.[62] (*Id.* at 62:7 – 13.) He

5  testified that he has never had contact with anyone at Oh Well Media because Wolfe handles those

6  communications, but that if he did, it would be with Kevin Holloway. (*Id.* at 57:11 – 58:7.) Pratt

7  stated that Oh Well Media operates out of Vanuatu but that he produces all the content for that

8  entity. (*Id.* at 64:18 – 65:15.)  He claims that no one from Oh Well Media contacts him requesting

9  he produce content: "We just take it upon ourselves. We know what we're doing." (*Id.* at 65:22 –

10  66:2.) Pratt states that a contract exists between Oh Well Media and BLL Media giving ownership

11  of the videos to Oh Well Media and that he signed on behalf of BLL Media but does not know who

12  signed on behalf of Oh Well Media. (*Id.* at 66:4 – 24 ["guessing" that Holloway would be the

13  signatory].)

14        Pratt testified that he does not know either why Bubblegum Films transferred the rights to

15  all of the videos to Oh Well Media and Sidle Media or what assets Bubblegum Films received in

16  return for assigning the video rights. (Pratt Depo. Vol. III, 133:25 – 136:9.)

17           **2.  *Defendants Use Five Entities to Operate GirlsDoToys.com***

18      *M1M Media, Inc.* is a California company owned by Pratt and Wolfe 50/50 set up for the

19  purpose of operating the website GirlsDoToys.com. (10/2/19 Trial Tr. 202:9 – 204:4; Pratt Depo.

20  Vol. I, 39:9 – 40:10 [testifying he and Wolfe have a joint partnership called M1M Media, Inc. or

21  M1M Media, LLC, but does not know which].)

22

23

24      [62] Pratt testified that he was meant to run the website, recruit the models, shoot the videos, and
market the website and Holloway was meant to receive the rights to the videos and a percentage of the

25  profits. (*Id.* at 271:19-276:25.) When asked why it took from 2006 to 2015 to formalize his agreement with
Holloway, Pratt stated, "I mean everything was a mess, corporate structure-wise, that's why I hired Matt to

26  –" (*Id.* at 276:24-277:9.) Pratt could give no further explanation as to what he meant by "the corporate
structure was a mess," claiming ignorance and deflecting such questions by deferring to Wolfe. (*Id.* at

27  277:10-278:25 ["I'm not too sure. Matt deals with all that kind of stuff. [...] You are just asking the wrong
person. I have no clue about any of this stuff."].)

28

**STATEMENT OF DECISION**

***Merro Media, Inc.*** is 100% owned by Merro Media Holdings, LLC (Ex. 1123.) Wolfe is Sole Director, Chairperson, Chief Executive Officer and President, Chief Financial Officer, and Secretary.  [Ex. 1111].) Wolfe claims to provide consulting services to BLL Media, Inc. through Merro Media, Inc. yet he is unaware of any written agreements between those entities regarding those services. (10/3/19 Trial Tr. 127:4 – 10.)

***Merro Media Holdings, LLC***, which is solely owned by Wolfe, is a holding company that owns Merro Media, Inc. (Ex. 1058; 10/3/2019 Trial Tr. 33:4-34:1, 106:9-107:1.)

***Hayst Holdings, Limited*** is a New Zealand entity through which Wolfe provides "technical" services to BLL Media. (See 10/2/2019 Trial Tr. 24:3-26:19.)

***Sidle Media Limited*** is a Vanuatu entity which owns the domain name GirlsDoToys.com and holds the rights to the videos Defendants produced for GirlsDoToys. Wolfe claims he does not own Sidle Media and does not know who does. (10/7/19 Trial Tr. 38:6 – 7; 10/3/19 Trial Tr. 106:3 – 18.) Pratt claims he does not own Sidle Media. (Pratt Depo. Vol. III, 75:12 – 16.)

According to the share certificates in evidence, Sidle Media is owned by Oh Well Media and Torque Asset Management in equal parts. (Ex. 1673.125 – 126.) And, as already explained, Pratt owns Oh Well Media. Wolfe owns Torque Asset Management. (Ex. 1673.136.)

Bubblegum Films appears to have transferred rights in GDT videos to Sidle Media on November 6, 2015. (Ex. 3283.) BLL Media also transferred assets to Sidle Media. (Ex. 3320.6 – 10 [Assignment of Assets dated Oct. 20, 2015].)

There is no evidence that any consideration was provided in these transactions, nor any evidence showing a legitimate reason for the transfer.[63] While Wolfe agreed that he and Pratt indirectly own the entity that holds the rights to the girlsdotoys.com domain, M1M Media, that

---

[63] Pratt testified that he does not know what Bubblegum Films received in exchange for transferring the rights to these videos to Sidle Media, if anything. (Pratt Depo. Vol. I, 265:18-266:4.) Defendants have produced no evidence that any consideration was given to anyone in this transaction. Pratt testified he has "no idea" why Bubblegum Films transferred the rights of the videos produced for GirlsDoToys to Sidle Media. (Pratt Depo. Vol. I, 256:14-257:4.) Furthermore, this transaction appears to be effectuated by "C. Pane" who signed the assignment agreement as a director of Bubblegum Films, however, Pratt testified he had never heard of Mr. Pane and had no idea who he was. (*Id.* at 260:8-13, 261:22-262:4; 28:15 – 25 [testifying he has heard of Charles Pane as part of this lawsuit but never met him or talked to him and in no other context].) Pratt attempted to explain, saying "it was either a mistake or it was overlooked[.]" (*Id.* at 263:17-22.) Wolfe has heard of Charles Pane but never spoken to him.

-121-

**STATEMENT OF DECISION**

1  Pratt owns Bubblegum Films, and that Pratt apparently transferred the rights of the domain to Sidle

2  Media, Wolfe did not receive anything for allowing that domain to be transferred because "[i]t was

3  never my domain. . . . It was always intended to be Sidle Media's." (10/7/19 37:5 – 24.) Again,

4  Wolfe cites "problems, issues, miscommunications, all that kind of stuff." (*Id.* at 38:1 – 3.) Wolfe

5  claims M1M Media has a license agreement with Sidle Media to market GDT videos, but again, no

6  such agreement has been produced in trial. (10/3/19 Trial Tr. 105:27 – 106:10.)

7        In light of this evidence, the Court finds that Pratt and Wolfe, though a series of shell

8  companies, wholly own and control this entity.

9        ***Torque Asset Management Limited*** is yet another entity for which Defendants deny

10  ownership and knowledge. Wolfe claims he does not own Torque Asset Management. (10/3/19

11  Trial. Tr. 104:16 – 105:4.) Yet Wolfe's name appears on share certificates of Torque Asset

12  Management as the sole shareholder. (Ex. 1673.136.)

13                ***3.   Defendants Created Domi Publications, LLC to Claim that***

14                    ***MomPOV.com is Separate from the Other Websites***

15        ***Domi Publications, LLC***, co-owned by Pratt and Wiederhold, was formed in February

16  2015. (Pratt Depo. Vol. 1, 42:22 – 43:6.) Domi runs the website MomPOV.com. (*Id.* at 43:15 – 21.)

17  Pratt owned 50% interest in Domi until the middle of trial. (Pratt Depo. Vol. 1, 254:20 – 24.)

18                *a.   Defendants Operate MomPOV.com Using the Same Business*

19                     *Practices as the Other Websites*

20        The evidence at trial demonstrates that Defendants used similar business practices to operate

21  all three websites. Recruiting for all three websites starts with advertisements for modeling being

22  posted on Craigslist and filming the videos takes place in hotel rooms. (Ex. 1511.52–53.)

23        According to the testimony of Myrna Jeffrey, Domi uses similar business practices to recruit

24  women to appear on MomPOV.  Ms. Jeffrey testified that she responded to a Craigslist ad for

25  modeling that did not mention pornography. (11/719 Trial Tr. 94:5 – 8; 96:14 – 15.) Ms. Jeffrey

26  testified that she received an email from "James Chamberlain" (Wiederhold's alias [*Id.* at 97:4 –

27  10]) that revealed the job was for an adult video and stated, "You won't find a more professional

28  and legit person/company." (*Id.* at 98:5; Ex. 5418.)  Over the phone, Wiederhold told Ms. Jeffrey

STATEMENT OF DECISION

1    that the video would only be released in foreign countries, not the United States." (11/7/19 Trial Tr.

2    100:24 – 101:2; 103:7 – 8.) As in the recruiting process for GirlsDoPorn and GirlsDoToys,

3    Wiederhold never mentioned the website MomPOV.com (*Id.* at 103:25–104:1) and told Ms. Jeffrey

4    that the video would not be released online. (*Id.* at 103:11 – 13.)

5        As in the shoots for GirlsDoPorn, Wiederhold rushed Ms. Jeffrey to sign documents

6    quickly, at the last minute, just prior to starting the shoot. (*Id.* at 102:23 – 24.) Wiederhold

7    represented to Ms. Jeffrey that she would receive $1,500 for doing a single video, but after the

8    video was finished, he informed her that she was expected to do a second video to earn the $1,500.

9    (*Id.* at 101:17–102:5; 104:25–105:14; 105:4–19; 106:5–13; 107:6 – 108:10.)  Finally, when Ms.

10   Jeffrey discovered the video was online, she contacted Wiederhold, begging him to remove it. (*Id.*

11   at 112:4–15.) Like Pratt, Wolfe, and Garcia, his response was, "Sorry, there's nothing I can do" and

12   hung up on her. (*Id.* at 112:24–113:2.)

13       The Court concludes that MomPOV's business and recruiting practices are indicative of a

14   common modus operandi between MomPOV and Girls Do Porn. The Court finds that they involve

15   common ownership and personnel and constitute a single business enterprise.

16                    *b.   Domi Publications, LLC and BLL Media, Inc. were*

17                         *Commingled Until Very Recently*

18       Many of the assets used in the operation of Defendants' three pornographic websites are

19   commingled or were commingled during the relevant time period. Though Domi has attempted to

20   separate out the assets related to the operations of MomPOV.com (which was launched in 2011 and

21   existed under the Bubblegum Films/BLL Media umbrella for several years) in an effort to claim

22   that it is entirely separate from GirlsDoPorn and GirlsDoToys, most of this effort came long after

23   Domi was formed on February 20, 2015. (Ex. 5003.1-4.) It is not until 2018 that most of the assets

24   related to MomPOV were actually severed from those of the rest of the enterprise.

25       The MOMPOV.COM trademark was originally registered by BLL Media Holdings, LLC on

26   July 29, 2014. (Ex. 5001.9.) It was not until January 27, 2018 (1.5 years after this lawsuit began)

27   that the trademark was transferred to Domi Publications. (Ex. 5001.3.)

28

**STATEMENT OF DECISION**

1    According to the GoDaddy records in evidence, the MomPOV.com domain was first held

2    by Wiederhold's personal account starting April 13, 2010.[64] (Ex. 1744.1–2.) Records show the

3    domain in Pratt's BLL Media account in January 2013. (See Ex. 1744.98.) On April 25, 2017,

4    Weiderhold created a new account in his own name but using "domipublications" as the username.

5    (Ex. 1744.541.) On February 7, 2018, the domain was finally transferred from Pratt's account into

6    the account Wiederhold created for "domipublications.com." (Ex. 1744.547; 1744.693.)

7    .    The only account that the record shows was segregated in a timely manner after Domi was

8    formed is the CCBill account for credit card payment processing. The payments for subscriptions to

9    MomPOV were processed through the same CCBill account until March 31, 2015 when

10   Wiederhold created a separate account for Domi. (Ex. 5004.2; Wiederhold Depo. 57:6-58:15,

11   110:7-112.9 [previously, MomPOV and GirlsDoPorn each had a sub-account in the CCBill account

12   owned by Pratt].)

13       Ms. Moser testified that at the BLL Media offices, credit cards for different companies were

14   "strewn around" and that she recalls holding a debit card for Domi Publications at one time. (*Id.* at

15   18:3 – 19:9.)

16       Defendants have joint defense agreement and have asserted a common interest privilege.

17   (10/3/19 Trial Tr. 31:24 – 28.) And, all Defendants were jointly represented by the same law firm

18   in this lawsuit until October 19, 2016, with managing agents of each entity presumably consenting

19   to the joint representations. (ROA No. 52.)

20       Most of the entities list the same address on documentation, which is not a place of

21   operation but just a P.O. Box. (See, e.g., Pratt Depo. Vol. 1, 41:22 – 42:13 [EG Publications lists

22   113 West G Street, Suite 123, San Diego, California as its address. But Pratt explains, "[t]hat's just

23   our P.O. Box. I mean it is probably the mailing address, but we didn't operate out of there." Instead,

24   the entity "probably" operated out of 1620 Fifth Avenue, Suite 675, San Diego, California].

25

26

27       [64] The account also holds or held many domains clearly related to GirlsDoPorn, such as
REALGIRLSDOPORN.COM, GIRLSDOPORNPICS.COM, GDPBLOG.COM,

28   GIRLSDOPORNFREE.COM, and GDPGIFS.COM (both before and after Domi Publications came into
existence). (Ex. 1744.1–15.)

-124-

**STATEMENT OF DECISION**

1    As late as 2017, both GirlsDoPorn and MomPOV listed the same Custodian of Records—

2    BUBBLEGUMFILMS INC in Vanuatu—on their websites in compliance with 18 U.S.C. § 2257.

3    (Ex. 365.2 [GirlsDoPorn.com]; Ex. 1573 [MomPOV.com].).

4    Until Wiederhold moved to Las Vegas in 2014, MomPOV was run out of the same offices

5    as GirlsDoPorn.  Approximately 100 of MomPOV.com's videos were shot in San Diego.

6    (Wiederhold Depo. 368:21 – 369:15.)

7    Based on this evidence, the Court determines that MomPOV and Domi were substantially

8    intertwined with Defendants' various GDP entities as part of a common pornography enterprise.

9                        *c.   Domi Publications, LLC is a Continuation of the Entity that*

10                             *Previously Operated MomPOV.com*

11    The issue of who "owned" MomPOV at any given time was contested at trial.  The position

12    taken by Defendants at trial was essentially that, prior to the formation of Domi, MomPOV was

13    owned by an informal "joint partnership" between Pratt and Wiederhold that was never reduced to

14    writing or formalized in any way. (Wiederhold Depo. 41:1-20; Wolfe Depo. as PMQ of BLL

15    Media, Inc., Vol. II, 311:17 – 312:20.)

16    However, much of the other evidence discussed above indicates that MomPOV was, for all

17    intents and purposes, owned and controlled by Pratt's BLL Media/Bubblegum Films/Clockwork

18    Productions enterprise. (see Wolfe Depo. Vol. II, 311:17 – 312:21 [Wolfe, as PMQ for BLL Media,

19    Inc. (and all other entities aside from Domi) testifying that "MomPOV may have been under BLL

20    Media"].)

21    The Court need not decide precisely who owned MomPOV prior to the formation of Domi

22    Publications because the Court finds that all Defendants, including Domi Publications, are alter

23    egos of each other and otherwise jointly and severally liable for all harms suffered by Plaintiffs.

24    Even if the transfer of assets from the purported joint venture was categorized as a sale of assets,

25    the evidence indicates that Domi was a mere continuation of the existing enterprise to produce

26    videos for and to market and sell subscriptions to MomPOV.com. The joint venture did not receive

27    any consideration for the transfers of its assets. Notably, many of these transfers did not occur until

28

**STATEMENT OF DECISION**

**EXH. 1 - 125**

1    three years after Domi was incorporated and well after this lawsuit was filed. This includes the

2    transfer of the MomPOV trademark and domain name to Domi Publications in 2018.

3         Whether Pratt's ownership stake in MomPOV prior to Domi was as an individual or as one

4    half of a "joint partnership" is of no moment because Pratt has always been at the center of the joint

5    venture and undisputedly was entitled to 50% of the profits generated by MomPOV at all times.

6         Douglas Wiederhold is not a defendant in this case. The Court finds that Wiederhold's

7    conduct as an employee of Defendant Bubblegum Films, Clockwork Productions, Inc., and

8    Defendant BLL Media (from 2007 to 2015) and his conduct as 50% owner and primary manager of

9    Defendant Domi Publications (from 2015 to the present) is evidence of alter ego among all

10   Defendants.

11              *d.   Defendants Use Affiliate Marketing to Cross Advertise for the*

12                    *Benefit of All of Pratt's Websites*

13        Defendants employ "affiliate marketing" services offered by CCBill, Defendants' credit

14   card payment processor, to advertise for and increase web-traffic to their subscription websites. By

15   participating in CCBill's affiliate program, Defendants pay a commission to third parties each time

16   an internet user purchases a subscription on one of Defendants' websites after following a link from

17   that third party's affiliate site.[65] When CCBill processes a subscription fee that originated from an

18   affiliate site, CCBill sends half of the fee to the affiliate site and half to Defendants' account.[66] It is

19   undisputed that affiliate advertising increases traffic to Defendants' websites and the number of

20   subscriptions sold.[67]

21

22

23

24

---

25        [65] (10/2/19 Trial Tr. 187-189 [Wolfe describing "the affiliate marketing model"].)

26        [66] (Pratt Depo. Vol. I, 78:12-79:2; Vol. II, 397:12-24; Vol. III, 130:9-132:8.)

27        [67] When asked about why Domi had not attempted to remove a link that said "MomPOV" on an
     affiliate site, Wiederhold stated, "I'll take all the links I can get. [] Q: You'll take all the links you can get
28   why? A. It's traffic. Q. Okay and how does that benefit Domi Publications? A. More traffic, more sales."
     (Wiederhold Depo. 261:6-12.)

-126-

**STATEMENT OF DECISION**

Typically, affiliate websites contain pictures or video clips of Defendants' content, including images and videos of the Plaintiffs.[68] Defendants permit affiliate sites to partially display their content provided they include links to Defendants' websites.[69] Simply put, Defendants pay hundreds of thousands of dollars in commissions each year to affiliate sites for advertising and directing internet traffic to Defendants' websites in order to increase subscription sales.[70]

While Wolfe, Wiederhold, and Walters[71] all testified that they "couldn't control" their affiliates, the Court is not persuaded.[72] Defendants can remove an affiliate from its affiliate

[68] (10/2/19 Trial Tr. 189:14-18 ["Q. Okay. But the purpose of the affiliate marketing model is that users can go see three to five-minute clips of videos that then act as advertisement for the subscription site? [Wolfe]. As a summary, I believe so, yeah."].)

[69] (See 10/7/19 Trial Tr. 101:2-24; 10/2/19 Trial Tr. 197:1-7 ["Q. GirlsDoPorn allows third parties to publish clips of their videos so long as the clips direct traffic to girlsdoporn.com? [...] [Wolfe]: As -- as an affiliate, yeah."].)

[70] (10/3/19 Trial Tr. 17:7-19:25 [Wolfe testifying that BLL Media Inc. paid approximately $477,000 in affiliate referral fees in 2016]; Ex. 1210.12.) BLL Media Inc.'s profit and loss statement for 2013 shows the company paid $253,073.38 for "Affiliate Referral Fee[s]" and an additional $110,659.73 for "Advertising and Promotion." (Ex. 1210.2.) The statement for 2014 shows $363,228.79 for "Affiliate Referral Fee[s]" and $215,173.48 paid for "Advertising and Promotion." (Ex. 1210.6.) In 2015, BLL Media, Inc. paid $455,548.62 in "Affiliate Referral Fee[s]" and $95,456.64 for "Advertising and Promotion." (Ex. 1210.9.) In 2016, BLL Media, Inc. paid $477,159.11 in Affiliate Referral Fees and $75,181.09 for Advertising and Promotion. (Ex. 1210.12.)

