Brian M. Holm (California State Bar No. 255691)
HOLM LAW GROUP, PC
171 Saxony Road, Suite 203
Encinitas, California 92024
p. 858.433.2001   f. 888.483.3323
brian@holmlawgroup.com

John J. O'Brien (California State Bar No. 253392)
THE O'BRIEN LAW FIRM, APLC
1804 Garnet Ave., Suite 408
San Diego, California 92109
p. 619.535.5151
john@theobrienlawfirm.com

Edward D. Chapin (California State Bar No. 53287)
echapin2@sanfordheisler.com
Cara W. Van Dorn (California State Bar No. 321669)
cvandorn@sanfordheisler.com
SANFORD HEISLER SHARP, LLP
655 W Broadway, Suite 1700
San Diego, CA 92101
p. (619) 577-4253   f.  (619) 577-4250

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE NOS. 1 through 50, inclusive, individuals,<br><br>        Plaintiffs,<br><br>v.<br><br>MG FREESITES, LTD., dba "PORNHUB," a foreign entity; MINDGEEK S.A.R.L. a foreign entity; and MINDGEEK USA INCORPORATED, a Delaware corporation; 9219-1568 QUEBEC, INC., dba "MindGeek," a foreign entity; and MG BILLING US CORP., dba "Probiller.com," a Delaware corporation,<br><br>        Defendants. | Case No.: 3:20-CV-02440-WQH-KSC<br><br>Judicial Officer: William Q. Hayes<br>Dept.: 14B<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND ATTORNEYS' FEES PURSUANT TO 18 U.S.C. § 1595**<br><br>DEMAND FOR JURY TRIAL |

Jane Doe Nos. 1 through 50 **(collectively "Plaintiffs")** hereby allege as follows:

## I.

## THE PARTIES

a.    PLAINTIFFS

1.    Plaintiff Jane Doe No. 1 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

2.    Plaintiff Jane Doe No. 2 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

3.    Plaintiff Jane Doe No. 3 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

4.    Plaintiff Jane Doe No. 4 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

5.    Plaintiff Jane Doe No. 5 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

6.    Plaintiff Jane Doe No. 6 is a United States citizen who resided within this judicial district at all relevant times alleged herein.

7.    Plaintiff Jane Doe No. 7 is a United States citizen who resided within this judicial district when the actions occurred giving rise to her claims herein and now resides outside this judicial district.

8.    Plaintiff Jane Doe No. 8 is a United States citizen who resided within this judicial district when the actions occurred giving rise to her claims herein and now resides outside this judicial district.

9.    Plaintiff Jane Doe No. 9 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

10.    Plaintiff Jane Doe No. 10 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

11.    Plaintiff Jane Doe No. 11 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

12.     Plaintiff Jane Doe No. 12 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

13.     Plaintiff Jane Doe No. 13 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

14.     Plaintiff Jane Doe No. 14 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

15.     Plaintiff Jane Doe No. 15 is a United States citizen who resided within this judicial district when the actions occurred giving rise to her claims herein and now resides outside this judicial district.

16.     Plaintiff Jane Doe No. 16 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

17.     Plaintiff Jane Doe No. 17 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

18.     Plaintiff Jane Doe No. 18 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

19.     Plaintiff Jane Doe No. 19 is a citizen of Canada and resided outside of this judicial district at all relevant times alleged herein.

20.     Plaintiff Jane Doe No. 20 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

21.     Plaintiff Jane Doe No. 21 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

22.     Plaintiff Jane Doe No. 22 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

23.     Plaintiff Jane Doe No. 23 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

24.     Plaintiff Jane Doe No. 24 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

25.     Plaintiff Jane Doe No. 25 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

26.     Plaintiff Jane Doe No. 26 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

27.     Plaintiff Jane Doe No. 27 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

28.     Plaintiff Jane Doe No. 28 is a citizen of Canada and resided outside of this judicial district at all relevant times alleged herein.

29.     Plaintiff Jane Doe No. 29 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

30.     Plaintiff Jane Doe No. 30 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

31.     Plaintiff Jane Doe No. 31 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

32.     Plaintiff Jane Doe No. 32 is a United States citizen who resided within this judicial district at all relevant times alleged herein.

33.     Plaintiff Jane Doe No. 33 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

34.     Plaintiff Jane Doe No. 34 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

35.     Plaintiff Jane Doe No. 35 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

36.     Plaintiff Jane Doe No. 36 is a citizen of Canada and resided outside of this judicial district at all relevant times alleged herein.

37.     Plaintiff Jane Doe No. 37 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

38.     Plaintiff Jane Doe No. 38 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

39.     Plaintiff Jane Doe No. 39 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

40.     Plaintiff Jane Doe No. 40 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

41.     Plaintiff Jane Doe No. 41 is a citizen of Canada and resided outside of this judicial district at all relevant times alleged herein.

42.     Plaintiff Jane Doe No. 42 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

43.     Plaintiff Jane Doe No. 43 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

44.     Plaintiff Jane Doe No. 44 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

45.     Plaintiff Jane Doe No. 45 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

46.     Plaintiff Jane Doe No. 46 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

47.     Plaintiff Jane Doe No. 47 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

48.     Plaintiff Jane Doe No. 48 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

49.     Plaintiff Jane Doe No. 49 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

50.     Plaintiff Jane Doe No. 50 is a United States citizen who resided outside of this judicial district at all relevant times alleged herein.

**b.   DEFENDANTS**

51.     At all relevant times alleged herein, defendant MindGeek S.a.r.l. is a foreign entity (a Société à responsabilité limitée) conducting business throughout the United States, including within the Southern District of California.  MindGeek S.a.r.l., formerly

known as ManWin, is the convergence of two large pornography companies, Mansef and InterTube. Over the last decade, MindGeek S.a.r.l. went on an acquisition spree buying up its competition and now owns and operates over 100 pornographic websites, production companies, and brands. MindGeek S.a.r.l. has, for all intents and purposes, monopolized the pornography industry, and is believed to own and/or control the majority of the pornography on the Internet, much of which it distributes for free, to any person with a web connection, regardless of age. Although incorporated in Luxembourg, MindGeek S.a.r.l.'s principal place of business is Montreal, Canada, with satellite offices in, among other places, San Diego, Los Angeles, San Francisco, London, Bucharest (Romania), and Nicosia (Cyprus).

52.    At all relevant times alleged herein, defendant MG Freesites, Ltd. is a foreign entity incorporated in the Republic of Cyprus conducting business throughout the United States and California, including within the Southern District of California. Upon information and belief, MG Freesites, Ltd. is a wholly owned subsidiary of MindGeek S.a.r.l, either directly or through intermediary companies that are also under the control of MindGeek S.a.r.l. Upon information and belief, MG Freesites, Ltd. is predominantly under the control of and operated by directors, officers and employees working in MindGeek's offices in the United States and Canada, with little business operations being conducted within the Republic of Cyprus where MG Freesites, Ltd. is incorporated.

53.    Defendant MindGeek USA Incorporated is a corporation incorporated in the State of Delaware, with its principal executive office at 21800 Oxnard Street, Suite 150, Woodland Hills, CA 91367 and several offices in Southern California. Upon information and belief, MindGeek USA Incorporated is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also under the control of MindGeek S.a.r.l.

54.    Defendant MG Billing US Corp. is a credit card processing corporation incorporated in the State of Delaware, with its principal executive office at 21800 Oxnard Street, Suite 150, Woodland Hills, CA 91367, that conducts business as "Probiller.com."

55.     Defendant 9219-1568 Quebec, Inc. is a company organized and existing under the laws of Canada with a principal place of business located in Montreal, though it conducts business as "Mindgeek" throughout the United States, including within the State of California and this District.

56.     MindGeek S.a.r.l., MG Freesites, Ltd., MindGeek USA Incorporated, MG Billing US Corp., and 9219-1568 Quebec, Inc., as well as all of these entities' subsidiary and sister companies, are collectively referred to as **"MindGeek"** or the **"Defendants"** herein.

57.     Upon information and belief, MindGeek has incorporated dozens of subsidiaries and sister companies around the world for the purpose of avoiding liabilities and to hide the identity of the entities and individuals behind its corporate actions.  Upon information and belief, MindGeek S.a.r.l and all other MindGeek entities operate as a single business enterprise solely dedicated to producing, distributing, and monetizing pornography on the Internet.  In doing all acts alleged herein, and as a business generally, MindGeek USA Incorporated, MindGeek S.a.r.l., MG Freesites, Ltd., MG Billing US Corp., 9219-1568 Quebec, Inc., and all of their subsidiary and sister companies were and are alter egos of one another.

58.     Plaintiffs are unaware of any MindGeek-related entity that does not act at the direction of the MindGeek enterprise operated by the Defendants.

59.     Upon information and belief, and in particular, the Defendants: (a) commingled their funds and other assets, failed to segregate funds between them, and have without authorization diverted corporate funds and assets for noncorporate uses; (b) treated each other's assets as their own; (c) issued shares of one other to themselves and third parties haphazardly and without authority; (d) held themselves out as being personally liable for the debts of each other; (e) failed to maintain minutes and corporate records, and confused the records of the separate entities; (f) used the same business locations and employed the same employees; (g) failed to adequately capitalize the entities; (h) used each other as a conduit for a single venture of themselves; (i) failed to

maintain arm's length relationships among themselves; and (j) diverted assets without consideration from/to one another to the detriment of creditors, including Plaintiffs. Recognition of the privilege of separate existences between the Defendants would promote injustice, unfairness, and fraud.  Any separateness is to be disregarded.  As such, these defendants are jointly and severally liable in this action as alter egos.

60.     In doing all things alleged herein, Defendants were agents, servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees of each other in the acts and/or omissions herein alleged.  The Defendants were acting within the course and scope of their authority as such agents, servants, representatives, partners, joint venturers, affiliates, parents, subsidiaries, and/or employees and with the permission, authorization, consent, and ratification of each other.

## II.
## JURISDICTION AND VENUE

**a.     SUBJECT MATTER JURISDICTION**

61.     This Court has original subject matter jurisdiction over the private right of action for victims of sex trafficking under 28 U.S.C. § 1331.

62.     Plaintiffs' claims arise under 18 U.S.C. § 1595, which states, "[a]n individual who is a victim of a violation of this chapter may bring a civil action…in an appropriate district court of the United States. . . ." 18 U.S.C. § 1595(a).

**b.     PERSONAL JURISDICTION**

63.     This Court has personal jurisdiction over all Defendants.  MindGeek USA Incorporated and MG Billing US Corp. are both domiciled and maintain their principal places of business are in California.  Each of the five Defendants has minimum contacts with California such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.  Defendants have purposefully availed themselves of California jurisdiction, there is a substantial nexus between Plaintiffs' claims and Defendants' California-based activities, and jurisdiction is fair.

64.     More specifically, by operating interactive commercial websites and transacting various forms of business related thereto in California (e.g., contracting with California residents and knowingly and repeatedly transmitting currency and computer files to and from California over the Internet), all of the Defendants purposefully availed themselves of doing business in California.  Among other things, the Defendants purposefully: (a) directed their activities at California residents; (b) derived benefit from their activities in California; (c) created a substantial connection with California; (d) engaged in significant activities within California; (e) created continuing obligations between themselves and residents of California; and (f) caused liability-producing acts and foreseeable consequences in California.

65.     Further, there exists personal jurisdiction as MindGeek S.a.r.l., MG Freesites, Ltd., and 9219-1568 Quebec, Inc. were and are agents, partners, alter egos, ratified the conduct, and have substantial control of and over forum-based MindGeek USA Incorporated and MG Billing US Corp.

66.     Finally, Defendants contracted and partnered with the forum-based perpetrators of the subject sex trafficking to split revenues that Defendants generated by advertising, marketing, selling, and exploiting videos it solicited from GirlsDoPorn featuring victims of the GirlsDoPorn sex trafficking venture.  Particularly, pursuant to its partnership with GirlsDoPorn as part of its "Viewshare Program," defendant MG Freesites, Ltd. processed revenue for and made monthly payments to the forum-based sex traffickers representing GirlsDoPorn's share of revenues MG Freesites Ltd. received by advertising, marketing, selling, and exploiting the victims' sex trafficking videos on MG Freesites, Ltd.'s websites.  Plaintiffs are informed and believe and allege thereon that MG Billing US Corp. processed payments for Plaintiffs' videos published on MindGeek's Viewshare Program and received affiliate fees processed by GirlsDoPorn's credit card processors for subscriptions purchased on GirlsDoPorn.com after MindGeek redirected users from one of its Tubesites to GirlsDoPorn.com.  Plaintiffs are informed and believe and allege thereon that 9219-1568 Quebec, Inc. hired and managed employees that

published, maintained, advertised, edited, and optimized GirlsDoPorn's videos, including videos of Plaintiffs, on MindGeek's Tubesites.[1]

**c.**   **VENUE**

67.    Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (d) in that a substantial part of the events or omissions giving rise to the claims occurred in this district and the corporate defendants are subject to personal jurisdiction in this district. Particularly, the subject sex trafficking actions occurred in San Diego, California.  Many of the perpetrators are currently in custody and being prosecuted for sex trafficking in this judicial district.  Further, MindGeek contracted and maintained a business partnership with the perpetrators of the subject sex trafficking within this judicial district and made payments to financial institutions within this judicial district as part of that relationship. MindGeek maintains an office situated in and conducts substantial business within this judicial district.  Finally, several plaintiffs reside within this judicial district.

## III.

## SUMMARY OF CLAIMS

68.    Federal law defines the crime of sex trafficking as knowingly recruiting, enticing, harboring, transporting, or soliciting a person to engage in a commercial sex act knowing or in reckless disregard of the fact that force, threats of force, fraud, coercion, or

---

[1] MindGeek operates its freesites, including, PornHub.com, YouPorn.com, RedTube.com, and Tube8.com through its subsidiary, MG Freesites, Ltd.  *See* Complaint at ¶ 2, *MG Freesites, Ltd. v. ScorpCast*, No. 1:20-cv-01012-CFC (D. Del. July 28, 2020) (MG Freesites, Ltd. representing that it operates www.pornhub.com).  Further, MindGeek appears to operate www.pornhubpremium.com through multiple entities: it is copyrighted by "MG Cyprus Limited," while its customer service and billing pages state it is owned and operated by "MG Billing US Corp, 2300 Empire Avenue, 7th Floor, Burbank, CA 91504 USA" and "MG Billing Limited, 195-197 Old Nicosia-Limassol Road, Dali Industrial Zone 2540, Block 1, Cyprus," and its terms of service state it is "operated by MG Freesites Ltd, Block 1, 195-197 Old Nicosia-Limassol Road, Dali Industrial zone, Cyprus 2540."

any combination thereof were used in the process.  18 U.S.C. § 1591(a)(1).  A person also commits criminal sex trafficking if he or she knowingly benefits, financially or by receiving anything of value, from participation in a venture engaged in sex trafficking if the person knows or has recklessly disregarded the fact that illegal means were used in the process.  18 U.S.C. § 1591(a)(2).