Pratt estimated that 300-500 affiliates had signed up to promote GirlsDoPorn.com over the years. (Pratt Depo. Vol. I, 77:13-17.)

[71] Defendants' expert, Lawrence Walters, Esq., testified that "pay sites have no ability generally to know even who their affiliates are or what particular websites are being used to promote the pay sites[.]" (Walters Depo. 84:1-4.) This statement, however, is contrary to the testimony of Wiederhold and Wolfe. (See infra notes 72-79.) The statement is also undermined by Walters' further testimony that pay sites "have no incentive to identify the promotional tools that are being used by affiliates; that they are focused on revenue generation and on traffic. And in the absence of something like a Complaint or some indicia of fraud or something unusual with the revenue that's being sent to the pay site, that there would - - based on industry standards - - be no reason for pay sites to monitor or control or even know about the activities of the third-party affiliates." (Walters Depo. 83:21-84:13.) While the Court does not doubt that members of the industry typically make little to no effort to exercise any control over affiliates, the evidence does not support a finding that a pay site is *unable* to do so.

[72] (See Wiederhold Depo. 346:15-17 ["There's like a separate affiliate report and then spectrum updates, sales, check amounts."]; 348:6-12 ["Q: On the separate affiliate report that we are discussing, does it provide the amount of money that CCBill has paid out to those separate affiliates? A: I believe so."]; 356:14-15 ["As pertaining to traffic incoming to MomPOV.com, that I am able to look up the analytics."]; 227:25-228:2 ["There's internal analytics, we can see the stats or sales generated by outside parties and [CCBill] pay them and they pay us what's left over."].) Defendants received regular reports from CCBill showing revenues generated by subscriptions. (Pratt Depo. Vol. I, 85:4-22.) CCBill tracks the URL that links the subscriber to GirlsDoPorn.com for each subscription sold, so one could, for example, determine how many purchases stemmed from any particular video on Pornhub. (Pratt Depo. Vol. II, 424:2-25:22.)

-127-

**STATEMENT OF DECISION**

1   program through CCBill, thereby eliminating any incentive for the affiliate to continue advertising

2   for Defendants.[73]  Defendants have de-affiliated from such websites in the past.[74]  Defendants can

3   and have used DMCA takedown requests to stop third party websites from using their content.[75]

4   Finally, Defendants can enforce their ownership rights against an affiliate by suing for trademark or

5   copyright infringement for use of material owned by Defendants.  The fact is, Defendants *choose*

6   not to exercise control over their affiliates because the affiliates are providing a valuable service by

7   directing web traffic to Defendants' websites.[76]

8           Some of the affiliate sites displaying Plaintiffs' images link to GirlsDoPorn.com, some link

9   to MomPOV.com, and some cross-advertise by linking to both websites. (See Exs. 1525 [Girls-Do-

10   Porn.com]; 1746 [Imagepost.com].)  One site, Girls-Do-Porn.com, was a dedicated affiliate site for

11   GirlsDoPorn.com in that it exclusively shows images of GirlsDoPorn models, including all of the

12   Plaintiffs with the exception of Jane Does 4 and 8. (Ex. 1525.)  Both Pratt and Wolfe were aware of

13   this affiliate site. (Pratt Depo. Vol. [Dec. 6, 2018] 212:14 – 18; 10/7/19 Trial Tr. 87:23 – 25; 102:22

14   – 103:6.)[77] Girls-Do-Porn.com contained links to GirlsDoPorn as well as other pornographic

15   websites, including a link that says "MomPOV" (Ex. 1525), which links to MomPOV.net—a

16   dedicated affiliate site for MomPOV.com containing content from, advertisements for, and links to

17

18

19   [73] (10/2/19 Trial Tr. 191:19-25 ["Q. If one of these registered affiliates used GirlsDoPorn content on
     its affiliate website and then directed traffic to some other porn site, would BLL Media send a DMCA
     request, telling them to stop using the content that BLL Media has the right to? [Wolfe]. I believe so, and
20   we'd probably delete your affiliate account too."]; 196:23-197:4 ["Q. But BLL Media had the ability to close
     those accounts? [Wolfe]: By either BLL Media or CCBILL, correct."].)

21   [74] "Q. To your knowledge, as the PMQ of BLL Media and its DMCA processes, has BLL Media,
22   Inc., ever had a complaint that it sent to a third-party affiliate website for the way it was using its content?
     [...] [A]: I believe there has been, but I can't recall of anything specific. But I believe so. There's definitely
23   been affiliate accounts closed, but I don't recall the reason." (10/3/19 Trial Tr. 195:26-196:13.)

24   [75] Wolfe testified, "If somebody - - if anybody took our content and put a link to a different website
     on our content, then yes, we would DMCA them." (10/7/19 Trial Tr. 101:27-102:8.)

25   [76] "Q. And in discussing this person's use of MomPov.net, you and Mike determined that it was
     beneficial to Domi Publications so you would allow him to continue to do it? [...] A. It was [...] sending us
26   traffic, so as long as it was helping us... it was something we were willing to let go for the time being. [...]
     Q. Because it generated subscribers for Domi Publications? A. Yes." (Wiederhold Depo. 237:14-238:2.)

27   [77] Regarding girls-do-porn.com, Wolfe testified, "I believe there's a small ad on the ... on the right-
28   hand side of the web page using content that comes from MomPov.com, and I believe if you click that ad, it
     goes to MomPov.net, as far as I remember." (10/7/19 Trial Tr. 107:27-108:3.)

-128-

**STATEMENT OF DECISION**

1  MomPOV.com, along with a link to GirlsDoPorn.com. (Ex. 1532.) Wiederhold testified that he was

2  aware of MomPOV.net and even considered taking action against it but decided not to do so

3  because it directed traffic to MomPOV.com and therefore provided a net benefit.[78]

4      At trial, no documentation related to Defendants' Affiliate Program with CCBill was

5  produced,[79] so there was no evidence to show how much of Defendants' revenue is derived from a

6  particular Affiliate. Pratt testified that the affiliate Forum.DoPorn generated approximately $5,000

7  in sales per week and received $2,500 per week in affiliate fees. (Pratt Depo. Vol. III, 127:5 – 9.)

8                  ***4.   Defendants' Managers and Employees Provide Services for All***

9                    ***Three Websites and Transactions are Not Arms-Length***

10  The entities in Defendants' pornography enterprise share common employees.

11  ***Pratt*** supervises and manages every aspect of the production, publication, and advertising of

12  videos for GirlsDoPorn.com since the website launched in 2007. (Pratt Depo. Vol. II, 51:4 – 52:19.)

13  Pratt has also co-managed all operations related to GirlsDoToys.com.  (10/2/19 Trial Tr. 202:9 –

14  203:18.)  Pratt was involved in the operation of MomPOV when it first launched in 2010 and Pratt

15  paid all production costs for MomPOV until 2014. (Wiederhold Depo. 51:2-14.) Now, although

16  Pratt draws a salary from Domi, he provides no services to Domi. (Pratt Depo. Vol. I, 254:3 –

17  255:5; Vol. III, 35:18 – 36:6.)

18  ***Wolfe*** began providing services to Pratt in 2011. (10/2/19 Trial Tr. 9:6 – 9.) He provides

19  BLL Media, Inc. with "consulting services" through Merro Media and "marketing" services

20  through Hayst Holdings. (10/2/19 Trial Tr. 25:13 – 26:2.) He handles various aspects of business

21  operations and payroll for Defendants. (Pratt Depo. Vol. I, 52:20 – 53:4, 234:13 – 235:15.) Wolfe

22

23      [78] When asked about MomPOV.net, Weiderhold stated, "…the first time I found out about it I
24  wasn't too happy and I did consult Mike about it." Mike's take was, "As long as they're sending us traffic,
   it's a win-win." (Wiederhold Depo. 234:1-9.)

25      [79] Wiederhold testified that he could easily find out how many affiliate sites were promoting
26  MomPOV.com at a given time and what percentage of the revenue came from a particular affiliate (or
   affiliates in general) but has not done so. (Wiederhold Depo. 305:14-306:3 ["Q. Does CCBill have a portal
27  that you can access to see how many transactions that it's done for your – your website? A. Yes. Q. It has a
   running ledger of all the transactions? A. Yes. Q. Does it also provide a breakdown of when an affiliate
28  payment is being made with regard to a transaction that's made? [objection] A. I believe all the analytics
   outlines pretty much all of the transactions and where they go and who they came from."].)

-129-

**STATEMENT OF DECISION**

1  co-managed the operations of GirlsDoToys.com. (10/2/19 Trial Tr. 202:9 – 203:18.) Wolfe was

2  produced as the PMQ for BLL Media's operations. (10/2/19 Trial Tr. 88:1 – 7.)

3          The record indicates that Wolfe has provided numerous services for Domi Publications or

4  MomPOV.com. (Wolfe Depo. Vol. II, 150:1 – 151:20 [Wolfe testifying that he helped troubleshoot

5  issues with the MomPOV.com website].) Wiederhold testified that Wolfe provided administrative

6  services, including handling billing issues, for MomPOV.com "off and on from the beginning" and

7  that Domi has never paid him for any of those services. Wiederhold testified "if it's Michael's

8  responsibility and he didn't want to do it, he would just have Matt do it." Wiederhold Depo. 46:17-

9  48:14.

10         *Garcia* is the male performer and casting director for GirlsDoPorn. (Pratt Depo. Vol. II,

11  54:1 – 3.) Garcia's casting services also provide GirlsDoToys with female models to shoot.

12         *Wiederhold* worked with Pratt to produce videos for GirlsDoPorn.com since the site

13  launched until early 2012. (Wiederhold Depo. 106:9-22.) He was an employee on BLL Media,

14  Inc.'s payroll until July 2015. (Ex. 1677.446.)  Wiederhold was listed as a "Director" for

15  Clockwork Productions, Inc. (Ex. 1660.8) and signed a CCBill contract on behalf of that entity.

16  (Ex. 1511.441.) Wiederhold and Pratt began producing content for MomPOV in 2010, they built

17  the website together, and then the website launched in 2011. Wiederhold runs the majority of the

18  day-to-day operations for MomPOV.

19         *Moser* worked for BLL Media as an administrative assistant starting in March 2015.

20  (9/20/19 Trial Tr. 61:14 – 19.) She organized contracts, receipts, and expenses, and performed

21  QuickBooks and payroll. (*Id.* at 62:24 – 63:4.) She testified that she recalls doing some work for

22  Domi Publications for which she was not separately paid.  (9/23/19 Trial Tr. 175:16 – 176:5 [she

23  sent Wiederhold a bill but never followed up because "Matt said to let it go."].) Ms. Moser also

24  testified that when Wolfe created for her a diagram of all Defendants' relevant entities, he included

25  Domi Publications. (9/20/19 Trial Tr. 103:16 – 24.)

26         *Gyi* worked for BLL Media from November 2015 through April or May 2017 as a camera

27  operator shooting videos for GirlsDoPorn and GirlsDoToys. (8/29/19 Trial Tr. 73:10 – 22.) He

28  recalls creating a highlight reel for MomPOV.com and uploading it to the various tube sites. (*Id.* at

**STATEMENT OF DECISION**

1   108:18 – 109:6.)  He used equipment owned by BLL Media to perform this task and was paid by

2   BLL Media for the time he spent.  (*Id.* at 109:25 – 110:4.)

3        ***Alex Martinez*** performs DMCA takedown services for GirlsDoPorn and MomPOV.

4   (Deposition of Alex Martinez, April 17, 2018, at 187-191.) Martinez testified "it wasn't anything

5   different. It was Mom POV and Girlsdoporn, I would just submit them the same. I wasn't doing

6   anything different." (*Id.* at 190:1-3.)  Pratt instructed him to perform DMCA takedown services for

7   Mom POV. (*Id.* at 190:21-191:1.) He confirmed that he was paid exclusively by BLL Media and

8   had never heard of Domi Publications. (*Id.* at 190:15-20.) Martinez testified that he used the same

9   form prepared by BLL Media to submit take-down requests for both GirlsDoPorn and for

10  MomPOV.com. (*Id* at 191:9-18.)

11       The BLL Media ledger shows payments made to Domi employees after Domi was formed.

12  For example, BLL Media paid Ryan Somavia and Doug Wiederhold "Wages" as late as July 2,

13  2015. (Ex. 1677.446.) BLL Media paid MomPOV models as well, specifically Tara Burns who

14  testified at trial. (Ex. 1677.13, .219, .314, .503, .508, .558, .561 [payments to Tara Burns as late as

15  May 11, 2015]; Ex. 1677.14 [payment to Nicole Doucette 2013].)

16       In addition to the services that the entities provide each other free of charge, the record

17  contains several examples of transactions lacking consideration. In instances where there was a

18  services agreement among two or more entities, the individuals behind the entities were often on

19  both sides of the transaction. For example, as Wolfe testified, when BLL Media, Inc. provided

20  DMCA takedown services for Domi Publications, *if* BLL Media was charging Domi pursuant to a

21  contract, then Pratt and Wiederhold would have been the ones to negotiate the terms.

22       On June 2, 2015, BLL Media, Inc. assigned filming equipment to Domi, including two

23  cameras, two lenses, one hard drive, and four lights. (Ex. 1511.424.) There is no evidence of

24  consideration for this assignment. Wiederhold did not recall whether anything was paid and did not

25  recall negotiating a price.

26       Pratt testified that he performed no services for Domi Publications at all, but he received

27  $19,000 to $20,000 per month in salary from that company. (Pratt Depo. Vol. III, 35:18 – 20; 101:2

28

**STATEMENT OF DECISION**

1  – 4.) Finally, Pratt transferred his 50% interest in Domi after the trial began, and there is no

2  evidence in the record to establish that consideration was given. (10/3/19 Trial Tr. 26:24 – 27:9.)

3    What this all means can be distilled as follows: Defendants ran a web of interrelated entities

4  without observing corporate separation or formalities and with Pratt and a handful of individuals

5  under him running the show as a common enterprise. Assets and employees were interchangeable

6  and shuffled between the entities without consideration.

7        **5.  *The Record Shows Pratt's Intent to Use the Entities to Escape***

8           ***Liability and Protect his Assets***

9    Defendants have provided no valid business-related explanation for their transfers of

10  valuable assets to entities in located in Vanuatu in the face of evidence suggesting that the assets

11  were transferred in order to place them beyond the reach of any creditors. The Court is not

12  persuaded by Defendants' claim that these transfers were effectuated to fix "mistakes" in the

13  "corporate structure" and that "this is how it was supposed to be all along."

14    Wolfe conceded that he wired funds from BLL Media to Vanuatu using his company Hayst

15  Holdings. (10/2/19 Trial Tr. 66:6 – 67:16.) These payments were made to Melanesian Business

16  Executive Corporate Services (MBECS) (10/2/19 Trial Tr. 39:17 – 41:2), yet Wolfe claims he does

17  not know anyone who works there and does not know whether he emailed with anyone. (10/2/19

18  Trial Tr. 41:3 – 42:11.)[80]

19    Wolfe claims these payments are pursuant to the license agreement between BLL Media and

20  Oh Well Media—the license agreement was not produced at trial.  (10/2/19 Trial Tr. 64:3 – 66:15.)

21  Plaintiffs, on the other hand, assert that these payments were made to Melanesian Business

22  Corporate Services to keep the Vanuatu entities open. (10/3/19 Trial Tr. 96:24 – 97:3; 104:16 – 19.)

23    That Defendants' web of offshore entities was created to escape liability is bolstered by a

24  laundry list of other actions. Pratt sold his house and his car to ensure, in his words, "the models

25

26

27    [80] The record contains communications between Wolfe, Holloway, Probin, and several individuals

28  apparently working for MBECS. (10/2/19 Trial Tr. 67:17 – 71:17.) Some of these emails were apparently
sent from Kevin Holloway's email but were signed "Cheers, Lindsay." (*Id.* at 60:9 – 21.)

**STATEMENT OF DECISION**

1  won't get a dime." (09/23/19 Trial Tr. at 60:15 – 19 [Moser also testified that Pratt asked her to

2  destroy documents for the same purpose].)

3      Pratt filed bankruptcy in January 2019.  (09/23/19 Trial Tr. at 65:13 – 18) Pratt admitted in

4  his third deposition that his bankruptcy schedules stated—under penalty of perjury—that all of his

5  companies had a net worth of zero. (Pratt Depo. Vol. III, 83:24 – 84:23 [BLL Media, Inc., EG

6  Publications, and M1M Media have no reasonable value]; 108:10 – 109:10 [Domi has a value of

7  $0].) Pratt voluntarily dismissed the bankruptcy approximately one month after filing.

8      Through counsel, Pratt was served with a notice to appear. Yet when Plaintiffs sought to call

9  him to testify, Pratt's counsel announced that he had left the country around the beginning of trial

10  but counsel did not know his whereabouts. Wolfe testified that Pratt was "on holiday" but also did

11  not know his location. (10/01/19 Trial Tr. at 209:19 – 211:16.) In light of Pratt's failure to appear,

12  this Court issued an arrest warrant, but he never appeared.

13      According to Wolfe's testimony and Defendants' counsel, Pratt, presumably after he left the

14  country, transferred his interest in Domi Publications. At trial, Defendants produced neither an

15  agreement evidencing this transfer nor evidence of consideration Pratt received.

16  **III.   LEGAL AUTHORITIES AND FINDINGS**

17      **A. Defendants are Liable for Fraud or Deceit**

18      California law permits a person injured by fraud to seek damages: "One who willfully

19  deceives another with intent to induce him to alter his position to his injury or risk, is liable for any

20  damage which he thereby suffers." (Civ. Code § 1709.) The California Civil Code identifies four

21  species of fraud or deceit that can form the basis of a cause of action:

22

23      1. The suggestion, as a fact, of that which is not true, by one who
   does not believe it to be true;

24      2. The assertion, as a fact, of that which is not true, by one who has
   no reasonable ground for believing it to be true;

25      3. The suppression of a fact, by one who is bound to disclose it, or
   who gives information of other facts which are likely to mislead for

26      want of communication of that fact; or,
   4. A promise, made without any intention of performing it.

27

28

-133-

**STATEMENT OF DECISION**

1  (Civ. Code § 1710.)  Plaintiffs assert four causes of action that sound in fraud or deceit: Intentional

2  Misrepresentation (First Cause of Action); Fraudulent Concealment (Second Cause of Action);

3  False Promise (Third Cause of Action); and Negligent Misrepresentation (Fourth Cause of Action).

4  The Court finds Defendants are liable on each of these claims.

5                        *i.  Defendants Misrepresented Material Facts*

6           An action for deceit can be based upon "[t]he suggestion, as a fact, of that which is not true,

7  by one who does not believe it to be true; or [t]he assertion, as a fact, of that which is not true, by

8  one who has no reasonable ground for believing it to be true[.]" (Civ. Code § 1710, subd. (1), (2).)

9           "The fact represented or suppressed, allegedly constituting fraud, is deemed material if it

10  relates to a matter of substance and directly affects the purpose of the party deceived in entering

11  into the contract." (*Thomas v. Hawkins* (1950) 96 Cal.App.2d 377.) "What the parties deem

12  material will be accepted by the courts as such." (*Ashburn v. Miller* (1958) 161 Cal.App.2d 71, 79

13  citing Rest. of Torts, § 538, p. 86; Prosser on Torts (2d Ed.), p. 555.) "A misrepresentation is

14  judged to be material if a reasonable man would attach importance to its existence or nonexistence

15  in determining his choice of action in the transaction in question." (*Engalla v. Permanente Med.