69.    From 2007 until October 2019, Michael Pratt **("Pratt")**, Matthew Wolfe **("Wolfe")**, Douglas Wiederhold **("Wiederhold")**, and Andre Garcia **("Garcia")** ran a sex trafficking venture out of San Diego, California known as "GirlsDoPorn."[2]  For over a decade, GirlsDoPorn sex-trafficked hundreds of high school and college-aged women using fraud, coercion, and intimidation to get the young women to film pornographic videos under the false pretense that the videos would remain private, off the Internet, and never be seen in North America.  In reality, GirlsDoPorn intended to publish the videos on its subscription website, as well as to dozens of other heavily trafficked websites available to anyone with an Internet connection, as it had done with hundreds of its prior videos.  GirlsDoPorn (and MindGeek) knew the illegal and unconsented publication of a victim's sex video would upend the victim's life.  Once published, GirlsDoPorn's victims were brutally harassed by peers and strangers, effectively turning them into pariahs in their own communities.  The victims were ostracized by friends and family, many lost their jobs, and some were expelled from college.  The relentless harassment caused all victims to become suicidal and some even attempted such.

70.    In June 2016, four victims filed an action in the Superior Court of California, County of San Diego **("San Diego Superior Court")** against GirlsDoPorn for, among other things, intentional misrepresentation, concealment, and misappropriation of likeness **("State Court Action")**.  By November 2017, an additional eighteen victims

///

///

---

[2] The individuals, websites and the offshore and domestic entities used to operate this sex trafficking venture are collectively referred to herein as **"GirlsDoPorn."**

had joined the State Court Action, for a total of twenty-two plaintiffs.[3]  After nearly three years of extensive litigation, on August 19, 2019, the State Court Action proceeded to a bench trial before the Honorable Kevin A. Enright, which was covered heavily by the media.

71.     On October 9, 2019—as victim testimony accumulated—the United States Attorney for the Southern District of California charged GirlsDoPorn's three principals (Pratt, Wolfe, Garcia) and three others with federal sex trafficking and conspiracy to commit sex trafficking under 18 U.S.C. § 1591 **("Section 1591")**.  A grand jury indictment unsealed about a month later formally charged them with these crimes.[4]  The grand jury also indicted Pratt for Production of Child Pornography in violation of 18 U.S.C. § 2251, subs. (a) and (e).  Wolfe and Garcia were arrested on or about October 9, 2019.  Pratt escaped to Mexico and is currently a fugitive of justice on the Federal Bureau of Investigation's Most Wanted List.

72.     The civil trial in the State Court Action concluded on November 26, 2019, about six weeks after the arrests.  On January 2, 2020, the Honorable Kevin A. Enright issued a nearly two-hundred-page proposed statement of decision[5] detailing the "fraud, intimidation and coercion" GirlsDoPorn used to coax its victims into filming adult videos.  The decision collectively awarded the twenty-two plaintiffs nearly $13 million in compensatory and punitive damages, voided all contracts as part and parcel of the fraudulent and coercive scheme, and enjoined GirlsDoPorn from using their fraudulent and coercive practices in any future business dealings.  Later, the San Diego Superior Court awarded the plaintiffs another nearly $8 million in attorney fees and costs.

---

[3] The complaints from the State Court Action (San Diego Superior Court Case Nos. 37-2016-00019027-CU-FR-CTL, 37-2017-00033321-CU-FR-CTL and 37-2017-00043712-CU-FR-CTL) are hereby incorporated by reference as though set forth fully herein.

[4] The Indictment from *United States v. Pratt*, No. 19:CR-4488-JLS (S.D. Cal. Nov. 7, 2019), ECF No. 34, is hereby incorporated by reference as though set forth fully herein.

[5] The Final Statement of Decision, entered on April 27, 2020, is hereby incorporated by reference as though set forth fully herein.

73.     Garcia pled guilty to sex trafficking under Section 1591 and conspiracy to commit sex trafficking for his role in the GirlsDoPorn sex trafficking venture.[6]  Garcia is set to be sentenced by the Honorable Janis L. Sammartino in the coming months.  Wolfe remains in federal custody in San Diego awaiting trial.  Pratt is still at large.

74.     Over the last two decades, United States Congress has taken significant measures to fight sex trafficking as criminals began utilizing the Internet to perpetrate and monetize their crimes.  Part of Congress' fight includes making it more difficult for traffickers to carry out and profit from their crimes by deterring otherwise law-abiding businesses from providing services to suspected traffickers.  Pursuant to 18 U.S.C. § 1595 **("Section 1595")**, any business that "knew or should have known" it was profiting from its participation in a sex trafficking venture is civilly liable to the victims for damages and attorney fees.  Section 1595 presents businesses frequented by sex traffickers (*e.g.,* hotels, websites, social media platforms, and online dating applications) with a choice: either deny services to suspected sex traffickers, or provide services to the suspected traffickers and accept the profits from the transaction but risk civil liability to the sex trafficking victims.

75.     MindGeek operates some of the most popular pornographic websites in the world, including the 8th most popular website in the United States, www.PornHub.com. In 2011, MindGeek contracted with GirlsDoPorn and began advertising, selling, marketing, and exploiting videos featuring GirlsDoPorn's sex trafficking victims on its websites.  Having accepted GirlsDoPorn into its coveted Content Partner Program, MindGeek participated in GirlsDoPorn's sex trafficking venture by taking active steps to promote GirlsDoPorn videos, push the GirlsDoPorn brand, spread GirlsDoPorn content throughout its network of pornography websites, and maximize GirlsDoPorn's subscription sales.

*///*

---

[6] *See* Plea Agreement, *United States v. Pratt*, Case No. 19:CR-4488-JLS (S.D. Cal.), ECF No. 138.

76.     On information and belief, MindGeek received millions of dollars through its partnership with GirlsDoPorn by, among other things, collecting affiliate referral fees, advertisement sales, and revenue from MindGeek's own subscription websites. MindGeek's business materially benefitted from the increased traffic to its Tubesites driven by GirlsDoPorn's cult-like following and the thousands of people who logged onto MindGeek's websites to view pornographic videos of women they knew for free.

77.     As early as 2009, MindGeek knew GirlsDoPorn was running a sex trafficking scheme by using fraud, coercion, and intimidation as part of its customary business practices to cause women to film pornographic videos. MindGeek was aware of this because GirlsDoPorn's victims sent MindGeek complaints detailing the fraud and coercion they were subjected to by GirlsDoPorn and/or hired "takedown companies," which submitted hundreds of Digital Millennium Copyright Act ("DMCA") takedown requests to MindGeek on their behalf. Furthermore, several brave victims described their harrowing experiences in publicly available statements, and GirlsDoPorn itself posted publicly available anecdotes in which it admits to and jokes about its use of fraud, intimidation, and coercion.

78.     When the State Court Action was filed in June 2016 and MindGeek was served with a subpoena for records shortly thereafter, there can be no doubt that MindGeek was fully aware of GirlsDoPorn's unlawful business practices.

79.     Despite this knowledge, MindGeek continued to partner with GirlsDoPorn, never cutting ties or even bothering to investigate or question its business partner regarding the mounting evidence of sex trafficking that MindGeek received. On information and belief, MindGeek contracted with, marketed for, and processed revenue for GirlsDoPorn because of the value of its illegal sex trafficking videos. In fact, MindGeek continued its partnership with GirlsDoPorn until October 2019 when the Department of Justice shut down GirlsDoPorn by arresting and indicting its principals— at which point, there was no longer a company left for MindGeek to partner with. Of note, even after severing its partnership with GirlsDoPorn, MindGeek continued to host

and profit from GirlsDoPorn's videos, including those featuring Plaintiffs.

80.     MindGeek's repeated decisions to ignore the many red flags signaling GirlsDoPorn was engaged in sex trafficking prior to the filing of criminal charges in October 2019, easily establish "reckless disregard," which is sufficient for criminal liability under Section 1591.

81.     However, Plaintiffs need only show that MindGeek *should have known* that GirlsDoPorn was engaged in sex trafficking in order to establish civil liability for damages and attorney fees under Section 1595—a standard that is far surpassed here.[7] Any ignorance MindGeek may have had to GirlsDoPorn's business practices is a direct result of its own negligence, which still triggers Section 1595 liability.

82.     MindGeek knew it was partnering with, distributing revenue to, and profiting from a sex trafficking venture for years.  MindGeek also knew of the significant harassment and trauma GirlsDoPorn's victims were enduring as a result of its continued publication of the victims' videos.  MindGeek simply did not care and continued to partner with GirlsDoPorn until it was no longer profitable.  MindGeek's actions were malicious, oppressive, and taken in reckless disregard of the Plaintiffs' rights.  Plaintiffs are therefore entitled to punitive damages against MindGeek to punish MindGeek for its reprehensible actions and to deter others from taking similar actions in the future.

## IV.

## FACTUAL BACKGROUND

### A.    THE AFFILIATE MARKETING RELATIONSHIP BETWEEN PAYSITES SUCH AS GIRLSDOPORN.COM AND FREESITES SUCH AS PORNHUB.COM

83.     The online pornography industry consists of two types of websites: "paysites" and "freesites."  As the name suggests, **"freesites"** allow the public to view videos for free, without requiring any membership, payment, age verification, or personal

---

[7] "The phrase 'knew or should have known' echoes common language used in describing an objective standard of negligence." *A.B. v. Marriott Int'l, Inc.*, No. 19-5770, 2020 WL 1939678, at *7 (E.D. PA, Apr. 22, 2020) (quoting *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 19-849, 2019 WL 4929297 (S.D. Ohio, Oct. 7, 2019)).

information.  Freesites are also referred to as "tubesites" because most freesites mimic the business model of YouTube.com.  The names of MindGeek's freesites, YouPorn, RedTube, and Tube8, are ostensibly derived from the name YouTube.

84.    The videos on freesites are typically five to ten-minute clips of longer pornographic videos or short compilations of many longer pornographic videos.  The short clips on freesites are the equivalent of a movie trailer giving the public the gist of the entire production.

85.    **"Paysites"** are websites where, as the name suggests, the customer must pay to view the pornographic content.  The videos on paysites are commonly said to be behind a "paywall."  Paysites are owned and operated by pornography production companies and feature full-length pornographic videos, typically 30 to 60 minutes in length.  GirlsDoPorn operated two paysites where it sold videos featuring its sex trafficking victims, GirlsDoPorn.com and GirlsDoToys.com, which offered access to libraries of its victims' full-length videos for $30 to $60 per month.

86.    Freesites attract significant web traffic with the allure of free pornography—albeit only short trailer versions cut from the more desirable full-length videos—which allows freesites to generate revenue through advertisement sales.  These heavily trafficked websites also present a golden marketing opportunity to convert a freesite visitor into a paysite monthly subscriber.  Once on the freesite, a potential customer is targeted with hyperlinked advertisements that, if clicked, take the potential customer to a corresponding paysite with the hope that, once on the paysite, the potential customer purchases a subscription.

87.    Freesites earn money by partnering with paysites through "affiliate programs" operated by the payment processing companies who process subscribers' credit card, cryptocurrency, and Paypal payments on the paysites.  When a paysite opts into a payment processor's affiliate program—something that nearly all paysites do—freesites are able to register with the payment processor as an **"affiliate"** of the paysite. As part of the registration, freesites provide the payment processor with its bank account

information.  Once registered, the freesite begins marketing free trailer versions of the paysites' full-length videos surrounded by advertisements redirecting the customer to the paysite if clicked.  If a hyperlinked advertisement on a freesite directs a potential customer to a paysite, the payment processor is able to track which freesite (now registered as an affiliate) directed the potential customer to the paysite through the use of an affiliate URL and/or software referred to as a "cookie" that tracks the internet user's history.  If the potential customer subscribes to the paysite after being directed there by a registered affiliate, the payment processor splits the subscriber's monthly payments between the paysite and the freesite affiliate, often in perpetuity and often 50%/50%.  The money earned by the freesite for referring customers to paysites is called an "affiliate fee."

**B.**   **MINDGEEK OWNS AND OPERATES DOZENS OF WEBSITES, INCLUDING THE 8TH MOST POPULAR WEBSITE IN THE WORLD, WWW.PORNHUB.COM**

88.     MindGeek owns and operates dozens of pornographic websites, including both paysites and freesites.

89.     MindGeek's four most popular websites are www.PornHub.com **("PornHub.com")**, www.Redtube.com **("RedTube.com")**, www.YouPorn.com **("YouPorn.com")**, and www.Tube8.com **("Tube8.com")**, each of which is similar in format to YouTube.com **(collectively "MindGeek's Tubesites")**.

90.     PornHub.com is MindGeek's flagship website.  In 2019, PornHub.com had roughly 42 billion visits (an average of 115 million per day), making it the 8th most popular website in the United States behind Google.com (1st), YouTube.com (2nd), Facebook.com (3rd), Amazon.com (4th), Yahoo.com (5th), Twitter.com (6th), and Instagram.com (7th).  In 2019, PornHub.com had more visitors than Wikipedia.org, Reddit.com, NetFlix.com, Craigslist.org, and Bing.com.  Further, according to analytics MindGeek posted on PornHub.com, the United States is the top country by volume of PornHub.com usage and, as for top cites, Los Angeles, California is ranked the 4th highest in the world.

C.   **MᴵɴᴅGᴇᴇᴋ's Uɴɪǫᴜᴇ Bᴜsɪɴᴇss Mᴏᴅᴇʟ Iɴᴛᴇɢʀᴀᴛᴇs Sᴇᴠᴇʀᴀʟ Rᴇᴠᴇɴᴜᴇ Sᴛʀᴇᴀᴍs ᴛᴏ Mᴀxɪᴍɪᴢᴇ Pʀᴏꜰɪᴛs**

91.     MindGeek's Tubesites are interactive, robust, and multi-faceted e-commerce websites designed to attract and sell various sex related products and services—primarily pornographic videos—to a high volume of sex industry customers, production companies, and performers.  MindGeek's Tubesites do extensive business over the Internet, whereby MindGeek knowingly and repeatedly receives and transfers funds for various purchases and services, transfers computer files and other information, and enters into contracts with individuals and entities throughout the world, including residents of every state.

92.     The homepage of PornHub.com includes, without limitation, the following links to the various products MindGeek is marketing and/or selling:

- **A "Premium" link** directs the customer to: www.pornhubpremium.com ("PornHub Premium").  MindGeek describes the content on PornHub Premium as a "carefully curated selection" of pornography,[8] to which customers can subscribe for $9.99 per month.

- **A "Shop" link** directs customers to www.pornhubapparel.com ("PornHub Apparel").   There, customers across the globe, including in California, can buy various PornHub-branded merchandise, from Christmas tree ornaments to underwear. PornHub Apparel is powered by Shopify, a publicly-traded company on the New York Stock Exchange.  The governing law in PornHub Apparel's terms of service is California.