16  Grp., Inc.* (1997) 15 Cal. 4th 951, 977.)

17           Here, as set forth above, there is ample evidence that Defendants and their agents

18  deliberately misrepresented material facts to each Plaintiff, namely: (a) that her video would not be

19  posted on the internet or made available in the United States; (b) that it would only be sold on DVD

20  in limited overseas venues (such as direct sale to a private collector in Australia); (c) that her name

21  and personal information would be protected; and (d) that Defendants had never had an issue with

22  models' videos or identities coming to light—it simply had never happened.

23           Defendants clearly knew that these representations were false. Defendants were also plainly

24  aware that the misrepresented facts were material: most prospective models, including the Plaintiffs

25  here, specifically expressed their concerns about distribution. In fact, Defendants' entire

26  recruitment model and efforts, from the initial advertisement through filming and post-production,

27  were designed to assuage these concerns through false information and deception. Accordingly, the

28  Court concludes that Defendants' conduct was intentional.

### ii. Defendants Concealed Material Facts

"The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact" constitutes actual fraud. (Civ. Code § 1710, subd. (3); 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 678.) The trial record establishes that Defendants did not disclose the following facts to Plaintiffs:

(1) that Defendants own the subscription websites GirlsDoPorn.com and GirlsDoToys.com, which have more than 15,000 subscribers, and that the videos are posted on these sites;
(2) that Defendants have always only published videos online (never on a DVD);
(3) that Defendants use affiliate marketing and other advertising strategies to maximize public exposure and viewership of their videos and increase traffic to their websites;
(4) that Defendants routinely publish 5- to 7-minute clips of their videos on popular free websites such as Pornhub.com, YouPorn.com, and XVideo.com;
(5) that numerous websites host forums on which anonymous users identify women who film pornographic videos, and then find and post their names, personal information, pictures, and social medial links;
(6) that many women who have filmed a video with Defendants have been identified on these websites and that there are multiple running lists of Defendants' models' names linked to the episode numbers of their videos;
(7) that many women who filmed with Defendants later complained about being harassed after their videos were released online, including their videos being sent directly to their family and friends;
(8) that Defendants routinely decline to take any action to protect the names and personal information of their models, have no intention of doing so, and indeed directly profit from disseminating the models' identities to their relations, friends, and to the public;
(9) that the agreed-upon amount of pay for filming a video was subject to change at Defendants' sole discretion upon a model's arrival in San Diego, and may be reduced by hundreds or thousands of dollars; and
(10) that Plaintiffs' faces would be clearly visible during the video, but that the male actor's face would never appear in the video.

An affirmative duty to disclose may arise under several circumstances. Such duty can arise "when the defendant had exclusive knowledge of material facts not known to the plaintiff [and] when the defendant actively conceals a material fact from the plaintiff. . . ." (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336 [quoting *Heliotis v. Schuman* (1986) 181 Cal.App.3d 646, 651].)[81] "[A] disparity in knowledge may impose an affirmative duty of disclosure" on the party

---

[81] Section 551(2) of the Restatement (Second) of Torts, provides: "(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated... (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

-135-

1    with superior knowledge. (*Butcher v. Truck Ins. Exch.* (2000) 77 Cal. App. 4th 1442, 1464–65.)[82]

2    Moreover, a party which undertakes to disclose or provide information cannot do so in a selective,

3    self-serving manner: It must disclose enough information so that its representations are accurate and

4    not misleading.

5         Defendants' affirmative duty to disclose these facts arises due to Defendants' far superior

6    and exclusive knowledge of the adult entertainment industry and their own business strategies and

7    practices. Defendants knew that Plaintiffs were young (Defendants recruit and only consider

8    women between ages 18 and 22) and had no experience in the adult entertainment industry (it is

9    Defendants' practice to only hire women who have never appeared in a pornographic video before).

10   At the time they were recruited by Defendants, Plaintiffs could not have known which websites

11   Defendants own and operate because Defendants maintained a business policy and practice of never

12   disclosing that information. Plaintiffs could not have known that Defendants intended to publish

13   and aggressively market the video on dozens of websites in an effort to maximize viewership

14   because Defendants told Plaintiffs an entirely different story and hired reference women to confirm

15   the cover story. Plaintiffs all testified that, prior to filming, they had never heard of PornWikiLeaks

16   and had no idea that such websites existed and targeted women who filmed videos with Defendants.

17   Defendants were aware of these websites and knew exactly what occurred on them. Defendants

18   were aware of their superior knowledge with respect to the Plaintiffs and deliberately exploited that

19   disparity to the Plaintiffs' detriment.

20        An affirmative duty to disclose also arises "when the defendant makes partial

21   representations but also suppresses some material facts." (*LiMandri*, 52 Cal.App.4th at p. 336.)

22   "One who is asked for or volunteers information must be truthful, and the telling of a half-truth

23   calculated to deceive is fraud." (*Cicone v. URS Corp.* (1996) 183 Cal.App.3d at 194, 201; see also

24   *Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1104 [collecting cases] ["the extent of an

25   insurance agent's duty depends on the nature of the interaction between the agent and the insured

26

27       [82] Defendants' argument that the parties' status as parties to a commercial transaction precludes a duty to disclose lacks merit. It is just this type of transaction that can create such a duty: "a duty to disclose may

28   arise from the relationship between seller and buyer, employer and prospective employee… or parties entering into any kind of contractual agreement." (*LiMandri*, 52 Cal.App.4th at 337 [citations omitted].)

**STATEMENT OF DECISION**

EXH. 1 - 136

1    and the representations the agent made regarding coverage when discussing the policy."]; *Fanucci*

2    *v. Allstate Ins. Co.* (N.D. Cal. 2009) 638 F. Supp. 2d 1125, 1143 [reasonable reliance may be found

3    where the insured specifically told insurance agent that he wanted an umbrella policy and the agent

4    advised the insured on which policy to buy, holding himself out as having special knowledge [this

5    is despite the insured being an attorney and despite the policy being relatively clear].)

6         The Court finds that Defendants owed an affirmative duty based on their own actions and

7    representations in their interactions with Plaintiffs. By volunteering detailed information about their

8    distribution process and channels and the availability of the video, Defendants assumed an

9    obligation to tell the truth. Defendants could not conceal material information that would

10   undermine these representations and expose them as false and misleading. In answering Plaintiffs'

11   questions about distribution and who would be able to see the video, they had to respond truthfully.

12        As each Plaintiff stated in her trial testimony, the facts that Defendants concealed were

13   material and would have changed her decision if she had known the truth.  Defendants knew that

14   these facts would be important to Plaintiffs because of their business model and scheme to solicit

15   first-time models who would never "do porn" again; most prospective recruits, including the

16   Plaintiffs here, posed the same basic set of questions and concerns relating to whether the videos

17   could be discovered. In addition, most women asked these very questions, or, alternatively,

18   Defendants had received enough complaints from prior models to know that information about

19   distribution, marketing, model identification, and harassment were critical to the women targeted by

20   their scheme.  Defendants intentionally withheld and actively concealed such information in order

21   to obtain Plaintiffs consent to film a pornographic video. The Court therefore finds that Defendants

22   are liable for fraudulent concealment.

23                    ***iii.  Defendants Made False Promises***

24        "'Promissory fraud' is a subspecies of an action for fraud and deceit. A promise to do

25   something necessarily implies the intention to perform; hence, where a promise is made without

26   such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v.*

27   *Superior Court* (1996) 12 Cal. 4th 631, 638 [citing *Union Flower Market, Ltd. v. Southern*

28

**STATEMENT OF DECISION**

1    *California Flower Market, Inc.* (1938) 10 Cal.2d 671, 676, 76 P.2d 503; Civ.Code, § 1710, subd.

2    (4); 5 Witkin, Summary of Cal.Law, § 685, pp. 786–87].)

3        Detrimental reliance on a false promise is shown when the misrepresentations were made at

4    a time when the promisor "had no coercive power over" the promisee and the promisee "was free to

5    decline the offered position." (Lazar, 12 Cal. 4th at p. 642 ["Rykoff used misrepresentations to

6    induce Lazar to change employment, a result Rykoff presumably could not have achieved truthfully

7    (because Lazar had required assurances the Rykoff position would be secure and would involve

8    significant increases in pay)."].)

9        Defendants made at least three types of false promises here.

10        First, Defendants falsely promised Plaintiffs that Defendants would not put their videos

11    online despite having every intention to do so. Indeed, Wolfe testified that Defendants' only

12    method of distributing pornographic videos was online and that Defendants had never distributed

13    the videos anywhere other than the internet, by DVD or otherwise. Wolfe also testified that

14    Defendants publish clips of each video on free websites and use internet affiliate marketing to

15    spread the video to as many people as possible. Each Plaintiff testified that she would not have

16    made the video if she had known that the Defendants intended to publish the video online and

17    intended to heavily market the video to maximize the number of viewers.

18        Second, Defendants promised they would protect Plaintiffs' identities, personal information,

19    and privacy. In fact, Defendants had no intention to do so and did just the opposite. Instead,

20    Defendants were aware of and profited handsomely from the internet forums in which anonymous

21    users post the name, personal information, and social media links of every single model whose

22    video was published on GirlsDoPorn.com. The evidence at trial showed that Pratt owned

23    PornWikiLeaks.com from November 2015 until August 2016 and that the lists of GDP model

24    names posted on the site were actively maintained during this time.

25        Defendants further knew that people frequently posted models' names in the comments to

26    the videos published on Defendants' Pornhub channel but Defendants did not take any action to

27    delete those comments. The fact that the documents Defendants give to women to sign ostensibly

28    provide the right to "exploit my name real or fictitious" further demonstrates that Defendants have

**STATEMENT OF DECISION**

1   no intention to honor their promises to protect women's privacy. Defendants (but not Plaintiffs)

2   knew full well that there is substantial money to be made in leaking models' real names and

3   identities. The evidence supports a conclusion that Defendants directly participated in doing so in

4   order to increase website traffic, or at a minimum, knowingly and deliberately disregarded their

5   promises to ensure privacy and anonymity because such leaks enhanced profitability. Plaintiffs

6   testified that if they had known their real names would have appeared on internet forums, they

7   would not have filmed the videos.

8          Third, Defendants promised to pay each Plaintiff a particular amount in order to entice her

9   to film a video. Several Plaintiffs did not reply to Defendants' first email and only responded after

10  Defendants increased their offers. The women expected to be paid what they have been promised;

11  Defendants do not inform them that their pay may be subject to change.

12         In reality, Defendants have no intention of honoring their promises regarding pay.

13  Defendants' practice—undisclosed to their models—is to grade each woman's appearance after she

14  arrives in the hotel room and state an excuse (a supposed physical flaw) to underpay her. This is not

15  only humiliating but routinely results in women being paid less than the minimum amount they

16  were willing to accept in order to agree to fly to San Diego and film the video.

17         Defendants, in essence, pledge whatever sum they think they need to in order to lure a recruit

18  to San Diego. In most cases, they already know that they will not actually pay the full amount. For

19  example, Defendants offered Jane Doe 6 a total of $7,000 for one shoot but paid her much less. The

20  evidence shows that Defendants *never* paid *any* model more than $6,000 for a single shoot, making

21  it unlikely that they ever meant to do so for Jane Doe 6.[83] Defendants' promises to pay specific fixed

22  sums to models, including Plaintiffs, were false.

23         Each of these promises was made to induce Plaintiffs to agree to participate in a

24  pornographic video and to overcome any objections they might have. Each of the promises were

25

26         [83] Similarly, Jane Doe A, a third-party model, testified that she was promised $10,000 to do two shoots-
    -$6,000 for a boy-girl video and $4,000 for a solo video with sex toys. Jane Doe A testified that she would

27  not have agreed to come to San Diego for less than $10,000. Yet, at the time they were recruiting her,
    Defendants had already shut down the website on which solo videos were published (GDT) and were no longer

28  filming such videos. Defendants therefore paid her only $6,000—for the boy-girl video. The extra $4,000 was
    needed to induce Jane Doe A to agree, but was not paid—nor was it ever meant to be.

STATEMENT OF DECISION

1 | made at a time when the Plaintiff was free to decline the offer—prior to her arrival in San Diego to

2 | shoot the video. Each Plaintiff testified that she would not have filmed the video if Defendants had

3 | not made these false promises.  The Court finds that Defendants are liable for the damages these

4 | false promises caused to each Plaintiff.

5 |         ***iv.   Plaintiffs Reasonably Relied on Defendants' Misrepresentations,***

6 |         ***Non-Disclosures, and False Promises***

7 |     .   In determining whether Plaintiffs' reliance on Defendants' various representations was

8 | reasonable, the Court must take into consideration their intelligence, knowledge, education, and

9 | experience.  (*Broberg v. The Guardian Life Ins. Co. of Am.* (2009) 171 Cal. App. 4th 912, 921–22.)

10 | For example: "Exceptionally gullible or ignorant people have been permitted to recover from

11 | defendants who took advantage of them in circumstances where persons of normal intelligence

12 | would not have been misled. [...] 'No rogue should enjoy his ill-gotten plunder for the simple

13 | reason that his victim is by chance a fool.'" (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th

14 | 1640, 1667 [citing *Seeger v. Odell* (1941) 18 Cal.2d 409, 414-15].)  "What would constitute fraud

15 | in a given instance might not be fraudulent when exercised toward another person. The test of the

16 | representation is its actual effect on the particular mind . . . ." (*Blankenheim v. E. F. Hutton & Co.*

17 | (1990) 217 Cal.App.3d 1463, 1475.)

18 |         Generally, "[a] plaintiff will be denied recovery only if his conduct is
19 |         manifestly unreasonable in the light of his own intelligence or
        information. It must appear that he put faith in representations that
20 |         were 'preposterous' or 'shown by facts within his observation to be
        so patently and obviously false that he must have closed his eyes to
21 |         avoid discovery of the truth.' [Citation.] Even in case of a mere
        negligent misrepresentation, a plaintiff is not barred unless his
22 |         conduct, in the light of his own information and intelligence, is
23 |         preposterous and irrational. [Citation.]"

24 | (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th

25 | 835, 865; *Public Employees' Retirement System v. Moody's Investors Service, Inc.* (2014) 226

26 | Cal.App.4th 643, 673.)

27 |     "Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no

28 | defense when the misrepresentation was intentional rather than negligent. [Citations] As a general

-140-

**STATEMENT OF DECISION**

**EXH. 1 - 140**

1  rule negligence of the plaintiff is no defense to an intentional tort. [Citation] The fact that an

2  investigation would have revealed the falsity of the misrepresentation will not alone bar his

3  recovery. . ." (Seeger, 18 Cal.2d at 414-15 [emphasis added].)  As Professor Williston eloquently

4  stated many years ago:

> [I]f a party has fraudulently misrepresented a document's contents or
> induced the other party to refrain from reading the document, courts
> will allow a remedy, choosing not to permit a positively fraudulent
> party to prosper because of the stupidity or credulity of the defrauded
> party, subject only to the rights of innocent third parties. In short, the
> law should not give any assistance to a knave, a scoundrel or a con
> artist who preys upon the less alert or more naive members of society.

10  (Williston on Contracts (4th ed. 2012) § 69:35, pp. 37-39.)

11      Here, each Plaintiff testified that she asked for and received numerous assurances that the

12  videos would not be available online and would only be sold in foreign countries. Defendants made

13  these representations repeatedly, including on the phone before agreeing to do the shoot and in

14  person on the day of the shoot—and Plaintiffs had no specific reason to question their veracity. (See

15  *Orozco v. WPV San Jose, LLC* (2019) 36 Cal. App. 5th 375, 391 [finding that plaintiff justifiably

16  relied on defendant's misrepresentations when plaintiff specifically asked and was expressly

17  assured numerous times, including the day of signing, that no competing businesses were being

18  considered for tenancy in the shopping center]; *Fanucci v. Allstate Ins. Co.* (N.D. Cal. 2009) 638 F.

19  Supp. 2d 1125, 1143 [a court could find reasonable reliance when the insured specifically told

20  insurance agent that he wanted an umbrella policy and the agent advised him on which policy to

21  buy].)

22      The Court concludes that Plaintiffs' reliance was reasonable under the circumstances.

23      First, the Court considers Plaintiffs' characteristics. The Court finds that Plaintiffs—like GDP

24  models in general—are typically young, undereducated, and inexperienced in life; they have no

25  experience or knowledge of the porn industry. They are unable to seek advice or guidance from others

26  because they do not want anyone else to know what they are doing. Defendants specifically sought

27  out women with these characteristics and exploited them.

28

-141-
STATEMENT OF DECISION

**EXH. 1 - 141**

1    Second, the Court considers Defendants' conduct and the nature of their representations.

2    Defendants developed a well-honed approach, over several years, designed to convey indicia of

3    reliability and overcome models' objections and concerns. Defendants provide a consistent story

4    reinforced by the use of "reference" models. Their misrepresentations are highly specific (e.g. DVDs

5    are sold to collectors in Australia) and they are usually able to provide a plausible and satisfactory

6    answer to any question. Defendants falsely assure women that they have never had a problem with

7    disclosure of models' videos or identities—a matter particularly within Defendants' knowledge.

8    Moreover, everything appears polished and professional, which enhances Defendants' credibility.

9    All in all, Defendants do not come across as a questionable fly-by-night operation but an established,

10   high-end enterprise that does everything in a classy way (luxury cars and hotels, sophisticated

11   equipment) and has hundreds of references to back up their assertions. Unfortunately, what Plaintiffs

12   understandably mistook for integrity was all crafted to create a false veneer and merely represented

13   the trappings of the success of Defendants' longstanding fraud.

14            ***v.   Defendants' Deceit was a Substantial Factor in Causing Plaintiffs'***

15            ***Emotional Distress and the Court Awards Monetary Damages***

16        Based on the foregoing, the Court finds Defendants liable for fraud and awards damages

17   accordingly.  Fraud victims are entitled to compensatory damages, as well as the profits and ill-

18   gotten gains that the defendants gained by their wrongful conduct.  As Civil Code § 1709 makes

19   clear, Defendants are liable for *any* damage their deceit has caused to Plaintiffs.

20            1.   *Plaintiffs are Entitled to Emotional Distress Damages*

21        "That general damages for mental pain and suffering are recoverable in a tort action of

22   deceit is established by the cases." (*Sprague v. Frank J. Sanders Lincoln Mercury, Inc.* (1981) 120

23   Cal. App. 3d 412, 417.) Here, the bulk of Plaintiffs' damages comes from the significant emotional

24   distress that they endured as a result of Defendants publishing their videos online. The Court has

25   considered each Plaintiff's individual experience, as established by their testimony at trial and any

26   documentary evidence presented.

27        The Court took into account that each Plaintiff expresses herself differently and has learned

28   to cope with this experience in different ways. The Court weighed the physical manifestations of

-142-

**STATEMENT OF DECISION**

**EXH. 1 - 142**

1    emotional distress, whether they be tangible impacts on the Plaintiff's life (e.g., dropping out of

2    school, changing career path, injury to close personal relationships) or physical symptoms of

3    emotional distress (e.g., depression, anxiety, isolation, sleeplessness, etc.).

4         Defendants argue that most of Plaintiffs' emotional distress stems from their "regret" of

5    filming the pornographic film as opposed to the particular channel of distribution. The Court

6    disagrees. Although several Plaintiffs testified that they experienced emotional distress as a result

7    of the filming, each and every Plaintiff testified that her distress skyrocketed when the video was

8    released online. The Court does not award damages for pain or distress caused by the filming of the

9    video itself. The Court has considered such distress to the extent that it impacted the severity of

10   emotional distress caused by the release of the video online.