- **A "Toys" link** directs the customer to: www.pornhubtoys.com/ ("PornHub Toys").  There, customers across the globe, including in California, can purchase various sex toys and other paraphernalia, which appear to ship from the United States (and

---

[8] MindGeek curates this content from various production companies, including, without limitation: (a) Screw My Wife Productions (based in Northridge, California); (b) Smash Pictures (Chatsworth, California); (c) Suze Randall (Calabasas, California); and (d) Wildlife Productions (Northridge, California).

there is no shipping charge when ordered from California). In addition to other features and advertisements, PornHub Toys offers the following solicitation: "We Make Money Selling Sex Toys! So Can You! Porn[H]ubToys is looking for sex-positive affiliates. We need enthusiastic site-owners, performers, and online promoters to refer sex toy consumers to our site. Every successful sale earns you royalty commissions." PornHub Toys represents it "is managed . . . in association with Pornhub.com."

- A **"F[***] Now" link** directs the customer to: www.adultfriendfinder.com ("Adult Friend Finder"). This website appears to be a thinly veiled dating website where prostitutes and/or their handlers can solicit johns. The banner on the site reads: "The nude snaps you're about to see were posted by horny women looking for f[***] buddies, not boyfriends. If you wish to proceed, you'll have to answer a few questions first." (Redacted for profanity.) Adult Friend Finder is headquartered in Campbell, CA.

- A **"Live Cams" link** directs customers to www.pornhub.com/live. Here, performers can sign up to make money from live pornographic performances, which customers pay to view live and can also compensate performers via a "tip" function.

- An **"Advertising" link** invites parties to advertise products and services on PornHub.com through www.trafficjunky.com, a website owned by Defendant MG Freesites Ltd.

- A **"Model Program" link** invites pornographic models to "make ad revenue, sell your videos and build your fan base on the largest adult platform in the world."

- A **"Jobs" link** solicits various employment opportunities with MindGeek, including, as of this complaint, for product managers, search engine optimization specialists, and model recruiters.

True and correct copies of screenshots of PornHub.com captured on December 7, 2020 are attached hereto as Exhibit 1. The screenshots are redacted for nudity.

93.     The most popular feature on MindGeek's Tubesites are the expansive searchable video libraries.  Prior to December 8, 2020, PornHub.com had approximately 14,000,000 pornographic videos in its free video library.  Most videos are between five and twenty minutes long.  If each of these 14,000,000 videos were just four minutes long, it would take over 106 years for one person to watch all of the footage.

94.     The videos in the public libraries on MindGeek's Tubesites come from several different sources, including members of the public,[9] third party pornography production companies, and also MindGeek itself, which publishes trailer versions of videos produced by its very own pornography production companies and brands, such as Reality Kings, Brazzers, and Digital Playground.

95.     As part of the interactive experience offered on MindGeek's Tubesites, customers and viewers can create accounts, post comments regarding content, and communicate with one another.  Account-holders can subscribe to follow certain performers and send performers compensation through the websites.  Finally, prior to December 8, 2020, MindGeek's Tubesites also allowed its users to download videos from the public library for free, thereby turning it into a free content sharing platform for its users.

96.     In early December 2020, after multiple news outlets published reports about MindGeek permitting and facilitating sex trafficking on its Tubesites, several credit card companies publicly terminated their relationships with MindGeek as a result.  In response, on December 8, 2020, MindGeek announced several changes to its policies, including *inter alia*, (1) allowing "Verified Uploaders Only," (2) "Banning Downloads," and (3) "Expand[ing] Moderation."[10]

---

[9] Up until December 2020, MindGeek permitted any member of the public to upload a video to the general library on its Tubesites without verifying the user's age or identity. MindGeek failed to collect any personal information that would allow MindGeek or the authorities to locate or identify the person who uploaded a specific video.

[10] *See* Our Commitment to Trust and Safety, PORNHUB HELP CENTER, *available at* https://help.pornhub.com/hc/en-us/categories/360002934613 (last visited Mar. 25, 2021).

**D.    MINDGEEK ACTS AS A CO-DEVELOPER OF CONTENT FOR THOSE ENROLLED IN ITS "CONTENT PARTNER PROGRAM" AND "PREMIUM VIEWSHARE PROGRAM"**

97.    Beyond the commercial and entertainment services offered to consumers, MindGeek's Tubesites offer business-to-business services.  MindGeek offers pornography production companies the opportunity to partner with MindGeek through several programs that allow MindGeek to advertise, market, sell, and exploit the partners' videos in exchange for splitting the profits therefrom.  These programs include the **"Content Partner Program"** and **"Premium Viewshare Program."**

98.    MindGeek describes its Content Partner Program as follows:

> The Content Partner Program is designed for studios with a pay-site to expose their content to millions of visitors.   Once partnered, **you receive a personalized channel that includes free ad space both on your channel and on your videos**. **Through the use of video features on our homepage, your content is promoted to our users** which will direct traffic back to your pay-site, with the intention of converting them into paying members.   In turn, we would receive a share of this revenue through your affiliate program.   There is no compensation based on views in this program.[11]

99.    MindGeek markets its Content Partner Program as providing "100+ milion [sic] visits per day, **Dedicated account reps**, Most ad space in the industry, Exposure across the Pornhub network (PornHub.com, YouPorn.com, RedTube.com and Tube8.com)."[12]

100.    MindGeek's advertisement for the program also states:

> The Pornhub Content Partner Program has a global reach of over 100 million daily users with world-leading, high-quality adult

---

[11] *See What is the Content Partner Program*? PORNHUB HELP CENTER, https://help.pornhub.com/hc/en-us/articles/360048496113-What-is-the-Content-Partner-Program- (last visited Mar. 26, 2021) (emphasis added).

[12] Pornhub Network Content Partner Program, PORNHUB, https://www.pornhub.com/partners/cpp (last visited Mar. 26, 2021) (emphasis added).

traffic and has been a proven program for hundreds of studios and content producers who take part. **We have helped boost the branding and exposure of content partners** from a variety of niches, turning our traffic into your earnings![13]

101.   Pornography production companies must apply to join MindGeek's Content Partner Program.  If accepted, MindGeek creates a "channel" on MindGeek's Tubesites centralizing the Content Partner's videos in a single location where MindGeek's potential customers are able to search the channel for particular videos, organize them by ratings and recentness, and, by subscribing to the channel, receive notifications, *e.g.,* when a Content Partner posts a new video.

102.   MindGeek's dedicated account representatives create hyperlinked advertisements on the channel using the Content Partner's licensed content that, when clicked, send a user to the Content Partner's paysite or to Pornhub Premium.

103.   These dedicated account representatives design channels for Content Partners to keep prospective customers interested in the Content Partner's niche of pornography for as long as possible.  The longer MindGeek can keep the potential customer engaged on the Content Partner's channel, the longer MindGeek is able to target the potential customer with hyperlinked advertisements in hopes of redirecting the potential customer to the Content Partner's paysite or to Pornhub Premium where MindGeek may then generate affiliate fees if the potential customer purchases a subscription.  According to MindGeek's job postings for the position, their Content Partner Account Representatives "create, optimize and maintain content partner ad campaigns[.]"

104.   MindGeek vets the Content Partners before it allows an applicant to become part of its brand.  Far beyond merely providing a platform to upload videos, the services MindGeek provides to its Content Partners actively promote the Content Partner's videos.  Furthermore, Plaintiffs are informed and believe that Mindgeek ranks its Content Partners

---

[13] *Id.*  (emphasis added).

and provides more attention, staff, and resources to those Content Partners generating the most user traffic and affiliate fees for Mindgeek.

105.   While MindGeek's Tubesites are predominantly freesites designed to earn MindGeek ad-based revenue and affiliate fees, portions of MindGeek's Tubesites also act as paysites through MindGeek's Premium Viewshare Program.  MindGeek describes this program as follows:

> The Viewshare program, also known as Pornhub Premium, is designed to earn you revenue based on the number of views your content receives.  In this program you will upload full-length, HD videos which are locked behind our paywall, and you are compensated every time a Premium user watches your video. While Premium is an ad-free environment, partners receive a prominent "Join" button on their channel and below their videos to drive traffic back to their pay-site.
>
> Are you a studio or producer without a pay-site?  No problem! The only requirement to be eligible for the Viewshare program is that you are producing HD, adult video content.[14]

106.   By contracting with MindGeek in its Viewshare Program, pornography companies license their videos to MindGeek, which MindGeek then advertises, markets, and sells to the public through the "premium" portion of MindGeek's Tubesites existing behind a paywall.

107.   MindGeek provides search engine optimization services for those participating in its Content Partner Program and Viewshare Program, which increases traffic from external search engines such as Google.com.  MindGeek also actively "suggests" its Content Partners' and Viewshare Premium content to users of its Tubesites, which internally drives traffic to and generates revenue for MindGeek's partners.

---

[14] *What is the Viewshare program?* PORNHUB HELP CENTER, https://help.pornhub.com/hc/en-us/articles/360047765034-What-is-the-Viewshare-program- (last visited Mar. 26, 2021).

108.   Upon information and belief, MindGeek employees edit and create titles and tags associated with videos and images for its Content and Viewshare Partners.  "Tags" are keywords to be associated with a video and will be referenced, along with the words in the title, when users search the websites' video collection.  MindGeek collects the tags and terms searched by each Tubesite user, inputs that information into its algorithm and database, and suggests similar content to the user, hoping to keep the user's attention.

109.   MindGeek distinguishes itself from passive platforms by actively curating users' experiences and by monitoring, influencing, creating, editing, developing, and promoting content initially filmed and uploaded by third parties who participate in these programs.[15]

110.   If MindGeek partners with a company through its Content Partner Program and its Viewshare Program, MindGeek also drafts and creates advertisements, tags, and hyperlinks on the Content Partner's channel soliciting potential customers to view the Content Partner's full-length videos behind the paywall on the premium portion of MindGeek's Tubesites.

111.   On information and belief, MindGeek's representatives also create trailers to use in advertisements for the Content Partner's paysite and MindGeek's Viewshare Program.  In so doing, MindGeek edits and modifies the partner video content, as well as uniquely names, titles, describes, and tags the videos.

112.   MindGeek generates revenue from the sale of the advertisements it features in and alongside unpaid videos on its Tubesites.  MindGeek also advertises its own products on Content Partner's channels or in the Content Partner's videos, which provides another source of revenue for MindGeek.

113.   MindGeek also collects revenue from subscriptions sold to users of the "premium" sections of its Tubesites.  Those subscriptions generated $1.3 billion in

---

[15] The "About" page of MindGeek's website declares, "[w]e're designers, analysts, developers, editors, marketers and so much more, sharing a drive for excellence working alongside the brightest in our fields."  *About MindGeek*, MindGeek.com/about/ (last visited Mar. 31, 2021).

revenue between 2012 and 2018.    MindGeek's revenue from subscriptions for 2018 alone totaled $220.9 million – or a weekly average of $4.2 million.[16]

**E.    GIRLSDOPORN SEX-TRAFFICKED YOUNG WOMEN FROM 2007 UNTIL 2019**

114.    GirlsDoPorn started in 2006 when Pratt bought the domain GirlsDoPorn.com and set out to create a paysite featuring 18 to 22-year-old women, who had never appeared in a pornographic video before and did not plan to do so again. GirlsDoPorn's channels on MindGeek's Tubesites later advertised GirlsDoPorn's videos as: "Real amateur girls having sex on video for the very first time… You will not find these girls on any other website – all girls are 100% exclusive – this is the only [sic] and only time they do porn."

115.    From 2007 until 2009, Pratt and Wiederhold traveled the United States filming pornographic videos in hotel rooms, with Pratt as videographer and Wiederhold as the male actor.  In July 2009, Pratt launched the GirlsDoPorn.com website after he and Wiederhold had amassed enough videos.  The two continued to film victims together for the next two years.  In 2011, Pratt's childhood friend from New Zealand, Wolfe, joined Pratt and Wiederhold.  Around this same time, Garcia replaced Wiederhold as the male actor and Wiederhold began focusing on a similar website featuring older female victims, MomPOV.com, that, like GirlsDoPorn, used fraud and coercion as part of its regular business practices.

**i.    GirlsDoPorn's Fraudulent Recruiting Practices**

116.    GirlsDoPorn niche was to film 18 to 22-year old "girls next door" having sex who will never appear in another pornographic video.  Consequently, GirlsDoPorn's success turned on its ability to induce a high volume of everyday high school and college women with zero interest in filming Internet pornography to fly to San Diego and shoot a pornographic video.

---

[16] Gordon Deegan, Grant Thornton Resigns as Auditor to Firms Owned by PornHub Operator, Irish Times, (February 9, 2021) https://www.irishtimes.com/business/economy/grant-thornton-resigns-as-auditor-to-firmsowned-by-pornhub-operator-1.4480517#.YCMd5f48f6s.twitter.

117.   To overcome its victims' obvious reservations, GirlsDoPorn created a scheme that relied heavily on fraud, coercion and intimidation, and which it used to locate and recruit all of its victims.  The scheme, which GirlsDoPorn honed over the years, included: (a) drawing women in through bait-and-switch advertisements for clothed modeling; (b) offering (although most times never paying in full) enough money to overcome the woman's general compunction against the idea of participating in pornography; (c) lying about the utmost concern the victims have—where and how the video will be distributed and who will be able to see it, by claiming it would be sold on DVD's in foreign countries or given to a private collector; (d) paying and coaching fake reference models to earn the victim's trust and to reassure the victim that, like their own videos that they claimed to have filmed, the victim's video will never be online or available to anyone in the United States, and that the victims will remain anonymous; (e) concealing the websites and their own identities at every stage of the recruiting and filming process; (f) curtailing the women's ability to investigate or discover the truth; and (g) using legal threats to stifle the victims' ability to seek redress through the courts.

### ii.   The False and Misleading Craigslist Advertisements

118.   GirlsDoPorn predominantly posted advertisements on Craigslist.com purporting to seek young women for clothed modeling work.  The facially benign advertisements offered 18 to 22-year-old women with little to no modeling experience a relatively large sum of money to apply for modeling jobs.  The advertisements directed prospective models to sham modeling websites, such as BeginModeling.com, ModelingGigs.com, and ModelingWorks.com, all owned by GirlsDoPorn, and which also appear to be for clothed modeling work.  Neither the Craigslist.com advertisements nor the sham modeling websites contained any indication that pornography was involved, let alone nudity.  The websites contained an application form directing the prospective victims to upload pictures and provide contact information (email, phone number, address).

///

119.   In 2010, GirlsDoPorn admitted to using deceptive modeling advertisements to lure victims to hotel rooms.  The caption for a victim's video published on the public portion of GirlsDoPorn's website read:

> This smokin hot 18 y/o teen named jessica was trying too find some money so that she could get a boob job done.  **She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha** :)  (sics in original, emphasis added.)