11        Defendants understandably focus on preexisting mental health problems and other

12   aggravating or contributing factors of Plaintiffs' distress. Plaintiffs need only show that the fraud

13   was a substantial factor of their emotional distress. (*Manderville v. PCG&S Grp., Inc.* (2007) 146

14   Cal. App. 4th 1486, 1498.) "A substantial factor in causing harm is a factor that a reasonable person

15   would consider to have contributed to the harm. It must be more than a remote or trivial factor. It

16   does not have to be the only cause of the harm." (CACI 430.) The Court finds that Defendants'

17   release of the video online was a substantial factor in causing each of the emotional distress-related

18   facts contained in the Court's findings for each Plaintiff.

19        In accordance with the California Civil Jury Instruction Number 3905A, the Court

20   considered past and future mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety,

21   humiliation, and emotional distress in deciding a reasonable amount based on the evidence.  The

22   Court finds that Plaintiffs are reasonably certain to continue to suffer, at a minimum, the anxiety

23   and embarrassment that each Plaintiff discussed in testimony.

24                        *2.   Plaintiffs are Entitled to Damages and Ill-Gotten Gains from*

25                             *the Fraud*

26        "One who willfully deceives another with intent to induce him to alter his position to his

27   injury or risk, is liable for any damage which he thereby suffers." (Civ. Code § 1709.)  For the

28   breach of an obligation not arising from contract, the measure of damages, except where otherwise

                                    -143-

1  expressly provided by this Code, is the amount which will compensate for all the detriment

2  proximately caused thereby...." (Civ. Code § 3333.)

3          California protects an individual's proprietary interest in his or her identity.

4  (*Motschenbacher v. R.J. Reynolds Tobacco Co.* (9th Cir. 1974) 498 F.2d 821, 825-826 (applying

5  Calif. law).) Likeness is a property right. (*Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813, 818-

6  819; citing Civ. Code § 654 ["property" is the ownership of a thing to the exclusion of others].)

7          . Plaintiffs are entitled to receive the difference in value between what they gave to defendant

8  and what they received. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240.) And

9  under section 3343, emotional distress damages may still be included, because the section expressly

10  leaves open any other "legal or equitable remedies to which a [defrauded] person may be entitled."

11  (*Sprague* at 417-418, citing Civ. Code 3343(b)(2); and *Stout v. Turney* 22 Cal.3d 718, 729-730

12  ["nothing in section 3343 requires plaintiff show "out-of-pocket" loss. The statute awards damage

13  for "out-of-pocket" loss together with any additional damage.... If a plaintiff shows no traditional

14  "out-of-pocket" loss, that component of the award is zero. If, however, he goes on to show

15  consequential or additional damage, the amount which he so demonstrates is recoverable."].)

16          The Parties stipulated that Defendants received a total of $1,025,831.50 in profits from the

17  use of the twenty-two Plaintiffs' videos. Thus, it is undisputed that Defendants derived $46,628.70

18  from the use of each Plaintiff's video(s).

19      **B. Defendants' Putative Contracts Do not Vitiate Plaintiffs' Reasonable Reliance: The**

20          **Documents are Invalid and Unenforceable as they were Secured by Fraud and are**

21          **Otherwise Tainted by Illegality**

22          As an integral part of Defendants' scheme, Defendants required each Plaintiff and model to

23  sign documents at the moment shooting was about to begin. While Defendants rely on the documents

24  to claim that Plaintiffs released all rights to the videos and consented to unlimited publication and

25  use of the videos online, the documents are unenforceable for several reasons.

26          First, on their four corners alone, the documents are not valid, enforceable contracts: they

27  contain vague, incomprehensible language and are missing material terms. Second, the fraud,

28  intimidation, and coercion that Defendants used to obtain Plaintiffs' signatures render the

-144-

**STATEMENT OF DECISION**

1   documents legally invalid and ineffective. Third, both procedural and substantive unconscionability

2   render the documents invalid.  Finally, the documents are unenforceable due to illegality.  For all of

3   these reasons, this Court finds that the signed documents were obtained without valid consent, and

4   exercises its equitable powers to set the putative contracts aside to avoid an unjust result.

5               ***i.   Despite Plaintiffs' Failure to Fully Read the Documents, the***

6                    ***Documents are Unenforceable Due to Defendants' Fraudulent and***

7                    ***Wrongful Conduct***

8        "The consent of the parties to a contract must be: 1. Free; 2. Mutual; and, 3. Communicated

9   by each to the other." (Civ. Code § 1565.)  "An apparent consent is not real or free when obtained

10  through: 1. Duress; 2. Menace; 3. Fraud; 4. Undue influence; or, 5. Mistake." (Civ. Code § 1567.)

11  Section 1572 of the Civil Code, which echoes Section 1710, defines "actual fraud" as:

12            . . . any of the following acts, committed by a party to the contract, or
              with his connivance, with intent to deceive another party thereto, or to
13            induce him to enter into the contract:
              1. The suggestion, as a fact, of that which is not true, by one who does
14            not believe it to be true;
              2. The positive assertion, in a manner not warranted by the information
15            of the person making it, of that which is not true, though he believes it
              to be true;
16            3. The suppression of that which is true, by one having knowledge or
              belief of the fact;
17            4. A promise made without any intention of performing it; or,
18            5. Any other act fitted to deceive.
19

20  (Cal. Civ. Code § 1572; see also Rest., Contracts, § 471; *Pearson v. Norton* (1964) 230 Cal.App.2d

21  1 ["Actual fraud involves conscious misrepresentation, or concealment, or non-disclosure of a

22  material fact which induces the innocent party to enter the contract."]; *Lazar v. Sup. Ct.* (1996) 12

23  Cal.4th 631, 644 ["our Legislature more than a century ago codified the common law cause of

24  action for promissory fraud in inducing a contract, along with actions for promissory fraud and

25  fraud, generally."].)  "A single fraudulent misrepresentation is sufficient to void execution of a

26  contract." (*Ramos v. Pacheco* (1944) 64 Cal.App.2d 304, 310.)[84]

27  _____

28        [84] It is a "well-settled rule that parol evidence is admissible to prove fraud in the inducement even
     though the contract recites that all conditions and representations are embodied therein." (*Ferguson v. Koch*
     (1928) 204 Cal. 342, 347, 268 P. 342; *Mooney v. Cyriacks* (1921) 185 Cal. 70, 80–81 [contract provision

-145-

**STATEMENT OF DECISION**

Here, as explained in Section III.A., *supra*, Defendants misrepresented and concealed material facts and made false promises regarding, among other things, where the video would be published, in order to induce Plaintiffs to travel to San Diego and engage in sexual intercourse on camera. Once Plaintiffs arrived in San Diego, they were given no option but to proceed with what they had started.[85] Defendants also misrepresented and concealed the contents of the documents themselves in order to induce Plaintiffs to sign them. Thus, the Court finds Plaintiffs' apparent consent to the documents is not real or free because it was, with respect to each Plaintiff, obtained by actual fraud.

Despite ample evidence of fraud, Defendants argue that the Court should enforce the documents' broad and perpetual release against Plaintiffs because Plaintiffs signed the documents without taking the time to read them. But Defendants did not provide Plaintiffs sufficient time to review the documents, imploring that they were behind schedule and filming needed to begin immediately. At the same time, to secure their signatures, Defendants misrepresented the nature and terms of the documents in a manner consistent with previous representations and assurances. "The general rule in California is that even in the absence of a fiduciary relationship plaintiff's failure to read a contract is excusable where reliance is placed on the misrepresentations of the other party." (*Rosenthal v. Great W. Fin. Sec. Corp.* (1996) 14 Cal. 4th 394 [citation omitted].) "[A] defendant who had misrepresented the facts should not generally be heard, in an action for 'equitable relief,'

which recites that all conditions and representations are embodied therein will not prevent plaintiff from introducing parol evidence that sale was induced by fraud]; *Morris v. Harbor Boat Building Co.* (1952) 112 Cal.App.2d 882, 888 ["it was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud ... even though the contract recites that all conditions and representations are embodied therein"]; *Oak Industries, Inc. v. Foxboro Co.* (S.D.Cal.1984) 596 F.Supp. 601, 607 [under California law, extrinsic evidence is admissible to prove fraud in the inducement notwithstanding a contract provision that no representations have been made other than those stated in the agreement].)

[85] Although Plaintiffs' claim is based on fraud rather than duress or menace, it must be noted that coercion and intimidation were factors considered in finding consent invalid here. Several Plaintiffs testified that they attempted to retract their consents before commencement of or during the sexual portion of the video but were compelled by Defendants to proceed. Several Plaintiffs changed their minds and attempted to decline to do the video before the shoot began. Each of these Plaintiffs testified that Pratt, Garcia, or Wolfe told them that Defendants had already spent the money to bring them to San Diego and set up the shoot and that they were not allowed to back out. Jane Does 4, 7, 13, 14, 15, 18, and 19 testified that they asked to stop during the shoot, explaining that they were in pain and/or that the shoot had lasted much longer than represented, but none of them was permitted to stop. Each was required to continue to engage in sexual intercourse until Defendants decided they had all of the footage they wanted.

-146-

**STATEMENT OF DECISION**

1  to assert the plaintiff's reliance on his misrepresentations was negligent, at least in the absence of

2  facts making the plaintiff's conduct 'preposterous or irrational.'" (*Id.* at 422.)

3      For instance, a release of claims, "regardless of how comprehensively worded," is not

4  binding if the releaser's misapprehension "as to the nature or scope of the release" was caused by

5  the other party's misconduct and "not due to his own neglect." (*Casey v. Proctor* (1963) 59 Cal.2d

6  97, 103, 28 Cal.Rptr. 307; see also *Frusetta v. Hauben,* (1990), 217 Cal.App.3d at p. 557, 266

7  Cal.Rptr. 62 [release "may be rendered void on the grounds of fraud or misrepresentation regarding

8  the nature of the claim covered by the release so long as the releasor's failure to learn the nature of

9  the terms was not attributable to his own negligence."];[86] *Gardner v. Rubin* (1957) 149 Cal.App.2d

10  368, 372 [negotiable instrument not enforceable even by holder in due course where executed

11  through fraud and "in the absence of negligence on the part of the maker "]; *Ramirez v. Superior*

12  *Court* (1980) 103 Cal.App.3d 746, 756, n. 3 ["no agreement exists unless the parties signing the

13  document act voluntarily and are aware of the nature of the document and have turned their

14  attention to its provisions or reasonably should have turned their attention to its provisions"].)[87]

15      Although it is true that Plaintiffs did not fully read the documents before signing them, this

16  was due not to Plaintiffs' negligence but to Defendants' intentional misconduct. Further, Plaintiffs

17  had no reasonable opportunity to learn that Defendants' misrepresentations were false.

18          *1.   Plaintiffs' Failure to Read and Understand the Documents is*

19             *Attributable to Defendants' Misconduct and Not to Any*

20             *Culpable Negligence on Plaintiffs' Part*

21      The evidence at trial revealed a consistent pattern of Defendants presenting the documents

22  to the Plaintiffs only minutes before the start of the pornographic video shoot, having never

23  mentioned prior to that moment that there would be contracts to sign. When presenting the

24

25  [86] In *Frusetta,* the court found that an alleged representation by an insurance adjuster that a $250 check was only a partial payment when the adjuster knew that plaintiff's medical bills far exceeded that

26  amount, if true, could be sufficient to void the "release of all claims" that the plaintiff signed without reading because such an act would support a finding of bad faith, fraud or overreaching by the adjuster.

27  [87] "Under such circumstances it is unnecessary to effect a rescission of the release, and no question of notice to rescind or of restoration of consideration received arises." (Casey, 59 Cal. 2d at p. 103; see, e.g.,

28  *Garcia v. California Truck Co.* (1920) 183 Cal. 767, 770; *Wetzstein v. Thomasson* (1939) 34 Cal.App.2d at p. 560.)

**STATEMENT OF DECISION**

1   documents, Defendants briefly describe their content in a manner echoing or consistent with prior

2   misrepresentations—sometimes broadly (9/9/19 Trial Tr. 50:24-51:19 ["this is just the basic

3   agreements, everything we spoke about"]; Jane Doe 18 Depo. 132:18-22 [Jane Doe 18 testifying

4   Garcia told her, "It's everything we've already talked about. It's just the release for images. It's just

5   saying we have the right to use your image exactly how we said we would"].) or, in some cases,

6   more specifically (See, e.g., 9/27/19 Trial Tr. 62:15-25 ["this paragraph just means that no names

7   are going to be used and everything is kept confidential. This paragraph means that we have - - like

8   this gives us the right to put it on DVD format to Australia."]; 9/10/19 Trial Tr. 136:7-16 ["This is

9   where it says not online .... Here's we're not forcing you to do this."]; 8/21/2019 Trial Tr. 83:19-

10  84:10 ["this is what we talked about, this is no internet there ... it's going on DVD in Australia ...

11  no names."].)  Plaintiffs testified that they felt they did not need to read the documents before

12  signing because Defendants had repeatedly provided explicit assurances—backed by plausible

13  details—of the term that was of substantial concern to them: where the video would be distributed

14  and who would see it. Nothing surrounding the presentation and execution of the putative contracts

15  was sufficient to unring the bell of these repeated misrepresentations; rather, Defendants sought to

16  reinforce them.

17          According to the California Supreme Court, "any actual concealment" or "any affirmative

18  misrepresentation regarding the existence or meaning" of the material term at issue strongly

19  supports a finding that a party's failure to read a contract in reliance on its adversary's assurances

20  that the party need not read the agreement was reasonable. (Rosenthal, 14 Cal. 4th at p. 426.)  In

21  *Rosenthal*, unlike here, the plaintiffs did not claim any misrepresentation or concealment related to

22  the term at issue—an arbitration clause; nor did they claim any other sort of "misconduct" by the

23  defendants that interfered with their opportunity to read the documents. (Ibid.)[88]  In contrast, here,

24  the term at issue is the scope of distribution of the video, and the trial record shows that Defendants

25  had made affirmative misrepresentations to Plaintiffs that the videos would only be sold on DVD

26  through isolated overseas channels and never placed online.

27

28          [88] Moreover, as a general matter, strong legislative preference exists for the enforcement of arbitration clauses. There is no similar preference favoring the putative contracts at issue here.

-148-

**STATEMENT OF DECISION**

1    In addition to misrepresenting the contents of the documents, Defendants did not give the

2    Plaintiffs a fair opportunity to read the documents, telling them that the shoot was behind schedule

3    and had to get going.  When a Plaintiff asked for time to read the documents or inquired about their

4    contents, Defendants became ill-tempered and told them that there was no time, that they already

5    knew what the agreement was, and that they could review the documents after the shoot.  A few

6    Plaintiffs testified that Defendants conducted the on-camera interview while they completed the

7    documents, distracting the women with personal questions, including everything from small talk to

8    highly-sensitive inquiries about their sexual history and preferences.

9    Several Plaintiffs had, at Defendants' suggestion, consumed alcohol and/or marijuana

10    shortly before being presented with the documents to sign.  These actions by Defendants constitute

11    the type of "misconduct" contemplated in *Casey v. Proctor, supra*, which, this Court finds,

12    deprived Plaintiffs of a reasonable opportunity to read the documents before signing.  (See also

13    *Rosenthal*, 14 Cal. 4th at p. 423, n. 12, [evidence that a party "actually took some action or said

14    something to hurry or pressure" the signing party would support argument that failure to read

15    contract before signing was reasonable].)

16    *2.  Defendants' Obscurant Drafting Made It Impossible for*

17    *Plaintiffs to Discover that Defendants' Oral Representations*

18    *were False*

19    Finally, the contents of the documents themselves interfered significantly with Plaintiffs'

20    ability to "discover the real terms of the contract."  The documents that Defendants provide for

21    models to sign are vague and confusing.  An average person would not be able to understand the

22    nature and scope of the terms.  Indeed, it is difficult for *anyone* but a trained lawyer undertaking a

23    close reading to decipher the subject matter, parties, and intended terms of the so-called

24    agreements.  (Cf. Rosenthal, 14 Cal. 4th at 426 [plaintiff could have easily learned of the existence

25    and meaning of arbitration agreement by simply reading the one-page agreement because the

26    arbitration clause was "in bold print in the center of the page's right column of text," "include[ed] a

27    brief explanation of the meaning of arbitration," and there was "immediately above the signature

28    line, a bold-print reminder that 'this agreement contains a predispute arbitration clause...'"].)

STATEMENT OF DECISION

1    And, even if Plaintiffs could understand these terms, nothing in the documents is "patently

2    at odds" with Defendants' oral representations. The documents do not disclose Defendants'

3    intention to publish the videos online; nor do they provide the name of Defendants' popular

4    subscription website or Defendants' plan to publish clips of the videos on highly trafficked free

5    pornography websites. When a defendant's oral representations are not "patently at odds with the

6    express provisions of the written contract," a plaintiff cannot necessarily be expected to discover

7    the falsity of those statements. (*Orozco*, 36 Cal. App. 5th 375, 391; see also *Dias v. Nationwide*

8    *Life Ins. Co.* (E.D. Cal. 2010) 700 F. Supp. 2d 1204, 1217 ["When the misrepresentations are not

9    inconsistent with the terms of an insurance policy, reliance on the misrepresentations may still be

10   'justifiable.'"].)

11   In *Orozco*, for example, the plaintiff specifically inquired as to whether competing

12   businesses were being considered as tenants and was repeatedly assured—including on the day of

13   signing the lease—that they were not. The court accordingly held that the plaintiff "would not have

14   discovered the misrepresentations by reading the lease." Even though the lease contained an

15   integration clause as well as a general disclaimer disavowing any "representation or warranty as to

16   current occupancy or future occupancy of any particular tenant," it "did not even mention" the

17   competing hotdog vendor. (Orozco, 36 Cal. App. 5th at 392-93.) Similarly, here, the documents'

18   generic, boilerplate terms do not supplant and undo Defendants' concrete and repeated promises.

19   Defendants could not cover specific express misrepresentations—that the videos would never be

20   placed online and that the models' identities would be secured—with standard legalese.

21   Having reviewed the putative contracts at issue, the Court finds that the Defendants drafted

22   the documents with the specific intent of misleading Plaintiffs of their scheme and obscuring the

23   true nature of what they intended to do with the videos. It is not surprising that Defendants'

24   documents do not clearly inform the model of Defendants' heavy online presence; as every Plaintiff

25   testified, she never would have agreed to participate had she known the truth. Defendants are fully

26   aware of this fact and rely on deception and coercion to obtain models' consent.

27   *Duick v. Toyota Motor Sales, U.S.A., Inc.* is another analogous case. Defendants there drew

28   plaintiff in by soliciting her to take an online personality test. This was all a ruse designed to gather

-150-

**STATEMENT OF DECISION**

1    her personal information—which was then used to make her the target and butt of an elaborate

2    prank as part of an advertising campaign for a particular Toyota vehicle model. The court found the

3    terms and conditions of the personality evaluation, which Toyota claimed constituted plaintiff's

4    consent to participate in the prank, were void in their entirety:

> (1) defendants were the drafters and creators of the relevant Web
> pages, including the full text of the terms and conditions; (2) by
> drafting and presenting the terms and conditions as they did,
> including the use of the phrase "Personality Evaluation," defendants
> misrepresented and concealed (whether intentionally or not) the true
> nature of the conduct to which Duick was to be subjected; and (3)
> Duick was not negligent in failing to understand the true nature of the
> conduct to which she was to be subjected, because no reasonable
> person in her position would have understood it.