120.   GirlsDoPorn continued to use bogus clothed modeling advertisements to attract victims, including Plaintiffs, until it was shut down in October 2019.

**iii.     The Deceptive Emails to get Victims to Answer Their Calls**

121.   If the photographs submitted to the sham modeling websites and age of the victim met GirlsDoPorn's criteria (attractive and under 22 years old), GirlsDoPorn would respond with an email.  GirlsDoPorn used stock emails to reach out to the victims.  Since the emails were in writing, GirlsDoPorn used deft wording, fake names for the employees, and danced around the true nature of the job, never using the word pornography, never mentioning its websites, and never disclosing where it would distribute the final product.  Instead, the emails stated: "[t]his is a legitimate adult gig for an established Southern California company" and "[a]ll the girls that I shoot are first times.  I shoot cheerleaders, sorority girls, preppy college girls, IG [Instagram] models with 70k followers and models of that caliber."

122.   If the prospective victim did not respond to this initial email, GirlsDoPorn sent a follow-up email increasing the amount of pay and offering "$300 if you want to do clothed modeling" even though clothed modeling was never on the table.  The entire purpose of the vague emails was to get the victim to answer the phone so GirlsDoPorn could begin its campaign of lies without the fear of a paper trial or to get the victim to travel to a hotel where GirlsDoPorn would meet the victim, get her alone in a hotel, and then coerce her into filming pornography.

///

#### iv.     The Lies on the Phone

123.    Once on the phone, GirlsDoPorn told the victim the job was for an "adult video," but immediately and falsely reassured the victim the video would never be published online or seen by anyone in North America since the videos would only be distributed on DVD in a foreign country, typically Australia and New Zealand.  Pratt and Wolfe have New Zealand accents, which helped sell this lie.  GirlsDoPorn played with different lies to see which were more successful.  For a period of time, GirlsDoPorn told its victims the videos were for a wealthy individual in Australia who commissioned the video.  While the details of GirlsDoPorn's representations varied slightly, the part of the message that mattered most to the prospective models remained the same— "the video is not going online and no one in the United States will find out."

#### v.     GirlsDoPorn Coached and Paid "Reference Models" to Lie to Victims

124.    Prospective victims were naturally skeptical of GirlsDoPorn's promises of anonymity made over the phone.  However, as proof of its ability to keep the footage off the Internet and out of North America, GirlsDoPorn paid other young women (referred to as "reference models") to reach out to the victim and assure her that her privacy and anonymity would remain intact.  The reference model—in text messages, phone calls and/or over Facetime—would tell the prospective victim she had already filmed videos for the company, the footage was never leaked online, and had never been discovered by anyone in their lives.  The reference models shared their social media accounts and other personal details with the victims to earn their trust and as proof that they were who they said they were.  However, unbeknownst to the victim, GirlsDoPorn paid and coached the references to lie about distribution and to conceal GirlsDoPorn's true identity, as a simple Google search of the term "GirlsDoPorn" leads to GirlsDoPorn's website, hundreds of videos branded with GirlsDoPorn's logo published on MindGeek's Tubesites freely accessible to anyone in the United States, and several firsthand horror stories from GirlsDoPorn's previous victims on Reddit, Facebook and elsewhere.

///

125.   Kailyn Wright acted as a reference for dozens of victims even though she knew the truth about GirlsDoPorn.  In the State Court Action, Wright testified that GirlsDoPorn instructed her "to tell them [prospective victims] it would not be going online and that it was going overseas to wealthier countries."  When asked why she told women that their videos would not be released online when she knew that this was not true, Wright testified, "Because that's what they told me to say.  That's what they were paying me to say."

126.   Amberlyn Clark, a girlfriend of Garcia's, had never filmed a video for GirlsDoPorn.  She testified in the State Court Action that Garcia helped her create a fake backstory about how she was from a small town, filmed several videos for the company, and none were released online or in the United States.  Garcia instructed Ms. Clark to tell prospective models that the videos "wouldn't be put online and that they would go to private collectors" located "[o]utside of the U.S."  Garcia also advised her to assure models that "no one would find out."  Finally, Garcia instructed her to never mention the name GirlsDoPorn or use his real name.

**vi.   The False Promises of Pay**

127.   In addition to lying about distribution, GirlsDoPorn's business practice was to continue to increase the offer to the victim in order to get her to fly to San Diego for a shoot, but with no intention of actually paying in full.  GirlsDoPorn's assistant, Valorie Moser, who was also indicted for her actions in the sex trafficking venture, testified in the State Court Action that Pratt asked her to recruit several "super hot" women that had submitted applications to the fake modeling websites, but whom he and Garcia could not convince to fly to San Diego.  Pratt instructed Ms. Moser that, once on the phone with these prospective victims, she should "[m]ake an offer of a price that was high enough to get the model on a plane."  However, even before the victim arrived in San Diego, Pratt had graded the victim as an "A, B, or C model" based on her attractiveness and youth, and already knew GirlsDoPorn would not pay the inflated price.  Once the victim was alone in a hotel room in San Diego, GirlsDoPorn (usually Garcia) routinely fabricated an

excuse to pay the victim less, such as by claiming the victim had cellulite, bruises, scars or uneven breasts.  If a victim complained, GirlsDoPorn blamed the victim for submitting misleading pictures and would tell the victim she would be required to pay for the cost of the hotel and flight if she did not accept less.  Having flown to San Diego and alone in a hotel room with two agitated males, this left the victim with little choice but to accept the lesser amount and proceed with GirlsDoPorn's demands or risk the unknown.

### vii.    Further Coercion and Deceit in San Diego

128.   GirlsDoPorn also coached its makeup artists, drivers, and cameramen how to answer victims' general questions about who they are or if the video will ever leak online.  If asked, the employees were initially instructed to confirm the video will not be online.  Like the fake reference models, the employees were also coached to never mention GirlsDoPorn and to reassure models that everything will be fine.  GirlsDoPorn's long-time and San Diego, California-based corporate attorney, Aaron Sadock, who is also Pratt's long-time personal attorney, forced all employees and contractors to sign Non-Disclosure Agreements and advised them the agreements prevented them from telling victims they interacted with the true nature of the business.  After GirlsDoPorn was sued in 2016, Sadock coached the employees how to give deceptive answers to questions about distribution and the company's identity.  Consequently, after June 2016, when victims asked GirlsDoPorn's drivers, cameramen and makeup artists about distribution or the name of the company once they arrived in San Diego, the victims received the same false assurances about anonymity promised over the phone and by reference models and deft, misleading responses crafted by an attorney that evaded providing any material information that would alert the victim as to who the Defendants were or the true nature of Defendants' intentions.

129.   GirlsDoPorn took the models to their hotel rooms where GirlsDoPorn offered alcohol and/or marijuana to the victim, regardless of her age, before the shoot and encouraged her to drink or smoke in order to "loosen up."  A makeup artist that GirlsDoPorn coached to conceal the true nature of the shoot did the victim's makeup.

130.    Just minutes before filming, GirlsDoPorn presented the victims with, at least, one document to sign.  They did not permit the women to thoroughly read or review the document(s) before signing them, often times telling the victims the document(s) merely confirmed the agreement they had already reached over the phone.  In some other instances, GirlsDoPorn told the victim the documents were "just to prove that [she is] 18," to show they were "not forcing [her] to do this," or "this is just about the basic agreements, everything we spoke about," or "just kind of a formality."  By this time, the victims had been in the hotel room for over an hour and had typically consumed alcohol and/or marijuana.  GirlsDoPorn also intentionally waited until the last minute to present the document(s) to the victim to create a false sense of urgency, telling many victims that they were "behind schedule" and that the victim needed to hurry up and sign the document(s).  Garcia, Wolfe, and/or Pratt also got irritable and aggressive when victims asked questions about the document(s) or requested time to read.  GirlsDoPorn often videotaped the victims as they signed the document(s).  The videos, which are published on MindGeek's Tubesites, show GirlsDoPorn's cameramen peppering the victims with questions as the victims attempted to read the contract.

131.    The document(s) do not directly contradict the express promises about distribution; they do not clearly indicate that the videos *will* be published online on GirlsDoPorn.com (which is never identified), as well as dozens of free tube sites, and marketed broadly on affiliate websites.  Instead, the document(s) contain broad, vague release language couched in disorganized, complicated legalese and only mentions the innocuously named shell entities GirlsDoPorn maintained (*e.g.,* Bubblegum Films, Inc. or Oh Well Media, Limited) as the contracting party.  Thus, Google searches done in hotel rooms by several victims would lead to innocuous websites set up by GirlsDoPorn for these shell entities rather than GirlsDoPorn.com or GirlsDoPorn's videos on MindGeek's websites.

132.    While filming the sexual portions of the video, some victims asked to stop, but the actor and videographer would not permit it.  They told women they could not

leave until they had the footage they wanted, often falsely saying the victim was contractually obligated to finish and that she would be forced to repay them for the costs of production if she did not proceed. If a victim was grimacing or showing signs of distress during a scene, GirlsDoPorn would force the victim refilm the segment, hide any pain she was experiencing and act as if she were enjoying it. This often caused filming to last for four or five hours. At times, Garcia or Pratt became aggressive and agitated if a woman hesitated to perform an act or asked to leave. Once in the hotel room, the victims lacked any feasible means of egress until GirlsDoPorn released them.

### viii. GirlsDoPorn's Distribution, Doxing, and its Immense Profits

133. GirlsDoPorn published the full-length videos in the "members area" of its paysites, GirlsDoPorn.com and GirlsDoToys.com. Once published to its paysites, GirlsDoPorn used an aggressive marketing strategy to encourage as many people as possible to view the videos. These efforts included partnering with MindGeek via its Content Partner and Viewshare Programs.

134. Further, aware that the victim's classmates, friends, and coworkers would be keen on paying to view the full-length video, GirlsDoPorn intentionally sent (or recklessly knew others would send) links of the victims' trailer videos on MindGeek's Tubesites to social media accounts of people in the victim's social circles, including friends, family, co-workers, employers, teachers, and classmates. By sending links to trailer versions of the video to people who knew the victim, those people would then share the links with others acquainted with the victim, thereby causing the videos to go viral amongst everyone victim knew within 24 to 48 hours of the video being released. By making the video go viral like this, GirlsDoPorn was able to sell monthly subscriptions to customers who otherwise had zero interest in subscribing to GirlsDoPorn (or any other monthly pornography paysite for that matter), but who simply wanted to see the victims' full-length video out of curiosity.

///

///

135.   GirlsDoPorn had something of a cult following.  Numerous websites and forums existed for the sole purpose of doxing[17] GirlsDoPorn's victims.  Anonymous internet users ("trolls") created and congregated on online forums where the sole purpose was to identify GirlsDoPorn's victims by name, glean personal information about them, and harass them.  The trolls shared any information they could find on the forums, including the model's name, email addresses, high school, biographical information, and links to the victims and their families' social media accounts.  Armed with the woman's social media and contact information, trolls sent links to the victim's video to people connected to her on social media.  Other trolls contacted the women personally to attack, bully, shame, and sexually proposition them.  Some trolls contacted and harassed the victims' family members, friends, classmates and church members.

136.   PornWikiLeaks.com was the most notorious doxing website in the pornography business.  Pornography actors worked hard to keep their personal information private so as to avoid harassment (or worse) from stalkers and trolls. PornWikiLeaks.com's business model was to publish personal information of people in the pornography industry (*i.e.,* "dox" them) and charge them a fee to remove the personal information.

137.   GirlsDoPorn's victims were doxed on PornWikiLeaks.com as early as 2012. The doxing of GirlsDoPorn victims became so great in PornWikiLeaks.com's general forum that, in July 2015, PornWikiLeaks.com created a special forum dedicated solely to GirlsDoPorn's victims called, "Girlsdoporn.com GDP Girls Do Porn Exposed real names and personal family info."  By early 2016, the special forum had hundreds of thousands, if not millions, of posts related to GirlsDoPorn's victims.

138.   In November 2015, GirlsDoPorn purchased PornWikiLeaks.com to use as a marketing tool due to the high level of traffic visiting the site.  In January 2016,

---

[17] Merriam Webster defines "dox" (däks, *slang*) as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge."  *See* https://www.merriam-webster.com/dictionary/dox.

advertisements linking to GirlsDoPorn's subscription paysites began appearing in the PornWikiLeaks.com forums where the victims were being doxed.

139.   Plaintiffs are informed and believe and allege thereon that MindGeek—like everyone else in the pornography industry—was acutely aware of PornWikiLeaks.com, its doxing practices, and the GirlsDoPorn special forum thereon.  Some of the posts on PornWikiLeaks.com were narratives from GirlsDoPorn's victims detailing the fraud and coercion used by GirlsDoPorn as part of its recruitment and filming process.

140.   The doxing forums, virality of the videos, and publicly available videos on MindGeek's Tubesites created significant traffic to GirlsDoPorn's paysite, where it maintained ten to fifteen thousand subscribers per month.

141.   The Federal Bureau of Investigation estimates GirlsDoPorn made over $17 million from its sex trafficking operation between 2009 and 2019.[18]

**F.   THROUGH ITS PARTNERSHIP WITH GIRLSDOPORN, MINDGEEK KNOWINGLY ASSISTED, SUPPORTED, AND FACILITATED AN ACTIVE SEX TRAFFICKING VENTURE**

142.   Section 1591 defines sex trafficking as "knowingly. . . recruit[ing], entic[ing], harbor[ing], transport[ing], . . . or solicit[ing] by any means a person … knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion[,] or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1).[19]  GirlsDoPorn's consistent use of fraud, intimidation, and coercion to induce women to film pornography clearly constitutes sex trafficking.

143.   A person also commits criminal sex trafficking if he or she "knowingly . . . *benefits, financially or by receiving anything of value, from participation in a venture*

---

[18] *See* Press Release, GirlsDoPorn Owners and Employees Charged in Sex Trafficking Conspiracy, Dept. of Justice (Oct. 10, 2019), *available at* https://www.justice.gov/usao-sdca/pr/girlsdoporn-owners-and-employees-charged-sex-trafficking-conspiracy.

[19] A "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

which has engaged in an act [of sex trafficking]" while "knowing or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion[,] or a combination of such means will be used to cause the person to engage in a commercial sex act."   18 U.S.C. § 1591(a)(2) (emphasis added). Section 1591 defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C. § 1591(e)(4). MindGeek committed criminal sex trafficking by knowingly participating in and benefitting from GirlsDoPorn's criminal sex trafficking venture.

144.   In or around 2009, GirlsDoPorn created accounts on MindGeek's Tubesites and began posting videos there.

145.   In or around 2011, GirlsDoPorn applied and MindGeek selected GirlsDoPorn to participate in its Content Partner Program and ViewShare Program with the promise and intent of assisting GirlsDoPorn in developing and promoting its content, enhancing the visibility and popularity of the GirlsDoPorn brand, and increasing the traffic to and the sale of subscriptions for GirlsDoPorn's paysites.