11   (*Duick v. Toyota Motor Sales, U.S.A., Inc.* (2011) 198 Cal. App. 4th 1316, 1322 ["We have read the

12   terms and conditions in their entirety, and we conclude that, as written, they could not have alerted

13   a reasonable reader in Duick's position to the true nature of what defendants proposed to do to

14   her . . . [b]ecause of their vagueness and opacity (such as unexplained references to an 'interactive

15   experience' and a 'digital experience')[.]"].)  As in *Duick*, Defendants drew Plaintiffs in under false

16   pretenses.  And, the documents they presented for Plaintiffs to sign are so vague and opaque that

17   they do not alert a reasonable reader in Plaintiffs' position to what Defendants actually proposed to

18   do to them: here, to widely disseminate the videos online and to market them through tactics

19   including propagation of Plaintiffs' identities within their communities. Plaintiffs did not freely and

20   knowingly consent to this—it was their nightmare scenario—and could not have done so merely by

21   reading the documents. As in *Duick*, the documents are unenforceable.

> 3.   *Plaintiffs are entitled to the same relief under a fraud in the*
> *inducement theory.*

24       While distinct as legal concepts, there is no clear line in this case between fraud in the

25   inducement and fraud in the execution of a contract. Rather, Defendants engaged in a single,

26   unbroken scheme and course of conduct in which they drew Plaintiffs in by fraudulent

27   misrepresentations and maintained that fraud through the execution of the documents—including

28   by mispresenting the nature and content of the agreement itself. Any difference between these legal

-151-

STATEMENT OF DECISION

1  doctrines is, therefore, inconsequential as a practical matter. Viewed through either lens, Plaintiffs'

2  purported consent is legally ineffective, and the putative contracts cannot therefore be enforced.

3        To the extent that any Plaintiffs' contract is properly deemed voidable rather than void, the

4  Court finds that filing this lawsuit seeking to invalidate the contracts for all purposes met the notice

5  and restoration requirement for rescission. (Civ. Code § 1691 ["When notice of rescission has not

6  otherwise been given or an offer to restore the benefits received under the contract has not

7  otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on

8  rescission shall be deemed to be such notice or offer or both."].)[89] Furthermore, the Court exercises

9  its equitable power to set aside and decline to enforce the contracts based on its finding that

10 Plaintiffs' assent was procured by fraud. (E.g., *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.

11 App. 4th 1141, 1154 ["[T]here is no support for, and we reject out of hand, the notion that a court

12 has no equitable power to set aside a provision of a contract procured by fraud."].)  Failing to do so

13 would improperly reward the Defendants for their conduct.[90]

14

15

---

16  [89] Civil Code § 1693 contemplates the scenario presented here and provides the following
    instructions:

17

18          When relief based upon rescission is claimed in an action or
            proceeding, such relief shall not be denied because of delay in giving notice
            of rescission unless such delay has been substantially prejudicial to the other
19          party.

20          A party who has received benefits by reason of a contract that is
            subject to rescission and who in an action or proceeding seeks relief based
21          upon rescission shall not be denied relief because of a delay in restoring or in
            tendering restoration of such benefits before judgment unless such delay has
            been substantially prejudicial to the other party; but the court may make a
22          tender of restoration a condition of its judgment.

    [90] "If...a party seeks relief based upon rescission and the court determines that the contract has not
23  been rescinded, the court may grant any party to the action any other relief to which he may be entitled under
    the circumstances...." (Civ. Code § 1692.) "Rescission and restoration are required only under equitable
24  principles and to prevent the taking of unfair advantage. Restoration is not required unless the ends of justice
    require it." (*Persson*, 125 Cal. App. 4th at 1155 [citation omitted].) Here, the ends of justice make strict
25  adherence to such concepts inequitable and unnecessary. Plaintiffs do not receive any unfair advantage from
    retaining the relatively-modest sums they received to shoot the videos, and it would be unjust to require them
26  to tender back these monies. This would be in effect accepting and enforcing Defendants' version of the
    agreements—i.e., that they have only paid the models in order to publish their videos online—procured by
27  deceit. The Court cannot accept that Plaintiffs' services—provided under the agreed terms as they were led
    to understand them—are worth nothing, and will not take a detour to determine their "true" value. They are
28  certainly worth no less (and possibly considerably more) than what the parties agreed to.

-152-

**STATEMENT OF DECISION**

EXH. 1 - 152

*ii.* ***The Documents Signed by Plaintiffs are Unenforceable Due to***
***Procedural and Substantive Unconscionability***

"If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract . . . ." (Civ. Code § 1670.5(a).) "Courts have long had the authority to set aside unconscionable or illegal contractual provisions, for example, while enforcing the remainder of a contract." (Persson, 125 Cal. App. 4th 1141, 1153.) Section 1670.5 "codified the principle that a court can refuse to enforce an unconscionable provision in a contract." (Id. at 1153–54.)

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (*Grand Prospect Partners v. Ross Dress for Less, Inc.* (2015) 232 Cal. App. 4th 1332, 1346 [quoting *Williams v. Walker-Thomas Furniture Co.* (D.C.Cir.1965) 121 U.S. App.D.C. 315].) Establishing unconscionability requires showing both a procedural and a substantive element, though these two elements are evaluated on a sliding scale and therefore need not be present to the same degree. (Id. at 1346–47 [citing *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246].)

*1. The Documents Are Procedurally Unconscionable*

Procedural unconscionability can be established by showing either oppression or surprise. (Id. at 1347.) Oppression generally involves a contract of adhesion—"a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*The McCaffrey Grp., Inc. v. Superior Court* (2014) 224 Cal. App. 4th 1330, 1349, 169 Cal. Rptr. 3d 766, 781 [quoting *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113–114, 99 Cal.Rptr.2d 745, 6 P.3d 669].) Oppression can be established "by the totality of the circumstances surrounding the negotiation and formation of the contract. . . ." (Grand Prospect Partners, L.P., supra, 232 Cal. App. 4th at p. 1348.)

> [Relevant circumstances] include, but are not limited to (1) the amount of time the party is given to consider the proposed contract;

-153-
STATEMENT OF DECISION

> (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.

(Ibid. [noting that pressure can come from "a stronger party using high-pressure tactics, coercion or threats short of duress [, or] surrounding circumstances such as market conditions and factors affecting timing."].)

Surprise, on the other hand "typically involves a provision 'hidden' within the prolixity of a printed form contract drafted by the party having superior bargaining strength." (*The McCaffrey Grp.*, 224 Cal. App. 4th at p. 1349 [citation omitted].) If the challenged term is not hidden, surprise can exist if the term "is otherwise beyond the reasonable expectation of the weaker party." (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal. App. 4th 1305, 1321.)

The evidence at trial revealed that Defendants' contracting practices are tainted by procedural unconscionability. Defendants' documents, standardized forms drafted by Defendants and/or their attorneys, were presented to Plaintiffs to sign immediately without any opportunity for negotiation. To say that Defendants occupied a position of superior bargaining strength understates the reality of the circumstances at the moment that Plaintiffs were made to sign the documents: a model is alone in a hotel room being cajoled and rushed to sign by two strange men who not only control the reservations for her flight home but also could easily overpower her physically. That the agreement is not subject to negotiation is evidenced by those instances in which Defendants unilaterally decided to pay a Plaintiff less than what was initially promised to her in order to obtain her agreement to travel to San Diego. While some Plaintiffs were too frightened or intimidated to speak out, those who did question this decision met with Defendants' absolute refusal to pay what was promised. In examining Defendants' documents and the trial record, the Court finds all the markers of an unconscionable contract of adhesion.

Defendants' use of surprise independently supports the finding of procedural unconscionability. Plaintiffs are young and have no experience in the adult entertainment industry. (Cf. *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal. App. 3d 473, 489 [unfair surprise and

STATEMENT OF DECISION

1   procedural unconscionability more difficult for experienced businessmen to establish].)  The

2   Model/Talent Release uses a small font and dense legalese to obscure the important terms therein.

3   Rather than clearly stating that the video will be published online, on Defendants' website and

4   dozens of others, the Document contains a few vague, general clauses that purport to give

5   Defendants unfettered rights over the video.  After receiving numerous assurances and promises

6   that the video will not be published online and will have only a limited distribution on DVD in

7   foreign countries, these oblique references are insufficient to overcome Plaintiffs' existing

8   understanding—an understanding borne of Defendants' own express representations.  In this

9   context, the Court finds that the documents are ambiguous and fail to meaningfully disclose

10  Defendants' ability and intention to publish the pornographic videos on their websites and popular

11  free websites.  This is particularly so because Defendants deliberately recruit and target women

12  who are young and inexperienced, have not completed a college (and, in some cases, high school)

13  education, and are unacquainted with the pornography industry.

14         Defendants point to a sentence in the IC Agreement to show that Plaintiffs should have

15  realized that Defendants intended to publish the video on the internet.  However, this sentence is

16  buried in Paragraph 7 on the bottom of the second page in a section called "Model Representations

17  and Warranties."  (Cf. Morris, 128 Cal. App. 4th at p. 1321 [when the challenged contract provision

18  is preceded by a clear heading in large type drawing a reader's attention and requiring the party's

19  initials may refute a claim of surprise).) In light of Defendants' many specific representations about

20  their distribution mechanisms, business model, and overall intentions, no reasonable person in

21  Plaintiffs' shoes would have located and discerned this term, let alone understood it to encompass

22  what Defendants actually intended to do with the video: put it on the internet and allow it to be

23  directed to models' friends and family. (See A & M Produce Co., 135 Cal. App. 3d at p. 490

24  [noting that "one suspects that the length, complexity and obtuseness of most form contracts may

25  be due at least in part to the seller's preference that the buyer will be dissuaded from reading that to

26  which he is supposedly agreeing."].)  Here, Defendants bolstered the obscurant language of the

27  document by encouraging Plaintiffs to rely on specific, clear oral representations.

28         Accordingly, the Court finds that Defendants' documents are procedurally unconscionable.

-155-

STATEMENT OF DECISION

*2.   The Documents are Substantively Unconscionable*

"[T]he substantive element [of unconscionability] is concerned with the fairness of the agreement's actual terms and assesses whether they are overly harsh or one-sided." (Grand Prospect Partners, 232 Cal. App. 4th at p. 1347; *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal. App. 4th 1199, 1213 [Substantive unconscionability "traditionally involves contract terms that are so one-sided as to 'shock the conscience,' or that impose harsh or oppressive terms."].)

In determining whether a provision is substantively unconscionable, courts are permitted and even encouraged to look outside the four-corners of the contract. For example, in deciding whether a price term is unconscionable, "courts look to the basis and justification for the price"—factors almost always outside the written agreement, including "the market price"; "the cost of the goods to the seller"; "the inconvenience imposed on the seller"; and "the true value of the product or service." (*Perdue v. Crocker Nat'l Bank* (1985) 38 Cal. 3d 913, 926–27, 702 P.2d 503, 512.) ·

Due to the high level of procedural unconscionability, even a low level of substantive unconscionability is sufficient to render the putative contracts unenforceable. Here, the documents Plaintiffs signed are written entirely for the benefit of Defendants and, under the relevant circumstances, are overly harsh and oppressive. Not a single provision in the documents inures to Plaintiffs' benefit or places any limitation on Defendants. Instead, the documents—under the view advanced by Defendants—purport to permit Defendants to do anything they wish with the videos and to "exploit" models' actual names. Each Plaintiff testified that privacy was her primary concern and that if she had understood the true meaning of the documents (and Defendants' true intentions), she never would have signed the documents or agreed to do the video.

A number of terms are particularly unconscionable. For example, the agreements purport to absolve Defendants of liability for how they use the videos in the future—even though Plaintiffs are unaware of Defendants' fraud and deceit and are unable to anticipate Defendants' undisclosed intentions to use the videos in a manner directly counter to their express representations. Such exculpatory clauses immunizing stronger parties for prospective unlawful conduct—particularly of an intentional nature—are illegal and void as contrary to public policy (See, e.g., Cal. Civ. Code § 1668 [prohibiting exculpatory contracts that exempt anyone from responsibility for fraud, willful

-156-

**STATEMENT OF DECISION**

1  acts, or violations of law]; *Three Crown Apartments v. PNC Bank* (N.D. Cal. Oct. 26, 2012) No.

2  C–12–03579, 2012 WL 5338054, at *6 ["[i]t is now settled… that… 'a party [cannot] contract

3  away liability for his fraudulent or intentional acts or for his negligent violations of statutory law…

4  Thus, the release… does not prohibit Plaintiff's claims based on subsequent conduct that either

5  intentionally or unintentionally violates state law."] [citations omitted].)[91]

6        The Court's evaluation of the documents' substance must include an acknowledgment of the

7  highly sensitive subject matter at issue (pornographic videos depicting Plaintiffs engaging in sexual

8  activity) and the privacy interests at stake for each of the Plaintiffs.  The Court may also consider

9  the relevant circumstances contributing to the fairness of the documents—that Defendants held

10  themselves out to be a company that produces pornographic videos to sell on DVDs in foreign

11  countries and promised never to publish the videos online.  In light of these facts, the Court finds

12  that the one-sided, broad, blanket releases set forth in the documents are overly harsh and

13  oppressive.

14        Based on the strong evidence of procedural unconscionability and the inherent unfairness of

15  the documents, the Court finds as a matter of law that the documents are unconscionable and

16  declines to enforce them as a result.

17              ***iii.  The Documents Signed by Some Under-Age Plaintiffs are Void for***

18                              ***Illegality***

19        Defendants cannot enforce contracts against Jane Does 4, 5, 12, 14, 16, and 17, because

20  each of these women was under the legal drinking age when Defendants furnished alcohol to her, in

21  violation of California law, shortly prior to presenting her with legal documents to sign. (Bus. &

22  Prof. Code § 25658(a) ["… every person who sells, furnishes, gives, or causes to be sold,

23  furnished, or given away any alcoholic beverage to any person under 21 years of age is guilty of a

24  misdemeanor."].)  This Court cannot enforce a putative contract under which the weaker party's

25  "consent" was procured through illegal means.

26  _____

27        [91] An exculpatory clause releasing a party from liability for negligent (as opposed to willful or statutory) misconduct must be conspicuous, clear, unambiguous, and explicit. The subscribing party must express the specific intent of exculpating the potential tortfeasor for the particular conduct at issue. (E.g., *Leon*

28  *v. Family Fitness Center (No. 107), Inc.* (1998) 61 Cal. App.4th 1227) Defendants' documents fail this test.

-157-

**STATEMENT OF DECISION**

**EXH. 1 - 157**

*iv.   The Documents (and Verbal Script) are too Vague and Indefinite to*

*Constitute Enforceable Contracts*

Even aside from fraud, unconscionability, and illegality, the putative agreements suffer from intractable formation issues. They are too ill-formed to enable the required meeting of the minds needed to form a contract. Plaintiffs were placed on insufficient notice of what they were purporting to agree to.

*1. · The Witten Agreements are Uncertain, Vague, and Indefinite*

Terms of a contract must be sufficiently definite in all particulars essential to its enforcement. (*Magna Development Co. v. Reed* (1964) 228 Cal.App.2d 230; *Maganallez v. Hilltop Lending Corp.* (N.D. Cal. 2007) 505 F. Supp.2d 594, 601-603.) As the Fourth District Court of Appeal, Presiding Justice Judith McConnell, has opined:

> In order for acceptance of a proposal to result in the formation of a contract, the proposal "must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain." [Citation.] A proposal "'cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain. [¶] ... The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" [Citations.] If, by contrast, a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.

(*Bowers v. Raymond J. Lucia Companies, Inc.*, (2012) 206 Cal.App.4th 724, 734 [citations omitted].) "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1192.) "Whether a contract is certain enough to be enforced is a question of law for the court." (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 348 fn. 1.)

Here, in the 1-page "Model Talent Release" document, the Court finds the following terms indefinite and not reasonably certain: "Producer: Clockwork Productions, Inc [sic] on behalf of BLL Media Inc.," "Appearance," "Program," and "Employer." (See, e.g., Jane Doe No. 1

-158-

STATEMENT OF DECISION

1  Agreement, ¶¶ 1-8, Trial Exhib. 36.)[92]  The names and capacities of contracting parties are material,

2  especially in a case like the present, where Defendants own/operate a plethora of entities, foreign

3  and domestic, which has changed over the years.  The phrase "on behalf of" is vague and the

4  Defendants did not clarify this at trial.  In fact, Defendant Wolfe testified he does not understand it.

5       Further, there is no basis for determining either party's contractual performance: the

6  Plaintiffs' required contractual performance (including in the "Appearance" and/or "Program") is

7  undefined, as is the other party's performance—most notably, the material term of price paid to the

8  model—is missing entirely from the agreement. This is consistent with the Court's findings that

9  Defendants did not intend to honor their payment promises but arbitrarily made up what they

10  wanted to pay on the spot.

11       In the 8-page document, "Model/Talent Release and Independent Contractor Agreement",

12  the Court finds the following terms indefinite and not reasonably certain: "Adult Content," and

13  "other online Website." (See, e.g., Jane Doe No. 1 Agreement, at Recitals, ¶ ¶ 1-10, Trial Exhib.

14  25.)

15       Moreover, as with the one-page version, there is no basis for determining *either* party's

16  contractual performance. The Plaintiffs' required contractual performance (the "Adult Content") is

17  undefined. Again, Defendants' performance—most notably, the material term of price paid to the

18  model—is missing entirely from the agreement. (*Id.* pg. 2, 8.)

19       The Court has read the agreements in full and finds them all uncertain, vague, and

20  indefinite.  The agreements provide no basis for determining what obligations the parties have

21  agreed to; accordingly, the Court finds the agreements are not enforceable as a matter of law.

22                    *2.  The Verbal Scripts are Uncertain, Vague, and Indefinite*

23       To the extent Defendants allege that the "verbal scripts" are independent, enforceable

24  contracts, they also suffer from critical flaws. These scripts do not reflect bilateral agreements—with

25  promises, consideration, and obligations on each side. Rather, Defendants unilaterally required

26

27

28      [92]  For brevity, the Court refers to Jane Doe No. 1's documents in this subsection, and does not address each and every Plaintiff's alleged agreement with Defendants.

STATEMENT OF DECISION

1   models to recite the scripts verbatim before filming began. Defendants did not read or ascribe to a

2   counter-script or representation in which they agreed to anything.

3       Examining the scripts on their face, they are plagued by similar problems as the written

4   documents. In various material particulars, the intention of the parties cannot be ascertained, such

5   that the Court can determine the parties' obligations and if and when they have been breached.

6   Accordingly, the Court finds that the verbal scripts do not constitute enforceable contracts. (*Bowers,*

7   206 Cal.App.4th at 734; *Patel,* 45 Cal.4th at 348 n. 1.)

8       For these reasons, in addition to those set forth in the prior sections, the Court finds that the

9   verbal release is not enforceable as a matter of law. The Court has already found, above, that

10  recitation of the script is not a meaningful manifestation of a model's assent to have her video

11  posted online and disseminated throughout her community.

12  **C.  Defendants are Liable for Misappropriation of Likeness**

13      The civil causes of action for misappropriation of likeness are derived from the "right to

14  publicity," which can be defined as "the legally protected interest a person has to control the

15  commercial exploitation of his name, photograph or likeness"; this interest finds its roots in an

16  individual's right to privacy as well as his or her property rights. (*Eastwood v. Superior Court*

17  (1983) 149 Cal. App. 3d 409, 419; see also *Lugosi v. Universal Pictures* (1979) 25 Cal. 3d 813,

18  833-34.) In California, both common law and statute provide a remedy for the unauthorized

19  commercial exploitation of a person's identity.

20      The elements of a common law cause of action for misappropriation are: "(1) the

21  defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to

22  defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury."

23  (*Eastwood,* 149 Cal. App. 3d at 417 [citing Prosser, Law of Torts (4th ed. 1971) § 117, pp. 804–

24  807; Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 606, p. 2244].)