146.   MindGeek's dedicated account representatives helped GirlsDoPorn create, name, and design dedicated channels for GirlsDoPorn's videos on MindGeek's Tubesites.

147.   MindGeek assisted GirlsDoPorn in developing content and creating trailer versions of victims' videos, including those featuring Plaintiffs, to post on its dedicated channel.  MindGeek representatives titled, edited, and tagged these illegal videos, including those of the Plaintiffs.

148.   In its advertising efforts for GirlsDoPorn, MindGeek designed and created hyperlinks and other advertisements to encourage users to view GirlsDoPorn's channels on MindGeek's Tubesites and to entice users to navigate either to MindGeek's premium pages or to GirlsDoPorn's paysites to purchase subscriptions and watch full-length videos.

149.   MindGeek also created search engine optimization campaigns to promote and maximize the exposure of GirlsDoPorn's sex trafficking videos, including of the Plaintiffs.

150.   MindGeek created tags and search terms for GirlsDoPorn to make their videos easier to find on its own websites and on other search engines.

151.   MindGeek actively suggested GirlsDoPorn's videos and channels to users of its Tubesites.

152.   Through the ViewShare Program, MindGeek processed millions of dollars in revenue it sent to GirlsDoPorn for its Section 1591-violative videos, including those of the Plaintiffs.

153.   Pursuant to their partnership, MindGeek hosted around 70 videos, including those of Plaintiffs, on the GirlsDoPorn channel on Pornhub.com alone.  As of fall 2019, those 70 videos had more than 700,000 subscribers and were collectively viewed almost 700,000,000 times.

154.   The GirlsDoPorn channels on YouPorn.com, Tube8.com, and RedTube.com featured anywhere from 100 to 200 videos featuring Plaintiffs and other sex trafficking victims, which also collectively had hundreds of millions of views.

155.   By August 2019, the videos on GirlsDoPorn's channels on all of MindGeek's Tubesites collectively had nearly *one billion* views.  This total does not account for the hundreds of videos featuring GirlsDoPorn's victims that were also uploaded to the general libraries on MindGeek's Tubesites.  Many of those videos also had millions of views each.

156.   There are currently 4,135 channels on PornHub.com, which MindGeek ranks by popularity.  As a result of GirlsDoPorn and MindGeek's joint efforts in maintaining, editing, and curating, while it was still live, GirlsDoPorn's channel on PornHub.com was the 30th highest ranking channel on the site.  Many of the channels that ranked higher than GirlsDoPorn were channels for pornographic brands that MindGeek owned and produced, such as Brazzers and Reality Kings, and for which MindGeek had more incentive to expend time and money on since MindGeek retained 100% of the subscriptions generated from those paysites instead of the 50% affiliate fee it received from GirlsDoPorn.  Plaintiffs are informed and believe that GirlsDoPorn was one of

MindGeek's top ten most profitable Content Partners.

157.   Upon information and belief, GirlsDoPorn's videos were viewed on MindGeek's Tubesites significantly more than on any other website.[20]

158.   Upon information and belief, MindGeek referred and linked more users to GirlsDoPorn's paysites than any other affiliate website.  Accordingly, MindGeek is responsible for more of GirlsDoPorn's subscription revenue than any other affiliate website.

159.   Given the dominant share of the internet pornography market owned and controlled by MindGeek, it is unknown whether GirlsDoPorn could have become or remained a viable business concern absent its partnership with Mindgeek.  Certainly, GirlsDoPorn never could have achieved the level of popularity and success it did without MindGeek actively assisting, supporting, and facilitating its unlawful business.

G.   **MindGeek Earned Millions in Revenue and Otherwise Materially Benefitted From Its Participation in GirlsDoPorn's Sex Trafficking Venture**

160.   The MindGeek-GirlsDoPorn partnership allowed MindGeek to sell, market, and otherwise exploit the illegal videos featuring GirlsDoPorn's victims, including of the Plaintiffs, for its own financial gain.

161.   Plaintiffs are informed and believe MindGeek generated millions of dollars in affiliate fees and premium subscriptions from selling, marketing, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture, including Plaintiffs.

162.   With nearly one billion views of GirlsDoPorn's videos on MindGeek's Tubesites, GirlsDoPorn's videos generated an enormous amount of traffic for MindGeek's Tubesites, increasing MindGeek's ability to sell advertisements to third parties and increasing its ability to advertise and sell its own products on its Tubesites.

---

[20] The ease with MindGeek permitted free videos to be shared and downloaded on its Tubesites allowed users to obtain copies and widely circulate videos of GirlsDoPorn's victims among victim's friends, family, colleagues, and classmates through social media, email, text, and internet forums.

163.   GirlsDoPorn's infamous practice of doxing its victims also increased traffic to MindGeek's Tubesites as the victims' friends, family, colleagues, classmates, and acquaintances scrambled to view GirlsDoPorn's videos of women they knew and shared the videos with others.

**H.   MINDGEEK KNEW OR CERTAINLY SHOULD HAVE KNOWN THAT GIRLSDOPORN USED FRAUD, INTIMIDATION, AND COERCION AS PART OF ITS CUSTOMARY BUSINESS PRACTICES THROUGHOUT ITS PARTNERSHIP WITH GIRLSDOPORN**

164.   Although criminal sex trafficking under Section 1591(a)(2) requires showing the participant/beneficiary of a sex trafficking venture knew or recklessly disregarded the fact that unlawful means such as force, fraud, or coercion were being used to cause a victim to engage in a commercial sex act, Section 1595 provides sex trafficking victims with a civil cause of action against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act [of sex trafficking.]"  18 U.S.C. 1595(a) (emphasis added).

165.   As early as 2009, MindGeek knew, or should have known, GirlsDoPorn was using force, fraud, and coercion to get its victims to engage in commercial sex acts for more than a dozen separate reasons.  As the years passed, the red flags indicating that GirlsDoPorn was engaged in sex trafficking mounted and MindGeek's ability to claim ignorance of GirlsDoPorn's fraudulent and coercive business practices becomes less and less viable.  The indicia of sex trafficking willfully accepted and/or ignored by MindGeek include, *inter alia*:

**i.     Many Victims Complained Directly to MindGeek**

166.   MindGeek's Tubesites include a takedown portal where GirlsDoPorn's victims repeatedly complained to MindGeek about the fraud and coercion employed by GirlsDoPorn throughout the entire process and the significant emotional distress and harassment they suffered as a result of MindGeek's continued publication of their videos. ///

167.   For example, on August 8, 2016, Jane Doe No. 11 asked MindGeek to remove her video from PornHub.com by submitting the following request to PornHub.com's takedown portal.

> Reason:  Im going to kill myself if this stays up here.  I was scammed and told this was only going to be on dvds in another country.  Please im begging you please ill pay!

> Agree to Distribution: No.  (sics in original.)

168.   On August 13, 2016, Jane Doe No. 11 sent MindGeek another takedown request for her video, which MindGeek published on its website, Tube8.com: "They scammed me and told me it was only going to dvds in another country.  Please this is ruining my life."

169.   On May 31, 2017, after MindGeek continued to publish her video on PornHub.com, Jane Doe No. 11 sent another request to remove her video.

> I WAS SCAMMED. THIS COMPANY LIED TO ME ABOUT THIS BEING ON THE INTERNET! THEY TOLD ME IT WOULD ONLY BE AVAILIBLE ON DVD IN AUSTRALIA. MY WORK FRIENDS AND FAMILY ALL KNOW AND THIS VERY LINK IS BEING SENT AROUND. I WANT TO JUST DIE

(Sics and capitalization in original.) Jane Doe No. 11's video was on MindGeek's Tubesites until after GirlsDoPorn's principals were arrested in October 2019 when MindGeek finally decided to take action.

170.   In another instance, a victim sent a takedown request on December 14, 2016, advising MindGeek:

> I was told this video went to a private viewer, and now it is all over the internet.  I was lied to, and this isn't okay.  I have reached out to them with no response.

171.   In January 2016, Jane Doe No. 36 submitted a content removal request to MindGeek, begging to have her video removed because of the lack of consent and harassment she was under.

> That's what I am trying to explain is that I did not consent to being online!!!   :(((( me and other girls are being brutally harassed."

(sics in original.)

172.   Jane Doe No. 36 followed up with MindGeek a few days later advising the Defendants she and her boyfriend were in therapy because of the continued publication of the videos.

173.   These are just some of many examples of take down requests MindGeek received notifying MindGeek that GirlsDoPorn used fraud and coercion to get the women to engage in commercial sex acts and the corresponding harassment and suicidal tendencies the victims had as a result of the continued publication of the video.  Plaintiffs have been informed and believe MindGeek received dozens, if not hundreds, of similar takedown requests from GirlsDoPorn victims over the years and never conducted an investigation of the repeated claims of fraud or coercion perpetrated by its content and viewshare partner, GirlsDoPorn.

**ii.    Third-Parties Complained to MindGeek**

174.   In addition to hearing directly from GirlsDoPorn's victims, third party "takedown companies" hired by GirlsDoPorn's victims notified MindGeek that GirlsDoPorn's victims did not consent to their videos being online.  Such companies exist to help people remove their likenesses from the Internet.  These entities send DMCA takedown notices to websites publishing pictures or videos obtained without consent. Many of GirlsDoPorn's victims hired takedown companies to assist with the removal of their videos from the Internet, including from MindGeek's Tubesites.  These third-party companies sent hundreds, if not thousands, of notices to MindGeek advising MindGeek that it was publishing the victim's videos without the victim's consent.

### iii.   GirlsDoPorn Publicly Admitted to Using Fraudulent Tactics to Lure Young Women into a Hotel Room Under False Pretenses

175.   From the time GirlsDoPorn.com launched in 2009, anyone paying the slightest attention to the pornography business or doing the slightest due diligence of its business partners understood GirlsDoPorn used force, fraud, and coercion to get its high school and college-aged victims to appear in its pornographic videos.

176.   As of 2010, GirlsDoPorn's homepage indicated:

> Girlsdoporn is the only website that uses only 100% amateur girls.  There are a lot of websites out there that <u>claim</u> they have first timers only . I myself have joined these kinda websites and then days later started recognising the girls on other websites all over the internet and been dissapointed . This is why I built Girlsdoporn.com here you will find nothing but amateurs. I refuse too shoot any girls who have prior exerience . All the girls you will finrised d on my site are normal everyday girls you would find in the city streets - malls - colleges and normal 9-5 jobs . I personally hunt out each and every one for your viewing pleasure. You would be suphow quickly the offer of quick cash turns these girls into part time pornstars. Everything you read or see on this website is 100% real and true. We have no need too trick or lie too you.. ENJOY GUYS !

(sics in original.)  GirlsDoPorn's niche is enigmatic in that most, if not all, women would not consent to appearing in a sex video that will be published on dozens of free websites that could be easily accessed by friends and family.  Not long after GirlsDoPorn launched its website in 2009, GirlsDoPorn publicly laughed about fraudulently inducing a victim to a hotel room under the false pretense of a clothed modeling job.  A caption to a video read:

> This smokin hot 18 y/o teen named jessica was trying too find some money so that she could get a boob job done. **She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha** :)  (sics in original, emphasis added.)

---

177.   These posts were available to MindGeek in 2011 when it accepted GirlsDoPorn into its Content Partner Program and ViewShare Program and began selling, marketing, and exploiting videos featuring GirlsDoPorn's victims.  Upon information and belief, MindGeek did no due diligence regarding GirlsDoPorn's business practices prior to partnering with GirlsDoPorn in its Content Partner Program and ViewShare Program.

### iv.   The Videos Contain Obvious Indicia of Fraud

178.   The content of GirlsDoPorn's videos shows GirlsDoPorn lied to the young women about the publication of the video, and MindGeek admits reviewing all video submissions.

179.   All GirlsDoPorn videos begin with a five to ten-minute "interview" of the victims.  The victim's responses in the interviews made clear they believed the video would not be published on the Internet or available to anyone in the United States.

180.   Further, no content or dialogue in the interviews clarified the production company was GirlsDoPorn or intended to post the subject videos on GirlsDoPorn.com or any website, for that matter.  Finally, in these interviews, the women often expressed how they would be ostracized if the video were made public—something MindGeek and GirlsDoPorn knew would occur *en masse* once the video was published and marketed on MindGeek's Tubesites, especially considering the doxing occurring on PornWikiLeaks.com, which, as mentioned above, was a notorious website known to all in the pornography industry.

### v.   The Videos Contain Obvious Indicia of Coercion

181.   The video content made clear the victims were subjected to coercion and did not consent to all of the sex acts portrayed in the videos.  Some of GirlsDoPorn's videos depict victims who are in visible distress, including, in some instances, bloodstained sheets and condoms.  In other videos, tracks of the victim's tears can be seen in the victim's makeup—the victim obviously having been in tears while the camera was not rolling or having been edited out by GirlsDoPorn.  In some videos, furniture can be seen piled in front of the hotel room door.  MindGeek claims that it reviews all content, so it

should have seen and been alarmed by this content.  Since at least 2016, numerous online forums available from a simple Google search of "girlsdoporn" detailed these signs of duress at length.

### vi.    The Videos Contain Obvious Use of Alcohol and Drugs

182.   GirlsDoPorn's victims' videos that MindGeek marketed, sold, and exploited include women under 21-years-old who are clearly under the influence of drugs and/or alcohol based on the victim's gait, blurred eyes, and slurred speech.  Alcohol and marijuana paraphernalia are visibly strewn about the hotel room in the background of numerous videos.  Since MindGeek claims that a human content moderator reviews every video, it should have been aware women in GirlsDoPorn's videos were frequently under the influence.

### vii.    GirlsDoPorn Made Publicly Available Statements Containing Admissions of Unlawful Acts

183.   Beginning in or around 2014, GirlsDoPorn operated an online forum that included firsthand accounts of the fraudulent and coercive tactics it used.  For example, the forum included an account directly from GirlsDoPorn's owners of a woman who "flip[ed] out in the middle of the shoot [and] had a panic attack" when she "had enough" and locked herself in the bathroom to avoid continuing with the filming process. In the narrative, GirlsDoPorn mocked the victim for calling her mother for help and described their efforts to convince her to finish the scene.  GirlsDoPorn joked about the woman being so upset that she disappeared from the hotel room and was never heard from again.

184.   GirlsDoPorn published this post in its forum in or around March 2015, where it remained live and publicly available until the forum was taken down in or around January 2020.