25      A statutory claim entails a similar showing. Civil Code § 3344(a) provides in relevant part:

26      Any person who knowingly uses another's name, voice, signature,
        photograph, or likeness, in any manner, on or in products,
27      merchandise, or goods, or for purposes of advertising or selling, or
        soliciting purchases of, products, merchandise, goods or services,
28

-160-

**STATEMENT OF DECISION**

1  without such person's prior consent, [...] shall be liable for any
   damages sustained by the person or persons injured as a result
2  thereof.

3  See also *Newcombe v. Adolf Coors Co.* (9th Cir. 1998) 157 F.3d 686, 692 [distilling the statutory

4  cause of action down to three elements: "(1) a 'knowing' use; (2) for purposes of advertising, and

5  (3) a direct connection between the use and the commercial purpose."].)[93]

6            *i.  Knowing Use of Likenesses in Products or for Advertising*

7      Section 3344 imposes liability for knowing use of another's likeness, in any manner, either

8  in products or for advertising purposes. The Court notes at the outset that three separate manners of

9  "use" are present in this case. First, Plaintiffs' likenesses appeared in Defendants' products (i.e.,

10  Plaintiffs' full-length pornographic videos), which were sold to subscribers for a monthly fee.

11      Second, Defendants posted photographs and sample video clips of Plaintiffs on the publicly-

12  available homepage of Defendants' subscription websites and on the GirlsDoPorn channel on

13  numerous free sites.  The purpose and effect of this use was to advertise for Defendants' paid

14  websites and entice viewers to purchase a subscription.

15      Third, Defendants participated in an affiliate marketing program *knowing* that the affiliates

16  websites used Plaintiffs' videos and images to drive internet traffic to Defendants' website in the

17  same way as Defendants' own posts on tube sites did.  Defendants paid commissions to the

18  affiliates for their marketing services, creating an incentive for affiliates to continue posting

19  Plaintiffs' images.

20      The non-Domi Defendants do not dispute that they knowingly and intentionally sold access

21  to Plaintiffs' videos in the members-only section of their websites or that they received subscription

22  payments as a result.  The non-Domi Defendants also do not dispute that Pratt posted Plaintiffs'

23  images on the public-facing homepage to entice viewers to purchase a subscription to see the full-

24  length videos.  Defendants also admit that they posted Plaintiffs' images and video clips on the

25

26      [93] It is worth noting that "the statute no longer requires that the unauthorized use occur in a product
27  advertisement or endorsement or other such solicitation of purchase. Cases decided under the pre–1984
   version of section 3344, such as Eastwood [], supra [], must be read with this change in mind."  (KNB
28  Enterprises, 78 Cal. App. 4th at p. 367 n. 5.)

STATEMENT OF DECISION

1  GirlsDoPorn channels on numerous free "tube" sites to advertise for and drive traffic to their

2  websites. These uses clearly satisfy the requirements of the common law and the statute.

3      In addition, Defendants' willing participation in an affiliate marketing program also

4  constitutes a knowing use for the purposes of advertising. This finding applies to Domi as well as

5  the other Defendants. The Court disagrees with Defendants' argument that they cannot be held

6  liable for the content on affiliate websites. The evidence meets the applicable liability standard.

7      First, Defendants affirmatively *chose* to participate in CCBill's affiliate program. Second,

8  affiliate advertising is not free. Defendants pay a large commission for affiliate sites to advertise

9  their websites, typically using their content. Third, Defendants *can* control or at least influence

10 their affiliates. They can easily remove any affiliate from the CCBill program for any reason at any

11 time, eliminating the incentive for that affiliate to continue advertising for Defendant. Defendants

12 can also initiate DMCA takedown requests against any affiliate for the use of their content but

13 choose not to. By electing to take no action, Defendants ratified the affiliates' use of Plaintiffs'

14 likenesses and profited from doing so. It is well-settled that one can be liable for harm caused by

15 the tortious act of another if he:

16      (a) orders or induces the conduct, if he knows or should know of
17      circumstances that would make the conduct tortious if it were his
        own, or (b) conducts an activity with the aid of the other and is
18      negligent in employing him, or (c) permits the other to act . . . with
        his instrumentalities, knowing or having reason to know that the other
19      is acting or will act tortiously, or (d) controls, or has a duty to use
        care to control, the conduct of the other, who is likely to do harm if
20      not controlled, and fails to exercise care in the control . . .

21

22 (Rest. 2d Torts § 877 (1979).)

23      The Court is not persuaded by Defendants argument that they have a lot of affiliates, and

24 that it would be burdensome to monitor the content of each one. One cannot endeavor,

25 successfully, to generate a far-reaching advertising campaign—which involve the use of Plaintiffs'

26 likenesses in highly-sensitive pornographic content—and then bemoan the consequences of the

27 enterprise. The Court finds a recent Second Circuit opinion persuasive on this point. That court

28 held a defendant company liable for the wrongful acts of its affiliates because the defendant

-162-

STATEMENT OF DECISION

1  company knew about those acts but, instead of taking action to stop them, sat back and reaped the

2  benefits. (*Fed. Trade Comm'n v. LeadClick Media, LLC* (2d Cir. 2016) 838 F.3d 158, 168 ["[W]e

3  hold that under the FTC Act, a defendant may be held liable for engaging in deceptive practices or

4  acts if, with knowledge of the deception, it either directly participates in a deceptive scheme or has

5  the authority to control the deceptive content at issue."].)[94]

6        In determining whether the "use" element is satisfied by participation in the affiliate

7  program, the Court examines several factors: who created the content at issue, who posted the

8  content at issue, whether Plaintiffs' images were used *in* the advertisement, and what was being

9  promoted in the advertisement. (See *Cross v. Facebook, Inc.* (2017) 14 Cal. App. 5th 190, 209–10,

10  review denied.)

11        Here, the facts differ dramatically from those in *Cross*. First, Defendants themselves

12  created the content containing Plaintiffs' images and knew its use on the internet was unauthorized.

13  Second, in this case, the affiliate site is, itself, an advertisement for Defendants' websites; that is its

14  purpose. Third, the advertisements at issue actually contain Plaintiffs' images and links to

15  Defendants' websites, driving traffic and thus, subscription sales. Thus, the fact that a third party

16  directly posted the content is not dispositive.

17        In *Cross*, an internet provider such as Facebook did nothing more than operate a platform

18  (i.e., provide a space for others to post content) and run advertisements next to the content; it had no

19  knowledge that the use of the images within the third-party content was unauthorized. In the present

20  case, on the other hand, Defendants—including Domi—took affirmative measures to use Plaintiffs'

21  images and videos, knowing that the use was unauthorized. Here, Plaintiffs' images were created

22  by and under the supervision of Defendant Pratt (50% owner of Domi) and then posted on affiliate

23  sites for the benefit of one or more of Pratt's companies. Because Pratt's knowledge of GDP's

24  deceptive business practices is imputed to Domi, Domi's solicitation of affiliates known to use

25  GDP's content to advertise for MomPOV.com establishes Domi's use of Plaintiffs' likenesses.

26

27     [94] See also *Falcon Foto v. Domain Mgmt. Servs.*, (C.D. Cal. Nov. 29, 2010) No. CV 10-6469 CAS
JCX, 2010 WL 4916645, at *4 (denying motion to dismiss misappropriation claim: "As clearly alleged in

28  the FAC, Defendant also uses Mr. Sizemore's name, image and persona to advertise and entice potential
customers to become members of Defendant's Domains and affiliate marketing program.")

**STATEMENT OF DECISION**

### ii. Lack of Consent

1

2 The other elements of these claims are also met. Defendants distributed Plaintiffs videos

3 and images online despite having first-hand knowledge that such distribution was unauthorized.

4 The signed documents do not relieve Defendants of liability for misappropriation for the reasons

5 stated above. (See Restatement (First) of Torts § 892, comment (d) [consent is a valid defense to

6 tort actions only when the consent is "unaffected by fraud"]; *Lightbourne v. Printroom Inc.* (C.D.

7 Cal. 2015) 122 F. Supp. 3d 942, 946 (signed writing permitting use of likeness can be undermined

8 by facts that "would somehow vitiate his express legal consent"].)

9 Defendants knew that the Plaintiffs did not consent to their video being posted online on any

10 website because Plaintiffs made it eminently clear that they would only agree to do the shoots if the

11 videos were not going to be released online. Obviously, Defendants were aware of the lies they

12 told these women and knew (or should have known) that such lies negated any apparent consent.

13 Moreover, it is beyond peradventure that Defendants were aware that the twenty-two Plaintiffs in

14 this action claimed that they did not consent when the women complained to them or, at the latest,

15 when Plaintiffs filed this suit. But, Defendants kept Plaintiffs' videos on their own websites.

### iii. Commercial Benefit

16

17 "[The next] requisite element[] of a common law right to publicity claim is that defendant

18 appropriated plaintiff's name 'to defendant's advantage, commercially or otherwise.' Similarly,

19 Civil Code section 3344, subdivision (a) requires that the name be used 'for purposes of advertising

20 or selling.'" (*Cross*, 14 Cal. App. 5th at p. 210.) The affiliate marketing program clearly satisfies

21 this element as well.

22 By signing up for CCBill's Affiliate Program and paying the affiliates to post Plaintiffs'

23 images and video clips on third-party sites, Defendants received a commercial benefit from affiliate

24 advertising. (*Newcombe*, 157 F.3d at 693 ["[plaintiff's] likeness was certainly used to Coors' and

25 Belding's commercial advantage as the drawing which resembled [the plaintiff] was a central figure

26 in the advertisement and the purpose of the advertisement was to attract attention."].) Based on the

27 evidence at trial (the testimony of Wolfe, Pratt, Wiederhold, and documents introduced by

28

1   Plaintiffs), the Court finds that Defendants received a substantial commercial benefit from

2   permitting affiliates to use Plaintiffs' likenesses.

3                              *iv.  Damages*

4        "[U]nder section 3344(a), an injured party may recover either the amount of damages

5   specified in the statute or actual damages, whichever is greater, as well as profits from the

6   unauthorized use." (*Orthopedic Sys., Inc. v. Schlein* (2011) 202 Cal. App. 4th 529, 547; 135 Cal.

7   Rptr. 3d 200, 213.) "Injury to a plaintiff's right of publicity is not limited to present or future

8   economic loss, but 'may induce humiliation, embarrassment, and mental distress.'" (*Abdul-Jabbar*

9   *v. Gen. Motors Corp.* (9th Cir. 1996) 85 F.3d 407, 416; CACI 1821.)

10       Here, Plaintiffs' evidence of damages is strong. The content at issue does not consist of run-

11  of-the-mill likenesses but hardcore pornographic videos and still images extracted from those videos.

12  Plaintiffs have provided extensive testimony and evidence about how their lives have been affected

13  and destroyed by the unauthorized publication and dissemination of this content via the internet. The

14  Court finds Plaintiffs' accounts to be consistent, credible, and compelling—warranting significant

15  damages.

16       Plaintiffs are also entitled to recover the profits Defendants' received from the unauthorized

17  use. The parties stipulated that Plaintiffs' videos generated $1,025,831.50 in profits for Defendants.

18  None of this revenue was generated by an authorized use of Plaintiffs' videos as Defendants only

19  earned money from posting the videos online.

20       "Section 3344 provides for minimum damages of $750, even if no actual damages are

21  proven." (*KNB Enterprises v. Matthews* (2000) 78 Cal. App. 4th 362, 367; Civ. Code § 3344(a).)

22  The misappropriation statute "can be read to presume that a person whose name, photograph, or

23  likeness is used by another for commercial purposes without their consent is 'injured as a result

24  thereof.'" (*Fraley v. Facebook, Inc.* (N.D. Cal. 2011) 830 F. Supp. 2d 785, 806.)  At least two

25  courts have held, "after surveying California court decisions, that 'courts generally presume that the

26  fourth element of the applicable test has been established if there is sufficient evidence to prove the

27  first three elements.'" (Id. at 806-07 [quoting *Del Amo v. Baccash* (C.D. Cal. Sept. 16, 2008) No.

28  07–663–PSG, 2008 WL 4414514, at *6].)

                          **STATEMENT OF DECISION**

1   Here, because it is difficult to establish the specific harm Plaintiffs endured as a result of

2   defendants' use of their likenesses, the Court will presume injury as allowed by Section 3344 and

3   impose the statutory penalty of $750 per Plaintiff.

4   **D.   Defendants Violated Business & Professions Code § 17200**

5   "Unfair competition" includes any "unlawful, unfair, or fraudulent business act or practice

6   and [also includes any] unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code §

7   17200.)

8   Whether conduct is a "business practice" within Section 17200 is a question of fact

9   dependent on the circumstances of each case.  The test is probably less exacting than that required

10   by Evidence Code § 1105 to prove a business custom or habit.  (*Marshall v. Brown* (1983) 141

11   Cal.App.3d 408, 416.)  A "practice" may be found based on nothing more than "a pattern of

12   behavior pursued as a business practice." (*People v. Casa Blanca Convalescent Homes, Inc.* (1984)

13   159 Cal.App.3d 509, 527.)  Section 17200 even covers single acts of misconduct.  (*Klein v. Earth*

14   *Elements, Inc.* (1997) 59 Cal.App.4th 965, 969.)

15   "Unlawful, unfair or fraudulent" act or practice is framed in the disjunctive.  So,

16   business conduct that is not "unlawful" or "fraudulent" may nonetheless be prohibited as

17   "unfair." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20

18   Cal.4th 163, 180.)

19   A business practice is not immune from Section 17200 merely because it has become

20   customary or habitual either for the defendant or the defendant's industry.  (*Casa Blanca*, 159

21   Cal.App.3d at 527.)

22   Section 17200 "was intentionally framed in its broad, sweeping language, precisely to

23   enable judicial tribunals to deal the innumerable new schemes which the fertility of man's invention

24   would contrive." (*Cel-Tech*, 20 Cal.4th at 180.)  Unfair business practices may "run the gamut of

25   human ingenuity and chicanery," and courts construe Section 17000 accordingly.  (*Id.*)  The

26   overriding purpose and priority of Section 17200 is the protection of the unwary from being duped

27   by the unscrupulous. (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 808.)  Section 17200 and its

28

-166-

**STATEMENT OF DECISION**

1    remedies are cumulative to the remedies of all other laws. *(Wang v. Massey Chevrolet* (2002) 97

2    Cal.App.4th 856.)

3        As set forth below, the Court finds Plaintiffs have met their burden on their Section 17200

4    cause of action – as against all Defendants – and the Court orders the relief stated below.

5             ***i.***    ***Defendants Violated Section 17200's Prohibition on Unlawful***

6               ***Business Practices***

7        The violation of virtually any law – civil, criminal, federal, state, municipal, statutory,

8    regulatory or court made – is a violation of the "unlawful" prong of Section 17200. *(Saunders v.*

9    *Superior Court* (1997) 27 Cal.App.4th 832, 838-839.)

10       Here, the Court's findings that Defendants are liable to Plaintiffs for fraud (including

11   intentional misrepresentation, concealment, and false promise), for misappropriation of likeness

12   (common law and Civ. Code § 3344), and fraudulent transfer support a further finding that

13   Defendants violated Section 17200's prohibition on unlawful business practices. The Court finds

14   that all Plaintiffs suffered an injury-in-fact caused by the Defendants' unlawful conduct.

15            ***ii.***    ***Defendants Violated Section 17200's Prohibition on Unfair***

16              ***Business Practices***

17       California courts have applied at least three different tests for unfairness in consumer cases.

18   *(Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 256-257.)

19       One test, as noted by the Fourth District, is whether the alleged business practice "is

20   immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires

21   the court to weigh the utility of the defendant's conduct against the gravity of the harm to the

22   alleged victim." (See *Bardin v. Daimlerchrysler Corp.* (2006) 136 Cal.App.4th 1255.)

23       Here, the Court's earlier findings that Defendants are liable to Plaintiffs for fraud (including

24   intentional misrepresentation, concealment, and false promise) and for misappropriation of likeness

25   (common law and Civ. Code § 3344) support a further finding that Defendants violated Section

26   17200's prohibition on unfair business practices. The Court finds that all Plaintiffs suffered an

27   injury-in-fact caused by the Defendants' conduct.

28

-167-

**STATEMENT OF DECISION**

### iii.    *Defendants Violated Section 17200's Prohibition on Fraudulent Business Practices*

A business practice is "fraudulent" within the meaning of Section 17200 if "members of the public are likely to be deceived." (*Committee on Children's Television v. General Foods Corp.* (1983) 35 Cal.3d 197, 211.)

Under Section 17200, a business practice may be "fraudulent" without the plaintiff proving intent, as in common law fraud, requiring the proof of intent, scienter, actual reliance, or damage. Actual deception is not required. All that is required is proof that "members of the public are likely to be deceived." (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167.)

A "fraudulent" business practice can include a deceptive manner in which otherwise lawful contract terms are presented, advertised, or marketed. (See *People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119 [car rental company engaged in deceptive acts in the manner in which its sales force described the collision damage waiver to customers]; *Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 649 [nursing home engaged in deceptive acts when it presented "third party guarantee" agreements to families of patients, misleading them into thinking their signatures were required as a condition to admitting their loved ones to the facility].)

Here, the Court's earlier findings that Defendants are liable to Plaintiffs for fraud (including intentional misrepresentation, concealment, and false promise) and for misappropriation of likeness (common law and Civ. Code § 3344), as well as the Court's finding all Plaintiffs suffered an injury-in-fact caused by the Defendants' conduct, support a further finding that Defendants violated Section 17200's prohibition on fraudulent business practices.

### iv.    *All Defendants are Liable for the Section 17200 Violations*

Section 17200 authorizes direct liability on any "person" engaged in prohibited conduct, which includes "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." (Bus. & Prof. Code §§ 17201, 17203.)

In addition to direct liability, vicarious liability principles apply to violations:

1.    Corporate officers may be subject to liability for the Section 17200 violations of their corporations, especially with knowledge and involvement in the subject

STATEMENT OF DECISION

scheme. (*People v. Sarpas* (2014) 225 Cal.App.4th 1539, 1562 [officers who indirectly receive the benefit of their corporation's violations can be liable]; *People v. Orange County Charitable Servs.* (1999) 73 Cal.App.4th 1054, 1074-1075 [officer liable for his deep involvement in the corporate scheme]; *People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119 [court upheld individual liability on a majority shareholder/chief executive officer who approved and controlled the company's deceptive practices].)

2.  Corporate officers are personally liable for Section 17200 wrongs they commit, authorize, and/or direct on behalf of the corporation. (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785.)

3.  Aiders and abettors are subject to Section 17200 liability. (*People v. Witzerman* (1972) 29 Cal.App.3d 169 [all defendants "cooperated with each other" in the advertising and sale of the particular offending service]; *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 918 [one who "furnishes the means for [the] accomplishment [of a fraud] is liable equally with those who actually make the misrepresentation"]; *American Philatelic Society v. Claibourne* (1935) 3 Cal.2d 689, 696-697 [same].)

4.  Co-conspirators are liable for Section 17200 violations committed pursuant to the conspiracy, no matter who actually performs the wrongful acts. (*People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 917-920; *People v. Chapman* (1962) 207 Cal.App.2d 557 [conspiracy shown through statements by co-conspirators]; *Wyatt,* 24 Cal.3d at 784-785 [conspiracy shown circumstantially by examining the nature of the acts and relationship of the parties].)

5.  Successors are liable for the Section 17200 violations of predecessors. (*Cortez v. Purolator Products Air Filtration Co.* (2000) 23 Cal.4th 163.)