///
///
///
///

---

**viii.    Several Victims Publicly Posted Survival Stories Describing GirlsDoPorn's Unlawful Acts**

185.    Numerous victims have also come forward publicly to detail the force, fraud, and coercion they underwent from GirlsDoPorn.  In 2016, one victim published a detailed account of the fraud on Reddit.  It reads:

> One day, I answered an ad for "beginmodeling.com" and after that, my life would never the same. From the minute Johnathan contacted me, I was lied to repeatedly, manipulated, and coerced into filming. A fake website, fake references from "past models", the entire premise is a lie.
>
> [...]
>
> He'll convince you that no one will ever see it, it's for Australia/foreign markets only, it's only released on DVDs, etc. I knew nothing about the industry before this, how was I to know I was being naive? If you refuse, they tell you you'll have to reimburse them for the flight/hotels. You're all alone, surrounded by people you don't know, and you only have one choice.
>
> Dre will offer to smoke with you, Johnathan will offer you a drink, before you know it, they've got cameras out and they're recording you. They read you lines.   "I am not under the influence and I consent to the filming.."  They're pulling out contracts. They don't give you time to read them. "Begin Modeling" is written at the top. Why? This isn't modeling at all! They give you a little script for your pre-interview. They tell you exactly what to say if you won't say what they want you to. It's all fake.  They are extremely smart. And extremely manipulative.
>
> [...]
>
> I cry at one point. They switch angles so you can't see my face. I start to bleed. They switch again, and then abandon the sex all together.  "Do you know what a facial is?" I didn't.

(A true and correct copy of the entire publication is attached hereto as Exhibit 2.)

---

186.   Another victim detailed her account with GirlsDoPorn online explaining how GirlsDoPorn lured her to San Diego under the guise of modeling only to be forced to film pornography.  (A true and correct copy of the entire publication is attached hereto as Exhibit 3.)

### ix.   "Miss Delaware Teen USA" Was Publicly Maligned After Her GirlsDoPorn Video was Leaked

187.   In or around June 2012, a woman, who was actively competing in beauty pageants such as Miss Teen USA, responded to a modeling advertisement and, like its other sex trafficking victims, ended up filming a pornographic video for GirlsDoPorn under false pretenses and coercion.

188.   In November 2012, that woman won the "Miss Delaware Teen USA" pageant.

189.   In February 2013, GirlsDoPorn publicly released this woman's video on its website and a trailer of the video on its channels on MindGeek's Tubesites.  Her identity and status as Miss Delaware Teen USA were quickly discovered and spread across the internet.

190.   The Miss Delaware Teen USA Organization learned about the video, and the woman was forced to resign her position as Miss Delaware Teen USA.

191.   MindGeek released a public statement on its YouPorn.com Official Blog coyly acknowledging that the woman's video had "found it's way online" (sic in original) and that the woman had attempted to "den[y] any involvement in the video."  These statements demonstrate MindGeek's understanding that the woman had been defrauded by GirlsDoPorn and, like all other victims who had complained to GirlsDoPorn and Mindgeek at the time, believed whatever photographs and footage taken in San Diego, the video would be distributed outside North America and not be release online.

192.   MindGeek also praised GirlsDoPorn and bragged about its connection with the studio that released a pornographic video apparently without the woman's knowledge or consent: "Luckily for us, Girls Do Porn, the studio responsible for the video, just so

happens to be a YouPorn partner and have been kind enough to upload a preview of the Miss Teen Delaware sex tape for our viewing pleasure!"

193.   MindGeek also acknowledged that the release of the video had caused the woman real harm: "Though [she] has resigned her title of Miss Teen Delaware, YouPorn has stepped in to take the sting out of the situation, offering her a $250,000 deal to become the first ever Miss YouPorn!"

194.   Despite its knowledge of the obvious fraud and coercion, instead of investigating further or taking steps to remove the apparently non-consensual content, MindGeek used the buzz created by the teenager's humiliation to further promote the video, its Content Partner GirlsDoPorn, and its own Tubesite—notwithstanding the ruin it would cause the victim.

**x.     GirlsDoPorn Provided MindGeek with Unbelievable Responses after Victims Complained to MindGeek**

195.   As part of the DMCA process, when a victim sent a takedown notice to MindGeek, GirlsDoPorn had the opportunity to respond.  GirlsDoPorn's responses were from a purported Chief Executive Officer with a clearly fake name for an entity purportedly incorporated in the tiny third world nation of Vanuatu.  GirlsDoPorn's response to takedown notices sent to MindGeek often stated: "My name is Jordan Powers and I am the CEO of BUBBLEGUM FILMS /GIRLSDOPORN.COM."  The signature block "Jordan Powers" responded with stated:

> Thank you.
> BUBBLEGUMFILMS INC
> c/o GT Group Limited
> 1st Floor Pacific Building
> Port Vila, Vanuatu 65774
> DMCA@MOMPOV.COM

196.   Furthermore, on information and belief, neither "Bubblegum Films, Inc." nor any other dubious Vanuatu entities GirlsDoPorn used was a party to GirlsDoPorn's contracts with MindGeek for the Content Partner Program and Viewshare Program.

Rather, on the GirlsDoPorn side, the parties and signatories to these agreements were Pratt and/or his San Diego, California-based GirlsDoPorn entity, BLL Media, Inc. GirlsDoPorn also listed Bubblegum Films, Inc. and the Vanuatu address as its 2257 location. Consequently, MindGeek was aware that GirlsDoPorn maintained a fake international front for its operation out of a tiny remote island in the Pacific.

197.   In the event the above dubious correspondence was not unbelievable enough, in 2011, media widely publicized that authorities shut down GT Group Limited, which purportedly incorporated Bubblegum Films, Inc., because it was a criminal operation helping launder money for criminal enterprises, such as drug cartels and gunrunners.[21]

### xi.   Twenty-Two Victims Publicly Filed a Lawsuit Detailing GirlsDoPorn's Unlawful Practices, Which Received Extensive Media Coverage

198.   On June 2, 2016, four plaintiffs sued GirlsDoPorn for fraud and privacy claims in the State Court Action. By March 2017, there were twenty-two (22) plaintiffs in that case. The lawsuit garnered significant press, some of which targeted MindGeek's role in publishing the victims' videos. Each of the plaintiffs in the State Court Action filed numerous public declarations detailing the fraud and coercion they underwent. As early as 2017, the San Diego Superior Court found plaintiffs were more likely than not going to prevail at trial.

### xii.   MindGeek Was Served With A Subpoena Seeking the Records of Victims Complaining About Fraud and Requesting Removal of Videos

199.   On September 19, 2017, the plaintiffs in the State Court Action served MindGeek with a subpoena seeking documents related to takedown requests for PornHub.com, YouPorn.com, and Redtube.com.

///

---

[21] *See* Gerard Ryle, *Inside the shell: Drugs, arms and tax scams,* INTERNATIONAL CONSORTIUM OF INVESTIGATIVE JOURNALISTS (Feb. 7, 2013), *available at* https://www.icij.org/ investigations/offshore/geoffrey-taylor/.

200.   Further, in January 2019, the San Diego Superior Court found there was a "substantial probability" that plaintiffs would prevail on their fraud claims, which, under California law, required clear and convincing evidence of the fraud.  Based on the findings, the San Diego Superior Court issued an order allowing plaintiffs to do pretrial financial discovery for punitive damages under Civil Code section 3295.

### xiii.   MindGeek's Own DMCA Attorney Provided Expert Testimony in the State Court Action

201.   In March 2019, GirlsDoPorn designated MindGeek's very own DMCA attorney, Lawrence Walters, as an expert on affiliate marketing issues.  Plaintiffs in that action deposed Mr. Walters.

202.   Mr. Walters was scheduled to testify *in persona* but did not appear after the criminal charges were filed.  His deposition transcript and video were admitted into evidence instead.

203.   Despite its knowledge of the ongoing State Court Action, MindGeek continued to publish and profit from the GirlsDoPorn victim's videos, completely ignoring the dozens of public declarations and hard evidence of its fraud and coercion.

### xiv.   MindGeek Attempted to Purchase GirlsDoPorn During the State Court Action

204.   Upon information and belief, around 2018, while the State Court Action was pending, MindGeek entered into a Letter of Intent with GirlsDoPorn seeking to purchase GirlsDoPorn's video library and that, during the due diligence for this prospective acquisition, MindGeek further learned of the fraud and coercion GirlsDoPorn use to recruit and groom its victims causing MindGeek to back out of the purchase.  MindGeek continued to partner with GirlsDoPorn pulling out of the transaction.

### xv.   MindGeek Removed GirlsDoPorn Videos From its General Library, But Not From GirlsDoPorn's Channel or From the ViewShare Program

205.   MindGeek's websites have a flaw in that they allow pirates to upload its Content Partners' full-length videos to its general library where the public may view the

videos for free.  Having full-length videos in the general library hurts MindGeek's business in that potential customers will be less inclined to purchase subscriptions from MindGeek's Content Partners' paysites and generate affiliate fees for MindGeek if the potential customers can simply view the Content Partner's full-length videos for free in the general library.

206.   Plaintiffs are informed and believe and thereon allege that MindGeek employees scour the general library to remove full-length versions of its Content Partners' videos from its general library.

207.   Plaintiffs are informed and believe that, when victims of GirlsDoPorn's sex trafficking venture complained to MindGeek about their GirlsDoPorn videos, MindGeek only removed the videos from the general library on its Tubesites and would not remove any of the videos from its Content Partners' Channels, which MindGeek had itself spent considerable time and expense optimizing, editing, and marketing.  Indeed, when GirlsDoPorn victims alerted MindGeek to a full-length video in its general library, the victims were simply doing MindGeek a favor by locating videos they were already attempting to find and remove.  MindGeek's decision of whether to remove a video was primarily, if not solely, driven by whether the video was profitable for MindGeek, such as videos on the GirlsDoPorn Channel or on ViewShare and had nothing to do with whether the victim consented.

208.   Plaintiffs are informed and believe that MindGeek never conducted any investigations into the victims' claims of lack of consent in determining whether to remove any videos.

I. **DESPITE ITS KNOWLEDGE OF GIRLSDOPORN'S UNLAWFUL BUSINESS PRACTICES, MINDGEEK MAINTAINED ITS PARTNERSHIP WITH THE SEX TRAFFICKING VENTURE FOR YEARS AND CONTINUES TO REAP THE BENEFITS TO THIS DAY**

209.   Despite the fifteen aforementioned independent reasons that MindGeek knew, acted in reckless disregard of the fact, and/or should have known that GirlsDoPorn was engaged in sex trafficking, MindGeek continued its partnership with GirlsDoPorn.

210.   By maintaining its partnership with GirlsDoPorn, MindGeek continued to solicit and pay for new content from GirlsDoPorn, encouraging GirlsDoPorn to continue sex trafficking more and more women.

211.   Upon information and belief, MindGeek knew that GirlsDoPorn's business practice of defrauding women into filming pornographic videos was part of what made the videos so popular.  In February 2013, if not before, MindGeek learned the value of GirlsDoPorn's fraudulent business practices and nonconsensual videos when Miss Delaware Teen USA's video was released and she was publicly identified in the video, generating media attention and interest all over the internet.  MindGeek also learned from PornWikiLeaks that GirlsDoPorn's unlawful business practices and the doxing of its victims increased the popularity of the videos and drove up their value.

212.   It was not until the State Court Action was ready to proceed to trial in July 2019 that MindGeek made *any* effort to remove GirlsDoPorn videos.  And even then, MindGeek only agreed, grudgingly, to remove videos of the twenty-two plaintiffs in the State Court Action. GirlsDoPorn's channel and all other videos remained live.

213.   In October 2019 when the owners and operators of GirlsDoPorn were indicted on federal sex trafficking charges and GirlsDoPorn was shut down by federal authorities, MindGeek technically ended its partnership with GirlsDoPorn because at that point, there was no company left.  However, MindGeek continued hosting and benefitting from GirlsDoPorn's videos on its Tubesites long after the criminal indictment.

214.   Upon information and belief, when the criminal indictment was filed and members of GirlsDoPorn were arrested, the media coverage that followed caused a spike in the public's interest in GirlsDoPorn's videos.  Accordingly, MindGeek enjoyed the financial benefit of increased traffic to its Tubesites as more people learned about GirlsDoPorn through the media reports and sought out its content.

215.   Similarly, when Hon. Kevin Enright issued his preliminary statement of decision on January 2, 2020 finding GirlsDoPorn liable for nearly $13 million in damages for various forms of fraud, misappropriation of likeness, deceptive business practices,

another spike in media coverage and public interest occurred.  Upon information and belief, because MindGeek Tubesites still hosted many GirlsDoPorn videos at this time, MindGeek enjoyed the financial benefit of increased traffic to its Tubesites from those searching for GirlsDoPorn videos in early 2020.

216.   Nearly a month later, MindGeek finally made efforts to GirlsDoPorn videos featuring non-plaintiffs from its Tubesites.

217.   As of December 12, 2020, MindGeek still hosted GirlsDoPorn's videos on its websites, including videos of Plaintiffs.  The URLs for the victims' videos contained affiliate tails and were surrounded by hyperlink advertisements that, if clicked, redirected the visitors to various paysites.  Most of the hyperlink advertisements on these victim's videos redirected the visitor to MindGeek's paysite, www.Brazzers.com.  Others redirected the visitor to third party paysites, such as JerkMate.com. Accordingly, MindGeek continued to benefit from GirlsDoPorn's sex trafficking venture throughout 2020.  Mindgeek finally removed those videos after Plaintiffs filed the initial complaint.

**J.**   **MINDGEEK FACILITATES AND ENCOURAGES NON-CONSENSUAL CONTENT ON ITS TUBESITES BECAUSE MINDGEEK ITSELF BENEFITS FROM SUCH CONTENT**

218.   GirlsDoPorn victims are only a subset of the many victims who have had non-consensual or underage videos posted on MindGeek's Tubesites from which MindGeek has benefitted and profited.

219.   MindGeek has a long, well-documented history of content depicting non-consensual sexual acts being posted, viewed, shared, and monetized on its Tubesites, including, *inter alia*, videos of children engaged in sexual acts, women being raped, sex acts filmed using "spy-cams" without gaining one or more participant's consent, sex acts performed while one party was clearly unconscious or severely impaired.  MindGeek has always been aware of such non-consensual and illegal content on its Tubesites and has not only permitted it to remain but has gone out of its way to ensure that it remains.

220.   MindGeek claims that it has always employed content moderators and used software to ensure unlawful content did not reach its Tubesites or, if it did, to remove the

unlawful content as soon as it was discovered.  These claims cannot be true.  Despite touting itself as an industry-leading technology company, innumerable videos have appeared on MindGeek's Tubesites that are plainly unlawful on their face based on the video's title, description, tags, and/or a cursory review of the content.

221.   Even worse, many sex trafficking victims have come forward with harrowing stories begging MindGeek to remove clearly non-consensual videos from its Tubesites but being ignored or given the run-around.  Shockingly, former content moderators employed by MindGeek have stated publicly that their superiors directed them that their job was not to find and remove non-consensual content, but to find a justification to leave questionable videos on the sites.

222.   Finally, even when unlawful videos were identified and removed, they often quickly reappear.  MindGeek has knowingly chosen not to take actions to ensure that non-consensual videos cannot be reposted despite *always* having the technology and ability to do so.