Here, the evidence at trial established that all defendants participated in the fraud (including intentional misrepresentation, concealment, and false promise) and misappropriation of likeness (common law and Civ. Code § 3344) of Plaintiffs - as corporate officers, and agents. Accordingly, the Court finds Section 17200 liability as to all defendants.

> #### v.    The Court Orders Defendants Restore to Plaintiffs all Images and Videos, and Purported Rights/Copyrights Thereto and to Remove any Such Images and Videos Produced by Them from the Internet

Section 17203 authorizes the Court to make: "such orders or judgments … as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person … any money or property … which may have been acquired by means of such unfair competition.

"[A] court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the status quo ante as nearly

-169-

1   as may be achieved." (*Jayhill Corp.*, 9 Cal.3d at 286 [trial court has inherent power to order

2   Defendants make restitution to those defrauded].) Restitution does not require "individualized

3   proof of deception, reliance, and injury if necessary to prevent the use or employment of an unfair

4   practice." (*West v. Superior Court* (1992) 2 Cal.4th 1254.) Restitution may consist of "money or

5   property that defendants took directly from plaintiff." (*Korea Supply Co. v. Lockheed Martin Corp.*

6   (2003) 29 Cal.4th 1134, 1146-1147.)

7        Here, based on the above findings, the Court orders restitution, *infra*.

8             ***vi.***    ***The Court Awards Declaratory Relief in the Form of Voiding the***

9                 ***Purported Model Release Agreements***

10       The Court may award declaratory relief in a Section 17200 action. (*AICCO, Inc. v.*

11   *Insurance Co. of North America* (2001) 90 Cal.App.4th 579, 590.)

12        Here, based on the above findings, the Court issues declaratory relief, *infra*.

13             ***vii.***    ***The Court Orders a Permanent and Mandatory Injunction against***

14                 ***Defendants***

15       Section 17204 permits injunctions by "any person acting for the interests of itself...or the

16   general public." (*Herr v. Nestle U.S.A., Inc.* (2003) 109 Cal.App.4th 779, 789.) The Legislature

17   "intended ... to permit courts to enjoin ongoing wrongful business conduct in whatever context

18   such activity might occur." (*Committee on Children's Television, Inc.*, 35 Cal.3d at 210.) In

19   exercising this mandate, courts can protect the public's right to be protected from fraud and deceit

20   and may enter injunctive relief on that basis alone. (*People ex rel. Mosk v. National Research Co.*

21   *of Calif.* (1962) 201 Cal.App.2d 765, 771.)

22       Mandatory injunctions are permissible under Section 17200 to make up for past misleading

23   statements and conduct. (*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4

24   Cal.App.4th 963, 972-974.) The mandatory injunction requiring an affirmative disclosure to cure

25   deceptive advertising practices is authorized under Section 17200. (*Id.* [court of appeal affirmed

26   trial court's order of injunction that required a dairy guilty of false advertising to place a warning on

27   all of its advertisements and products for the next 10 years].)

28

-170-

**STATEMENT OF DECISION**

1    This is because "an injunction against future violations might have some deterrent effect,

2    [but] it is only a partial remedy since it does not correct the consequences of past conduct." (Id. at

3    973.) An "order which commands a party only to go and sin no more simply allows every violator

4    a free bite at the apple." (Id. [internal cites omitted].)

5    The Ninth Circuit has similarly ordered mandatory injunctions requiring an insurer to

6    rewrite its insurance policy to conform to law. (Chabner v. United of Omaha Life Insurance Co.

7    (9th Cir. 2000) 225 Fed.3d 1042, 1053.) And, in Federal Trade Commission cases, courts have

8    frequently approved of mandatory or corrective disclosures. (See, e.g., Grolier, Inc. v. FTC (9th

9    Cir. 1983) 699 Fed.2d 983, 987.)

10    Here, based on the above findings (including the testimony of Defendant Wolfe and Jane

11    Doe A, which established Defendants were continuing this conduct even through the time of trial

12    and that Defendants' scheme continued to target other members of the public both in California and

13    nationwide), the Court orders an injunction, infra.

14    **E.  Defendants' are Liable for Fraudulent Transfer**

15    The Court finds that Defendants' transfers of video rights, funds, and other assets to Oh

16    Well Media, Ltd. and Sidle Media, Ltd. ("the Vanuatu entities") were fraudulent and are therefore

17    voidable under the Uniform Voidable Transactions Act (UVTA) (Civ. Code, § 3439, et seq.)

18    Notably, these assets are the fruits of Defendants' fraudulent activity which is the subject of this

19    action, including their tortious conduct towards Plaintiffs themselves.

20    The purpose of the UVTA "undoubtedly is to prevent debtors from placing property which

21    legitimately should be available for the satisfaction of demands of creditors beyond [creditors']

22    reach." (Tatung Co., Ltd. v. Shu Tze Hsu (C.D. Cal. 2016) 217 F. Supp. 3d 1138, 1186, citing

23    Borgfeldt v. Curry (1914) 25 Cal. App. 624.) Here, the Court voids Defendants' transfer of assets to

24    the Vanuatu entities to prevent them from placing anything of value beyond Plaintiffs' reach.

25    A transfer is voidable as to a creditor, whether the creditor's claim arose before or after the

26    transfer was made,[95] if the debtor made the transfer as follows:

27    

28    _____
[95] Plaintiffs are creditors within the meaning Civil Code section 3439.01(c) even though their claims have not yet been reduced to judgment. A "claim" is merely "a right to payment, whether or not reduced to judgment, [...] contingent, [...] matured, [...] or disputed[.]" (Civ. Code § 3439.01, subd. (b).) "Certainly, for purposes of the Uniform

-171-

**STATEMENT OF DECISION**

**EXH. 1 - 171**

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

    (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

    (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(Civ. Code, § 3439.04(a).) In determining actual intent, the Court may consider:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

(Civ. Code, § 3439.04, subd. (b).)

    Here, Plaintiffs have proven that Defendants engaged in multiple transfers that meet these criteria: the transfer of rights to the pornographic videos, the domain names, and revenue from Bubblegum Films to Oh Well Media and Sidle Media (Exs. 3282 and 3283) and from BLL Media, Inc. to Oh Well Media and Sidle Media. (Ex. 3320.)[96]

---

Fraudulent Conveyance Act, a tort claimant before judgment is rendered is a 'creditor' within the meaning of Civil Code section 3439.01." (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1057–58, citing Estate of Blanco (1978) 86 Cal.App.3d 826, 832.) "It is well settled in this state that the relationship of debtor and creditor arises in tort cases the moment the cause of action accrues." (*Hansen v. Cramer* (1952) 39 Cal.2d 321, 323.)

[96] Defendants used model releases naming the producer and photographer as "Clockwork Productions on behalf of Bubblegum Films" and others that stated "Clockwork Productions on behalf of BLL Media."

-172-

**STATEMENT OF DECISION**

1       ### *i. Defendants Transferred Assets to Vanuatu with the Intent to Hinder,*

2       ### *Delay, or Defraud the Plaintiffs in this Action and Without Receiving*

3       ### *Reasonably Equivalent Value*

4       Evidence of Defendants' intent to hinder, delay, or defraud the Plaintiff-creditors by

5   transferring their assets to Vanuatu entities is persuasive.

6       Regarding ownership of the Vanuatu entities, the evidence indicates that, as discussed

7   above, they are owned either by Pratt and Wolfe or by insiders and agents acting on Defendants'

8   behalf and under their control: that Pratt himself owns or controls Oh Well Media and that Pratt and

9   Wolfe co-own and control Sidle. Consequently, the transfers at issue are the functional equivalent

10  of taking the assets out of one pocket and putting them in the other because the transfers do not

11  divest Defendants of possession of the assets.

12      While the transfers themselves were not concealed, many details and information

13  surrounding them are not in evidence.  There is no explanation why these transactions occurred,

14  who Charles Pane is and why he is signing as a director, or what Bubblegum Films and BLL Media

15  received in return. One agreement was backdated. Pane did not appear.  The purported licensing

16  agreement never materialized. Defendants' position that the transfers were part of an effort to "fix

17  mistakes in the corporate structure" and that Oh Well Media and Sidle Media (which did not exist

18  prior to September 2015) were "meant to have the rights all along" is not convincing. What is

19  persuasive to the Court is that these are not legitimate sales or transfers to true third parties but a

20  way of moving and hiding assets to avoid creditors. There is a lack of information and documentary

21  evidence of the transfers in this case.

22      The Court finds these transfers were made while Defendants were under the threat of being

23  sued for their fraudulent practices. The transfers occurred after Defendants had operated their

24  scheme for eight years and received dozens of complaints from models claiming to be defrauded.

25  Defendants were under the constant threat that one or more of these models would take legal action.

26  As Defendants themselves maintained at trial, they saw the prospect of lawsuits coming. The Court

27  finds that transferring their assets off-shore was one of the protective measures they took to ensure

28  that any model who sued would have nothing to recover.

-173-

### STATEMENT OF DECISION

1     The record indicates that the assets conveyed in these transfers constituted a significant

2   portion of Defendants' assets.  Pratt admitted in his third deposition that, in January 2019, his

3   bankruptcy schedules stated—under penalty of perjury—that all of his companies had a net worth

4   of zero. This was because the value had been transferred to the Vanautu entities, leaving ostensibly

5   empty shells in the United States. Consequently, the Court finds that the transfers at issue left

6   Defendants with little to their names.

7     There is little in the record showing that Defendants received *any* consideration for either of

8   the transfers. Defendants asserted that they benefited in the form of a written licensing agreement,

9   but such never materialized.

10     In addition, the Court considers Pratt's own statements about his plan to ensure that "the

11   models won't get a dime" to be compelling evidence of his intent.[97] Pratt followed up by

12   absconding before or during trial, ignoring a notice to appear and an arrest warrant issued by this

13   Court. These are strong indicia of his intent to escape liability and his intent regarding the transfers.

14     At the time of the transfers, Defendants had deliberately defrauded many women as part of a

15   longstanding scheme; they were faced with complaints of fraud from dozens of models, who

16   experienced devastating consequences and harm. It was merely a matter of time before the models

17   began to take legal action. Defendants also were aware that the injuries and damages caused by

18   their distribution practices—including dissemination of models' videos and identities in their

19   communities—were highly substantial on an individual level and massive in the aggregate.

20     Defendants took deliberate steps to avert the eventuality of a large judgment against them.

21   One measure was compelling women to sign the documents. But Defendants could not have

22   reasonably believed that signatures obtained on documents were airtight in the face of allegations of

23   fraud.  Thus, in accordance with Pratt's determination that "the models won't get a dime,"

24   Defendants funneled their assets to Vanautu where they believed models could not get them.

25     Based on the foregoing, the Court finds that Defendants' transferred their assets to entities

26   located on the island of Vanuatu, with the intent to hinder, delay or defraud the Plaintiffs.  The

27

28     [97] The Court also considers Pratt's conveyance of his interest in Domi Publications, LLC during trial in an effort to divest himself of all assets against which Plaintiffs could easily collect.

-174-

**STATEMENT OF DECISION**

1 | transfers were fraudulent transactions under Civil Code section 3439.04(a) and are therefore

2 | voidable by Plaintiffs.

3 | F. **Defendants are Jointly and Severally Liable to Plaintiffs**[98]

4 | The Court finds Defendants jointly and severally liable on the grounds Defendants are: (i) in

5 | a single business enterprise/alter egos and (ii) partners/joint venturers.

6 | *i.      Defendants are Jointly and Severally Liable as a Single Business*

7 | *Enterprise*

8 | Under the alter ego doctrine, a court may disregard the corporate form and hold one

9 | corporation liable for the debts of an affiliated corporation. (*Toho-Towa Co., Ltd v. Morgan Creek*

10 | *Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1109, citing *Las Palmas Associates v. Las Palmas*

11 | *Center Associates* (1991) 235 Cal.App.3d 1220, 1249.) If corporations are a "single business

12 | enterprise," the Court may pierce the corporate veil. (*Toho-Towa, supra*, 217 Cal.App.4th at 1107.)

13 | "[This] 'single-business-enterprise' theory is an equitable doctrine applied to reflect partnership-

14 | type liability principles…." (*Id.* at 1108.)

15 | The "single business enterprise" doctrine depends on the facts and circumstances of each

16 | case, but some factors that tend to establish it are: (1) a common venture; (2) common ownership;

17 | (3) common addresses and locations; (4) common management and employees; (5) common legal

18 | counsel; (6) common assets and resources; and (7) no arms-length transactions. (*Las Palmas*

19 | *Associates, supra*, 235 Cal.App.3d at 1249 – 1250; *Pan Pacific Sash & Door Co. v. Greendale*

20 | *Park, Inc.* (1958) 166 Cal.App.2d 652, 658 – 660; *Toho-Towa, supra*, 217 Cal.App.4th at 1108–09;

21 | *O'Donnell v. Weintraub* (1968) 260 Cal.App.2d 352, 358.)

22 | Here, the substantial evidence presented at trial (as well as Defendants' failure to explain

23 | such evidence) supports a finding of a single business enterprise during the relevant time period

24 | among all defendants:

25 | (1) Common Venture

26 | Based on the findings above, the Court finds a common venture among all Defendants.

27 | 

28 | [98]    The Court recognizes Domi Publications, LLC appealed two anti-SLAPP motions and there is a stay with respect to the Jane Doe Nos. 15-22 complaints against Domi Publications, LLC only. Therefore, these findings, as to Domi Publications, LLC only, are limited to Jane Doe Nos. 1-14's complaint.

**STATEMENT OF DECISION**

(2) <u>Common Ownership</u>

Based on the findings above, the Court finds common ownership among all Defendants.

(3) <u>Common Addresses and Locations</u>

Based on the findings above, the Court finds common addresses and locations among all Defendants.

(4) <u>Common Management and Employees</u>

Based on the findings above, the Court finds common management and employees among all Defendants.

(5) <u>Common Legal Counsel</u>

The Court finds common legal counsel among the Defendants. Domi and all defendants have a joint defense agreement and have asserted a common interest privilege. [10/3/19 Trial Tr. at 31:24-28).] Panakos Law, APLC (current counsel for Pratt, Wolfe, Garcia, BLL Media, Inc. BLL Media Holdings, LLC, EG Publications, Inc., Merro Media Holdings, LLC, and Merro Media, Inc.) previously represented Domi Publications, LLC in this action. Further, Panakos Law, APLC (BLL Media, Inc. and Pratt's counsel) incorporated Domi. (7/17/18 Wiederhold Depo. 278:4-9.)

(6) <u>Common Assets</u>

Based on the findings above, the Court finds common assets among all Defendants.

(7) <u>No Arm's Length Transactions</u>

Based on the findings above, the Court finds a lack of arm's length transactions among all Defendants.

(8) <u>Failure to Find a Single Business Enterprise Would Result in an Injustice</u>

Finally, as single business enterprise is a species of alter ego-type liability, the trial further elicited evidence supporting the second prong of alter ego (i.e., that failure to find the Defendants as one would result in injustice).

Valorie Moser testified Pratt sold his Lamborghini and Rancho Santa Fe house to avoid collection in this lawsuit. Pratt said he was doing this, so "The models weren't going to get a dime." (9/29/19 Trial Transcript, pg. 10-11, 60.) Ms. Moser also testified as to Pratt's intentions for

-176-

**STATEMENT OF DECISION**

1  leaving the country ["to avoid paying the models in this case"] and filing bankruptcy ["as soon as I

2  bankrupt the business, they are fucked"]. (Id. at 63, 65.)

3       In his bankruptcy petition, Pratt declared under oath that he is personally insolvent. Pratt

4  also declared, under oath, that, with regard to his entities (including defendants BLL Media, Inc.,

5  BLL Media Holdings, LLC, EG Publications, Inc., and Domi Publications, LLC), the "[a]ssets are

6  exceeded by liabilities, thus not worth anything. Company has no resaleable value."

7       Wolfe confirmed defendants shut down their website, www.GirlsDoToys.com, during the

8  litigation. (10/3/19 Trial Tr. 43.)

9       Wolfe testified that Pratt left the country, through Tijuana, Mexico, right before or during

10  trial. (10/1/19 Trial Tr., pg. 210-11.) As Pratt ignored Plaintiffs' Notice to Appear with

11  documents, the Court granted Plaintiffs' application for an arrest warrant.

12       Pratt transferred his 50% interest in Domi, and there is no evidence in the record to establish

13  that consideration was given. (10/3/19 Trial Tr. 26:24-27:9.)

<strong><em>ii.    Defendants are Jointly and Severally Liable as Partners and Joint<br>Venturers</em></strong>

16       Partners and joint venturers are both liable for the torts committed by other partners/joint

17  venturers committed within the scope of the partnership/joint venture. (See, CACI 3711 and 3712.)

18  > The distinction between joint ventures and partnerships is not sharply
19  > drawn. A joint venture usually involves a single business transaction,
> whereas a partnership may involve 'a continuing business for an
20  > indefinite or fixed period of time.' Yet a joint venture may be of longer
> duration and greater complexity than a partnership. From a legal
21  > standpoint, both relationships are virtually the same. Accordingly, the
> courts freely apply partnership law to joint ventures when appropriate.
22

23  (*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 482.) "The incidents of a joint venture are in all

24  important respects the same as those of a partnership. One such incident of partnership is that all

25  partners are jointly and severally liable for partnership obligations, irrespective of their individual

26  partnership interests. Because joint and several liability arises from the partnership or joint venture,

27  Civil Code section 1431.2 [Proposition 51] [providing for an assessment of comparative fault

28

-177-<br><strong>STATEMENT OF DECISION</strong>

<strong>EXH. 1 - 177</strong>

1   among tortfeasors for non-economic damages in certain types of cases] is not applicable." (*Myrick*

2   *v. Mastagni* (2010) 185 Cal.App.4th 1082, 1091.)

3       A joint venture exists when there is "an agreement between the parties under which they

4   have a community of interest, that is, a joint interest, in a common business undertaking, an

5   understanding as to the sharing of profits and losses, and a right of joint control." (*Simmons v.*

6   *Ware* (2013) 213 Cal.App.4th 1035, 1053.) "The law requires little formality in the creation of a

7   joint venture and the agreement is not invalid because it may be indefinite with respect to its

8   details." (*Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272, 285.)

9       Here, the Court finds all Defendants, including individuals Pratt, Wolfe, and Garcia, as well

10   as entity Domi Publications, LLC, are jointly and severally liable for each other's torts. The Court

11   bases this finding on the single business enterprise findings, *supra*, as well as the following

12   findings.

13       With regard to defendants Pratt and Wolfe:

14     1.   Wolfe is Pratt's childhood friend. (10/1/19 Trial Trans, pg. 209:10 – 16; 10/2/19
           Trial Trans, pg. 9-13.)

15     2.   Wolfe came to the United States to assist Pratt with www.GirlsDoPorn.com.
           (10/2/19 Trial Trans, pg. 9:6-9.)

16     3.   Wolfe operated www.GirlsDoToys.com through M1M Media, Inc. with Pratt.
           (10/3/19 Trial Trans, pg. 105:3-6; 106:23 – 107:4.)

17     4.   Wolfe filmed approximately 100 videos for www.GirlsDoPorn.com (10/1/19 Trial
           Trans. 197:2-7.)

18     5.   Pratt filmed many videos for www.GirlsDoPorn.com.

19     6.   Pratt misled Plaintiffs in recruiting for www.GirlsDoPorn.com.

20     7.   Pratt misled third parties in recruiting for www.GirlsDoPorn.com.