223.   Each of MindGeek's decisions, policies, and practices, including those with respect to GirlsDoPorn, can be explained by a single fact: non-consensual videos are popular, drive traffic to affiliates, and increase revenue for MindGeek.

i.     **As Technology Company Leading the Industry in Data-Mining, MindGeek Knows Exactly What Content Is On Its Tubesites**

224.   On the homepage of its website, MindGeek describes itself as "a global industry-leading information technology firm" that provides the following services:

a.     "Search Engine Marketing – The SEM team increases brand exposure and improves ROI by leveraging proven multi-channel inbound marketing strategies."

b.     "Data Analysis – Handling massive amounts of insightful data daily translates into optimized content and better user experiences."

///
///

c.     "Ad Platforms – Promotes better monetization for customers looking to reach their target demographic audience easily and quickly."[22]

225.   MindGeek deploys cutting-edge data-mining techniques to analyze the millions of hours of video on its Tubesites to learn about its users' preferences and maximize its profits.  In fact, MindGeek is considered one of the foremost leaders in data analysis.[23]

226.   "Detailed data tracking the sexual fantasies of hundreds of millions of people direct what MindGeek orders production studios to shoot for their subscription pages, which are then promoted on the company's vast network of tube sites to tap into their massive audience.  If the 'free' product flops, audiences for premium products grow and vice versa leaving MindGeek profiting either way[.]"[24]

227.   MindGeek's entire business model is built around gathering and analyzing detailed data about the content on its Tubesites.  MindGeek knows exactly what is on its Tubesites and knows which types of content are the most popular and drive the most revenue.  MindGeek's business practice is to permit content to remain on its Tubesites as long as that content is popular and drives revenue—regardless of whether that content is legal or not.

///

---

[22] *Who We Are* and *What We Do*, MindGeek.com (last visited Mar. 31, 2021).

[23] "MindGeek is at the leading edge of the second digital disruption: a highly successful company that has married big data, mined from billions of views, to content aggregation, organization, and even creation."  Kal Raustiala and Christopher J. Sprigman, *The Second Digital Disruption: Streaming and the Dawn of Data-Driven Creativity*, 94 N.Y.U. L. Rev., 1555 1561 (2019), *available at* www.nyulawreview.org/wp-content/uploads/2019/12/NYULawReview-94-6-RaustialaSprigman.pdf; *see also* Joe Castaldo, *Lifting the veil of secrecy on MindGeek's online pornography empire*, THE GLOBE AND MAIL (published Feb. 4, 2021) *available at* https://www.theglobeandmail.com/business/article-mindgeeks-business-practices-under-srutiny-as-political-pressure/.

[24] *The secretive world of MindGeek: the Montreal-based company behind Pornhub and RedTube*, Patricia Nilsson, FINANCIAL TIMES (published Dec. 18, 2020), *available at* https://financialpost.com/financial-times/the-secretive-world-of-mindgeek-the-montreal-based-company-behind-pornhub-and-redtube.

---

### ii.     MindGeek Makes <u>No</u> Effort to Find Non-Consensual Content On Its Tubesites

228.    MindGeek claims it does not want non-consensual videos on its Tubesites and is making a good faith effort to remove non-consensual content.  These claims simply are not credible when considered in light of the many videos on MindGeek's Tubesites that are easily recognizable as non-consensual based on the titles, tags, or descriptions that clearly indicate the videos are non-consensual or the content itself.

229.    During his testimony before the Standing Committee on Access to Information, Privacy and Ethics ("ETHI") for Canada's House of Commons, MindGeek Chief Executive Officer, Feras Antoon stated that "every single piece of content is viewed by our human moderators."  During the same meeting, MindGeek Chief Operating Officer, David Tassillo testified, "the content will not go live unless a human moderator views it.  I want to assure the panel of that."  Mr. Tassillo also stated that MindGeek used several types of software to find non-consensual content.[25]

230.    Despite this testimony, videos with the following titles have appeared on MindGeek's Tubesites:

> "Young Teen Gets Pounded"; "Old Man with Young Teen"; "Young Girl Tricked"; "A Club Where you can Play with Little Girls, and It's So Fun"; "Cute Amateur Teen Drunk and Stoned"; "First BBC on Drugs"; "Stolen Teens' Secret Peeing Scenes", with video cameras inside girls' toilets videotaping them without their knowledge; "Amateur Sex Tape Stolen from Teen Girl's Computer"; "Daddy F[***]s Young Teen Boy Virgin, First Time"; "Tika Virgin from High School Jakarta Grade Two"; "Jovencitas violadas", meaning "young rape", from an unknown user; "Drunk Teen F[***]d by Black Stranger"; "Innocent Teenage Girls are Used and Exploited"; "Crying Teen"; "Passed Out Teen"; "Very Young South American" with the tags

---

[25] Unofficial Transcript, Evidence of 19th Meeting of ETHI, p. 3 (Feb. 5, 2021) *available at* www.ourcommons.ca/Content/Committee/432/ETHI/Evidence/EV11098412/ETHIEV19-E.PDF."

"teenager" and "young", and a comment says, "This girls looks 13"; "Chinese Northeast Middle School"; "Junior High School Student"; "Anal Crying Teen"; "I'm 14", with a video of a young boy masturbating; "Gay 14", a video of a young boy masturbating; and "Pinay Junior High Student". . . "F[****]d Sister Hard in the Ass While She Was Drunk and Sleeping"; "Drunk Girl Gets Handcuffed and Abused Next to the Party"; "F[****]d Sleeping Schoolgirl After a Drunk Party"; and "Tinder Girl Passed Out At My House, So I Stuck It in Her Ass" . . . "Anal Sex With a Drunk Girl"; "Drunk Asian Girl Humped By My Friend"; "Hidden Camera: Girls in the Toilet At Prom"; and "CCTV in Changing Room: Full Naked Hockey Team" . . . "Black Slave Girl Brutalized"; "How to Treat Your N[****]r"; "Real Drunk Stupid Chink Whore"[.][26]

Such titles clearly indicate the videos contain blatantly non-consensual sexual acts. No good faith effort to find and remove non-consensual content could have possibly missed videos with such titles.

231. Other videos are easily identified as non-consensual based on a cursory review of the comments section. Documented examples of comments on Pornhub videos include: "This girls looks 13"; "Isn't this technically child porn?", "She looks 13. That's illegal", "Wow, she looks like she's 12", "I'm not legal but I have a winning video", "She looks nine. Trade CP?", and "She looks like she's 12, like she hasn't even hit puberty."[27] Such comments and the associated videos have remained on MindGeek's Tubesites for weeks, months, and years. This would not be the case if MindGeek had been making a good faith effort to remove non-consensual videos.

232. Not only is Mindgeek's claim it reviews every video dubious in light of these videos, but this claim is also practically impossible. Upon information and belief,

---

[26] Testimony of Laila Mickelwait, Evidence of 20th Meeting of ETHI, *supra* note 26, pp. 14-15 (redacted for profanity). These titles were documented before MindGeek's mass deletion of 10 million videos in December 2020 after media reports accusing MindGeek of hosting sex trafficking videos and several credit card companies discontinued their relationships with Pornhub based on those allegations. *Id.*

[27] *Id.*

MindGeek employs only *eighty* (80) moderators to review content across *all* of its websites worldwide, which includes approximately 1.36 million hours of new video that is uploaded each year.  By contrast, Facebook has 15,000 moderators.[28]

233.  Plaintiffs are further informed and believe that, "as of early 2020, Pornhub had under 10 moderators per eight-hour shift reviewing content on the site, in Cyprus. They had only 30 to 31 employees per day looking at content," for all of MindGeek Tubesites.[29]  MindGeek has refused to disclose the number of content moderators in its employ either currently or in the past.  However, MindGeek admits that it employs only about 1,800 individuals total.

234.  Plaintiffs are informed and believe that MindGeek's officers, directors, and managing agents knew that a significant number of videos featuring underage and non-consensual victims were being uploaded by Content Partners and members of the public to MindGeek's Tubesites on a daily basis and that MindGeek's officers, directors and managing agents made a deliberate decision to institute policies and procedures within MindGeek's reporting system that would prevent content moderators who learn of this illegal material from alerting any officer, director or managing agent of the presence of the illegal video on Mindgeek's websites.

235.  According to one former MindGeek employee, "[t]he goal for a content moderator is to let as much content as possible go through."[30]

236.  Another former MindGeek employee explained that, as a content moderator, he was expected to "moderate" up to 1,200 videos per day, and stated, "[o]ur job was to find weird excuses to keep videos on our sites."  His team joked about the "circuitous

---

[28] Nicholas Kristof, *The Children of Pornhub*, THE NEW YORK TIMES, Dec. 4, 2020 www.nytimes.com/ 2020/12/04/opinion/sunday/pornhub-rape-trafficking.html.

[29] Testimony of L. Mickelwait, Evidence of 20th Meeting of ETHI, *surpa* note 26, p. 15.

[30] *See Children of Pornhub*, *supra* note 28.

logic that managers employed when they approved questionable videos."[31]

237.   In addition to the human moderators who review the content, MindGeek also claims that it uses several types of software to screen for illegal content, however it is unclear what function each software is capable of performing, how Mindgeek uses each software, and when each software was acquired and implemented.[32]   Upon information and belief, MindGeek either recently acquired these software or did not use them in a good faith effort to find and remove unlawful content.

### iii.   MindGeek Makes <u>No</u> Effort to Remove Non-Consensual Videos— Even After Victims Identify Them And Beg For Their Removal

238.   Dozens of victims have come forward in recent months to tell harrowing stories about finding explicit non-consensual video(s) of themselves on Pornhub, including videos depicting violent rape, children as young as ten years old engaged in sex acts, and the sexual assault of women who are unconscious or severely intoxicated and unable to give consent, to name a few.  These victims describe contacting MindGeek to request the video(s) be removed and either being outright refused or forced to jump through unnecessary hoops to prove their identity despite the obvious illegality of the content.  When MindGeek did remove content, it did so slowly and reluctantly, and the

///

///

---

[31] Meghan Morris, *Former Pornhub moderators describe lax rules while being ordered to watch up to 1,200 videos per day: 'Our job was to find weird excuses to keep videos on our sites',* BUSINESS INSIDER (Dec. 16, 2020, 12:46 PM) *available at* www.businessinsider.com/inside-pornhub-parent-company-mindgeeks-moderation-process-2020-12?utm_source=notification&utm_medium=referral.  This employee recalls that in March 2020, Mindgeek increased the number of moderators and were instructed to flag videos "that he said would have sailed through before the increased scrutiny of MindGeek's sites, like videos depicting performers simulating scenes of sex involving a person who was asleep, some BDSM content, and videos with visible bottles of alcohol." *Id.*

[32] Evidence of 19th Meeting of ETHI, *supra* note 25, p. 3. Mr. Tassillo stated, "I can guarantee you that every piece of content, before it's actually made available on the website, goes through several different filters." *Id.* at p. 12.

content almost always reappeared immediately.[33]

239.   Plaintiffs are informed and believed:

a.      A 14-year-old girl found a nude video of herself, which she had taken and sent privately to her boyfriend, posted on Pornhub.  She contacted Pornhub, pretending to be her mother, to ask that the video be removed. Pornhub took several weeks to respond and then finally remove the video, which was re-uploaded soon thereafter.  She has gone through the same process several times.[34]

b.      A video of a 15-year-old girl being raped was posted on Pornhub. Pornhub refused to remove the video for three weeks, and when it finally agreed, it took another two months to actually remove the video, resulting in several hundred thousand additional views, downloads and distribution in her community.

c.      A child younger than 10 was sold into trafficking and was the subject of child pornography for almost 10 years.  Those videos were distributed on various MindGeek platforms where they remained until at least late 2020.

d.      A 15-year-old was secretly filmed via computer hack and then extorted to do other videos.  Those videos were posted on Pornhub with her personal information, distributed widely, including to her community and to her family, and subjected her to long-term abuse and stalking.  When she raised the issue to Pornhub, it refused to

[33] *See* Evidence of 20th Meeting of ETHI, *supra* note 26, pp. 2-12 (testimony of three MindGeek victims); *see also id.* at pp. 13 – 15 (testimony of Laila Mickewait reading quotes and testimonies of more than a dozen survivors whose content was distributed on Pornhub); *see also* Unofficial Transcript, Evidence of 18th Meeting of ETHI, (Feb. 1, 2021), *available at* https://www.ourcommons.ca/Content/Committee/432/ETHI/Evidence/EV11078599/ETHIEV18-E.PDF.

[34] Evidence of 18th Meeting of ETHI, *supra* note 33, pp. 1-2.

search for the videos or take any steps to prevent their distribution. The trauma led her to consider suicide.[35]

e.    One woman found explicit videos of herself taken by an ex-boyfriend when she was severely intoxicated and posted on Pornhub without her knowledge or consent.  When she contacted Pornhub to remove the videos, Pornhub refused, claiming that the videos had been claimed by a "verified model."  She sent Pornhub pictures of herself trying to prove that the profile was fake and that she was the person in the video.  Pornhub finally suspended the videos in December 2020 only after she filed a lawsuit *pro se* and the New York Times published its report.[36]

f.    A woman found an explicit video of herself taken while she was underage posted on a MindGeek website. Despite reporting the video numerous times, explaining that she is underage in the video and it was taken and posted without her consent, the video remains.

g.    A woman who was sex trafficked from ages 9 to 17 found videos of her being raped as a minor on Pornhub and RedTube. She was forced to get the police involved on multiple occasions to get the videos removed.

h.    One woman found a video of herself being orally raped on Pornhub in which she is crying, screaming, and had a bloody nose. She spent two months pleading with Pornhub before the video was removed.[37]

i.    A 14-year-old girl was raped by a man while another filmed. When videos of the assault appeared on Pornhub under the titles "teen crying

---

[35] Examples (b) through (d) were provided by Michael Bowe. *Id.* at p. 3.

[36] Witness testimony, Evidence of 20th Meeting of ETHI, *supra* note 26, pp. 2-4.

[37] Examples (f) through (h) were provided by Laila Mickelwait. *Id.* at pp. 13-14.

and getting slapped around," "passed out teen," and "teen getting destroyed," the girl spent six months begging Pornhub to remove the video but was ignored.  Only when she set up a new email account and posed as a lawyer threatening to take legal action were the videos finally removed.[38]

240.   These accounts demonstrate that MindGeek's claim that it immediately removes any video flagged as non-consensual simply is not credible.  Instead, these stories are consistent with the reports from former MindGeek employees stating that MindGeek encouraged content moderators to find a way *not* to remove content if at all possible.  At the very least, these stories show that MindGeek has *never* acted swiftly to remove videos after receiving complaints.

241.   In some cases, when public scrutiny has been drawn to non-consensual content based on comments and tags, Plaintiffs are informed and believe that MindGeek has left the video on its site but manipulated the content by removing the comments and tags for the videos.[39]  Such actions by MindGeek conceal unlawful content and interfere with law enforcement's ability to find unlawful material and pursue the perpetrators.