    8.   Wolfe, through his entities, Merro Media Inc./Merro Media Holdings, LLC, runs

21           operations at Pratt's direction at BLL Media, Inc. (10/1/19 Trial Trans., pg. 226:28 -
           228:5.)

22     9.   Wolfe is the Person Most Qualified on All Issues, and helped produced discovery
           documents, for Pratt's entity, BLL Media, Inc. (10/1/19 Trial Trans., at pg. 222:18 –

23           224:3; 225:26 – 229:18.)

24     10.  Wolfe, through his entities, Merro Media Inc./Merro Media Holdings, LLC,
           performs work for nobody other than BLL Media, Inc. (10/2/19 Trial Trans, pg. 92:

25           5-26.)

    11.  Wolfe misrepresented facts – in the exact fashion as Pratt - to other Jane Doe

26           Plaintiffs he filmed. (e.g., 9/11/19 Trial Trans., pg. 172:20 – 173:8 [told Jane Doe
           No. 1 nothing to worry about regarding distribution and confidentiality]; 5/17/2018

27           Jane Doe 7 Depo., 71:21-72:2 [told Jane Doe No. 7's friend videos not online].))

28     12.  Wolfe hung up the phone on complaining models in the same fashion as Pratt.
          (5/17/2018 Jane Doe 7 Depo., 26:11-16.)

-178-

STATEMENT OF DECISION

13. Wolfe knows the model agreements do not mention the Defendants' websites, www.GirlsDoPorn.com or www.GirlsDoToys.com, and knows the contracts were not changed after the lawsuit was filed. (10/2/19 Trial Trans, pg. 94:10 - 96:9.)

14. Wolfe knows the videos will go on websites, including www.GirlsDoPorn.com or www.GirlsDoToys.com. (10/2/19 Trial Trans, pg. 117:7 – 20; 229-6-7.)

15. Theodore Gyi testified that Wolfe instructed him not to tell models about the videos going online (8/29/19 Trial Trans, pg., 116:5-12, 142:7-11.)

16. Pratt told Valorie Moser to recruit models by concealing www.GirlsDoPorn.com and by telling the prospects the videos would be private and only on DVD overseas. (Ex. 1695:54-55 [Moser's notes from her meeting with Pratt in which he instructed her what to say and not say to models when recruiting]; 9/19/2019 Trial Tr. 95:1-10.)

17. Riva Yousif testified that Wolfe hired her for BLL Media, Inc., she would invoice Wolfe for BLL Media, Inc. work, Wolfe never told her which company she was working for, Wolfe and Pratt never discussed with her where the videos were published, and she never heard of www.GirlsDoPorn.com or www.GirlsDoToys.com before this lawsuit. (9/3/19 Trial Trans, pg. 109:17 – 19; 110:17-19; 112:12-16; 117:11-15; 118:3-18.)

18. Valorie Moser testified that, after this lawsuit was filed, Wolfe kept the model contracts under lock and key in his locked office, she testified Wolfe *created* a web diagram of entities chart (including BLL, Merro, and Domi Publications), Wolfe told her to block complaining models, and Wolfe tasked her with updating contracts to say "Oh Well Media" after the lawsuit commenced. (9/20/19 Trial Trans, pg. 67:11-24, 68:5-17, 103:16-24, 122:10-12; 199:8 - 201:24.)

19. Wolfe considers himself to be an independent contractor providing services through Merro Media, Inc., testifying, "99 percent of the income that Merro Media had generated was by invoicing BLL Media." (Oct. 2, 2019 Trial Trans., pg. 92:5-26.)

With regard to defendant Garcia:
1. Garcia has worked for Pratt and BLL Media, Inc. for many years.
2. Garcia misled every Plaintiff in the action, in the same fashion as Pratt and Wolfe.
3. Garcia misled third parties in the same fashion as Pratt and Wolfe.
4. Garcia hung up the phone on complaining models in the same fashion as Pratt and Wolfe.
5. Models complained to Moser about Garcia and she forwarded the complaints to Pratt.

With regard to defendant Domi Publications, LLC:
1. Domi's owner, Doug Wiederhold, prior to being in partnership with Pratt for www.MomPOV.com, which later merged into a limited liability company, worked for www.GirlsDoPorn.com as an actor and recruiter.
2. Wiederhold misled Ms. Jeffrey in the same fashion as Pratt and Wolfe.
3. Domi's own witness, Ms. Burns, admitted Domi is not completely truthful with prospective models.

## G. Punitive Damages

The Court finds the evidence supports an award of punitive damages.

*i.    There is Clear and Convincing Evidence Defendants Acted with Malice, Oppression or Fraud*

-179-

**STATEMENT OF DECISION**

**EXH. 1 - 179**

1    "In an action for the breach of an obligation not arising from contract, where it is proven by

2    clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, the

3    plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way

4    of punishing the defendant." (Civ. Code § 3294(a).)  The public purpose of punitive damages is to

5    punish wrongdoing and deter future misconduct by either the defendant or other potential

6    wrongdoers. (*Bardis v. Oates* (2004) 119 Cal.App.4th 1; *Textron Financial Corp. v. National Union*

7    *Fire Ins. Co., of Pittsburgh* (2004) 118 Cal.App.4th 1061.)

8    "Malice" for punitive damages purposes means "conduct which is intended by the defendant

9    to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a

10   willful and conscious disregard of the rights or safety of others." (Civ. Code § 3294 (c)(1).)

11   "Oppression" for purposes of a punitives award means "despicable conduct that subjects a person to

12   cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code § 3294 (c)(2).)

13   "Fraud" for purposes of a punitives award means "an intentional misrepresentation, deceit, or

14   concealment of a material fact known to the defendant with the intention on the part of the

15   defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

16   (Civ. Code § 3294(c)(3).)

17      "Clear and convincing" evidence for punitive damages means a "high probability." (CACI

18   201; *Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1090.)

19      Here at trial, clear and convincing evidence established defendants acted with the requisite

20   oppression, fraud, and/or malice.  Considering all of the facts found in this Proposed Statement of

21   Decision, including Defendants' calculated steps and mechanism to defraud models, Defendants'

22   failure to change their fraudulent conduct despite pleas from prior models (including suicidal

23   threats), Defendants' posting (and/or allowing) model and family personal contact information,

24   Defendants' harassing models (e.g., Jane Doe 1 at her law school), Defendant's attempting to

25   pay/intimidate witnesses, and Defendants' paying third parties to harass Plaintiffs' counsel, the

26   Court finds Defendants' actions meet each of the "malice, oppression or fraud" standards. (Civ.

27   Code § 3294(c).)

28

*ii.  In Determining the Amount of Punitive Damages, the Court Considered Defendants'*
*Reprehensible Actions over Many Years, and Defendants' Obfuscation Regarding*
*Their Net Worth*

Under California law, the measure or amount of punitive damages is not subject to any "per se" standards.  The trier of fact has broad discretion in assessing an appropriate amount and will be reversed only for an "excessive" award where it appears that discretion was exercised with "passion or prejudice." (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 114 CR 622; *Neal v. Farmers Ins. Exch.* (1978) 21 Cal.3d 910; CACI Nos. 3942, 3949.)

"[T]he calculation of punitive damages does not involve strict adherence to a rigid formula but instead involves 'a fluid process of adding or subtracting depending on the nature of the acts and the effect on the parties and the worth of the defendants.'" (*Gagnon v. Continental Cas. Co.* (1989) 211 Cal.App.3d 1598, 1604; *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 623-624.)  The more reprehensible the act, the greater the appropriate "punishment." (*Id.*)  Repeated misconduct is more reprehensible than an isolated instance of wrongdoing; thus, a recidivist may be punished more severely than a first-time offender. (*Lopez v. Watchtower Bible & Tract Soc. of N.Y., Inc.* (2016) 246 Cal.App.4th 566, 592.)  This is especially true where defendant was motivated by monetary gain and in fact reaped substantial profits from the conduct in question. (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1207.)

Evidence of "net worth" is not essential to upholding a punitive damages award.  Profitability of the misconduct of the defendant is also a sufficient basis for awarding punitive damages. (*Cummings Med. Corp. v. Occupational Med. Corp.* (1992) 10 Cal.App.4th 1291, 1298.)

Where defendant makes little effort to refute plaintiff's evidence regarding defendant's wealth and engages in conduct intentionally designed to conceal assets or give testimony that is evasive, nonresponsive or false, the trier of fact has wide latitude (per Evid.Code § 413) to draw inferences from the evidence unfavorable to defendant. (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 546-547; *Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 449-454.)

Here, the Court found the evidence at trial established the Defendants' actions, which were repeated over many years (and despite pleas and complaints to stop), were reprehensible.

-181-
STATEMENT OF DECISION

1      Pratt was served with a notice to appear at trial and to provide financial records through

2      2019. Pratt failed to appear and the Court ordered an arrest warrant be issued. The Court also finds

3      Pratt to be less than credible and forthcoming in responding to some financial condition questions

4      regarding him and his entities in his Civil Code Section 3295 deposition.

5      Expert Robert Taylor testified that the present value of the future cash flow of BLL Media,

6      Inc. from their inventory of 200 videos was $4,672,194; further, the parties stipulated that the

7      profits generated from use of the plaintiffs' names and likenesses total $1,025,831.50. Due to

8      Pratt's obfuscation, Mr. Taylor's testimony was based on incomplete financial records provided to

9      him from Pratt and BLL Media. Mr. Taylor did not have complete financial records from the

10      defendants for 2019, particularly because Pratt refused to appear at trial and produce the records.

11      Accordingly, Mr. Taylor testified that he had concerns that his analysis was not as accurate as it

12      could be because he did not have up-to-date records to review and analyze.

13      The Court finds for Plaintiffs on the alter ego theory as to all Defendants. As stated above,

14      all Defendants operate as a single business enterprise and a joint venture. Defendants engaged in

15      fraudulent transfers of their assets to the Vanuatu entities in order to conceal those assets. The

16      Court finds that the Defendants have not been forthcoming in discovery regarding their financial

17      condition leaving little evidence before the Court about the value of the transferred assets or any

18      other assets owned or controlled by the Defendants. The intent to obfuscate and avoid financial

19      responsibility is manifested by Pratt's statement, "the models won't get a dime."

20      Based on all of the above, the Court awards punitive damages against all Defendants, *infra.*

21      **H. Damages and Remedies**

22      The Court awards damages and orders equitable relief as follows:

23      **a. *The Court Awards Economic and Non-Economic Damages***

24      As the Court found liability on all remaining causes of action, *supra*, Plaintiffs are entitled

25      to recover economic and noneconomic damages arising out of Defendants' unauthorized use of

26      Plaintiffs' videos. The Parties stipulated that Defendants received a total of $1,025,831.50 in profits

27      from the use of the twenty-two Plaintiffs' videos. Thus, it is undisputed that Defendants derived

28      $46,628.70 from the use of each Plaintiff's video(s).

-182-

**STATEMENT OF DECISION**

Plaintiffs also have individualized emotional distress damages from all claims.  Having considered the particular facts relative to each Plaintiff, the Court finds and orders the following compensatory damages:

Jane Doe 1:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 500,000.00 |

Jane Doe 2:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 400,000.00 |

Jane Doe 3:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 400,000.00 |

Jane Doe 4:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 400,000.00 |

Jane Doe 5:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 250,000.00 |

Jane Doe 6:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 500,000.00 |

Jane Doe 7:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 250,000.00 |

Jane Doe 8:

| | | |
|---|---|---|
| Economic Damages | $ | 46,628.70 |
| Non-Economic Damages | $ | 250,000.00 |

-183-

STATEMENT OF DECISION

1  Jane Doe 9:

2      Economic Damages      \$      46,628.70

3      Non-Economic Damages      \$      400,000.00

4  Jane Doe 10:

5      Economic Damages      \$      46,628.70

6      Non-Economic Damages      \$      250,000.00

7  Jane Doe 11:

8      Economic Damages      \$      46,628.70

9      Non-Economic Damages      \$      500,000.00

10  Jane Doe 12:

11      Economic Damages      \$      46,628.70

12      Non-Economic Damages      \$      500,000.00

13  Jane Doe 13:

14      Economic Damages      \$      46,628.70

15      Non-Economic Damages      \$      400,000.00

16  Jane Doe 14:

17      Economic Damages      \$      46,628.70

18      Non-Economic Damages      \$      500,000.00

19  Jane Doe 15:

20      Economic Damages      \$      46,628.70

21      Non-Economic Damages      \$      500,000.00

22  Jane Doe 16:

23      Economic Damages      \$      46,628.70

24      Non-Economic Damages      \$      400,000.00

25  Jane Doe 17:

26      Economic Damages      \$      46,628.70

27      Non-Economic Damages      \$      500,000.00

28

-184-

**STATEMENT OF DECISION**

Jane Doe 18:

     Economic Damages         $     46,628.70

     Non-Economic Damages   $   250,000.00

Jane Doe 19:

     Economic Damages         $     46,628.70

     Non-Economic Damages   $   400,000.00

Jane Doe 20:

     Economic Damages         $     46,628.70

     Non-Economic Damages   $   400,000.00

Jane Doe 21:

     Economic Damages         $     46,628.70

     Non-Economic Damages   $   250,000.00

Jane Doe 22:

     Economic Damages         $     46,628.70

     Non-Economic Damages   $   250,000.00

### b. The Court Awards Equitable Relief

The Court, having found Defendants liable on all remaining claims, *supra*, and pursuant to Plaintiffs' declaratory relief cause of action, orders the following equitable relief:

#### 1.    Injunction

The Court issues the following injunctive relief:

- Defendants' written agreements must clearly and affirmatively disclose in bold and centered at the top of the first page the following language: "**the pornographic video subject to this agreement will be placed on the Internet, on www.GirlsDoPorn.com, or on free and public pornography websites.**"
- Defendants' must send any written agreements to prospective models, at least five (5) days in advance of the video shoot and before they travel to attend the shoot.
- If utilized, Defendants' "verbal release" must include the following language: "**I understand and agree that the pornographic video I am about to shoot will be placed on the Internet, on www.GirlsDoPorn.com, or on free and public pornography websites.**"
- Defendants must obtain a model's explicit, unambiguous consent in order to use her name or personal information for any purpose.

-185-

STATEMENT OF DECISION

- Defendants are prohibited from using, publishing, licensing or distributing Plaintiffs' images, likenesses, videos or copyrights. Defendants must remove Plaintiffs' images, likenesses, or videos produced by them from the internet sites owned or controlled by Defendants. Defendants must take active steps to have such images, likenesses and videos removed from circulation and to safeguard Plaintiffs' privacy.
- Defendants are prohibited from using or disseminating Plaintiffs' names or personal information in connection with their images, likenesses or videos and must take active steps to have such information removed from circulation and to safeguard Plaintiffs' privacy.

## 2. Restitution

Based on the findings herein, the Court orders Defendants to return to Plaintiffs all of Plaintiffs' property they took, including images, likenesses, videos, and/or copyrights.

## 3. Avoidance of Transfers

Based on the findings herein, the Court voids all of Defendants' purported transfers of videos and/or copyrights to the Vanuatu entities.

## 4. Declaratory Relief

Based on the findings herein, the Court voids and renders unenforceable all purported model releases and other agreements between Plaintiffs and Defendants. Court finds that Plaintiffs hold all rights, title, and interest in images, likenesses, and videos featuring Plaintiffs produced by Defendants.

### c. *The Court Awards Punitive Damages*

The Court, having found by clear and convincing evidence the Defendants engaged in malice, oppression, or fraud, *supra*, awards each Plaintiff the sum of $150,000 against all Defendants, jointly and severally.

## CONCLUSION

The Court therefore finds in favor of Plaintiffs in the aggregate amounts of $9,475,831.50 in compensatory damages and $3,300,000 in punitive damages against all Defendants, jointly and severally, plus the additional relief stated.

Judgment is to be entered accordingly.

IT IS SO ORDERED.

Dated:___4-27-20___

KEVIN A. ENRIGHT
Judge of the Superior Court

-186-

STATEMENT OF DECISION

**EXH. 1 - 186**

**SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN DIEGO**
[ ] COUNTY COURTHOUSE, 1100 UNION STREET, SAN DIEGO, CA  92101-3809
[x ] HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA  92101-3817
[ ] KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187
[ ] NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA  92083-6643
[ ] EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA  92020-3941
[ ] SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649
[ ] JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA  92123-2792
[ ] JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA  92083-6634

*FOR COURT USE ONLY*

F I L E D
Clerk of the Superior Court

APR 27 2020

By: R. Smith, Clerk

PLAINTIFF(S)/PETITIONER(S):
**JANE DOE NOS. 1-22**

DEFENDANT(S)/RESPONDENT(S):
**GIRLSDOPORN.COM, et al.**

JUDGE: JOEL R. WOHLFEIL
DEPARTMENT 73

**CLERK'S CERTIFICATE OF ELECTRONIC SERVICE**

CASE NUMBER
**37-2016-00019027-CU-FR-CTL**

I, certify that: I am not a party to the above-entitled case; that on the date shown, below, I served the following documents:

**STATEMENT OF DECISION FILED APRIL 27, 2020 (ROA #3112)**

by electronic service as set forth below.

| **NAME** | **EMAIL ADDRESS.** |
|---|---|
| Ed Chapin | Echapin2@sanfordheisler.com |
| John O'Brien | john@theobrienlawfirm.com |
| Brian Holm | brian@holmlawgroup.com |
| Cara Van Dorn | cvandorn@sanfordheisler.com |
| George Rikos | george@georgerikosslaw.com |
| Michael Pratt | mikepratt619@protonmail.com |
| | |
| Daniel Kaplan | dkaplan@danielkaplanlaw.com |
| Aaron Sadock | asadock@panakoslaw.com |
| Bonnie McKnight | bmcknight@panakoslaw.com |

**CLERK OF THE SUPERIOR COURT**

Dated: APR 27 2020

by: _____, Deputy

R. Smith

**CLERK'S CERTIFICATE OF ELECTRONIC SERVICE**

EXH. 1 - 187

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|

☒ CENTRAL DIVISION, CENTRAL COURTHOUSE, 1100 UNION ST., SAN DIEGO, CA 92101
☐ CENTRAL DIVISION, HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101
☐ CENTRAL DIVISION, KEARNY MESA, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123
☐ CENTRAL DIVISION, JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92081
☐ NORTH COUNTY DIVISION, JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA 92081
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910

**F I L E D**
Clerk of the Superior Court

APR 27 2020

By: R. Smith, Clerk

PLAINTIFF(S)/PETITIONER(S)
JANE DOE NOS. 1-22

DEFENDANT(S)/RESPONDENT(S)
GIRLSDOPORN.COM, et al.

JUDGE: KEVIN A. ENRIGHT

DEPT: 904

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

CASE NUMBER
37-2016-00019027-CU-FR-CTL

I certify that I am not a party to the above-entitled cause, that I placed a copy of the following document(s):

STATEMENT OF DECISION FILED APRIL 27, 2020 (ROA #3112)

in a sealed envelope addressed to the parties shown with postage prepaid, and deposited it in the United States mail at
☐ Chula Vista  ☐ El Cajon  ☒ San Diego  ☐ Vista, California.

**NAME & ADDRESS**

Michael Pratt
10375 Cerveza Baja Drive
Escondido, CA 92026

Matthew Wolfe
c/o Keith H. Rutman
501 W. Broadway, Suite 1650
San Diego, CA 92101

Andre Garcia
c/o Gretchen Von Helms
105 West F Street, 3rd Floor
San Diego, CA 92101

**NAME & ADDRESS**

Clerk of the Superior Court

Date: April 27, 2020

by _____, Deputy
R. Smith

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

Code Civ. Proc.§1013(a)(4)
page 1 of 1

**EXH. 1 - 188**