242.   MindGeek claims that if content is identified as illegal, either by human moderators or by software, it is prevented from being uploaded or removed from the site. MindGeek also claims that "when a piece of content is taken down by either one of those paths, we now automatically create a digital fingerprint of it, so when someone attempts to re-upload the content, it will get blocked at the upload phase."[40]

243.   However, MindGeek also admits that, although the fingerprinting software "was always available," it was *not until early 2020* (*i.e.*, shortly after Hon. Kevin Enright published the tentative decision in the State Court Action, which received extensive

---

[38] *'I was raped at 14, and the video ended up on a porn site,'* Megha Mohan, BBC News (published Feb. 10, 2020) *available at* https://www.bbc.com/news/stories-51391981.

[39] Testimony of Michael Bowe, Evidence of 18th Meeting of ETHI, *supra* note 33, p. 5.

[40] Testimony of David Tassillo, Evidence of 19th Meeting of ETHI, *supra* note 25, p. 6.

media coverage) that MindGeek began to automatically fingerprint illegal videos to prevent them from being re-uploaded.  While MindGeek emphasizes that "the end-user always had the ability to use [the fingerprinting software]," throughout its initial 13 years of operation, MindGeek *chose* not to fingerprint content that it *knew* was illegal—thereby choosing to permit it to be uploaded again.[41]  This fact alone is proves that MindGeek had no desire to keep non-consensual content off its Tubesites.

### iv.   MindGeek Exploits Non-Consensual Content To Drive Profits

244.   Due to its extensive and technologically advanced data-mining abilities, MindGeek knows what type of content is on its Tubesites.  Its business model is based on its ability to identify the types of content that are the most popular.

245.   While MindGeek claims that it does not want non-consensual content on its Tubesites, in reality, MindGeek permits, facilitates, and even encourages this type of illegal content *because it is popular, increases traffic, and drives revenue*.

246.   Videos depicting obviously non-consensual sex acts receive millions and millions of views on Pornhub and MindGeek's other Tubesites.  Although the views are largely free, the increased traffic directly generates advertising revenue for MindGeek, maximizes MindGeek's search engine optimization, generate affiliate fees, and provides massive amounts of valuable user data to allow MindGeek to hone its own algorithms.[42]

247.   In 2020, Pornhub suggested and promoted search terms that are clearly intended to return non-consensual material, such as "abused teen," "crying teen," "punished teen," "anal crying teen," "sleeping teen," "middle school sex," "Snapchat teen," "middle student," "stolen teen sex tape," "stolen teen homemade," "real hidden camera," "hidden camera," "voyeur," "spycam shower," "stop f[***]ing me," and "rape,"

---

[41] *Id.*

[42] *See* Testimony of Michael Bowe, Evidence of 18th Meeting of ETHI, *supra* note 33, pp. 2 – 6.

in Chinese.[43]  The existence of these search terms demonstrates that MindGeek knows how popular non-consensual content is among the users of its Tubesites and, shockingly, that MindGeek actively directs users to that content.

248.   By permitting and even promoting these search terms, MindGeek creates a market for videos depicting non-consensual content, which encourages users or producers to create such videos.

249.   MindGeek's officers, directors, and managing agents were aware that non-consensual content was rampant on its Tubesites but refused to implement any policies or procedures to find and remove such content—even though they had the ability to do so. Accordingly, Mindgeek's officers, directors, and managing agents not only ratified the presence of non-consensual content, including Plaintiffs' videos, on MindGeek's Tubesites but actively solicited and encouraged it.

**K.  MINDGEEK'S INTERNAL POLICIES AND PROCEDURES WERE INTENTIONALLY DESIGNED TO PERMIT CONTENT PARTNERS TO ENGAGE IN SEX TRAFFICKING AND TO KEEP ITS MANAGING AGENTS IN THE DARK ABOUT THE PERVASIVE SEX TRAFFICKING CONTENT BEING DEVELOPED, MARKETED, SOLD, AND EXPLOITED ON ITS TUBESITES**

250.   Plaintiffs are informed and believe that, from 2011 until October 2019, MindGeek had no policies or procedures to investigate prospective Content Partners' business practices or reputation prior to accepting the partner into its Content Partner Program or Viewshare Program.  Consequently, MindGeek made no effort to determine whether the videos it marketed, sold, and exploited through those programs featured victims of sex trafficking, rape, or were underage.

251.   Further, upon information and belief, from 2011 until 2019, MindGeek had no policies or procedures to investigate allegations of sex trafficking committed by its Content Partners or Viewshare Partners, or standards to which its Contents Partners

---

[43] Testimony of L. Mickelwait, Evidence of 18th Meeting of ETHI, *supra* note 33, p. 14 (redacted for profanity).

would be held in order to remain in such programs.

252.   Upon information and belief, after it partnered with GirlsDoPorn, MindGeek never investigated or questioned GirlsDoPorn about its business practices despite MindGeek obtaining knowledge of GirlsDoPorn's fraudulent and coercive practices detailed in the victims' complaints, public accounts of abuse, and in the State Court Action filings and testimony.

253.   Plaintiffs are informed and believe, from 2009 until at least October 2019, MindGeek had no policies and procedures requiring its employees to identify, flag, report, and remove unlawful content such as GirlsDoPorn videos, child pornography, or other non-consensual content.

254.   Further, upon information and belief, MindGeek failed to have any internal policies or procedures requiring Content Partner and/or ViewShare Partner account representatives (such as those working directly with GirlsDoPorn) to report evidence of sex trafficking the representatives discovered in their dealings with the Content Partners and/or ViewShare Partners to anyone else within the organization or to remove non-consensual content.

255.   If any officers, directors, or managing agents of MindGeek were not aware of GirlsDoPorn's sex trafficking venture, such ignorance was directly caused by their failure to implement internal policies requiring their employees working with Content Partners to report non-consensual content within the organization, despite their knowledge that such content was common and popular on MindGeek's Tubesites.

<strong>V.</strong>

<strong><u>HISTORY OF SECTION 1595 AND THE FOSTA AMENDMENT<br>TO THE COMMUNICATIONS DECENCY ACT</u></strong>

256.   Congress designed the Trafficking Victims Protection Reauthorization Act (**"TVPRA"**) to deter and punish, both criminally and civilly, sex traffickers and third parties who benefit from sex trafficking ventures.  When Congress enacted Section 1595 in 2003, the statute created a civil private right of action for victims against "the

---

perpetrators" of the sex trafficking.  In 2008, Congress broadened the scope of Section 1595 to include third parties who knew, *or should have known*, they were profiting from participation in a sex trafficking venture.  Section 1595 currently states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (**or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter**) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

18 U.S.C. § 1595(a) (emphasis added).[44]

257.   In 2015, the First Circuit Court of Appeal held the Communications Decency Act (47 U.S.C. § 230, "Section 230") provided immunity to online companies for Section 1595 lawsuits even if the company knowingly assisted sex traffickers.  *See Doe v. Backpage.com*, 817 F.3d 12 (1st Cir. 2016).  However, the First Circuit concluded by recommending any solution be made through the legislature.  *Id.* at 29.

258.   As a result of the decision in *Backpage.com*, Congress amended Section 230 as part of the Fight Online Sex Trafficking Act ("FOSTA") to make it clear that Section 230 shall have "[n]o effect on sex trafficking law," and shall not "be construed to impair or limit…any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title."  47 U.S.C. § 230(e)(5).  The amendment to Section 230 is retroactive, applying "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after ... enactment."  *See 132 Stat. 1253, § 4(b); see also, Woodhull Freedom Found. v. United States*, No. 18-5298, 2020 WL 398625 (D.C. Cir. June 24, 2020).

---

[44] "Section 1595 opened the door for liability against facilitators who did not directly traffic the victim, but benefitted from what the facilitator should have known was a trafficking venture." *Marriott Int'l, Inc.*, 2020 WL 1939678, at *7, quoting Gallant Fish, No Rest for the Wicked: Civil Liability Against Hotels in Cases of Sex Trafficking, 23 BUFF. HUM. RTS. L. REV. 119, 138 (2011).

259. While FOSTA provides victims with an exception to immunity under Section 230, Section 230 does not even apply at the outset if a website defendant develops content, solicits, and pays for illegal content and/or is sued for conduct beyond mere publishing, including, for example, processing illegal financial transactions.

# VI.

# CAUSE OF ACTION

# 18 U.S.C. § 1595

## (All Plaintiffs Against All Defendants)

260. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

261. GirlsDoPorn was a "sex trafficking venture" within the meaning of Sections 1591 and 1595. GirlsDoPorn recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiffs knowing a combination of force, threats of force, fraud, coercion, and/or threatened abuse of law and legal proceedings would be used to cause Plaintiffs to engage in commercial sex acts. GirlsDoPorn had a custom and practice of using force, threats of force, fraud, coercion, and/or threatened abuse of legal proceedings as part of its recruiting and filming practices and used such practices in recruiting the overwhelming majority, if not all, of its victims.

262. Plaintiffs are all victims of GirlsDoPorn's sex trafficking venture within the of meaning of Sections 1591 and 1595. GirlsDoPorn used fraud, coercion and intimidation to cause Plaintiffs to perform sex acts, which GirlsDoPorn filmed, and then distributed on MindGeek's Tubesites through MindGeek's' Content Partner and Viewshare Programs. Plaintiffs were all trafficked after January 2011.

263. As early as July 2009, and definitely by June 2016, MindGeek knew, acted in reckless disregard of the fact that, or, at the bare minimum, should have known, GirlsDoPorn operated a sex trafficking venture that wholly relied on a combination of force, threats of force, fraud, and coercion to get its victims (everyday high school and college women) to engage in commercial sex acts on film.

264.   On information and belief, MindGeek knowingly solicited a partnership with GirlsDoPorn for the very reason that Plaintiffs' illegal sex trafficking videos had great value to MindGeek.

265.   GirlsDoPorn posted at least one pornographic video of each Plaintiff on GirlsDoPorn's channel(s) on one or more MindGeek Tubesite.

266.   MindGeek knowingly participated in GirlsDoPorn's sex trafficking venture generally and in the sex trafficking of Plaintiffs in particular by, *inter alia*:

    a.   Partnering with GirlsDoPorn through its Content Partner Program and Viewshare Program;

    b.   Uploading GirlsDoPorn's sex trafficking videos to websites across its vast pornography empire including, among other sites, Pornhub.com, YouPorn.com, RedTube.com, and Tube8.com;

    c.   Hyperlinking, advertising, promoting, marketing, selling, and exploiting videos featuring victims of GirlsDoPorn's sex trafficking venture, including Plaintiffs;

    d.   Permitting users to download GirlsDoPorn's sex trafficking videos, which could then be uploaded to any other website or otherwise exploited;

    e.   Providing dedicated account representatives to work with GirlsDoPorn whose job was to maximize exposure and revenues from videos featuring Plaintiffs;

    f.   Assisting GirlsDoPorn in monetizing sex trafficking videos by acting as an affiliate for GirlsDoPorn.com and other paysites;

    g.   Providing search engine optimization services to GirlsDoPorn;

    h.   Actively suggesting GirlsDoPorn content to users of MindGeek's Tubesites;

///

///

i. Creating, drafting, developing, and designing trailers, titles, descriptions, tags, advertisements, logos, images, and other content for GirlsDoPorn's videos and Channel(s);

j. Refusing to remove GirlsDoPorn's sex trafficking videos when victims complained and even after it learned about and was subpoenaed in the State Court Action;

k. Refusing to fingerprint GirlsDoPorn videos, including Plaintiffs' videos, after removing the videos, thereby allowing the videos to be re-uploaded;

l. Removing user comments containing references to fraud, force, or coercion being used in filming the videos;

m. Facilitating financial transactions and distributing funds to GirlsDoPorn for the illegal videos; and

n. Failing to report GirlsDoPorn's sex trafficking venture to law enforcement authorities.

267. MindGeek knowingly benefitted from GirlsDoPorn's sex trafficking venture in general and from the sex trafficking of Plaintiffs in particular by, *inter alia*:

a. Earning millions of dollars in affiliate fees through the Content Partner program by sending user traffic from MindGeek's Tubesites to GirlsDoPorn's paysites;

b. Earning millions of dollars by selling "premium" subscriptions through the ViewShare Program using videos featuring GirlsDoPorn's victims, including Plaintiffs;

c. Enjoying the increased traffic to its Tubesites created by the presence of GirlsDoPorn content, including Plaintiffs' videos, on its Tubesites, which provided MindGeek increased advertisement revenue and increased sales of MindGeek's own products; and

d.     Hosting GirlsDoPorn's victims' videos in the general library of its freesites, which resulted in increased web traffic to MindGeek's Tubesites which, in turn, generated affiliate fees and subscriptions from third party paysites and MindGeek's own paysites, such as Brazzers.com and RealityKings.com.

268.   As a proximate result of MindGeek's knowing financial benefit and participation in GirlsDoPorn's sex trafficking venture, Plaintiffs have suffered damages, including, but not limited to, severe emotional distress, significant trauma, attempted suicide, and social and familial ostracization.  Further, MindGeek has received ill-gotten gains by selling, marketing, and exploiting videos featuring Plaintiffs' likenesses.

269.   Plaintiffs are informed and believe and thereon allege MindGeek's employees, officers, directors and/or managing agents had knowledge of GirlsDoPorn's sex trafficking venture or recklessly disregarded such.

270.   MindGeek's actions were intentional, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of the Plaintiffs' rights.  Plaintiffs are entitled to punitive damages to punish MindGeek for its actions and to deter others from acting similarly in the future.

## VII.
## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally:

a.     Awarding Plaintiffs compensatory damages in an amount that exceeds one million dollars for each plaintiff;

b.     Awarding Plaintiffs restitution for all monies MindGeek earned marketing, selling and exploiting Plaintiffs' videos;

c.     Awarding Plaintiffs punitive damages in an amount that exceeds one million dollars per plaintiff;

d.     Awarding Plaintiffs their attorney fees;

e.      Awarding Plaintiffs their costs and expenses;

f.      Awarding Plaintiffs pre-judgment and post-judgment interest;

g.      Permanently enjoining the Defendants from hosting Plaintiffs' videos and/or profiting therefrom;

h.      Declaring the Defendants as alter egos; and

i.      Granting such other and further relief as this Court deems just and equitable.

## VIII.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs demand a jury trial for all triable issues of fact.


RESPECTFULLY SUBMITTED:


Dated: April 1, 2021                    By:    _s/ Brian M. Holm_____
                                               Brian M. Holm
                                               John J. O'Brien
                                               Edward D. Chapin
                                               Cara W. Van Dorn
                                               **Attorneys for Plaintiffs**
                                               Email: brian@holmlawgroup.com
                                                      john@theobrienlawfirm.com
                                                      echapin2@sanfordheisler.com
                                                      cvandorn@sanfordheisler.com